**RECEIVED**
10/22/24
KELLY L. STEPHENS, Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

MICHIGAN PRESS ASSOCIATION and
NATIONAL FEDERATION OF
INDEPENDENT BUSINESS, INC.,

      *Petitioners,*

  v.

FEDERAL TRADE COMMISSION,

      *Respondent.*

No. __24-3912_____

## PETITION FOR REVIEW

Pursuant to 5 U.S.C. §§ 702–704, 706, 15 U.S.C. § 57a(e), and Federal Rule of Appellate Procedure 15(a), the Michigan Press Association and the National Federation of Independent Business, Inc. ("NFIB") petition this Court for review of the order issuing the Final Rule of the Federal Trade Commission in *Negative Option Rule*, RIN 3084-AB60 ("Final Rule"), issued on October 16, 2024. A copy of the Final Rule is attached as Exhibit A.

Venue is proper in this Circuit under 15 U.S.C. § 57a(e)(1)(A) because petitioner Michigan Press Association's principal offices are located in Lansing, Michigan, and petitioner NFIB's principal offices are located in Nashville, Tennessee.

1

The Final Rule is an attempt to regulate consumer contracts for all companies in all industries and across all sectors of the economy in which the customer purchases a service or subscription that will continue unless the customer exercises the option to cancel. The Final Rule calls these "negative option" contracts—estimated as covering over a billion paid subscriptions in the United States, Final Rule at 175—and deems them all to be deceptive unless they comply with onerous new regulatory obligations regarding disclosures, how those disclosures are communicated, a "separate" consent requirement, regulations of truthful company representative communications with customers, and prescriptive mandates for service cancellation, among others.

Petitioners seek review of the order issuing the Final Rule on the grounds that it is arbitrary, capricious, and an abuse of discretion within the meaning of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*; unsupported by substantial evidence, 15 U.S.C. § 57a(e)(3)(A); based on determinations that "precluded disclosure of disputed material facts which w[ere] necessary for fair determination . . . of the rulemaking proceeding taken as a whole," *id.* § 57a(e)(3)(B); and in excess of the Commission's statutory authority, in violation of the U.S. Constitution,

and otherwise contrary to law, *see* 15 U.S.C. § 57a(e)(3); 5 U.S.C. § 706. Petitioners respectfully request that this Court hold unlawful, vacate, enjoin, and set aside the Final Rule and provide such additional relief as may be appropriate.

October 22, 2024

Respectfully submitted,

*/s/ Benjamin M. Flowers*

Benjamin M. Flowers
Ashbrook Byrne Kresge LLC
P.O. Box. 8248
Cincinnati, OH 45249
513-201-5775
bflowers@ashbrookbk.com

*Counsel for Petitioners*

# CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2024, I caused the foregoing Petition for Review to be electronically filed with the United States Court of Appeals for the Sixth Circuit via email, pursuant to Sixth Circuit Rule 25(b)(1)(B).

I further certify that I will cause a true and correct copy of the foregoing Petition for Review, having been stamped by the Court with the date of filing, to be served upon the Secretary of the Federal Trade Commission via hand delivery at the following address. Such copy is being submitted to the Federal Trade Commission pursuant to 28 U.S.C. § 2112 by the persons who filed the Petition for Review in the United States Court of Appeals for the Sixth Circuit.

Office of the Secretary
Federal Trade Commission
600 Pennsylvania Avenue, NW
Suite CC-5610
Washington, DC 20580

I further certify that on October 22, 2024, I will cause one copy of the foregoing Petition for Review to be mailed to the Clerk of Court for the United States Court of Appeals for the Sixth Circuit via UPS Next Day Delivery. There are no parties "admitted to participate in the agency

proceedings" for purposes of Federal Rule of Appellate Procedure 15(c)(1) other than the respondent.

October 22, 2024                    Respectfully submitted,

                                    */s/ Benjamin M. Flowers*
                                    Benjamin M. Flowers

# Exhibit A

**FEDERAL TRADE COMMISSION**

**16 CFR Part 425**

**RIN 3084-AB60**

**Negative Option Rule**

**AGENCY:** Federal Trade Commission

**ACTION:** Final Rule.

**SUMMARY:** The Federal Trade Commission ("FTC" or "Commission") issues final amendments to the Commission's trade regulation "Rule Concerning Use of Prenotification Negative Option Plans," retitled the "Rule Concerning Recurring Subscriptions and Other Negative Option Programs" ("Rule," "final Rule" or "Negative Option Rule"). The final Rule now applies to all negative option programs in any media, and, among other things, (1) prohibits misrepresentations of any material fact made while marketing using negative option features; (2) requires sellers to provide important information prior to obtaining consumers' billing information and charging consumers; (3) requires sellers to obtain consumers' unambiguously affirmative consent to the negative option feature prior to charging them; and (4) requires sellers to provide consumers with simple cancellation mechanisms to immediately halt all recurring charges. This document also contains the text of the final Rule, the Rule's Statement of Basis and Purpose ("SBP"), and a final regulatory analysis.

**DATES:** The amendments are effective [INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN FEDERAL REGISTER], except that §§ 425.4 through 425.6 are effective [INSERT DATE 180 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

**ADDRESSES**: Relevant portions of the record of this proceeding, including this document, are available *at https://www.ftc.gov*.

**FOR FURTHER INFORMATION CONTACT:** Katherine Johnson, Attorney, (202) 326-2185, *kjohnson3@ftc.gov*, Division of Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Ave. NW, Washington, DC 20580.

**SUPPLEMENTARY INFORMATION:**

## I.    OVERVIEW

The Commission commenced this proceeding because it had reason to believe unfair and deceptive negative option practices are widespread in the marketplace. Negative option programs can provide substantial benefits for sellers and consumers. However, consumers cannot realize these benefits when sellers make material misrepresentations to induce consumers to enroll in such programs, fail to provide important information, bill consumers without their consent, or make cancellation difficult or impossible. Unfair and deceptive negative option practices have been a persistent source of consumer harm for decades, saddling shoppers with recurring payments for products and services they never intended to purchase nor wanted to continue buying. In the past, the Commission sought to address these practices through individual law enforcement actions and a patchwork of laws and regulations. Nevertheless, problems persist, as demonstrated by both a steady stream of state and federal law enforcement actions and thousands of consumer complaints each year. To address these practices, the Commission proposed amending the current Negative Option Rule to establish clear, enforceable performance-based requirements for all negative option features in all media. The Commission solicited comments first in an advance notice of proposed rulemaking ("ANPR") and then on proposed amendments in a notice of proposed rulemaking ("NPRM"). The Commission designed these amendments to

ensure consumers understand what they are purchasing and allow them to cancel their participation without undue burden.

The Commission now promulgates a final Rule. Pursuant to 15 U.S.C. 57a(a)(1)(B), the Rule, *inter alia,* defines the following acts and practices as unfair or deceptive within the meaning of Section 5 of the FTC Act:

- to misrepresent any material fact made while marketing using a negative option feature **(§ 425.3)**;

- to fail to clearly and conspicuously disclose material terms prior to obtaining a consumer's billing information in connection with a negative option feature **(§ 425.4)**;

- to fail to obtain a consumer's express informed consent to the negative option feature before charging the consumer **(§ 425.5)**; and

- to fail to provide a simple mechanism to cancel the negative option feature and immediately halt charges **(§ 425.6)**.

Further, the Rule, consistent with the final sentence of 15 U.S.C. 57a(a)(1)(B) includes requirements prescribed for the purpose of preventing such acts or practices.

The final Rule differs from the proposed Rule in two significant ways. First, the proposed Rule would have required sellers to provide annual reminders to consumers of the negative option feature. Second, the proposed Rule would have prohibited sellers from forcing consumers to receive saves[1] without first obtaining consumers' unambiguously affirmative consent. The

---

[1] Save was defined in the proposed Rule to mean an attempt by a seller to present any additional offers, modifications to the existing agreement, reasons to retain the existing offer, or similar information when a consumer attempts to cancel a negative option feature. Proposed Rule § 425.2(f).

Commission has considered comments both supporting and opposing these proposed provisions. As explained in the Section-by-Section analysis, the Commission declines to adopt these provisions of the proposed Rule at this time. Instead, the Commission plans to seek further comment through a supplemental NPRM ("SNPRM"), and therefore, keeps the record open on these issues.[2]

Finally, in response to the comments, the Commission adds two definitions and two provisions to the final Rule for clarity. The final Rule explicitly defines the terms "material" and "interactive electronic medium" consistent with how they were defined and discussed in the NPRM. Additionally, the final Rule includes a severability provision and a provision allowing requests for exemptions from the final Rule consistent with the Commission's Rules of Practice.[3]

## II.  BACKGROUND

### A.  Statutory Authority

The Commission promulgates the final Negative Option Rule, 16 CFR part 425 pursuant to Section 18 of the FTC Act, 15 U.S.C. 57a, the Administrative Procedure Act ("APA"), 5 U.S.C. 533; and part 1, subpart B of the Commission's Rules of Practice, 16 CFR 1.7-1.20. Section 18 permits the Commission to promulgate, amend, and repeal trade regulation rules that define with specificity acts or practices that are unfair or deceptive within the meaning of Section 5(a)(1) of the FTC Act, 15 U.S.C. 45(a)(1); and allows the Commission to prescribe requirements for the purpose of preventing these unfair or deceptive acts and practices.

---

[2] *See* 16 CFR 1.11 ("Commission's Rules of Practice" or "Commission Rules"); *cf.* Impersonation Rule, 89 FR 15072 (Feb. 29, 2024).
[3] *See* 16 CFR 1.16.

## B.     Negative Option Marketing

### 1.     Negative Option Programs

Negative option programs come in a variety of forms, but all share a central feature: each contain a term or condition that allows a seller to interpret a customer's silence, or failure to take an affirmative action, as acceptance of an offer.[4] Negative option programs generally fall into four categories: prenotification plans, continuity plans, automatic renewals, and free trial (*i.e.*, free-to-pay or nominal-fee-to-pay) conversion offers.

Prenotification plans are the only negative option practice currently covered by the Commission's current Negative Option Rule, originally promulgated in 1973. Under such plans (*e.g.*, book-of-the-month clubs), sellers provide periodic notices offering goods to participating consumers and then send—and charge for—those goods only if the consumers take no action to decline the offer. The periodic announcements and shipments can continue indefinitely. In continuity plans, consumers agree in advance to receive periodic shipments of goods or provision of services (*e.g.*, bottled water delivery), which they continue to receive until they cancel the agreement. In automatic renewals, sellers (*e.g.*, a magazine publisher, credit monitoring service provider, etc.) automatically renew consumers' subscriptions when they expire, unless consumers affirmatively cancel the subscriptions. Finally, in free-to-pay plans, consumers receive goods or services for free (or at a nominal fee) for a trial period. After the trial period, sellers automatically begin charging a fee (or higher fee) unless consumers affirmatively cancel or return the goods or services.

---

[4] The Commission's Telemarking Sales Rule defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 CFR 310.2(w).

Some negative option offers include upsell or bundled offers, where sellers use consumers' billing data to sell additional products from the same seller or pass consumers' billing data to a third party for their sales. An upsell occurs, *e.g.*, when a consumer completes a first transaction and then receives a second solicitation for an additional product or service. A bundled offer occurs, *e.g.*, when a seller packages two or more products or services together.

Importantly, negative option programs are distinct from other continuing agreements such as installment contracts. In an installment contract, consumers are obligated for the entire contractual period for the entire contract. A prime example of this type of transaction is a contract for purchasing a vehicle, which outlines terms, such as price, interest rate, and payment schedule. The contract thus allows the consumer to pay the purchase price of the vehicle over time. Consumers' failure to pay amounts due under an installment agreement may bring the total balance due, and may trigger halting performance, or provide the seller with other contractual rights.

A negative option, in contrast, merely determines whether a seller may continue to send, and charge for, goods or provide services without the consumer's further action. Notably, a contract could have both installment and negative option features. Take, for instance, a software license agreement. A consumer may purchase a software license for a year, in which the consumer is obligated for the entire year, payable monthly, to renew automatically at the conclusion of the year unless the consumer cancels the agreement.[5] Canceling the agreement during the first year does not void a consumer's obligation to pay for the whole first year, but it does terminate the consumer's responsibility for the next year.

---

[5] *See, e.g.*, *United States v. Adobe, Inc.*, No. 5:24-cv-03630 (N.D. Cal. 2024).

## 2. Prevalence of Deceptive or Unfair Negative Option Acts and Practices

Negative option programs are widespread in the marketplace and can provide substantial benefits for sellers and consumers. For businesses, the benefits of negative option marketing include "greater revenue predictability, customer base continuity, and the ability to better plan in advance."[6] For consumers, such benefits may include opportunities to explore new products prior to purchase (*e.g.*, free trials),[7] broader selections at lower prices and transaction costs,[8] and the convenience of uninterrupted products or services.[9] However, consumers cannot reap these benefits when marketers misrepresent material facts, fail to make adequate disclosures, bill consumers without their consent, or make cancellation difficult or impossible. Over the years, such problematic practices have remained a persistent source of consumer harm, saddling consumers with recurring payments for products and services they never intended to purchase nor wanted to continue buying.

The Commission tried to address these practices through individual law enforcement cases and a patchwork of regulations (*see* discussion at Sections III-IV). Nevertheless, problems persist, as demonstrated in part by the tens of thousands of complaints consumers submit about these practices to the FTC each year. Moreover, the Commission and states continue to regularly

---

[6] News/Media Alliance ("N/MA"), FTC-2023-0033-0873; *see also* Association of National Advertisers ("ANA"), FTC-2023-0033-1001; National Retail Federation ("NRF"), FTC-2023-0033-1005. Citations herein to comments are cited as the name of commenter and unique identifier (*e.g.*, FTC-2023-0033-____). Comments are available online at regulations.gov, Negative Option Rule (NPRM), FTC-2023-0033-0001, https://www.regulations.gov/document/FTC-2023-0033-0001.
[7] N/MA, FTC-2023-0033-0873; Sirius XM Radio Inc. ("Sirius XM"), FTC-2023-0033-0857; NCTA-The Internet & Television Association ("NCTA"), FTC-2023-0033-0858; Interactive Advertising Bureau ("IAB"), FTC-2023-0033-1000.
[8] *See* IAB, FTC-2023-0033-1000; Sirius XM, FTC-2023-0033-0857; Joint Comment from Entertainment Software Association, Digital Media Association, and Motion Picture Association ("ESA"), FTC-2023-0033-0867.
[9] N/MA, FTC 2023-0033-0873; NRF, FTC-2023-0033-1005; ANA, FTC-2023-0033-1001.

bring cases challenging harmful negative option practices, including more than 35 recent FTC cases.[10] These matters involved a range of deceptive or unfair practices, including inadequate disclosures for "free" offers and other products or services, enrollment without consumer consent, and inadequate or overly burdensome cancellation and refund procedures.[11] As discussed further below, the continuing stream of cases; the high volume of ongoing complaints; and comments on the record all demonstrate prevalent unfair and deceptive practices and unabated consumer harm.

## III.     THE FTC'S EXISTING REGULATORY SCHEME

### A.     The FTC's Current Negative Option Rule

The Commission first promulgated the Rule in 1973 pursuant to the FTC Act, 15 U.S.C. 41 *et seq*., finding some negative option marketers committed unfair and deceptive practices that violated Section 5 of the Act, 15 U.S.C. 45. Based on practices at the time, however, the Rule only applied to prenotification plans for the sale of goods, and therefore, does not reach the vast majority of modern negative option programs.[12]

---

[10] *See, e.g.*, *FTC v. FloatMe Corp.*, No. 5:24-cv-00001 (W.D. Tex. 2024); *United States v. Adobe, Inc.*, No. 5:24-cv-03630 (N.D. Cal. 2024); *FTC v. WealthPress, Inc.*, No. 3:23-cv-00046 (M.D. Fla. 2023); *FTC v. Bridge It, Inc.*, No. 1:23-cv-09651 (S.D.N.Y. 2023); *FTC v. Amazon.com, Inc.*, No. 2:23-cv-0932 (W.D. Wash. 2023); *see also* n.60.

[11] *E.g.*, *FTC v. Triangle Media Corp.*, No. 3:18-cv-01388 (S.D. Cal. 2018); *FTC v. Credit Bureau Ctr., LLC*, No. 1:17-cv-00194 (N.D. Ill. 2017); *FTC v. JDI Dating, Ltd.*, No. 1:14-cv-08400 (N.D. Ill. 2014); *FTC v. One Techs., LP*, No. 3:14-cv-05066 (N.D. Cal. 2014); *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649 (D. Nev. 2014); *FTC v. NutraClick, LLC*, No. 2:16-cv-06819 (C.D. Cal. 2016); *FTC v. XXL Impressions, LLC*, No. 1:17-cv-00067 (D. Me. 2017); *FTC v. AAFE Prods. Corp.*, No. 3:17-cv-00575 (S.D. Cal. 2017); *FTC v. Pact, Inc.*, No. 2:17-cv-1429 (W.D. Wash. 2017); *FTC v. Tarr*, No. 3:17-cv-02024 (S.D. Cal. 2017); *FTC v. AdoreMe, Inc.*, No. 1:17-cv-09083 (S.D.N.Y. 2017); *FTC v. DOTAuthority.com, Inc.*, No. 0:16-cv-62186 (S.D. Fla. 2016); *FTC v. BunZai Media Grp., Inc.*, No. 2:15-cv-04527 (C.D. Cal. 2015); *FTC v. RevMountain, LLC*, No. 2:17-cv-02000 (D. Nev. 2017).

[12] The Rule defines "negative option plan" narrowly to apply only to prenotification plans. 16 CFR 425.1(c)(1). In 1998, the Commission clarified the Rule's application to such plans in all

Specifically, the Rule required prenotification plan sellers to disclose their plans' material terms clearly and conspicuously before consumers subscribe. To do so, it required sellers to disclose seven material terms: (1) how subscribers must notify the seller if they do not wish to purchase the selection; (2) any minimum purchase obligations; (3) the subscribers' right to cancel; (4) whether billing charges include postage and handling; (5) that subscribers have at least ten days to reject a selection; (6) that if any subscriber is not given ten days to reject a selection, the seller will credit the return of the selection and postage to return the selection, along with shipping and handling; and (7) the frequency with which announcements and forms will be sent. [13] In addition, sellers had to disclose the specific periods during which they would send introductory merchandise, give consumers a specified period to respond to announcements, provide instructions for rejecting merchandise in announcements, and promptly honor written cancellation requests. [14]

## B.     Other Current Regulatory Requirements

Several other statutes and regulations also address harmful negative option practices. First, Section 5 of the FTC Act has served as the Commission's primary mechanism for addressing deceptive negative option claims. Additionally, the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. 8401-8405, the Telemarketing Sales Rule ("TSR"), 16 CFR part 310, the Postal Reorganization Act (*i.e.*, the Unordered Merchandise Statute), 39 U.S.C. 3009, and the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. 1693-1693r, all address

---

media, stating that it "covers all promotional materials that contain a means for consumers to subscribe to prenotification negative option plans, including those that are disseminated through newer technologies." 63 FR 44555, 44561 (Aug. 20, 1998).
[13] 16 CFR 425.1(a)(1)(i)-(vii).
[14] 16 CFR 425.1(a)(2) and (3); *id.* 425.1(b).

various aspects of negative option marketing. ROSCA, however, is the only law primarily designed to do so, but only for online transactions.

### 1. Section 5 of the FTC Act

Section 5(a) of the FTC Act, 15 U.S.C. 45(a), is the core consumer protection statute enforced by the Commission. That statute broadly prohibits "unfair or deceptive acts or practices" but does not specifically address negative option marketing.[15] Therefore, in guidance and cases, the FTC has highlighted six basic requirements negative option marketing must follow to avoid deceptive and unfair practices.[16] First, marketers must disclose the material terms of a negative option offer including, at a minimum: the existence of the negative option offer; the offer's total cost; the transfer of a consumer's billing information to a third party, if applicable;

---

[15] Under the FTC Act, "unfair or deceptive acts or practices" include acts or practices involving foreign commerce that cause or are likely to cause reasonably foreseeable injury within the United States or involve material conduct occurring within the United States. 15 U.S.C. 45(a)(4)(A). Section 5(n) of the FTC Act provides that "unfair" practices are those that cause or are likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. 15 U.S.C. 45(n).

[16] *See Negative Options: A Report by the Staff of the FTC's Division of Enforcement*, 26-29 (Jan. 2009) ("Staff Report"), https://www.ftc.gov/reports/negative-options-federal-trade-commission-workshop-analyzing-negative-option-marketing-report-staff. In discussing the principal Section 5 requirements related to negative options, the report cites the following pre-ROSCA cases, *FTC v. JAB Ventures, LLC*, No. 2:08-cv-04648 (C.D. Cal. 2008); *FTC v. Complete Weightloss Ctr.*, No. 1:08-cv-00053 (D.N.D. 2008); *FTC v. Berkeley Premium Nutraceuticals*, No. 1:06-cv-00051 (S.D. Ohio 2006); *FTC v. Think All Publ'g, LLC*, No. 4:07-cv-00011 (E.D. Tex. 2006); *FTC v. HispaNexo, Inc.*, No. 1:06-cv-424 (E.D. Va. 2006); *FTC v. Consumerinfo.com*, No. 8:05-cv-00801 (C.D. Cal. 2005); *FTC v. Conversion Mktg.*, No. 8:04-cv-01264 (C.D. Cal. 2004); *United States v. Mantra Films, Inc.*, No. 2:03-cv-9184 (C.D. Cal. 2003); *FTC v. Preferred Alliance, Inc.*, No. 1:03-cv-0405 (N.D. Ga. 2003); *United States v. Prochnow*, No. 1:02-cv-917 (N.D. Ga. 2002); *FTC v. Ultralife Fitness, Inc.*, No. 2:08-cv-07655 (C.D. Cal. 2008); *In re America Isuzu Motors*, FTC Docket No. C-3712 (1996); *FTC v. Universal Premium Servs.*, No. 2:06-cv-00849 (C.D. Cal. 2006); *FTC v. Remote Response Corp.*, No. 1:06-cv-20168 (S.D. Fla. 2006). The report also cited the FTC's previously issued guidance, *Dot Com Disclosures* (2002), archived at https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-issues-guidelines-internet-advertising/0005dotcomstaffreport.pdf. *See also* nn.244-251.

and how to cancel the offer. Second, Section 5 requires these disclosures to be clear and conspicuous. Third, sellers must disclose the material terms of the negative option offer before consumers agree to the purchase. Fourth, marketers must obtain consumers' consent to such offers. Fifth, marketers must not impede the effective operation of promised cancellation procedures and must honor cancellation requests that comply with those procedures. Finally, marketers cannot make any material misrepresentation regarding any portion of the transaction.

In addition to these deception-based requirements, the Commission has repeatedly stated billing consumers without consumers' express informed consent is an unfair act under the FTC Act.[17]

## 2. ROSCA

Enacted by Congress in 2010 to address, in part, ongoing problems with online negative option marketing, ROSCA contains general provisions related to disclosures, consent, and cancellation.[18] Specifically, ROSCA prohibits charging or attempting to charge consumers for goods or services sold on the Internet through any negative option feature unless the marketer: (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, regardless of whether a material term directly relates to the terms of the negative option offer;[19] (2) obtains a consumer's express informed consent before charging the consumer's account; and (3) provides simple mechanisms for the consumer to stop

---

[17] Courts have found unauthorized billing to be unfair under the FTC Act. *See, e.g.*, *FTC. v. Neovi, Inc.*, 604 F.3d 1150, 1157-59 (9th Cir. 2010), *amended by* 2010 WL 2365956 (9th Cir. June 15, 2010); *FTC v. Amazon.com, Inc.*, No. 2:14-cv-1038, 2016 WL 10654030, at *8 (W.D. Wash. Apr. 26, 2016); *FTC v. Ideal Fin. Sols., Inc.*, No. 2:13-cv-00143, 2015 WL 4032103, at *8 (D. Nev. June 30, 2015).
[18] 15 U.S.C. 8401-8405.
[19] ROSCA, 15 U.S.C. 8403(1); *see also In re MoviePass, Inc.*, FTC Docket No. C-4751 (2021).

recurring charges.[20] ROSCA, however, does not prescribe specific steps marketers must follow to comply with these provisions and is limited to online transactions.

Furthermore, pursuant to the statute, a violation of ROSCA is treated as a violation of a Commission trade regulation rule under Section 18 of the FTC Act.[21] Thus, the Commission may seek a variety of remedies for violations of ROSCA, including civil penalties under Section 5(m)(1)(A) of the FTC Act;[22] injunctive relief under Section 13(b) of the FTC Act;[23] and consumer redress, damages, and other relief under Section 19 of the FTC Act.[24]

### 3.     Telemarketing Sales Rule

The TSR prohibits deceptive telemarketing acts or practices, including those involving negative option offers, and certain types of payment methods common in deceptive negative option marketing. Specifically, the TSR requires telemarketers to disclose all material terms and conditions of the negative option feature, including the need for affirmative consumer action to avoid the charges, the date (or dates) the charges will be submitted for payment, and the specific steps the customer must take to avoid the charges. It also prohibits telemarketers from misrepresenting such information and contains specific requirements related to payment authorization.[25] The TSR, however, only applies to negative option offers made over the telephone.

---

[20] 15 U.S.C. 8403. ROSCA incorporates the definition of "negative option feature" from the TSR, 16 CFR 310.2(w).
[21] 15 U.S.C. 8404 (citing Section 18 of the FTC Act, 15 U.S.C. 57a).
[22] 15 U.S.C. 45(m)(1)(A).
[23] 15 U.S.C. 53(b).
[24] 15 U.S.C. 57b(a)(1), (b).
[25] 16 CFR 310.3(a).

### 4. Other Relevant Requirements

EFTA [26] and the Unordered Merchandise Statute [27] also contain provisions relevant to unfair and deceptive negative option marketing. EFTA prohibits sellers from imposing recurring charges on a consumer's debit cards or bank accounts without written authorization. [28] The Unordered Merchandise Statute provides that mailing unordered merchandise, or a bill for such merchandise, constitutes an unfair method of competition and an unfair trade practice in violation of Section 5 of the FTC Act. [29]

## IV. LIMITATIONS OF EXISTING REGULATORY REQUIREMENTS

The existing patchwork of laws and regulations does not provide industry and consumers with a consistent legal framework across media and offers. For instance, as discussed above, the current Rule does not cover common practices such as continuity plans, automatic renewals, and free-to-pay conversions. [30] In addition, ROSCA and the TSR do not address negative option

---

[26] 15 U.S.C. 1693-1693r.

[27] 39 U.S.C. 3009.

[28] EFTA provides that the Commission shall enforce its requirements, except to the extent that enforcement is specifically committed to some other federal government agency, and that a violation of any of its requirements shall be deemed a violation of the FTC Act. Accordingly, the Commission has authority to seek injunctive relief for EFTA violations, just as it can seek injunctive relief for other Section 5 violations.

[29] The Commission has authority to seek the same remedies for violations of the Unordered Merchandise Statute that it can seek for other Section 5 violations. The Commission can seek civil penalties pursuant to Section 5(m)(1)(B) of the FTC Act from violators who have actual knowledge that the Commission has found mailing unordered merchandise unfair. 15 U.S.C. 45(m)(1)(B).

[30] Indeed, the prenotification plans covered by the Rule represent only a small fraction of negative option marketing. In 2017, for instance, the Commission estimated that fewer than 100 sellers ("clubs") were subject to the current Rule's requirements. 82 FR 38907, 38908 (Aug. 16, 2017).

programs in all media. Yet, harmful negative option practices that fall outside of ROSCA and the TSR's coverage still occur.[31]

Additionally, ROSCA lacks specificity about cancellation procedures and the placement, content, and timing of cancellation-related disclosures. Instead, the statute requires marketers to provide "simple mechanisms" for the consumer to stop recurring charges without guidance about what is simple. While the statute provides more than adequate specificity to avoid blatant violations, it makes law enforcement actions much more difficult for closer calls, even when these practices cause significant harm.

## V. NEGATIVE OPTION RULEMAKING AND ENFORCEMENT EFFORTS

The Commission initiated its last regulatory review of the Negative Option Rule in 2009,[32] following a 2007 FTC workshop and subsequent Staff Report.[33] The Commission completed the review in 2014.[34] At the time, the Commission found the comments supporting the Rule's expansion "argue convincingly that unfair, deceptive, and otherwise problematic negative option marketing practices continue to cause substantial consumer injury, despite determined enforcement efforts by the Commission and other law enforcement agencies."[35] It

---

[31] *See, e.g.*, *In re Dun & Bradstreet, Inc.*, FTC Docket No. C-4761 (2022); *FTC v. Nobetes Corp.*, No. 2:18-cv-10068 (C.D. Cal. 2018); *FTC v. Dill*, No. 2:16-cv-00023 (D. Me. 2016); *FTC v. Shopper Sys., LLC*, No. 1:12-cv-23919 (S.D. Fla. 2012); *FTC v. XXL Impressions, LLC*, No. 1:17-cv-00067 (D. Me. 2017); *FTC v. Health Rsch. Labs., LLC*, No. 2:17-cv-00467 (D. Me. 2017); *FTC v. Mktg. Architects*, No. 2:18-cv-00050 (D. Me. 2018); *see also* Individual commenter, FTC-2023-0033-0007 (discussing deceptive and unfair negative option practices for in-person enrollment); Individual commenter, FTC-2023-0033-0129 (gym membership in-person enrollment); Individual commenter, FTC-2023-0033-0299 (same).
[32] 74 FR 22720 (May 14, 2009).
[33] *See* Staff Report, n.16.
[34] 79 FR 44271 (July 31, 2014).
[35] 79 FR 44275. The Commission cited a number of its law enforcement actions challenging negative option marketing practices, including, for example, *FTC v. Process Am., Inc.*, No. 2:14-cv-00386 (C.D. Cal. 2014) (processing of unauthorized charges relating to negative option

also noted practices not covered by the Rule (*e.g.*, trial conversions and continuity plans) accounted for most of the Commission's enforcement activity in this area. Nevertheless, the Commission declined to expand or modify the Rule because the enforcement tools provided by the TSR and, especially, ROSCA, which had only recently become effective, might prove adequate to address the extant problems. The Commission emphasized, however, if ROSCA and its other enforcement tools failed to protect consumers, the Commission would consider whether and how to amend the Rule.[36] Since that review, the problems with negative options have persisted.[37]

## VI.   RULE REVIEW AND REQUEST FOR COMMENT

### A.     2019 Advance Notice of Proposed Rulemaking

Given the persistence of unfair and deceptive practices despite significant law enforcement attention at both the federal and state level, the Commission published its 2019 advance notice of proposed rulemaking ("ANPR") seeking comments on the current Rule, as well as possible new measures to reduce consumer harm created by deceptive or unfair negative option marketing.[38] Specifically, the Commission sought comment on various alternatives, including amendments to existing rules to further address disclosures, consumer consent, and cancellation. The Commission also requested input on whether and how it should use its authority under Section 18 of the FTC Act to expand the Negative Option Rule to address

---

marketing); *FTC v. Willms*, No. 2:11-cv-00828 (W.D. Wash. 2011) (Internet free trials and continuity plans); *FTC v. Moneymaker*, No. 2:11-cv-00461 (D. Nev. 2011) (Internet trial offers and continuity programs); *FTC v. Johnson*, No. 2:10-cv-02203 (D. Nev. 2010) (Internet trial offers); and *FTC v. John Beck Amazing Profits, LLC*, No. 2:09-cv-04719 (C.D. Cal. 2009) (infomercial and telemarketing trial offers and continuity programs).
[36] 79 FR 44275-76.
[37] *See* Sections VI-VII of this SBP.
[38] ANPR, 84 FR 52393 (Oct. 2, 2019).

prevalent unfair or deceptive practices involving negative option marketing.[39] In response, the Commission received 17 comments.[40]

## B.    2021 Enforcement Policy Statement

On November 4, 2021, the Commission published an "Enforcement Policy Statement Regarding Negative Option Marketing" ("2021 Enforcement Policy Statement" or "EPS") to provide guidance regarding its enforcement of various statutes and FTC regulations.[41] The 2021 Enforcement Policy Statement enunciated various principles rooted in FTC case law and restated previous guidance related to the provision of information to consumers, consent, and cancellations. Among these principles, the Statement emphasized ROSCA's requirement that sellers disclose all material terms related to the underlying product or service that are necessary to prevent deception, regardless of whether that term relates directly to the terms of the negative option offer.[42] In addition, consistent with ROSCA, judicial decisions applying Section 5, and cases brought by the Commission, the 2021 Enforcement Policy Statement reiterated sellers should obtain consumers' acceptance of the negative option feature separately from any other portion of the transaction. Finally, the Statement explained sellers should provide cancellation

---

[39] Section 18 of the FTC Act authorizes the Commission to promulgate rules that define with specificity acts or practices in or affecting commerce which are unfair or deceptive. 15 U.S.C. 57a(a)(1)(B). The Commission may issue regulations "where it has reason to believe that the unfair or deceptive acts or practices which are the subject of the proposed rulemaking are prevalent." 15 U.S.C. 57a(b)(3). The Commission may make such a prevalence finding if it has issued cease and desist orders regarding such acts or practices, or any other available information indicates a widespread pattern of unfair or deceptive acts or practices. Rules under Section 18 "may include requirements prescribed for the purpose of preventing such acts or practices."

[40] The comments are available online. *See* Regulations.gov, Negative Option Rule (ANPR), FTC-2019-0082, https://www.regulations.gov/docket/FTC-2019-0082.

[41] EPS, 86 FR 60822 (Nov. 4, 2021).

[42] The Commission recently alleged a negative option seller's failure to disclose it was impeding access to its movie subscription service violates ROSCA. *In re MoviePass, Inc.*, FTC Docket No. C-4751 (2021).

mechanisms at least as easy to use as the method the consumer employed to initiate the negative option feature.

## C.   2023 Notice of Proposed Rulemaking

After reviewing the comments received in response to the ANPR and issuing the 2021 Enforcement Policy Statement, the Commission issued a notice of proposed rulemaking ("NPRM") on April 23, 2023 (88 FR 24716). In the NPRM, the Commission proposed amending the existing Rule to prohibit material misrepresentations and to require sellers to provide important information to consumers, obtain consumers' express informed consent, and ensure consumers can easily cancel negative option programs if they choose. All these proposed changes would be applicable to all forms of negative option marketing across all media (*e.g.*, telephone, Internet, traditional print media, and in-person transactions). [43]

The Commission designed the proposed amendments to curb deceptive or unfair practices occurring in negative option marketing. The Commission sought public comment on "all aspects" of the proposal, "including the likely effectiveness of the proposed Rule in helping the Commission combat unfair or deceptive practices in negative option marketing." [44] The Commission further identified specific questions and areas where it solicited available data and

---

[43] The Commission proposed to issue such amendments pursuant to Section 18 of the FTC Act, which authorizes it to promulgate rules specifying acts or practices in or affecting commerce which are unfair or deceptive. 15 U.S.C. 57a(a)(1)(B). Several commenters raised concerns the Commission failed to follow Section 18's procedures for two reasons. First, commenters argued the Commission's proposed Rule went beyond the scope of the ANPR. *See, e.g.*, ESA, FTC-2023-0033-0867; USTelecom-The Broadband Association ("USTelecom"), FTC-2023-0033-0876; Retail Industry Leaders Association ("RILA"), FTC-2023-0033-0883; U.S. Chamber of Commerce ("Chamber"), FTC-2023-0033-0885; The Computer & Communications Industry Association ("CCIA"), FTC-2023-0033-0984; IAB, FTC-2023-0033-1000; National Retail Federation ("NRF"), FTC-2023-0033-1005. Second, they argued the Commission's proposed Rule did not satisfy the specificity and prevalence requirements of Section 18. The Commission addresses these comments in Section VII.A.

[44] NPRM, 88 FR 24730.

evidence, including data and evidence supporting alternatives to the proposed regulations.[45] The Commission did not identify any disputed issues of material fact that needed to be resolved at an informal hearing.[46] The comment period closed on June 23, 2023.

In response, the Commission received more than 16,000 comments, and published the 1,162 unique comments from stakeholders representing a wide range of viewpoints.[47] Although some commenters raised concerns and recommended specific modifications or additions to the proposed Rule (some of which the Commission adopts as discussed herein), the majority generally supported the Rule. The Commission discusses these comments in Section VII below.

---

[45] *See* NPRM, 88 FR 24728 (inviting comments on free trials); *id.* at 24729 (requesting comments on proposed annual reminder provision); *id.* at 24730 (inviting comments on conflicts with existing state requirements; *id.* (seeking comments on proposed material changes provision and exempted activities or entities); *id.* (inviting submissions of "data, views, and arguments on the proposed amendments"); *id.* at 24732-33 (inviting comments on the impacts on small businesses, including any modifications to reduce costs or burdens for small entities); *id.* at 24734 (inviting comments on the Paperwork Reduction Act analysis). *See also id.* at 24730 (NPRM Section XIII, Request for Comments).

[46] *See* 16 CFR 1.11(e).

[47] Unique public comments to the NPRM are available online. *See* regulations.gov, Negative Option Rule (NPRM), FTC-2023-0033-0001, https://www.regulations.gov/document/FTC-2023-0033-0001. The Commission published 1,162 unique comments. As explained at regulations.gov, agencies may withhold duplicate/near duplicate examples of a mass-mail campaign. *See* Gen. Servs. Admin., Regulations.gov Frequently Asked Questions, Find Dockets, Documents, and Comments FAQs, "How are comments counted and posted to Regulations.gov?," https://www.regulations.gov/faq. The Commission cannot quantify the number of individuals or entities represented by the comments. The number of comments undercounts the number of individuals or entities represented by the comments because many comments, including those from different types of organizations, jointly represent the opinions or interests of many. Overall, the Commission received 16,612 comments. Of those, 15,449 were not posted online for various reasons (*i.e.*, 14 unrelated, 23 duplicates, and 15,412 that appear to be non-unique responses to mass media campaigns) and one comment was withdrawn. The Commission has considered all timely and responsive public comments it received in response to its NPRM.

### D. Informal Hearing and Recommended Decision

Section 18 of the Federal Trade Commission Act, 15 U.S.C. 57a, and the Commission's Rules of Practice, 16 CFR 1.11(e),[48] provide interested persons the opportunity to make an oral statement at an informal hearing upon request.[49] The Commission received six[50] such requests. Additionally, although the Commission did not designate any disputed issues of material fact in the NPRM, two interested commenters, IAB and NCTA, proposed the Commission consider several potential disputed issues of material fact.[51]

On December 8, 2023, the Commission published an Initial Notice of Informal Hearing (88 FR 85525, "Hearing Notice"). The Hearing Notice designated the Honorable Carol Fox Foelak, Administrative Law Judge for the Securities Exchange Commission, to serve as the presiding officer of the informal hearing and scheduled the informal hearing for January 16, 2024. In the Hearing Notice, the Commission again did not designate any disputed issues of material fact, finding the issues raised by IAB and NCTA did not need to be resolved at the informal hearing through cross-examination.[52]

On January 16, 2024, Judge Foelak commenced the informal hearing, at which IAB, NCTA, Performance Driven Marketing Institute ("PDMI"), TechFreedom, and the International Franchise Association ("IFA") appeared and made oral submissions subject to cross-

---

[48] The FTC Act provides that "an interested person is entitled to present his position orally or by documentary submission (or both)." 15 U.S.C. 57a(c)(2)(A).

[49] 16 CFR 1.11(e).

[50] The six requesters were (1) International Franchise Association; (2) TechFreedom; (3) Performance Driven Marketing Institute; (4) NCTA-The Internet & Television Association; (5) Frontdoor; and (6) Interactive Advertising Bureau. All but one—TechFreedom—identified their interest in the proceeding either as industry groups or private companies.

[51] *See* Notice of Informal Hearing ("Hearing Notice"), 88 FR 85525, 85526 (Dec. 8, 2023).

[52] 88 FR 85526-27.

examination.[53] Included in their oral and written submissions, IAB and NCTA renewed their requests to have the presiding officer designate disputed issues of material fact.[54] Following the hearing, Judge Foelak designated two disputed issues: (1) will the proposed rule have an annual effect on the national economy of $100 million or more?; and (2) what will the recordkeeping and disclosure costs associated with the proposed rule be? Judge Foelak held subsequent hearings on January 31, 2024, and February 14, 2024. She allowed post-hearing briefs filed by February 22, and February 28, 2024, respectively, and issued her recommended decision on April 12, 2024. Based on the evidence, the presiding officer found: (1) the proposed Rule will have an annual effect on the national economy of $100 million or more; and (2) there is insufficient evidence to make a finding regarding the size of the recordkeeping and disclosure costs associated with the proposed Rule.[55]

## VII.  DISCUSSION OF FINAL RULE

### A.  Legal Standard for Promulgating the Final Rule

As explained above in Section II, the Commission promulgates the final Rule, 16 CFR part 425, pursuant to Section 18 of the FTC Act, also known as Magnuson-Moss rulemaking ("Magnuson-Moss"). Under Section 18 and the Commission Rules,[56] to promulgate a rule the Commission must: (1) issue a SBP with statements detailing: (a) the prevalence of the acts or

---

[53] The Hearing Notice also allowed interested persons to make additional written submissions. The following interested parties timely filed additional written submissions on December 22, 2023: (1) BSA-The Software Alliance; (2) PDMI; (3) U.S. Chamber of Commerce; (4) IAB; (5) NCTA; and two individuals. All filings related to the Hearing Notice are available online at regulations.gov at https://www.regulations.gov/document/FTC-2023-0073-0001.

[54] Subsequently, IFA also asserted there were disputed issues of material fact regarding the impact to both small businesses and their consumers. IFA, FTC-2024-0001-0009.

[55] Recommended Decision by Presiding Officer, https://www.regulations.gov/comment/FTC-2024-0001-0042.

[56] 15 U.S.C. 57a and 16 CFR 1.14(a)(1).

practices treated by the rule; (b) the manner and context in which such acts or practices are unfair or deceptive; and (c) the economic effect of the rule, taking into account the effect on small business and consumers; and (2) "define with specificity acts or practices which are unfair or deceptive." The Commission addresses these requirements in part A.1-2. In part A.3, the Commission addresses additional legal issues, including the ANPR's scope and the "major questions" doctrine.

### 1. Statements Required Under Section 18(d) of the FTC Act

#### a) Statement Regarding Prevalence of the Acts and Practices Treated by the Rule

Under the Magnuson-Moss statute, the Commission may promulgate rules if it "has reason to believe that the unfair or deceptive acts or practices which are the subject of the proposed rulemaking are prevalent."[57] An act or practice is "prevalent" if the FTC has previously issued cease and desist orders regarding the act or practice, or if "any other information available to the Commission indicates a widespread pattern of unfair or deceptive acts or practices."[58] Based on the rulemaking record, the Commission has more than sufficient reason to believe unfair or deceptive acts and practices in the negative option marketplace are prevalent. These practices include: (1) material misrepresentations made while marketing using negative option features to induce consumers to enter into negative option programs; (2) failure to provide important information about material terms prior to billing consumers; (3) lack of informed consumer consent; and (4) failure to provide consumers with a simple cancellation method, including failure to honor cancellation requests, refusal to provide refunds to consumers

---

[57] 15 U.S.C. 57a(b)(3).
[58] 15 U.S.C. 57a(b)(3)(A)-(B); *see also Compassion Over Killing v. FDA*, 849 F.3d 849, 855 (9th Cir. 2017).

who unknowingly enrolled in programs, denying consumers refunds, forcing them to pay to return the unordered goods, requiring consumers to cancel using a more difficult method than the one used to sign up for the program, and forcing consumers to contend with multiple upsells before allowing cancellation.[59] These practices cause consumer harm by luring consumers into purchasing goods and services they do not want, or ensnaring consumers into unwanted recurring payments that are difficult or impossible to cancel.

The Commission relies on substantial evidence in the record showing a widespread pattern of unfair or deceptive conduct in the negative option marketplace. This evidence generally falls into three categories: state, private, and federal actions (including administrative and federal court FTC law enforcement actions); consumer complaints and comments; and studies. The Commission discusses each in turn below.

*Federal, State, and Private Actions.* As discussed in the ANPR and NPRM, the volume of enforcement efforts in recent years seeking to stem illegal negative option marketing is significant. These matters involve a range of deceptive and unfair practices, including: failure to adequately disclose the existence of negative options, including after the expiration of free trials; enrollment without consumer consent; and inadequate or unnecessarily burdensome cancellation and refund procedures. The FTC itself has brought at least 35 such cases in the years since ROSCA was enacted.[60] The Consumer Financial Protection Bureau ("CFPB") also has brought

---

[59] NPRM, 88 FR 24725.

[60] In the NPRM, the Commission cited a number of its law enforcement actions challenging negative option marketing practices, including, for example, *FTC v. Process Am., Inc*., No. 1:14-cv-00386 (C.D. Cal. 2014) (processing of unauthorized charges relating to negative option marketing); *FTC v. Willms*, No. 2:11-cv-00828 (W.D. Wash. 2011) (Internet free trials and continuity plans); *FTC v. Moneymaker*, No. 2:11-cv-00461 (D. Nev. 2011) (Internet trial offers and continuity programs); *FTC v. Johnson*, No. 2:10-cv-02203 (D. Nev. 2010) (Internet trial offers); and *FTC v. John Beck Amazing Profits, LLC*, No. 2:09-cv-04719 (C.D. Cal. 2009)

many of its own negative option cases.[61] Truth in Advertising, Inc. ("TINA"),[62] a consumer

advocacy organization, stated in 2019 that more than 100 federal class actions involving various

negative option terms and conditions have been filed since 2014. Notwithstanding these actions,

according to TINA, "the incidence of deceptive negative option offers continues to rise."[63] TINA

also reports that deceptive negative options "have only continued to grow" since its 2019

comment.[64]

(infomercial and telemarketing trial offers and continuity programs). Further examples of these matters include: *FTC v. Triangle Media Corp.*, No. 3:18-cv-01388 (S.D. Cal. 2018); *FTC v. Credit Bureau Ctr., LLC*, No. 1:17-cv-00194 (N.D. Ill. 2017); *FTC v. JDI Dating, Ltd.*, No. 1:14-cv-08400 (N.D. Ill. 2014); *FTC v. One Techs., LP*, No. 3:14-cv-05066 (N.D. Cal. 2014); *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649 (D. Nev. 2014); *FTC v. NutraClick, LLC*, No. 2:16-cv-06819 (C.D. Cal. 2016); *FTC v. XXL Impressions, LLC*, No. 1:17- cv-00067 (D. Me. 2017); *FTC v. AAFE Prods. Corp.*, No. 3:17-cv-00575 (S.D. Cal. 2017); *FTC v. Pact, Inc.*, No. 2:17-cv-1429 (W.D. Wash. 2017); *FTC v. Tarr*, No. 3:17-cv-02024 (S.D. Cal. 2017); *FTC v. AdoreMe, Inc.*, No. 1:17-cv- 09083 (S.D.N.Y. 2017); *FTC v. DOTAuthority.com, Inc*., No. 0:16-cv-62186 (S.D. Fla. 2016); *FTC v. BunZai Media Grp., Inc.*, No. 2:15-cv-04527 (C.D. Cal. 2015); and *FTC v. RevMountain, LLC*, No. 2:17-cv-02000 (D. Nev. 2017); *see also FTC v. WealthPress, Inc.*, No. 3:23-cv-00046 (M.D. Fla. 2023); *FTC v. Bridge It, Inc.*, No. 1:23-cv-09651 (S.D.N.Y. 2023); *FTC v. Amazon.com, Inc.*, No. 2:23-cv-0932 (W.D. Wash. 2023); *FTC v. FloatMe Corp.*, No. 5:24-cv-00001 (W.D. Tex. 2024); *United States v. Adobe, Inc.*, No. 5:24-cv-03630 (N.D. Cal. 2024).
[61] *See, e.g.*, *CFPB v. Transunion*, No. 1:22-cv-01880 (N.D. Ill. 2022); *CFPB v. ACTIVE Network, LLC*, No. 4:22-cv-00898 (E.D. Tex. 2022); *CFPB v. Sterling Jewelers, Inc.*, No. 1:19-cv-00448 (S.D.N.Y. 2019); *In re Equifax Inc., et al.*, CFPB No. 2017-CFPB-0001, 2017 WL 1036710 (Jan. 3, 2017) (consent order); *CFPB v. Prime Mktg. Holdings, LLC*, No. 2:16-cv-07111 (C.D. Cal. 2016); *In re Transunion Interactive, Inc., et al.*, CFPB No. 2017-CFPB-0002, 2017 WL 1036711 (Jan. 3, 2017) (consent order); *CFPB v. Student Financial Aid Servs., Inc.*, No. 2:15-cv-00821 (E.D. Cal. 2015); *CFPB v. Affinion Group Holdings, Inc.*, No. 5:15-cv-01005 (D. Conn. 2015); *CFPB v. Intersections Inc.*, No. 1:15-cv-835 (E.D. Va. 2015). Notably, the CFPB has independent authority to enforce FTC rules, and both agencies share some overlapping jurisdiction. *See* 12 U.S.C. 5581(b)(5)(B)(ii).
[62] TINA, FTC-2019-0082-0014 (cmt. to ANPR, https://www.regulations.gov/comment/FTC-2019-0082-0014) and FTC-2023-0033-1139 (cmt. to NPRM).
[63] NPRM, 88 FR 24720.
[64] TINA, FTC-2023-0033-1139.

Several state Attorneys General[65] also referenced dozens of enforcement actions taken in recent years to address the proliferation of deceptive negative option practices they regularly encounter, including the "lack of informed consumer consent, lack of clear and conspicuous disclosures, failure to honor cancellation requests and/or refusal to provide refunds to consumers who unknowingly enrolled in plans."[66] These agencies explained their actions "demonstrate that problems persist in this area and that additional regulatory action is needed."[67] For example, over the last decade, New York alone has reached 23 negative option settlements involving a variety of products and services such as membership programs, credit monitoring, dietary supplements, and apparel.[68] They also described several multi- and individual state law enforcement actions involving negative option offers for products and services such as satellite radio, social networking services, language learning programs, security monitoring, and dietary supplements. They further recounted numerous, illustrative complaints from consumers who

---

[65] Several State Attorneys General offered comments to the ANPR (FTC-2019-0082-0012 (state Attorneys General cmt. to ANPR, https://www.regulations.gov/comment/FTC-2019-0082-0012)), and additionally 26 Attorneys General for the states of Alabama, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Jersey, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Vermont, Washington, and Wisconsin ("State AGs") filed comments in response to the NPRM. *See* State AGs, FTC-2023-0033-0886 (cmt. to NPRM).

[66] NPRM, 88 FR 24720; State Attorneys General (ANPR), FTC-2019-0082-0012. They further explained the nature of the underlying products often fails to alert consumers of their enrollment in a negative option program. For instance, many offers involve credit monitoring or anti-virus computer programs costing less than $20 a month and have no tangible presence for consumers. The State AGs explained consumers are often unaware of having ordered these products, never use them, and never notice them on their bills. The State AGs further explained these transactions often pull consumers into a stream of recurring payments by obtaining credit card information to ostensibly pay for a small shipping charge. Consequently, they commented many consumers have been billed for such services for years before discovering the unauthorized charges. *Id*.

[67] NPRM, 88 FR 24721.

[68] State Attorneys General (ANPR), FTC-2019-0082-0012.

ordered what they thought were free, no-obligation samples but then found themselves enrolled in costly continuity programs.[69]

Additionally, the State AGs outlined several ongoing investigations into deceptive or unfair negative option programs since 2019. These investigations include allegations of misrepresenting offers as free when they were not; and failure to clearly and conspicuously disclose negative option features.[70]

Additionally, consumer advocacy organizations and others explained that the widespread prevalence of deceptive acts and practices underscores the "ongoing need for state engagement to limit negative option abuses."[71] Several commenters observed that more than half of states specifically regulate some aspect of negative option marketing.[72] A group of law professors

---

[69] *Id.*

[70] State AGs, FTC-2023-0033-0886.

[71] *See, e.g.*, Joint comment from Professor Kaitlin Caruso (U. of Maine School of Law), Professor Jeff Sovern (St. John's U. School of Law), Professor Dee Pridgen (U. of Wyoming College of Law), Professor Chrystin Ondersma (Rutgers Law School), Professor Vijay Raghavan (Brooklyn Law School), Professor David Vladeck (Georgetown U. Law Center), Professor Edward Janger (Brooklyn Law School), and Professor Susan Block-Lieb (Fordham U. School of Law) (collectively, "Law Professors"), FTC-2023-0033-0861.

[72] *See, e.g.*, PDMI, FTC-2023-0033-0864 (stating over 27 states regulate negative option marketing); N/MA, FTC-2023-0033-0873 (stating 35 states and the District of Columbia now have automatic renewal laws, and at least 20 address all forms of automatic renewals); Service Contract Industry Council ("SCIC"), FTC-2023-0033-0879 (noting about half of U.S. states enacted auto-renewal laws); NRF, FTC-2023-0033-1005 (stating at least half of all states have statutes governing free-trial, negative-option, and/or automatic-renewal programs); *see also* Law Professors, FTC-2323-0033-0861 (stating the "number of states that have recently adopted specific laws targeting negative option marketing, on top of their general prohibitions on unfair and deceptive practices and ability to enforce ROSCA, is particularly noteworthy."); IHRSA, The Global Health & Fitness Association ("IHRSA"), FTC-2023-0033-0863 (noting many states have laws on negative options). *But see* The Center for Consumer Law and Economic Justice at UC Berkeley School of Law ("Berkeley Consumer Law Center"), FTC-2023-0033-0855 (stating that "fewer than half the states have a law specifically addressing negative option marketing").

explain this "ongoing engagement just shows that unscrupulous negative-option business models remain such a problem that states *increasingly* find themselves needing to step in."[73]

*Consumer Complaints and Comments.* The FTC receives tens of thousands of complaints about negative options each year through its Sentinel complaint database, and marketers receive many more as demonstrated by evidence in FTC cases.[74] Additionally, TINA explained that negative options are one of its top complaint categories. These complaints usually involve consumers who unwittingly enroll in programs and then find it difficult or impossible to cancel.[75]

Moreover, hundreds of consumer comments detailed specific practices (discussed more thoroughly in connection with the Section-by-Section analysis below) demonstrating the prevalence of unfair or deceptive negative option practices. Likewise, comments from public interest and consumer advocacy groups further describe existing deceptive or unfair practices prevalent in the negative option marketplace. For example, Berkeley Consumer Law Center explained businesses regularly use dark patterns[76] to facilitate enrollment in subscription-based products and inhibit cancellation, and provided numerous examples of these activities.[77] A group of law professors referenced the burgeoning industry offering to help consumers identify and

---

[73] Law Professors, FTC-2023-0033-0861. This group also points out that private industry, too, has felt the need for more action in this area, noting that VISA and Mastercard have their own requirements for businesses that bill using a negative option model.

[74] *See, e.g.*, *United States v. Adobe, Inc.*, No. 5:24-cv-03630 (N.D. Cal. 2024) (ECF No. 40, Amd. Compl.); *FTC v. Amazon.com, Inc.*, No. 2:23-cv-0932 (W.D. Wash. 2023) (ECF No. 67, Amd. Compl.).

[75] TINA, FTC-2023-0033-1139.

[76] The term "dark patterns" has been used to describe design practices that trick or manipulate users into making choices they would not otherwise have made and that may cause harm *See Bringing Dark Patterns to Light,* FTC Staff Report (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.

[77] Berkeley Consumer Law Center, FTC-2023-0033-0855.

cancel their unwanted subscriptions. As they explained: "One might expect that, if consumers experienced the marketplace as one in which they are adequately informed of recurring payments and readily able to cancel them, there would not be an emerging industry to help them do just that."[78]

Members of Congress also detailed ongoing problems in this area. Citing the increase in consumer complaints and consumer harm in recent years, Representative Takano stated, "deceptive online marketing and unclear recurring payment plans are leaving too many consumers on the hook for products they may not want or even know they purchased."[79] Representatives Schiff and Norton noted their constituents' desire for greater protections in the negative option marketplace, stating the "proposed updates will help put the consumers back in control of their purchases and subscriptions."[80]

*Studies*. Finally, "studies cited by commenters confirm a pattern of consumer ensnarement in unwanted recurring payments."[81] A Better Business Bureau study of FTC data, titled "Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements," demonstrated complaints about free trials doubled between 2015 and 2017, with complaints during the period reaching nearly 37,000.[82] The BBB study shows consumer losses in FTC "free trial offer" cases exceeded $1.3 billion (over the ten years covered

---

[78] Law Professors, FTC-2023-0033-0861.
[79] NPRM, 88 FR 24720-21.
[80] Schiff and Norton, FTC-2023-0033-0868.
[81] NPRM, 88 FR 24725.
[82] Steve Baker, *Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements*, Better Business Bureau (Dec. 2018), https://www.bbb.org/article/investigations/18929-subscription-traps-and-deceptive-free-trials-scammillions-with-misleading-ads-and-fake-celebrity-endorsements.

by the study).[83] A group of consumer and public interest advocacy organizations, including the National Consumers League[84] stated that, according to the BBB, the average consumer loss for a free trial is $186.[85]

Referring to another survey conducted in 2016, TINA noted unwanted fees associated with trial offers and automatically renewing subscriptions ranked as "the biggest financial complaint of consumers."[86] Similarly, TINA noted the FBI's Internet Crime Complaint Center recorded a rise in complaints about free trial offers, growing from 1,738 in 2015 to 2,486 in 2017.[87] A 2019 Bankrate.com survey cited by NCL found that 59% of consumers have been signed up "against their will" for "free trials" that automatically converted into a recurring payment.[88]

NCL and others also cited a 2017 national telephone survey commissioned by CreditCards.com finding 35% of U.S. consumers have enrolled in at least one automatically

---

[83] *Id.*; *see also* Better Business Bureau, BBB Investigation Update: Free Trial Offer Scams (Apr. 2020), https://www.bbb.org/article/news-releases/22040-bbb-update-free-trial-offerscams (reporting the total has risen to nearly $1.4 billion since the 2018 BBB study); *id.* (observing that while celebrities, credit card companies and government agencies have increased their efforts to fight deceptive free trial offer scams, victims continue to lose millions of dollars to fraudsters after the release of a December 2018 BBB study about the shady practices).

[84] The six public interest and consumer advocacy groups are: Consumer Action, Consumer Federation of America, Demand Progress Education Fund, National Association of Consumer Advocates, Nation Consumer Law Center (on behalf of its low income clients,) and National Consumers League ("NCL") (collectively, the "Public Interest Groups").

[85] Steve Baker, *Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements*, Better Business Bureau (Dec. 2018).

[86] NPRM, 88 FR 24720 (citing Rebecca Lake, "Report: Hidden Fees Are #1 Consumer Complaint," mybanktracker.com (updated Oct. 16, 2018), https://www.mybanktracker.com/money-tips/money/hidden-fees-consumer complaint-253387.)

[87] NPRM, 88 FR 24721.

[88] Bankrate, "Despite safety concerns, 64% of U.S. debit or credit cardholders save their information online" (Oct. 24, 2019), at https://www.bankrate.com/pdfs/pr/20191024-online-shopping-survey.pdf (as cited by Civil Society Organizations, FTC-2023-0033-0870).

renewing contract without realizing it.[89] In response to the NPRM, the Public Interest Groups cited more recent studies confirming the continued prevalence of harms from deceptive and unfair negative option practices. For instance, consumer groups referenced a 2022 study, which concluded "on average, consumers pay two-and-a-half times what they originally estimated on monthly subscriptions, likely due to the lack of adequate notice from sellers."[90] They also noted burdensome cancellation procedures remain rampant. "One survey found that more than half of respondents reported it took an average of three months to cancel unwanted recurring payments."[91] That same study reported 71% of individuals lost more than $50 a month in unwanted subscriptions. Another study concluded consumers underestimate how much they pay to maintain their subscriptions by an average of $133/month (or $1,596 per year), and 42% of the consumers had forgotten about a subscription for which they continued to pay.[92]

Finally, TINA also noted a consumer survey by the Washington Attorney General's office finding "59% of Washingtonians (3.5 million residents) may have been unintentionally enrolled in a subscription plan or service when they thought they were making a one-time purchase."[93] TINA contended this is "consistent with" the 2022 Bankrate survey finding more

---

[89] NPRM, 88 FR 24720.
[90] Public Interest Groups, FTC-2023-0033-0880 (citing "Subscription Service Statistics and Costs," C+R Research Blog (May 18, 2022)).
[91] Public Interest Groups, FTC-2023-0033-0880 (citing Chase, "Survey from Chase Reveals That Two-Thirds of Consumers Have Forgotten About At Least One Recurring Payment In The Last Year" (Apr. 1, 2021), https://media.chase.com/news/survey-from-chase-reveals).
[92] State AGs, FTC-2023-0033-00866 (citing Sarah Brady and Korrena Bailie, "5 Tools To Help You Cancel Unwanted Subscriptions," Forbes (July 13, 2022), https://www.forbes.com/advisor/personal-finance/manage-subscriptions). *See also* Einav, Liran, et al., "Selling Subscriptions" (Dec. 1, 2023), https://nmahoney.people.stanford.edu/sites/g/files/sbiybj23976/files/media/file/mahoney_subscriptions.pdf.
[93] TINA, FTC-2023-0033-1139.

than half of U.S. adults experience unwanted charges from a subscription or membership.[94]

These findings are further supported by a Chase Bank study in 2021 finding nearly three-quarters of Americans waste more than $50 a month on unwanted subscription fees.[95]

Despite the robust evidence that unfair or deceptive practices are exceedingly prevalent, several trade organizations challenged the Commission's proposed prevalence determination. However, their arguments, as discussed below, are not persuasive.

First, they argued the Commission must show prevalence in a specific industry in order to regulate negative option practices in that industry, but the Commission failed to do so. For instance, NCTA asserted there is no evidence of widespread deceptive negative option practices in the broadband, cable, or voice industries warranting regulation.[96] Other commenters argued the Commission must identify the prevalence of a specific deceptive or unfair act to warrant regulating that specific act or practice under Section 18. For instance, IAB, NCTA, TechNet, and TechFreedom argued the Commission failed to show prevalence of misrepresentations about the underlying product or service in connection with negative option contracts. Similarly, three commenters argued the Commission should limit the scope of the Rule to business-to-consumer transactions and exclude business-to-business ("B2B") transactions, in part, because the Commission failed to show "the prevalence of harms created by automatically-renewing subscriptions entered into in the business-to-business context."[97]

As demonstrated above, however, there is ample evidence in the record demonstrating the prevalence of the specific unfair and deceptive practices across numerous sectors of the

---

[94] *Id.*
[95] *See* n.91.
[96] NCTA, FTC-2023-0033-0858; *see also* SCIC, FTC-2023-0033-0879.
[97] BSA, FTC-2023-0033-1015; *see also* Anonymous commenter, FTC-2023-0033-1007; NCTA, FTC-2023-0033-0858.

economy, which the Commission now addresses in an industry-neutral fashion.[98] Moreover,

nothing in Section 18 requires the Commission to find prevalence regarding a specific industry

or group.[99] The Commission need only find "some basis or evidence" demonstrating the practice

the Commission seeks to regulate "does indeed occur."[100] Such evidence exists here in

abundance. As NCTA itself pointed out, individual consumers complained of deceptive and

unfair practices in its members' industries.[101] Further, "consumer subscription models are

rapidly growing in popularity,"[102] and there is evidence of the proliferation of negative option

features in virtually every industry.[103] The harms outlined here resulted from the negative option

[98] *See* Sections VII.A.1.a-b and Section II.A.1.b of this SBP.

[99] *See generally* 15 U.S.C. 57a.

[100] *Pennsylvania Funeral Dirs. Ass'n, Inc. v. FTC*, 41 F.3d 81, 87-88 (3d Cir. 1994) (holding the FTC did not need "substantial, rigorous, quantitative studies" or to show the practice occurs in a certain percentage of transactions through the country to find prevalence). "Further, even where there is a limited record as to the prevalence of a practice on a nationwide basis or where the data reviewed only relates to a few states, the practice can be found to be prevalent enough to warrant a regulation." *Id.* at 87.

[101] NCTA, FTC-2023-0073-0008.

[102] CTA, FTC-2023-0033-0997. CTA reports that a 2022 study found the global subscription e-commerce market is expected to reach $904.2 billion by 2026, and between 2021 and 2022, existing subscription brands grew their customer bases by 31 percent.

[103] According to a 2018 McKinsey & Company study, the subscription e-commerce market increased more than 100% over a five-year period prior to the study's publication. Tony Chen, Ken Fenyo, Sylvia Yang, and Jessica Zhang, "Thinking Inside the Subscription Box: New Research on E-Commerce Consumers," McKinsey & Company (February 2018) (as cited by, *e.g.*, TechNet, FTC-2023-0033-0869 and Individual commenter, FTC-2023-0033-0800). PDMI also observed that negative options are offered in a wide array of product and services from major brands including media services, meal preparation kits, shaving and beauty products, beer and wine, contacts and ordinary household consumables. FTC-2023-0033-0864. Digital Content Next ("DCN"), FTC-2023-0033-0983, reports the United States had more than one billion paid subscriptions in Q1 2023 across the digital media landscape, indicating almost all online U.S. households subscribe to one or more digital media subscription services. *See also, e.g.*, Individual commenter, FTC-2023-0033-0137 (detailing difficulty cancelling recurring subscriptions for newspaper, mobile, and other businesses); Individual commenter, FTC-2023-0033-0217 (reported spending hours on the phone and online to cancel mobile account); Individual commenter, FTC-2023-0033-0465 (reported difficulty cancelling rewards program subscription); Individual commenter, FTC-2023-0033-0674 (complaint reporting difficulty

transaction itself, and many businesses, regardless of industry, are incentivized to continue to leverage negative options to the possible detriment of consumers.[104] The Commission also declines to limit the scope of the final Rule by excluding business-to-business transactions. As explained in Section VII.B.1, the Commission has a long history of protecting businesses, particularly small business, in their role as consumers; the practices and harms described here impact these consumers, as well.

### b) The Manner and Context in Which the Acts or Practices Are Unfair or Deceptive

Pursuant to Section 18 and the Commission's Rules, the Commission must also state the manner and context in which the prevalent acts or practices are unfair or deceptive. The record

---

canceling mobile device protection subscription); Individual commenter, FTC-2023-0033-0965 (trying to cancel mobile phone service because they bill for different amount every month); Individual commenter, FTC-2023-0033-0003 (difficulty cancelling "home warranty" subscription); Individual commenter, FTC-2023-0033-0004 (full cost and refund policy for gym contract not clearly disclosed); Individual commenter, FTC-2023-0033-0006 ("2 attempts and far too much time" to cancel radio subscription); Individual commenter, FTC-2023-0033-0008 (discussing how "subscription services in particular pervade the market. Even long-standing 'buy-it-once' products such as certain software suits have moved to subscription models"); Anonymous commenter, FTC-2023-0033-0013 (difficulty canceling home security monitoring contract, including hearing unwanted upsells); Anonymous commenter, FTC-2023-0033-0023 (webhosting service); Anonymous commenter, FTC-2023-0033-0024 (cable service); Individual commenter, FTC-2023-0033-0039 (language learning app); Anonymous commenter, FTC-2023-0033-0046 (software); Individual commenter, FTC-2023-0033-0049 (cannot cancel streaming service); Individual commenter, FTC-2023-0033-0050 (virus protection software and charity); Individual commenter, FTC-2023-0033-0052 (e-news service subscription); Individual commenter, FTC-2023-0033-0057 (magazine subscription service); Individual commenter, FTC-2023-00330061 (newspaper); Individual commenter, FTC-2023-0033-0063 (big box retailer membership); Individual commenter, FTC-2023-0033-0064 (cosmetics); Anonymous commenter, FTC-2023-0033-0066 (home warranty service); Individual commenter, FTC-2023-0033-0071 (lawncare service).
[104] *See* Prof. Chris Jay Hoofnagle, UC Berkeley ("Hoofnagle"), FTC-2023-0033-1137 (discussing the subscription economy). See also nn.244-251, collecting cases showing deceptive and unfair negative option practices occur across a wide range of industries and involve a variety of claims.

demonstrates consumers are often lured into enrolling in negative option programs through seller misrepresentations about material facts—for instance, when a seller offers a product for "free" when it is not.[105] Additionally, sellers misrepresent other aspects of the deal, such as product features, processing or shipping fees, billing information use, deadlines, consumer authorization, refunds, cancellations, among other facts.[106]

Sellers also often fail to disclose important information about the offer prior to billing the consumer. As detailed in the comments from, *inter alia*, State AGs and TINA, sellers fail to disclose in a clear and conspicuous manner the existence of the negative option feature, refund and cancellation deadlines, or other material terms of the agreement, resulting in consumers purchasing goods or services they do not want.[107] All of these unfair or deceptive acts are further supported in dozens of FTC, State AG, and class action cases.[108]

The record also demonstrates sellers fail to obtain consumers' express informed consent to the negative option feature before charging them. For instance, as detailed in representative consumer complaints from State AGs and several FTC cases, consumers are often unwittingly enrolled into recurring subscriptions with promises of no- or low-cost or discounted rates (not knowing that agreeing will result in subscription to a costly membership), with consumers not

---

[105] State AGs, FTC-2023-0033-0886 (consumer paid for shipping on "free" gift only to have it converted to a paid item because she retained the item); *id.* (Money Map Press), *FTC v. Triangle Media Corp.*, No. 3:18-cv-01388 (S.D. Cal. 2018) (consumers who clicked on ads for risk free trials, paid for shipping and handling fees unwittingly enrolled in negative option programs).
[106] *See* nn.244-251 (collecting cases).
[107] *See* State Attorneys General (ANPR), FTC-2019-0082-0012 and State AGs, FTC-2023-0033-0886; TINA, FTC-2019-0082-0014 and FTC-2023-0033-1139.
[108] *See, e.g., id.*; *see also FTC v. Pact, Inc.*, No. 2:17-cv-1429 (W.D. Wash. 2017); *United States v. MyLife.com, Inc.*, No. 2:20-cv-6692 (C.D. Cal. 2020); *FTC v. NutraClick, LLC*, No. 2:20-cv-08612 (C.D. Cal. 2020); *In re Dun & Bradstreet, Inc.*, FTC Docket No. C-4761 (2022). *See generally* Staff Report, n.16.

realizing the deceptive and unfair enrollment until they see unexpected charges, often after several billing cycles.[109]

Finally, substantial record evidence shows sellers often fail to provide a simple cancellation method. If consumers cannot easily leave a negative option program when they wish, the negative option feature is merely a means of charging consumers for goods or services they no longer want. Commission cases, the Sentinel complaint database, and state Attorneys General's complaints all show sellers often use difficult and cumbersome cancellation mechanisms to prevent or curtail cancellations.[110] This fact is further corroborated by studies discussed above.[111]

### c) Statement as to the Economic Effect of the Rule

Finally, pursuant to Section 18 and the Commission's Rules, the SBP must include a statement regarding the economic effect of the Rule. As part of these rulemaking proceedings, the Commission solicited and received comments on the economic impact of the proposed Rule. In issuing the final Rule, the Commission has carefully considered the comments and other information received as well as the costs and benefits of each provision, as discussed in more detail in Section X, Final Regulatory Analysis. That analysis demonstrates the benefits of the

---

[109] *See, e.g.*, State Attorneys General (ANPR), FTC-2019-0082-0012 and State AGs, FTC-2023-0033-0886; *FTC v. FloatMe Corp.*, No. 5:24-cv-00001 (W.D. Tex. 2024); *United States v. Cerebral, Inc.*, No. 1:24-cv-21376 (S.D. Fla. 2024); *FTC v. Bridge It, Inc.*, No. 1:23-cv-09651 (S.D.N.Y. 2023); *FTC v. Benefytt Techs., Inc.*, No. 8:22-cv-01794 (M.D. Fla. 2022); *FTC v. First Am. Payment Sys.*, No. 4:22-cv-00654 (E.D. Tex. 2022); *FTC v. NutraClick, LLC*, No. 2:20-cv-08612 (C.D. Cal. 2020); *FTC v. F9 Advert., LLC*, No. 3:19-cv-01174 (D.P.R. 2019); *FTC v. Age of Learning, Inc.*, No. 2:20-cv-07996 (C.D. Cal. 2020); *FTC v. NutraClick, LLC*, No. 2:16-cv-06819 (C.D. Cal. 2016); *FTC v. AH Media Grp., LLC*, No. 3:19-cv-04022 (N.D. Cal. 2019); *In re Urthbox, Inc.*, FTC Docket No. C-4676 (2019); *FTC v. Health Rsch. Labs., LLC*, No. 2:17-cv-00467 (D. Me. 2017); *FTC v HispaNexo, Inc.*, No. 1:06-cv-424 (E.D. Va. 2006).
[110] *See* Section VII.B.6.
[111] Section VII.A.1.a.

Rule far exceed the costs. Benefits were evaluated on a per-cancellation basis; that is, the analysis assumes the primary consumer benefit of the Rule will come in the form of faster cancellations. Costs were evaluated primarily to reflect resources spent by businesses to review and come into compliance with the Rule. The overall net benefit of the Rule is estimated to exceed $5.3B (and could be as much as $49.2B) over the first 10 years (in 2023 dollars).

## 2. Magnuson-Moss Specificity Requirement

Pursuant to Magnuson-Moss, the Commission must also define with specificity acts or practices which are unfair or deceptive and either prohibit those activities or establish rules to prevent them. The Commission has done just that, despite some commenters' arguments to the contrary. Specifically, IAB and others [112] argue the provision prohibiting material misrepresentations fails to define claims that fall within its scope, and therefore, "fails to identify covered acts with the requisite level of specificity." [113]

First, Section 18 does not require the Commission to define claims with specificity, only acts or practices. The practice of misrepresenting the material facts of a transaction, for instance, is a deceptive practice, but could vary depending on the transaction's terms. Requiring the Commission to identify particular claims would make its rules no better than a leaky sieve, unable to effectively address consumer harm.

---

[112] IAB, FTC-2023-0033-1000; Coalition Comments from CCIA, Direct Selling Association, Information Technology Industry Council, IAB, Software & Information Industry Association, and Chamber ("Coalition"), FTC-2023-0033-0884; PDMI, FTC-2023-033-0864; TechNet, FTC-2023-0033-0869; TechFreedom, FTC-2023-0033-0872; ACT-The App Association ("ACT App Association"), FTC-2023-0033-0874; USTelecom, FTC-2023-0033-0876.
[113] IAB, FTC-2023-0033-1000.

Second, the NPRM and the final Rule do define with the requisite specificity the unfair or deceptive negative option acts and practices covered by the Rule. [114] While those critical of the proposed Rule cite to *Katharine Gibbs School v. FTC*, 612 F.2d 658 (2d Cir. 1979), this case is inapposite. In *Katharine Gibbs School*, the Second Circuit held the Commission failed to connect elements of its trade regulation rule to specifically defined unfair or deceptive acts or practices. The opinion held the Commission may not merely set requirements and then define failure to meet those requirements as unfair or deceptive acts or practices. The Commission must instead identify some underlying deceptive or unfair conduct and connect the rule requirements to that conduct.

In contrast here, the Commission specifically identified misrepresentation of material facts as a deceptive practice, and defined the term "material" with the same meaning it has under Section 5 of the FTC Act. [115] Moreover, the misrepresentations provision goes further, providing categories of potentially material facts to assist the marketplace in understanding the provision and supporting those examples with cases. [116] Thus, the final Rule's prohibition against material misrepresentations is not only connected to underlying deceptive or unfair conduct, but in fact prohibits that very conduct.

---

[114] *See* Section I; Section VII.A, defining the acts and practices covered in § 425.3 through § 425.6 as unfair or deceptive and a violation of the Rule. As acknowledged by USTelecom, the "contours of the 'specificity' requirement have not been precisely defined." FTC-2023-0033-0876.
[115] *See* SBP Section VII.B.3 discussing § 425.3.
[116] *Id.* As explained in the *Katharine Gibbs School* dissent, "Congress required specific definitions of such practices so that a rule would 'reasonably and fairly inform those within its ambit of the obligation to be met and the activity to be avoided.'" 612 F.2d 658, 672 (*quoting* H.R. Rep. No.93-1107, 93d Cong., 2d Sess. 46 (1974), *reprinted in* (1974) U.S.C.C.A.N., pp. 7702, 7727).

### 3. Other Legal Issues

Several commenters raised additional challenges to the Commission's ability to promulgate the Rule. These challenges fall into two categories. First, some commenters argued the Commission failed to give adequate notice of the scope of the proposed amendments to the Rule in the ANPR in accordance with Section 57a(b)(2)(A) of the FTC Act. Second, four commenters argued the Commission exceeded its grant of Congressional authority under the "major questions" doctrine. The Commission addresses each argument below.

### a) ANPR

Several commenters asserted the ANPR, issued in 2019, failed to provide adequate notice of the acts and practices to be covered by the proposed Rule. Specifically, ESA, USTelecom, RILA, a coalition of trade associations, Chamber, CCIA, IAB, and NRF argued the ANPR failed to provide notice the proposed Rule would cover misrepresentations of all material facts; would require express informed consent to opt-in to receive a save;[117] and would require an annual reminder.[118] Thus, according to these commenters, including these provisions in the final Rule would violate Section 18(b)(2)(A). They further argued the lack of these topics' inclusion in the ANPR meant that affected entities had inadequate opportunity to provide input, leading to an inadequate rulemaking record.[119]

These arguments, however, are unpersuasive. Section 18 imposes no requirement the ANPR have the level of specificity the commenters demand. In fact, the statute only says the ANPR must include "a brief description of the area of inquiry under consideration, the objectives

---

[117] As discussed in Section VII.B.6, the Commission removes the proposed save provision from the final Rule.

[118] As discussed in Section VII.B.7, the Commission removes the proposed annual reminder provision from the final Rule.

[119] *E.g.*, IAB, FTC-2023-0033-1000.

which the Commission seeks to achieve, and possible regulatory alternatives under consideration by the Commission."[120] The Commission included a discussion of each of these topics in the ANPR.[121] Moreover, the affected entities have had the chance to raise concerns with the Rule in their comments to the NPRM, which the Commission has considered and responded to in this Statement of Basis and Purpose.

### b) Major Questions Doctrine

Four commenters asserted the Rule implicates the "major questions" doctrine.[122] According to the Supreme Court, the major questions doctrine is implicated in "extraordinary cases . . . in which the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority."[123] Citing this authority, the commenters argue Congress only granted the FTC "limited and tailored authorities to regulate certain mediums and types of negative option marketing, but not all mediums and types as the NPRM encompasses."[124] Further, they assert Congress never intended for the Commission to create a comprehensive regulatory scheme for negative option marketing that encompasses the variety of requirements proposed in the NPRM. Because negative option programs play an ever-increasing role in the economy, these commenters claim the proposed Rule would "dramatically

---

[120] 15 U.S.C. 57a(b)(2)(A). "The Advance Notice [of Proposed Rulemaking] is a formal invitation to participate in shaping the proposed rule and starts the notice-and-comment process in motion." Office of the Federal Register, "A Guide to the Rulemaking Process," https://www.federalregister.gov/uploads/2011/01/the_rulemaking_process.pdf.
[121] ANPR, 84 FR 52393; *see also id.* 52396-8 (Request for Comments); Section VII.B.3.b.1 (discussing ANPR in context of § 425.3).
[122] PDMI, FTC-2023-0033-0864; ACT App Association, FTC-2023-0033-0874; Coalition, FTC-2023-0033-0884; Chamber, FTC-2023-0033-0885.
[123] *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (internal quotations cleaned up). *Accord Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023).
[124] Coalition, FTC-2023-0033-0884.

alter" how companies structure their subscription services.[125] More specifically, they assert the prohibition against misrepresentations, together with the ability to seek civil penalties in federal court, would expand the FTC's authority beyond that envisioned by Congress.

However, far from exceeding Congressional intent, the Rule merely effectuates that intent in a way wholly consistent with the specific requirements set forth in Section 18 of the FTC Act. Specifically, Congress explicitly authorized the Commission to prescribe "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce (within the meaning of such section 5(a)(1))," which "may include requirements prescribed for the purpose of preventing such acts or practices."[126] As demonstrated below, each of the Rule's provisions identifies specific deceptive or unfair acts or practices that are prevalent throughout the marketplace and ties each Rule provision tightly to those findings.

As the Supreme Court explained, courts use the "major questions doctrine" when examining "extraordinary cases" where agency action would "make a radical or fundamental change" to a statutory scheme and assert "extravagant" authority over the national economy through "ambiguous statutory text," citing "modest words," "vague terms," "subtle device[s]," or "oblique or elliptical language."[127] Here, no such extraordinary circumstance exists. The prohibitions and disclosures in the Rule do not effect a major change in the economy. In fact, all the substantive requirements in the Rule are already extant under Section 5 of the FTC Act, ROSCA, or the TSR. Moreover, the Rules' terms, as explained below, are neither vague, oblique, or elliptical—in fact, if anything, they are clearer than the legal authority just cited.

---

[125] *See, e.g.*, PDMI, FTC-2023-0033-0864.
[126] 15 U.S.C. 57a(a)(1)(B).
[127] *West Virginia v. EPA*, 597 U.S. at 723 (cleaned up).

## B. Discussion of Specific Rule Provisions, Section-by-Section Analysis

Below, for each provision of the proposed Rule, the Commission reviews the provision, summarizes comments received in response, and sets forth the final Rule with an analysis of the comments and other record evidence.

### 1. Proposed § 425.1 Scope

The Commission proposed eliminating the old Rule's prescriptive requirements applicable to prenotification plans and replacing them with flexible, but enforceable, standards. The proposed requirements would apply to all forms of negative option marketing, including prenotification and continuity plans, automatic renewals, and free trial offers. [128] The expanded coverage would establish a common set of requirements applicable to all types of negative option marketing. The proposed Rule would cover offers made in all media, including Internet, telephone, in-person, and printed material, and would apply to all "negative option sellers." With certain exceptions, not applicable here, the FTC Act provides the agency with jurisdiction over nearly every economic sector. [129]

---

[128] The proposed Rule stated it applied to any form of negative option plan. Because "negative option plan" was a defined term in the old Rule specifically referring to prenotification plans, the Commission modifies the scope to apply to any form of "negative option program."

[129] Certain entities or activities are wholly or partially exempt from FTC jurisdiction under the FTC Act, including most depository institutions, charities, transportation and communications common carriers, and the business of insurance. Under Sections 4 and 5 of the FTC Act, however, the Commission's jurisdiction extends to companies organized to carry on business for their own profit or that of their members, even if those companies are organized under state law as a not-for-profit entity. *See California Dental Ass'n v. FTC*, 526 U.S. 756 (1999). *But see* n.151.

### a) Negative Option Seller

#### (1) Comments

The scope of the proposed Rule covered "negative option seller," defined to mean "the person selling, offering, promoting, charging for, or otherwise marketing goods or services with a negative option feature." Several commenters raised concerns regarding the scope of this definition.

The Chamber, for example, suggested the Commission delete the term "promoting" from the definition.[130] It cited a wide variety of actors who could be swept in by the term, including "advertising companies, web designers, [and] entities in the supply chain," who "may not actually play an active role in determining" what consumers see and hear about negative option programs.[131] An individual business commenter also criticized the term, saying to include "promoting" "would potentially burden our technicians and our business when we provide service for equipment manufacturers that have their own service contract programs."[132]

ETA, representing the payments industry, addressed the words "charging for" in the definition.[133] ETA interpreted those words not to cover "intermediaries, such as payment processors, that merely effect the transfer of funds from the consumer buyer to the merchant seller resulting from a negative option feature."[134] ETA noted that payment intermediaries typically "do not control the terms of the negative option feature and do not control the interface

---

[130] Chamber, FTC-2023-0033-0885.
[131] *Id.*
[132] Individual commenter, FTC-2023-0033-1136.
[133] Electronic Transactions Association ("ETA"), FTC-2023-0033-1004.
[134] *Id.*

with the consumer buyer."[135] ETA therefore suggested the final Rule "include an express exemption for payment processors and other intermediaries."[136]

Other commenters, while not specifically criticizing the definition of negative option seller, raised concerns about the scope of the proposed Rule where third parties are involved in marketing and cancellation. For example, several suggested the Rule exempt a seller who contracts with a third party for subscription enrollment, management, or cancellation services.[137] PDMI argued, "it is imperative that the Proposed Rule exempt sellers from compliance with those provisions that are not under their direct control … [and] should also exempt the seller from any misrepresentations made by a third-party platform."[138] NRF expressed concern a

---

[135] *Id.*

[136] *Id.* IHRSA noted health and fitness membership charges are typically processed on a monthly basis from the time of agreement, and in many cases by a third-party service provider. IHRSA, FTC-2023-0033-0863.

[137] NCTA asserted, "The proposed rule also fails to account for third-party sign-up arrangements. For example, programmers have arrangements with Roku, Amazon, Apple, and others that allow consumers to sign up through these third parties for their streaming services." NCTA, FTC-2023-0033-0858. N/MA suggested the Commission "should make clear that when a sale with a negative option feature is made through a third party that controls the process of purchasing and/or cancelling a subscription with a negative option feature, any new requirements would apply to the third party only, and not to the company that fulfills the subscription." N/MA, FTC-2023-0033-0873. Marketplace Industry Association ("MIA") requested "the Commission clarify that where there are third-party payment platforms managing Subscriptions on behalf of businesses … (collectively, "Third Party Subscription Managers"), that such Third Party Subscription Managers be legally responsible and legally liable for compliance with the proposed Rule. As is the case with Third Party Subscription Managers, businesses that offer Subscriptions have zero control over such Subscriptions, including the initiation of Subscriptions or the cancellation of Subscriptions. Said another way, it is impossible for businesses to comply with the proposed Rule where there are Third Party Subscription Managers. As such, the Association requests that the Commission make clear that Third Party Subscription Managers be responsible for compliance with the proposed Rule, including any penalties for noncompliance." MIA, FTC-2023-0033-1008.

[138] PDMI, FTC-2023-003-0864.

careful retailer could still "face steep financial penalties for negligent misrepresentations (concerning, *e.g.*, product efficacy) based on information provided by third-party vendors."[139]

### (2)  Analysis

Based on the record, the Commission revises the definition of "negative option seller" to remove the word "promoting," but declines to create status-based exemptions.[140] Moreover, the Commission clarifies it will enforce the final Rule in accordance with established Section 5 principles regarding parties' responsibilities for, and involvement in, relevant activity. This approach should fully address commenters' concerns while maintaining the Rule's consumer protections.

As several commenters observed, a wide variety of actors may have secondary or tertiary roles in promoting products or services with a negative option feature. Further, as the Chamber noted, "many of those participants . . . may not actually play an active role in determining how the negative option is presented to the consumer."[141] Similarly, participants in the promotion process may have no role in cancellation. Deleting the word "promoting" from the definition of negative option seller addresses this issue by ensuring those who have no active participation in the negative option feature are outside the Rule's coverage. However, this amendment does not mean all actors involved in promotion are exempt from the Rule. A participant who promotes and takes on a further role "selling, offering, charging for, or otherwise marketing goods or services with a negative option feature" remains subject to the final Rule, including the

---

[139] NRF, FTC-2023-0033-1005.
[140] *See also* Section VII.B.1; Section VIII.A.1.
[141] Chamber, FTC-2023-0033-0885.

provisions covering "promoting" such goods or services for those who meet the negative option seller definition. [142]

The Commission declines to adopt a status-based exemption for payment intermediaries. Such exemptions are overbroad, excluding actors engaged in the practices condemned by the Rule. For example, a payment processor selling its own services on a negative option basis, as opposed to just providing payment services for another negative option seller, is no different than any other business covered by the Rule. Additionally, as ETA correctly noted, the words "charging for" as used in the Rule do not cover intermediaries merely effecting the transfer of funds from the consumer buyer to the merchant seller. This is consistent with the Commission's interpretation of ROSCA's coverage of persons who "charge or attempt to charge any consumer." [143] Based on longstanding Section 5 principles, the Commission has not enforced ROSCA against payment intermediaries solely for their conduct in effecting funds transfers. [144] The Commission will apply the same principles to the Rule. [145]

Similarly, the Commission will not grant blanket exemptions to sellers who contract with third parties while offering subscription services. The Commission expects negative option sellers to evaluate their commercial relationships with the Rule's provisions in mind. Even where

---

[142] *See, e.g.*, *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 172 (2d Cir. 2016) (operator of affiliate marketing network liable where it did not create ads but "directly participat[ed] in the deceptive scheme by recruiting, managing, and paying a network of affiliates to generate consumer traffic through the use of deceptive advertising and allowing the use of deceptive advertising where it had the authority to control the affiliates participating in its network.").
[143] 15 U.S.C. 8403.
[144] *See FTC v. Apex Capital Grp., LLC*, No. 2:18-cv-09573 (C.D. Cal. 2018). In this ROSCA matter, the Commission amended its complaint to add payment intermediary defendants for their unlawful conduct in connection with the scheme. However, the Commission did not assert ROSCA claims against the payment intermediary defendants, instead asserting counts for credit card laundering and manipulation of chargeback levels as Section 5 violations.
[145] *Id.*; *see FTC v. First Am. Payment Sys.*, No. 4:22-cv-00654 (E.D. Tex. 2022) (ROSCA case against payment processor for its unlawful acts and practices against its merchant customers).

a seller does not directly manage its negative option feature disclosures, consent, or cancellation, it can satisfy its obligations under the Rule by choosing to contract with third parties who act in accordance with the Rule and monitoring those parties' performance. An exemption for all sellers who contract with third parties to manage aspects of their negative option programs would effectively nullify the Rule by incentivizing less than legitimate sellers to contract with actors engaged in deceptive practices to maximize negative option enrollments and frustrate cancellation with impunity. A seller cannot evade its responsibility to deal honestly with consumers by contracting with a third party who does not.[146]

### b) Insurance

### (1) Comments

Several commenters asked the Commission to expressly exclude insurance and state-regulated service contracts from the Rule.[147] They argued Congress prohibited the FTC from regulating the "business of insurance" in Section 2 of the McCarran-Ferguson Act and the FTC exempted insurance sales in its Cooling-Off Rule.[148] They also asserted, "[s]tate regulations in every jurisdiction require an insurer to give notice of a policy renewal," and state rules prohibit negative options.[149] Other commenters argued the Commission should exempt all service

---

[146] *E.g.*, *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 170 (2d Cir. 2016) ("A defendant may be held liable for its own acts of deception under the FTC Act, whether by directly participating in deception or by allowing deceptive acts or practices to occur that are within its control."); *see also FTC v. Inc21.com Corp.*, 688 F. Supp. 2d 927, 939 (N.D. Cal. 2010) ("Even if Inc21 did not approve of the fraud (and it seems likely that it *did* approve), the fact remains that Inc21 is responsible for organizing this engine of fraud and reaping its profits. As such, Inc21 may *certainly* be held accountable[.]") (emphasis in original).
[147] Asurion, FTC-2023-0033-0878; Florida Service Agreement Association, FTC-2023-0033-0882; American Property Casualty Insurance Association ("APCIA"), FTC-2023-0033-0996; National Association of Mutual Insurance Companies ("NAMIC"), FTC-2023-0033-1143.
[148] *See* 15 U.S.C. 1012; 16 CFR 429(a)(6).
[149] NAMIC, FTC-2023-0033-1143.

contract providers from the Rule due to existing state laws and regulations,[150] regardless of whether they are engaged in the "business of insurance" within the meaning of the McCarran-Ferguson Act.

**(2)     Analysis**

The Commission declines to exempt insurance or service contracts from the Rule. The final Rule can be enforced by the Commission only against covered persons and activities within the Commission's jurisdiction.[151] Restating or further specifying each jurisdictional limit in the final Rule's text, therefore, is not necessary.

Additionally, the requested industry-wide exemption is considerably broader than the FTC's jurisdictional limitations. The McCarran-Ferguson Act does not exempt entities engaged in the business of insurance from the Commission's jurisdiction unless such entities are subject to state regulation.[152] Moreover, activities of entities within the insurance industry that are beyond the scope of the "business of insurance" are subject to the Commission's jurisdiction.[153]

---

[150] SCIC, FTC-2023-0033-0879 (noting SCIC's comment to the ANPR stated most states have substantial regulatory frameworks for service contracts and that industry operates nationwide consistent with the intent of the proposed Rule); CTIA, FTC-2023-0033-0866 (noting service contracts are typically regulated by state departments of insurance and most states with autorenewal laws, including California, New York, and Oregon, provide an exemption for entities regulated by the state department of insurance); Frontdoor, Inc. ("Frontdoor"), FTC-2023-0033-0862 (noting majority of states have rigorous laws for the offering, sale, and renewal of home service contracts, including the use of automatic renewals and applicable cancellation rights).

[151] Nothing in this Rule, however, shall limit another agency's ability to enforce this Rule within its own statutory authority, even if that authority is different than the FTC's authority. *See, e.g.*, 12 U.S.C. 5581(b)(5)(B)(ii).

[152] *FTC v. IAB Mktg. Assocs. LP*, 746 F.3d 1228, 1235 (11th Cir. 2014) ("[T]he FTC Act applies to the business of insurance only to the extent that such business is not regulated by state law.").

[153] The Supreme Court has explained that, under the McCarran-Ferguson Act, a three-part factual inquiry is necessary to evaluate whether any particular activity constitutes the business of insurance. *See Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129 (1982). First, does the activity have the effect of transferring or spreading a policyholder's risk; second, is the activity

No commenter provided any compelling reason to exempt these otherwise covered activities from the Rule.

Finally, commenters' citations to existing state laws and regulations governing service contract sellers indicate these sellers already provide disclosures and protections consistent with the Rule. As a practical matter, sellers who already provide consumers the Rule's protections should not be burdened by its application. [154]

c) **Business-to-Business**

**(1)    Comments**

Nine commenters noted the NPRM did not expressly address whether the proposed Rule would apply to business-to-business ("B2B") transactions. Seven, including five industry associations, [155] said it should not apply. [156] Two individuals disagreed. [157]

Commenters advocating against including B2B sales in the Rule asserted the Commission should presume businesses are more sophisticated than individual consumers, [158]

---

an integral part of the policy relationship between the insurer and the insured; and third, is the practice limited to entities within the insurance industry. *Id.* This inquiry requires a factual analysis of the activities in question.

[154] Moreover, service contract sellers, like other interested persons, may seek full or partial exemption from the final Rule. *See* Section VIII.A.1 (discussing new § 425.8, Exemptions provision).

[155] BSA, FTC-2023-0033-1015 (B2B software sellers); CTIA, FTC-2023-0033-0866 (wireless communication industry); ETA, FTC-2023-0033-1004 (payments industry); NCTA, FTC-2023-0033-0858 (Internet and television); USTelecom, FTC-2023-0033-0876 (broadband). A sixth association, the U.S. Chamber of Commerce, asked the Commission to ensure that the scope of its cost-benefit analysis includes business-to-business transactions. FTC-2023-0033-0885.

[156] Anonymous commenter, FTC-2023-0033-1007; BSA, FTC-2023-0033-1015; CTIA, FTC-2023-0033-0866; ETA, FTC-2023-0033-1004; NCTA, FTC-2023-0033-0858; USTelecom, FTC-2023-0033-0876; ZoomInfo, FTC-2023-0033-0865.

[157] Individual commenter, FTC-2023-0033-0755; Individual commenter, FTC-2023-0033-0042.

[158] Anonymous commenter, FTC-2023-0033-1007; CTIA, FTC-2023-0033-0866; NCTA, FTC-2023-0033-0858; ZoomInfo, FTC-2023-0033-0865.

and contended B2B contracts typically are individually negotiated.[159] For example, ZoomInfo maintained business consumers are generally "more sophisticated than individual consumers," explaining B2B contracts "are assumed to result from arm's-length negotiation and often benefit from professional legal counsel."[160] Similarly, NCTA, an organization representing the Internet and television industry, characterized business consumers as "typically sophisticated," and said the Commission should not intervene in transactions based on "[n]on-form contracts that are the subject of extensive bargaining between sophisticated companies."[161]

Seller and consumer commenters differed on whether the harmful negative option practices discussed in the NPRM are extant for B2B consumers. In support of excluding B2B transactions, two commenters asserted there is insufficient evidence of harm in the B2B context to support a prevalence finding.[162] A B2B consumer, however, noted individuals and small businesses both suffer from the harms of deceptive and unfair negative option practices. "As a small business owner," the individual wrote, "as well as a consumer, I am especially aware of how purposely difficult many companies make it to cancel their services. From telephone companies to travel channel companies … to email targeting campaigns … the cancelling process is ridiculously complex and at times hidden, if it exists at all on their websites."[163]

Seller and consumer commenters also differed on the significance of existing state law B2B exclusions. Three B2B sellers recommended the Commission follow those states that

---

[159] CTIA, FTC-2023-0033-0866; NCTA, FTC-2023-0033-0858; USTelecom, FTC-2023-0033-0876; ZoomInfo, FTC-2023-0033-0865.
[160] ZoomInfo, FTC-2023-0033-0865.
[161] NCTA, FTC-2023-0033-0858. NCTA requested any final rule exclude individually negotiated business-to-business contracts. FTC-2023-0033-0858.
[162] BSA, FTC-2023-0033-1015; NCTA, FTC-2023-0033-0858. The Commission discusses the subject of prevalence more broadly at Section VII.A.
[163] Individual commenter, FTC-2023-0033-0755.

exclude B2B transactions.[164] A consumer, however, asserted such exclusions are why this Rule is necessary.[165] Specifically, the commenter explained: "negative option marketing also greatly affect[s] many individual sellers and small businesses," but due to B2B exclusions, "some larger corporations or companies are able to take advantage of that loophole and use predatory negative option practices against individual sellers and small businesses."[166]

Some sellers also referred to other federal regulations to support excluding businesses from the scope of the Rule. For instance, ETA and NCTA each noted the Commission excluded most B2B transactions in the TSR. ETA made the same observation about the Cooling Off Rule.[167] Both CTIA and USTelecom approvingly cited the FCC's approach. USTelecom explained, "the FCC has limited certain consumer protection rules to 'mass-market retail services'" that are "'marketed and sold on a standardized basis to residential customers, small businesses, and other end-user customers such as schools and libraries.'"[168] USTelecom further explained, "Mass-market retail services stand in contrast to 'customized or individually negotiated arrangements' that are typically offered to larger organizations."[169]

ETA questioned whether the Commission has authority to address B2B transactions. ETA argued the proposed Rule would let the Commission "interpose regulatory influence and law enforcement authority in contractual arrangements between businesses in a way that has not been authorized by Congress or justified by the Commission's own rationale for the Proposed

---

[164] Anonymous commenter, FTC-2023-0033-1007 (California); BSA, FTC-2023-0033-1015 (California, Colorado, Delaware); ZoomInfo, FTC-2023-0033-0865 (California, Colorado, Connecticut, Delaware, Hawaii, New York, Oregon, Tennessee, Virginia).
[165] Individual commenter, FTC-2023-0033-0042.
[166] *Id.*
[167] 16 CFR 429.0-429.3.
[168] USTelecom, FTC-2023-0033-0876.
[169] *Id.*

Rule."[170] ETA cited the Commission's use of ROSCA in the *First American Payment Systems* case to illustrate its view the Rule's application in the B2B context would be impermissible regulation of "an automatic renewal clause in an arm's length commercial agreement."[171]

Finally, ETA and ZoomInfo argued various provisions of the Rule, such as the disclosure and notice requirements, could present unusual implementation problems in B2B transactions. For instance, ETA asserted disclosure requirements could result in operational uncertainty because the Commission did not consider all the typical terms included in B2B agreements. Similarly, ZoomInfo explained "B2B agreements are often complex, involving multiple decision-makers and points of contact, who might rotate or leave their roles over the course of a contract."[172]

### (2) Analysis

The final Rule, like the proposed Rule, covers B2B transactions. It has been the Commission's longstanding view that Section 5 of the FTC Act[173] protects business consumers as well as individual consumers. Moreover, commenters' arguments that, under Section 5, all business consumers must be held to a heightened standard of sophistication are inconsistent with settled law.

The Commission has long enforced the FTC Act against those who deceive and act unfairly to businesses and other organizations.[174] As the Supreme Court explained in *FTC v. Standard Educ. Soc.*, 302 U.S. 112, 116 (1937), "Laws are made to protect the trusting as well as

---

[170] ETA, FTC-2023-0033-1004.

[171] *Id.* (citing *FTC v. First Am. Payment Sys.*, No. 4:22-cv-00654 (E.D. Tex. 2022)).

[172] ZoomInfo, FTC-2023-0033-0865. ETA also raised a concern about the definition of negative option seller, addressed in Section VII.B.1.a.

[173] 15 U.S.C. 45(a).

[174] *See, e.g.*, *Indep. Directory Corp. v. FTC*, 188 F.2d 468 (2d Cir. 1951) (deceptive practices in selling directory ads to businesses).

the suspicious." This principle applies no less to the business consumer than to the individual.[175]

The Commission maintains a decades-long list of business protection cases on its website and dedicates significant effort to educate and protect small businesses.[176] Indeed, the Commission has made protecting small businesses a priority.[177]

Moreover, the TSR never exempted B2B transactions entirely. Importantly, the Commission recently amended the TSR to cover a broader scope of B2B activity. Specifically, in 2024, the Commission expanded the TSR to prohibit material misrepresentations and false or misleading statements in B2B calls due to the ongoing harm to small businesses from such practices.[178]

Additionally, recent Commission actions to protect small businesses underscore the fact deceptive practices pertaining to negative option features occur in B2B transactions just as they do with individual consumers. None of these cases present the arms-length negotiation of contracts by sophisticated parties that commenters claim to be universal. For example, in its 2022

---

[175] *Indep. Directory Corp.*, 188 F.2d at 470 (applying *Standard Educ. Soc.*); *see also, e.g., FTC v. LoanPointe, LLC*, 525 F. App'x 696, 701 (10th Cir. 2017) (FTC need only prove "the likelihood that a consumer (here, *employers*)" would be deceived (emphasis added)); *FTC v. Crittenden*, 19 F.3d 26 (9th Cir. 1994) (Table) (noting stipulated judgment with B2B office supplier); *FTC v. Inc21.com Corp.*, 688 F. Supp. 2d 927 (N.D. Cal. 2010) (preliminary injunction against deceptive and unfair B2B billing scheme); *FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 934 (N.D. Ill. 2008) (FTC Act applies to B2B sales).

[176] *See* Fed. Trade Comm'n, "Protecting Small Businesses: Cases," https://www.ftc.gov/node/1211663 (last visited {}); Fed. Trade Comm'n, "Protecting Small Businesses," https://www.ftc.gov/tips-advice/business-center/small-businesses (last visited {}); Fed. Trade Comm'n, "Scams and Your Small Business: A Guide For Business," https://www.ftc.gov/tips-advice/business-center/guidance/scams-your-small-business-guide-business (last visited {}).

[177] *See* Press Release, Fed. Trade Comm'n, "FTC, BBB, and Law Enforcement Partners Announce Results of Operation Main Street: Stopping Small Business Scams Law Enforcement and Education Initiative" (June 18, 2018), https://www.ftc.gov/news-events/press-releases/2018/06/ftc-bbb-law-enforcement-partners-announce-results-operation-main (last visited {}).

[178] TSR, 89 FR 26760 (April 16, 2024).

action against *First American Payment Systems*,[179] the Commission alleged the defendants violated Section 5 and ROSCA by making false claims about fees and cost savings to persuade merchants in small- and medium-sized businesses, many of whom had limited English proficiency, to enter into payment processing agreements.[180] Once enrolled, the defendants allegedly withdrew funds from merchants' accounts without consent, and made it difficult and expensive to cancel the service. Under a stipulated court order, the defendants must (among other things) make it easier for merchants to cancel their services.

In the Commission's 2022 *Dun & Bradstreet*[181] matter, the complaint alleged multiple deceptive practices pertaining to products the defendant marketed to small- and medium-sized businesses, in violation of Section 5. The resulting consent order includes substantial provisions pertaining to negative option features.

The Commission's 2022 action against *Vonage*[182] also illustrates this point. The complaint detailed the defendants' deceptive and unfair practices targeting both business and residential customers and alleged those practices violated Section 5 and ROSCA.[183] The stipulated court order includes multiple provisions relating to consent, cancellation, and disclosures pertaining to both individual and business consumers.

Nonetheless, two arguments for excluding B2B transactions warrant additional discussion. <u>First</u>, several commenters elide the distinction between B2B agreements generally

---

[179] *FTC v. First Am. Payment Sys.*, No. 4:22-cv-00654 (E.D. Tex. 2022).
[180] In describing the basis for the misrepresentations provision of the proposed Rule, the NPRM cited (among other cases) *First Am. Payment Sys*. NPRM, 88 FR 24726 n.65. *See also* ETA, FTC-2023-0033-1004.
[181] *In re Dun & Bradstreet, Inc.*, FTC Docket No. C-4761 (2022).
[182] *FTC v. Vonage Holdings Corp.*, No. 3:22-cv-06435 (D.N.J. 2022).
[183] The *Adobe* matter provides another recent example of a matter alleging unlawful negative option practices targeting both individual and business consumers. *United States v. Adobe, Inc.*, No. 5:24-cv-03630 (N.D. Cal. 2024).

and individually negotiated B2B agreements. It is neither the purpose nor the effect of the final Rule to prevent businesses from entering into agreements with individually negotiated negative option terms. By requiring the cancellation mechanism to be "at least as easy to use" as the consent mechanism, the final Rule incorporates a symmetrical standard that accounts for individually negotiated B2B agreements. A B2B consumer who consents to a negative option feature through an individually negotiated term of an agreement can also individually negotiate the cancellation mechanism. Moreover, as the Commission noted above, it will enforce this Rule in the same manner in which it enforces Section 5 of the FTC Act. [184] The Commission has not used its consumer protection authority in the type of large individually negotiated B2B transactions commenters are worried about. [185] Unsurprisingly, no commenter cited any historical instance to the contrary. Thus, the Rule preserves the ability of sophisticated business consumers to individually negotiate B2B agreement terms. [186]

Second, it appears several commenters mistakenly thought the required simple cancellation mechanism would necessarily terminate **all** aspects of any broader contract or agreement. In fact, this provision only pertains to cancellation of the negative option feature. Complex commercial agreements, such as those described by ETA, will have numerous provisions unrelated to negative option features. Nothing in this Rule prohibits these provisions from being subject to separate cancellation and termination terms.

---

[184] *See* Section VII.B.1.a.

[185] *See* 16 CFR 2.3.

[186] The *Vonage* order expressly exempts negative option feature provisions in B2B contracts where the defendants "possess evidence that consumers negotiated significant terms of the negative option feature that are only negotiable with business consumers." *FTC v. Vonage Holdings Corp.*, No. 3:22-cv-06435 (D.N.J. 2022). The final Rule is less prescriptive and more flexible than that order, thereby promoting more flexibility in the marketplace.

## 2. Proposed § 425.2 Definitions

In the NPRM, the proposed Rule set forth several definitions. For example, the proposed Rule defined "negative option feature" as a contract provision under which the consumer's silence or failure to take affirmative action to reject a good or service or to cancel an agreement is interpreted by the negative option seller as acceptance or continuing acceptance of an offer. This definition is consistent with the TSR and ROSCA (which references the TSR's definition). The proposed term includes, but is not limited to, automatic renewals, continuity plans, free-to-pay conversion or fee-to-pay conversions, and pre-notification negative option plans.[187]

Additionally, the proposed Rule defined "clear and conspicuous," "negative option seller," and "save." To define "clear and conspicuous," the FTC imported its definition developed through years of enforcement experience. As explained in the NPRM, the proposed definition substantially overlaps with the concepts provided in California and District of Columbia negative option laws,[188] with one exception. Specifically, the District of Columbia definition requires disclosures to be visually proximate to any request for consumer consent. The final Rule incorporates this requirement in a separate consent section.

### a) Summary of Comments

The Commission did not receive any comments specifically supporting any proposed definition, though several commenters generally supported the concepts incorporated in the definitions, such as "clear and conspicuous disclosures." Several commenters critiqued the Commission's omission of certain definitions, such as "material" in connection with § 425.3 and

---

[187] Section II of this Notice contains descriptions of these various plans.
[188] Cal. Bus. & Prof. Code section 17601 and DC Code section 28A-202.

§ 425.4,[189] "simple cancellation mechanism,"[190] "practical," and "normal business hours,"[191] because these terms are used throughout the Rule. Other commenters asked the Commission to add a definition for "consumer" that excludes businesses,[192] while another asked the Commission to include small businesses in that definition.[193] Similarly, other commenters asked the Commission to "exempt" certain industries from, or otherwise alter the scope of, the definition of "negative option seller."[194]

Several commenters critiqued the proposed definitions. For example, ESA stated "the definition of 'save'[195] is overly broad and would prohibit the presentation of useful, consumer-friendly details about a consumer's subscription before they cancel it."[196] Other commenters

[189] *See, e.g.*, BSA, FTC-2023-0033-1015 (material is not defined); Chamber, FTC-2023-0033-0885 (same).

[190] Center for Data Innovation ("CDI"), FTC-2023-0033-0887; *see also* Act App Association, FTC-2023-0033-0874; NRF, FTC-2023-0033-1005 (failed to defined "as simple as").

[191] International Carwash Association, FTC-2023-0033-1142.

[192] *See, e.g.*, Anonymous commenter, FTC-2023-0033-1007; Zoominfo, FTC-2023-0033-0865; CTIA, FTC-2023-0033-0866; BSA, FTC-2023-0033-1015.

[193] Individual commenter, FTC-2023-0033-0042.

[194] *See, e.g.*, Asurion, FTC-2023-0033-0878 (exempt service contracts); Chamber, FTC-2023-0033-0885 (exclude promoting); ETA, FTC-2023-0033-1004 (exclude "charging for"). These requests are more appropriately addressed in the scope and requested exemptions, and the Commission does not consider them here.

[195] Save was defined in the proposed Rule as an attempt by a seller to present any additional offers, modifications to the existing agreement, reasons to retain the existing offer, or similar information when a consumer attempts to cancel a negative option feature.

[196] ESA, FTC-2023-0033-0867. PDMI argued similarly as to the definition of save. FTC-2023-0033-0864 (arguing sellers should be able to be able to immediately discuss pause, skip or modification options without having to ask for permission, particularly because it is impossible to know which customers prefer to cancel as opposed to merely modify their current plan). *Accord* USTelecom, FTC-2023-0033-0876 (definition of Save overly broad); RILA, FTC-2023-0033-0883 (modify definition of save to allow short clarification and confirmation of intent follow-up communications); Chamber, FTC-2023-0033-0885; CDI, FTC-2023-0033-0887 ("Commission should exclude information about permanent, irreparable harms that may result from cancellation, and is relevant to the current subscription or product plan."); CCIA, FTC-2023-0033-0984; IAB, FTC-2023-0033-1000 (definition of save overly broad and "would prohibit the presentation of useful, consumer-friendly details about a consumer's subscription before they cancel it.").

questioned why the "clear and conspicuous" definitions says a disclosure is not clear and conspicuous, if a consumer must click on a hyperlink to see it.[197]

Additionally, several commenters requested the Commission revise certain of its proposed definitions for clarity. For instance, the National Federation of Independent Businesses ("NFIB") asked the Commission to revise the definitions for "clear and conspicuous" and "negative option feature" to "make their meanings clearer"[198] by, for example, using simpler words in the clear and conspicuous definition ("words and grammar" versus "diction and syntax") or by providing detailed examples of each type of program covered in the definition of negative option feature. NFIB further explained "Those regulated by and served by subsection 425.2(d) most likely would understand the meaning of an automatic renewal, but perhaps not the meaning of the other examples."[199]

### b) Analysis

Based on the record, the Commission makes several changes to the proposed definitions. First, as explained in Sections VII.B.1.3 (material) and VII.B.6.c.2.b.ii (interactive electronic

---

[197] *See, e.g.*, NCTA, FTC-2023-0033-0858 (definition does not take into account small screens); Chamber, FTC-2023-0033-0885 ("The requirements that disclosure on the internet or mobile applications be 'unavoidable' and 'immediately adjacent' rase practical concerns."); CCIA, FTC-2023-0033-0984 (definition should "hew closely to the Commission's guidance in its *.com Disclosures* policy to ensure regulatory consistency.").

[198] NFIB, FTC-2023-0033-0789. *Accord* Kuehn, FTC-2023-0033-0871 (proposed revised definition of negative option feature); Chamber, FTC-2023-0033-0885 (requests the definition of negative option feature to be revised to exclude monthly subscription services). See Section VII.B.4 for further discussion of proposed modifications. *See also* ETA, FTC-2023-0033-1004 (clarify and narrow "automatic renewal in the definition).

[199] NFIB, FTC-2023-0033-0789 (requesting specific examples of each type of program be included in the definition of negative option feature); *see also* IHRSA, FTC-2023-0033-0863 (observes the Commission does not define what "automatic renewal, continuity plan" and other examples of negative option features mean).

medium), it adds definitions of material and interactive electronic medium for clarity. Further, as discussed in Section VII.B.4, the Commission modifies the definition of clear and conspicuous.

Second, the Commission removes the definition of save. As discussed in Section VII.B.6.c the proposed saves provision did not achieve the right balance between protecting consumers from unfair tactics and allowing sellers to provide necessary and valuable information about cancellation. Therefore, the Commission declines to include the NPRM's proposed limitation on saves, and instead will consider issuing an SNPRM in the future for further comment. Accordingly, without the saves provision, the Commission determines there is no need for a defined term at this time.

Although several commenters critiqued the lack of definitions for such terms as "simple cancellation mechanism," "practical," or "normal business hours," the Commission addresses these concerns with further clarification, rather than with formal definitions, in the Section-by-Section analysis below. As to commenter requests for a definition of "consumer" expressly excluding (or including) business-to-business transactions, the Commission similarly addresses these requests in the sections regarding scope and requested exemptions, above.

Finally, NFIB asked the Commission to add specific examples of each type of negative option program to the text of the Rule, stating those served by the Rule would likely not understand these "terms of art."[200] The Commission discusses examples of each type of negative option program in more detail as part of the SBP at Section II. Further, the Commission typically engages in robust consumer and business education campaigns when promulgating and issuing

---

[200] NFIB, FTC-2023-0033-0789.

final rules and will do so here. The Commission therefore disagrees the Rule must incorporate these examples into the text.[201]

### 3. Proposed § 425.3 Misrepresentations

Section 425.3 of the proposed Rule prohibited sellers from misrepresenting "any material fact related to the transaction, such as the negative option feature, or any material fact related to the underlying good or service."[202] As explained in the NPRM, "misrepresentations in negative option marketing cases often involve deceptive representations not only related to the negative option feature but to the underlying product (or service) or other aspects of the transaction as well."[203] These include "misrepresentations related to costs, product efficacy, free trial claims, processing or shipping fees, billing information use, deadlines, consumer authorization, refunds, [and] cancellation."[204]

The FTC Act provides the legal basis for the Commission to prevent and remedy misrepresentations in the negative option context. Specifically, Section 5(a)(1) of the FTC Act declares unfair or deceptive acts or practices in or affecting commerce to be unlawful. Negative option sellers making material misrepresentations are engaged in deceptive practices. Addressing these practices through the Rule prevents deception by giving the Commission the ability to seek

---

[201] Further, as explained in n.306, the Commission also declines to revise the definition of "clear and conspicuous" to replace the words "diction and syntax" with "words and grammar."
[202] NPRM, 88 FR 24734.
[203] NPRM, 88 FR 24726.
[204] *Id.* (citing *e.g.*, *FTC v. Tarr*, No. 3:17-cv-02024 (S.D. Cal. 2017); *FTC v. First Am. Payment Sys.*, No. 4:22-cv-00654 (E.D. Tex. 2022); *FTC v. XXL Impressions, LLC*, No. 1:17-cv-00067 (D. Me. 2017); *United States v. MyLife.com, Inc.*, No. 2:20-cv-6692 (C.D. Cal. 2020); *FTC v. Health Rsch. Labs., LLC*, No. 2:17-cv-00467 (D. Me. 2017); *FTC v. Leanspa, LLC*, No. 3:11-cv-01715 (D. Conn. 2011); *FTC v. WealthPress, Inc.*, No. 3:23-cv-00046 (M.D. Fla. 2023); *FTC v. BunZai Media Grp., Inc.*, No. 2:15-cv-04527 (C.D. Cal. 2015); *FTC v. Willms*, No. 2:11-cv-00828 (W.D. Wash. 2011); *FTC v. Universal Premium Servs.*, No. 2:06-cv-00849 (C.D. Cal. 2006); *FTC v. Remote Response Corp.*, No. 1:06-cv-20168 (S.D. Fla. 2006); and *FTC v. Johnson*, No. 2:10-cv-02203 (D. Nev. 2016).

civil penalties (where appropriate under 5(m)(1)(a)), where they are not already provided, thus deterring misrepresentations, protecting consumers, and leveling the playing field for "honest sellers who must compete with those who engage in deception."[205]

### a)    Summary of Comments

The State AGs strongly supported this provision, stating, for example, it would "combat[] seller misrepresentations, by providing the FTC with authority to seek civil penalties and consumer redress for material misrepresentations in all types of media."[206] Echoing the NPRM, they explained, "[l]ike the FTC, we have found that negative option marketing cases 'often involve deceptive representations not only related to the negative option feature but to the underlying product (or service) or other aspects of the transaction as well.'"[207]

Law Professors further supported prohibiting "material misrepresentations … whether or not the false claim is exclusively about the negative option feature."[208] They, too, offered evidence of the prevalence of misconduct, stating "entities like the Better Business Bureau have long reported, based on FTC and other data, the prevalence of misrepresentation in certain negative option arrangements, and non-FTC enforcement efforts confirm the problem."[209] Citing

---

[205] NPRM, 88 FR 24726.

[206] State AGs, FTC-2023-0033-0886.

[207] *Id.*

[208] Law Professors, FTC-2023-0033-0861.

[209] *Id.*, citing Better Business Bureau, "BBB Investigation Update: Free Trial Offer Scams" (Apr. 2020), https://www.bbb.org/article/news-releases/22040-bbb-update-free-trial-offerscams; C. Steven Baker & Better Business Bureau, "Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements" (Dec. 2018), https://www.bbb.org/article/investigations/18929-subscription-traps-and-deceptive-free-trialsscam-millions-with-misleading-ads-and-fake-celebrity-endorsements. The Law professors further pointed to evidence found by searching BBB's ScamTracker for terms like "subscription." *See, e.g.*, Better Business Bureau, ScamTracker, ID #720953, https://www.bbb.org/scamtracker/lookupscam/720953. They additionally cited Consumer Financial Protection Bureau, "CFPB Charges TransUnion and Senior Executive John Danaher

multiple sources, they argued the "Commission thus has more than ample 'reason to believe that' co-occurring negative option violations and other misrepresentations 'are prevalent.'"[210]

These commenters further argued the Commission should not adopt a narrower provision limited strictly to the elements of a negative option feature because, in their view, it would be difficult "to fully separate misrepresentations regarding the negative option feature from all other material misrepresentations."[211]

Several commenters, largely trade groups and sellers, criticized the proposed provision. As discussed in Section V.A, several questioned the prevalence of misrepresentations[212] and asserted the provision was not within the scope of the ANPR.[213] Additionally, several commenters argued the provision is overbroad, and suggested it is unnecessary in light of existing law. Finally, they proposed ways to narrow the proposed provision.

Several commenters objected to the scope of the proposed provision. Citing Commissioner Wilson's dissent to the NPRM, TechNet noted the proposed Rule "would capture alleged misrepresentations regarding the underlying product or service 'wholly unrelated' to the

---

with Violating Law Enforcement Order" (Apr. 2022), https://www.consumerfinance.gov/about-us/newsroom/cfpb-charges-transunion-and-seniorexecutive-john-danaher-with-violating-law-enforcement-order/; David Pierson, "Santa Monica fitness brand Beachbody is fined $3.6 million over automatic renewals," L.A. Times (Aug. 29, 2017), https://www.latimes.com/business/la-fi-beachbody-20170829-story.html; Bruce A. Craig, Negative-Option Billing - Understanding the Stealth Scams of the '90s, 7 Loy. Consumer L. Rev. 5 (1994).

[210] Law Professors, FTC-2023-0033-0861.

[211] Law Professors, FTC-2023-0033-0861.

[212] CTA, FTC-2023-0033-0997; ESA, FTC-2023-0033-0867; IAB, FTC-2023-0033-1000; N/MA, FTC-2023-0033-0873; RILA, FTC-2023-0033-0883; TechFreedom, FTC-2023-0033-0872. *See* Section VII.A for a discussion of prevalence addressing these comments.

[213] ANA, FTC-2023-0033-1001; CCIA, FTC-2023-0033-0984; Coalition, FTC-2023-0033-0884; ESA, FTC-2023-0033-0867; Frontdoor, FTC-2023-0033-0862; IAB, FTC-2023-0033-1000; NRF, FTC-2023-0033-1005; RILA, FTC-2023-0033-0883. *See* Section VII.A for a discussion addressing these comments.

negative option feature."[214] Three commenters asserted no current trade regulation rule prohibits misrepresentations so broadly.[215]

Similarly on scope, some commenters also argued the proposed language lacked the specificity necessary to give sellers notice of what conduct would violate the Rule.[216] For example, ACT App Association asserted, "Notwithstanding best efforts, tech startups' ability to flawlessly adhere to the vague and broad language used in this rule is unrealistic."[217]

A few commenters provided hypotheticals or asked rhetorical questions to illustrate concerns about the proposal's breadth. MIA, for example, stated, "if a streaming service advertises, 'movies that you will love,' but you do not 'love' them, is that a violation of this rule subject to penalties? If a housekeeping service claims, 'great cleaning every time,' but the resulting cleanliness is not up to the consumer's 'standards,' will that trigger this provision and any resulting penalties?"[218] The Chamber asked, "[c]ould a privacy policy, for example, be considered a material representation covered under this requirement?"[219]

Many of these commenters argued the reach of the proposed Rule would negatively impact consumers by discouraging negative option offerings. TechNet said, "[f]or a variety of

---

[214] TechNet, FTC-2023-0033-0869.
[215] NCTA, FTC-2023-0033-0858; PDMI, FTC-2023-0033-0864; TechFreedom, FTC-2023-0033-0872.
[216] For example, the Coalition and IAB both said, "The NPRM fails, however, to identify which claims would constitute a material fact, and thus fails to identify covered acts with the requisite level of specificity." Coalition, FTC-2023-0033-0884; IAB, FTC-2023-0033-1000. PDMI similarly claimed the proposed provision's lack of specificity "renders [the proposed Rule] overly vague and unlawful." FTC-2023-0033-0864. *See also* ESA, FTC-2023-0033-0867; TechFreedom, FTC-2023-0033-0872; USTelecom, FTC-2023-0033-0876 (citing *Katharine Gibbs School v. FTC*, 612 F.2d 658 (2d Cir. 1979)).
[217] ACT App Association, FTC-2023-0033-0874.
[218] MIA, FTC-2023-0033-1008.
[219] Chamber, FTC-2023-0033-0885. *See also* CDI, FTC-2023-0033-0887 ("consumers could argue that the dish detergent they received through a subscription service did not clean dishes as advertised.").

subscription services, the main drivers of consumer engagement are the subscription services'
ability to provide financial savings, convenience, and access to premium services . . . .
Unfortunately, the NPRM ignores these benefits and would discourage the offering of
subscription services altogether."[220] ESA feared "this section will discourage industry members
from developing and offering innovative negative option plans that consumers will enjoy."[221]

Several commenters asserted existing laws and regulations make the proposed provision
unnecessary. Some argued Section 5's prohibition against deceptive practices already provides
the Commission sufficient authority on this issue.[222] Others asserted state laws and regulations
prohibiting misrepresentations are sufficient to protect the public.[223]

Commenters were divided on ROSCA's coverage. NRF, for example, said "[i]n light of
the Commission's decision that ROSCA already prohibits deceptive statements made in
connection with a subscription, even if not directly related to subscription terms, many of the
proposed amendments are unnecessary."[224] In contrast, PDMI said while *MoviePass* "perhaps
reflects a colorable approach," the application of ROSCA there "exceeded Congress' intent."[225]
Similarly, IAB asserted the proposed Rule would break new ground by "grant[ing] the

---

[220] TechNet, FTC-2023-0033-0869.

[221] ESA, FTC-2023-0033-0867; *see also* IAB, FTC-2023-0033-1000 (predicting "autorenewing
(sic) subscriptions will become less common and significantly more costly because of the
regulatory risks" and "businesses and consumers will be harmed by the loss of convenience and
savings offered by autorenewal arrangements."); Chamber, FTC-2023-0033-0885 (contending
"many entities may forgo negative options altogether. This decreases consumer choice in the
marketplace given the clear popularity and use of negative option features across the
economy.").

[222] ANA, FTC-2023-0033-1001; Consumer Technology Association ("CTA"), FTC-2023-0033-
0997; N/MA, FTC-2023-0033-0873.

[223] NRF, FTC-2023-0033-1005; RILA, FTC-2023-0033-0883; SFE Energy, Inc. ("SFE"), FTC-
2023-0033-1151.

[224] NRF, FTC-2023-0033-1005.

[225] PDMI, FTC-2023-003-0864.

Commission authority to seek monetary remedies against a first-time offender for misrepresentations that would not give rise to monetary relief if made outside the context of an autorenewal agreement."[226]

Several commenters recommended changes if the proposed provision remains in the Rule. BSA, for example, suggested the Commission should define the term "material," citing the TSR and the FTC Policy Statement on Deception as examples.[227] Separately, RILA urged the Commission "to include clear language stating a 'reasonable person standard' will apply to determinations of 'material facts' related to products."[228]

Several commenters suggested the Commission limit the misrepresentation provision to the terms of the negative option feature. For instance, BSA advocated for limiting the provision "to facts relating to the transaction and not every material fact relating to the underlying good or service."[229] CCIA and CDI agreed, stating the final phrase should instead cover only those material facts related to the underlying negative option feature and exclude "any material fact related to the underlying good or service."[230]

b)      **Analysis**

Based on the record, the Commission adopts a clarified version of the material misrepresentation section and adds a definition for further clarification. Specifically, the final Rule omits the proposed language referring to "any material fact related to the transaction, such as the negative option feature, or any material fact related to the underlying good or service" and

---

[226] IAB, FTC-2023-0033-1000.
[227] BSA, FTC-2023-0033-1015; *see also* Chamber, FTC-2023-0033-0885 (noting "materiality" not defined in NPRM).
[228] RILA, FTC-2023-0033-0883.
[229] BSA, FTC-2023-0033-1015.
[230] CCIA, FTC-2023-0033-0984; CDI, FTC-2023-0033-0887; *see also* TechFreedom, FTC-2023-0033-0872.

instead prohibits misrepresentation of "any material fact," and defines "material" consistent with the TSR and Section 5 of the FTC Act. Further, to enhance clarity and specificity, the text lists several examples of potentially material fact categories, taken from Commission precedent.

As further explained below: (1) despite commenters' concerns to the contrary, this provision is consistent with the ANPR and prevalence requirements of Section 18 of the FTC Act; (2) consistent with ROSCA, the final provision is not limited to material misrepresentations about the negative option feature itself; (3) the Commission declines to exclude any subset of material misrepresentations from the scope of the Rule; and (4) for clarity, the Commission adds a definition of "material" consistent with established law of Section 5 and other Commission Rules.

### (1)    Adoption of a prohibition against misrepresentations is consistent with the ANPR and is appropriate to address prevalent unfair or deceptive acts or practices.

Prior to the publication of any notice of proposed rulemaking promulgated under the Magnuson Moss Act, the Commission must publish an advance notice of proposed rulemaking (ANPR).[231] That notice must contain a "brief description of the area of inquiry under consideration, the objectives which the Commission seeks to achieve, and possible regulatory alternatives under consideration by the Commission."[232] The ANPR in this case meets this standard. Specifically, in the ANPR, the Commission stated the objective of the Rule was to prevent deceptive or unfair practices in the marketing of products and services with negative option features. Several industry associations submitted comments in response to the ANPR, illustrating the effectiveness of the ANPR in soliciting views of the interested public and affected

---

[231] 15 U.S.C. 57a(b)(2).
[232] 15 U.S.C. (b)(2)(A)(i).

industry before issuing the NPRM.[233] Moreover, as detailed herein, the Commission has reviewed and carefully considered the views of the public and industry as expressed in response to both the ANPR and NPRM.

The record demonstrates misrepresentations made to induce consumers to enter into negative option programs are prevalent. Specifically, the Commission's enforcement experience (including consumer complaints, matters cited in the NPRM, and matters cited in this Statement of Basis and Purpose) as well as the experiences of the State AGs, the information cited by the Law Professors, and comments by consumer commenters all support this conclusion.[234]

As several commenters critical of the proposed provision correctly note, misrepresentations to induce consumers to join negative option programs are already unlawful under Section 5, as well as under other state and federal laws and regulations, depending on (among other things) media used and jurisdiction. This fact, however, does not undermine the need for the Rule provision. By definition, a Section 18 trade regulation rule addresses conduct that is already prohibited under Section 5. With such prohibited conduct defined, the trade regulation rule may also more broadly "include requirements prescribed for the purpose of preventing such acts or practices," but the core of a trade regulation rule is the description of acts or practices already violative of Section 5.[235] The misrepresentations section of the Rule is narrower than the full scope of tools available under Section 18. It simply prohibits conduct that

---

[233] Section 425.3 is the only remaining Section as to which commenters made this ANPR argument.
[234] *See* Section VII.1.a. In the cited Commission law enforcement matters, the Commission has applied its established materiality standard, limiting its actions to misrepresentations that are likely to affect consumers' choice of, or conduct regarding, goods or services. *In re Cliffdale Assocs., Inc*., 103 F.T.C. 110 (1984). That is to say, in the cited matters the Commission alleged defendants made misrepresentations to induce consumers to enter into negative option programs.
[235] 15 U.S.C. 57a(a)(1)(B).

is already deceptive. Such a provision promotes clarity and confidence in the marketplace and provides for more effective remedies (*i.e.*, civil penalties, where appropriate) against wrongdoers.

Moreover, the fact that ROSCA's disclosure requirement[236] already essentially prohibits material misrepresentations about online negative option transactions, means much of the rhetoric predicting the downfall of negative option marketing simply is ill-founded. Indeed, the Chamber pointed to the "clear popularity and use of negative option features across the economy" even as ROSCA has been law for over a decade.[237] Far from undermining legitimate business, the Rule's express prohibition on misrepresenting material facts in connection with promoting or offering for sale a negative option feature should increase consumer confidence in negative option marketing, thus making it easier for legitimate businesses to market their products.

**(2)  Prohibiting misrepresentation of any material facts, not just those pertaining to the negative option feature, promotes clarity consistent with ROSCA and Commission precedent.**

The final Rule prohibits misrepresentation of "any material fact." In doing so, it provides a non-exhaustive list of categories of potentially material facts (including transaction terms) and adds a definition of "material," consistent with Section 5 and the TSR. Specifically, consistent with Section 5, "material" means "likely to affect a person's choice of, or conduct regarding,

---

[236] 15 U.S.C. 8403(1).
[237] Chamber, FTC-2023-0033-0885.

goods or services."[238] This approach both clarifies the terms most at issue and ensures the Rule accords with longstanding Section 5 precedent.

The Commission declines to limit the misrepresentations prohibition solely to elements of the negative option feature.[239] First, the Commission finds imposing such a narrow restriction would be inconsistent with existing protections. Pursuant to ROSCA Section 8403, sellers must "clearly and conspicuously disclose **all material terms of the transaction** before obtaining the consumer's billing information." (Emphasis added). As Congress has explained, a healthy marketplace "must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business."[240] Limiting a misrepresentations prohibition solely to misrepresentations about the negative option feature itself would fall well short of the scope of ROSCA and the Commission's responsibility to protect the public.

Moreover, seller commenters themselves highlighted transaction elements other than negative option terms as critical to inducing consumers to choose negative option features. IAB, for example, pointed to the promise of "broader selection and lower prices" or "convenience and savings."[241] Similarly, TechNet identified the "ability to provide financial savings, convenience, and access to premium services" as "the main drivers" of varied subscriptions.[242]

---

[238] 16 CFR 310.2(t) (TSR); 16 CFR 461.1 (Impersonation Rule); Policy Statement on Deception (Oct. 14, 1983) (appended to *In re Cliffdale Assocs., Inc*., 103 F.T.C. 110 (1984)). *See also* BSA, FTC-2023-0033-1015 (requesting definition of material consistent with TSR and Policy Statement); Chamber, FTC-2023-0033-0885 (criticizing the proposed Rule for not defining materiality).

[239] *E.g.*, ESA, FTC-2023-0033-0867; NFIB, FTC-2023-0033-0789; TechFreedom, FTC-2023-0033-0872.

[240] 15 U.S.C. 8401(2).

[241] IAB, FTC-2023-0033-1000.

[242] TechNet, FTC-2023-0033-0869.

Furthermore, such a distinction may invite dishonest actors to misrepresent material facts about a transaction so long as they felt they could evade monetary liability for such misrepresentations. Moreover, simply refraining from making material misrepresentations is hardly a significant burden given the fact that such misrepresentations are already illegal under Section 5 of the FTC Act, and subject to civil penalties when made on the Internet and over the telephone pursuant to ROSCA and the TSR, respectively.

**(3)  The Commission declines to exclude any material facts from the scope of the provision.**

To further promote clarity, the Commission includes a list of non-exclusive examples in the text of § 425.3. In addition to the negative option feature itself, the examples include certain characteristics the Commission has identified as presumptively material for more than 40 years.[243] and which have in fact appeared as the subject of material misrepresentations in

---

[243] Policy Statement on Deception (Oct. 14, 1983) (appended to *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984)) (describing and citing materiality of purpose, safety, efficacy, and cost); *In re Thompson Medical Co., Inc.*, 104 F.T.C. 648, 816-17 (1984) (listing cost, purpose, efficacy, and safety as presumptively material characteristics).

Commission negative option cases—cost,[244] purpose or efficacy,[245] and health or safety.[246] The

record demonstrates the list must be non-exclusive because the Commission has observed the use

of material misrepresentations other than those enumerated to induce consumers to enter into

transactions with negative option features, including, for example, characteristics of the seller,[247]

---

[244] In the negative option context, material cost misrepresentations may include any cost (and total costs) from inception through the course of the commercial relationship, including misrepresentations as to recurring costs and refunds or guarantees. *See, e.g.*, *FTC v. FloatMe Corp.*, No. 5:24-cv-00001 (W.D. Tex. 2024); *United States v. Cerebral, Inc*., No. 1:24-cv-21376 (S.D. Fla. 2024); *FTC v. Bridge It, Inc.*, No. 1:23-cv-09651 (S.D.N.Y. 2023); *FTC v. Benefytt Techs., Inc.*, No. 8:22-cv-01794 (M.D. Fla. 2022); *FTC v. First Am. Payment Sys.*, No. 4:22-cv-00654 (E.D. Tex. 2022); *FTC v. XXL Impressions, LLC*, No. 1:17-cv-00067 (D. Me. 2017); *FTC v. Cardiff*, No. 5:18-cv-02104 (C.D. Cal. 2018); *FTC v. Health Rsch. Labs., LLC*, No. 2:17-cv-00467 (D. Me. 2017); *FTC v. Tarr*, No. 3:17-cv-02024 (S.D. Cal. 2017); *FTC v. AdoreMe, Inc.*, No. 1:17-cv-09083 (S.D.N.Y. 2017); *FTC v. Pact, Inc.*, No. 2:17-cv-1429 (W.D. Wash. 2017); *FTC v. Leanspa, LLC*, No. 3:11-cv-01715 (D. Conn. 2011); *FTC v. Willms*, No. 2:11-cv-00828 (W.D. Wash. 2011); *FTC v. Universal Premium Servs.*, No. 2:06-cv-00849 (C.D. Cal. 2006).
[245] *See, e.g.*, *FTC v. FloatMe Corp.*, No. 5:24-cv-00001 (W.D. Tex. 2024); *United States v. Cerebral, Inc*., No. 1:24-cv-21376 (S.D. Fla. 2024); *FTC v. NGL Labs, LLC*, No. 2:24-cv-05753 (C.D. Cal. 2024); *FTC v. Bridge It, Inc.*, No. 1:23-cv-09651 (S.D.N.Y. 2023); *FTC v. WealthPress, Inc.*, No. 3:23-cv-00046 (M.D. Fla. 2023); *In re Dun & Bradstreet, Inc.*, FTC Docket No. C-4761 (2022); *FTC v. First Am. Payment Sys.*, No. 4:22-cv-00654 (E.D. Tex. 2022); *In re MoviePass, Inc.*, FTC Docket No. C-4751 (2021); *United States v. MyLife.com, Inc*., No. 2:20-cv-6692 (C.D. Cal. 2020); *FTC v. RagingBull.com, LLC*, No. 1:20-cv-03538 (D. Md. 2020); *FTC v. Match Grp., Inc.*, No. 3:19-cv-02281 (N.D. Tex. 2019); *FTC v. XXL Impressions, LLC*, No. 1:17-cv-00067 (D. Me. 2017); *FTC v. Cardiff*, No. 5:18-cv-02104 (C.D. Cal. 2018); *FTC v. JDI Dating, Ltd.*, No. 1:14-cv-08400 (N.D. Ill. 2014); *FTC v. Credit Bureau Ctr., LLC*, No. 1:17-cv-00194 (N.D. Ill. 2017); *FTC v. Health Rsch. Labs., LLC*, No. 2:17-cv-00467 (D. Me. 2017); *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649 (D. Nev. 2014); *FTC v. Leanspa, LLC*, No. 3:11-cv-01715 (D. Conn. 2011); *FTC v. Willms*, No. 2:11-cv-00828 (W.D. Wash. 2011); *FTC v. Johnson*, No. 2:10-cv-02203 (D. Nev. 2010); *FTC v. Remote Response Corp.*, No. 1:06-cv-20168 (S.D. Fla. 2006).
[246] *See, e.g.*, *FTC v. XXL Impressions, LLC*, No. 1:17-cv-00067 (D. Me. 2017); *FTC v. Cardiff*, No. 5:18-cv-02104 (C.D. Cal. 2018); *FTC v. Health Rsch. Labs., LLC*, No. 2:17-cv-00467 (D. Me. 2017); *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649 (D. Nev. 2014); *FTC v. Leanspa, LLC*, No. 3:11-cv-01715 (D. Conn. 2011); *FTC v. Willms*, No. 2:11-cv-00828 (W.D. Wash. 2011).
[247] *E.g.*, *FTC v. Elite IT Partners, Inc.*, No. 2:19-cv-00125 (D. Utah 2019) (affiliation with well-known companies); *In re Urthbox, Inc.*, FTC Docket No. C-4676 (2019) (independence of reviews); *FTC v. BunZai Media Grp., Inc.*, No. 2:15-cv-04527 (C.D. Cal. 2015) (BBB accreditation and ratings); *FTC v. DOTAuthority.com, Inc.*, No. 0:16-cv-62186 (S.D. Fla. 2016)

the format of the ad or other sales communication,[248] consumer authorization,[249] consumer

privacy or data security,[250] and endorsements or testimonials.[251] The Commission cannot predict

what other material misrepresentations dishonest actors may employ in the future.

Some commenters asserted Section 18 does not authorize the Commission to prohibit

material misrepresentations in a given area of commerce. Section 18, however, permits the FTC

to promulgate "rules which define with specificity acts or practices which are unfair or deceptive

acts or practices in or affecting commerce (within the meaning of [Section 5(a)(1)]) . . . [and]

may include requirements prescribed for the purpose of preventing such acts or practices."[252] It

places no additional restrictions on the scope of this rulemaking.

Several commenters appear to think Section 18 requires the Commission to define

specific claims as deceptive; for example, two commenters cited the Business Opportunity

Rule's treatment of misrepresentations. ;[253]. While the cited Rules show one way to meet the

_____

(ratings); *FTC v. FTN Promotions, Inc.*, No. 8:07-cv-1279 (M.D. Fla. 2007) (affiliation with consumer's bank).
[248] *E.g.*, *FTC v. XXL Impressions, LLC*, No. 1:17-cv-00067 (D. Me. 2017) (radio news show); *FTC v. Leanspa, LLC*, No. 3:11-cv-01715 (D. Conn. 2011) (news reports).
[249] *E.g.*, *In re Dun & Bradstreet, Inc.*, FTC Docket No. C-4761 (2022) (charging for same product consumer previously purchased); *FTC v. Benefytt Techs., Inc.*, No. 8:22-cv-01794 (M.D. Fla. 2022) (charging for authorized products); *FTC v. Triangle Media Corp.*, No. 3:18-cv-01388 (S.D. Cal. 2018) (completeness of order); *FTC v. Apex Capital Grp., LLC*, No. 2:18-cv-09573 (C.D. Cal. 2018) (completeness of order); *FTC v. Moneymaker*, No. 2:11-cv-00461 (D. Nev. 2011) (purpose of authorization).
[250] *E.g.*, *United States v. Cerebral, Inc.*, No. 1:24-cv-21376 (S.D. Fla. 2024) (data security and privacy); *In re MoviePass, Inc.*, FTC Docket No. C-4751 (2021) (data security).
[251] *E.g.*, *FTC v. XXL Impressions, LLC*, No. 1:17-cv-00067 (D. Me. 2017); *FTC v. Cardiff*, No. 5:18-cv-02104 (C.D. Cal. 2018); *FTC v. Willms*, No. 2:11-cv-00828 (W.D. Wash. 2011).
[252] 15 U.S.C. 57a(a)(1)(B).
[253] PDMI, FTC-2023-003-0864 (contrasting the proposed Rule language with Business Opportunity Rule language, saying "The Business Opportunity Rule does not prohibit any misrepresentation in connection with business opportunities. It prohibits specific misrepresentations about earnings claims."); TechFreedom, FTC-2023-0033-0872 ("For example, the Business Opportunity Rule prohibits no fewer than 21 different kinds of

statute's specificity requirements, the statute does not require the Commission to define **claims** with specificity, but instead **acts or practices**.[254] For example, in the Business Opportunity Rule, the practice of misrepresenting "any material aspect of any assistance offered to a prospective purchaser" in a business opportunity transaction is a specific type of deceptive practice in or affecting commerce.[255] By the same token, the practice of misrepresenting material facts to induce consumers to consent to negative option features constitutes a specific type of deceptive practice.

The record, including the submissions of many industry commenters, shows negative option features are found across industries, but are consistently distinguishable as a subset of general commercial practices. As commenters point out, negative option features offer many distinct benefits to consumers and sellers. These benefits do not lose their distinct character merely because they occur across different kinds of goods and services sold across different channels. While the record shows this practice offers distinct benefits, it also shows the practice is plagued by distinct abuse. This is not a hypothetical statement; the Commission is not promulgating the final Rule because negative option features may engender deception, whether relating to the feature itself or to other material facts, but rather because the record shows they have.[256] Just as with the benefits of negative option marketing, these problems do not lose their

misrepresentation regarding business opportunities. This specificity is typical of trade regulation rules.") (footnotes omitted).
[254] 15 U.S.C. 57a(a)(1)(B).
[255] 16 CFR 437.6(i).
[256] *See, e.g.*, *FTC v. FloatMe Corp.*, No. 5:24-cv-00001 (W.D. Tex. 2024); *United States v. Cerebral, Inc*., No. 1:24-cv-21376 (S.D. Fla. 2024); *FTC v. NGL Labs, LLC*, No. 2:24-cv-05753 (C.D. Cal. 2024); *FTC v. Bridge It, Inc.*, No. 1:23-cv-09651 (S.D.N.Y. 2023); *FTC v. WealthPress, Inc.*, No. 3:23-cv-00046 (M.D. Fla. 2023); *FTC v. Benefytt Techs., Inc.*, No. 8:22-cv-01794 (M.D. Fla. 2022); *In re Dun & Bradstreet, Inc.*, FTC Docket No. C-4761 (2022); *FTC v. First Am. Payment Sys.*, No. 4:22-cv-00654 (E.D. Tex. 2022); *In re MoviePass, Inc.*, FTC

distinct character, in other words they are distinct practices, even though they appear in a variety of contexts.

In addressing this deceptive practice, the Commission remains guided by core principles articulated in its 1983 Deception Policy Statement. As the Commission explained, in considering whether to act against a deceptive practice, the Commission will observe the extent to which consumers themselves have been able to police and generate consequences for seller deception.

> Finally, as a matter of policy, when consumers can easily evaluate the product or service, it is inexpensive, and it is frequently purchased, the Commission will examine the practice closely before issuing a complaint based on deception. There is little incentive for sellers to misrepresent (either by an explicit false statement or a deliberate false implied statement) in these circumstances since **they normally would seek to encourage repeat purchases**. Where, as here, market incentives place strong constraints on the likelihood of deception, the Commission will examine a practice closely before proceeding. [257]

---

Docket No. C-4751 (2021); *United States v. MyLife.com, Inc*., No. 2:20-cv-6692 (C.D. Cal. 2020); *FTC v. RagingBull.com, LLC*, No. 1:20-cv-03538 (D. Md. 2020); *FTC v. Match Grp., Inc.*, No. 3:19-cv-02281 (N.D. Tex. 2019); *FTC v. Elite IT Partners, Inc.*, No. 2:19-cv-00125 (D. Utah 2019); *In re Urthbox, Inc.*, FTC Docket No. C-4676 (2019); *FTC v. Triangle Media Corp.*, No. 3:18-cv-01388 (S.D. Cal. 2018); *FTC v. Apex Capital Grp., LLC*, No. 2:18-cv-09573 (C.D. Cal. 2018); *FTC v. XXL Impressions, LLC*, No. 1:17-cv-00067 (D. Me. 2017); *FTC v. Cardiff*, No. 5:18-cv-02104 (C.D. Cal. 2018); *FTC v. JDI Dating, Ltd.*, No. 1:14-cv-08400 (N.D. Ill. 2014); *FTC v. Credit Bureau Ctr., LLC*, No. 1:17-cv-00194 (N.D. Ill. 2017); *FTC v. BunZai Media Grp., Inc.*, No. 2:15-cv-04527 (C.D. Cal. 2015); *FTC v. DOTAuthority.com, Inc.*, No. 0:16-cv-62186 (S.D. Fla. 2016); *FTC v. Health Rsch. Labs., LLC*, No. 2:17-cv-00467 (D. Me. 2017); *FTC v. Tarr*, No. 3:17-cv-02024 (S.D. Cal. 2017); *FTC v. AdoreMe, Inc.*, No. 1:17-cv-09083 (S.D.N.Y. 2017); *FTC v. Pact, Inc.*, No. 2:17-cv-1429 (W.D. Wash. 2017); *FTC v. RevMountain, LLC*, No. 2:17-cv-02000 (D. Nev. 2017); *FTC v. AAFE Prods. Corp.*, No. 3:17-cv-00575 (S.D. Cal. 2017); *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649 (D. Nev. 2014); *FTC v. Dill*, No. 2:16-cv-00023 (D. Me. 2016); *FTC v. Leanspa, LLC*, No. 3:11-cv-01715 (D. Conn. 2011); *FTC v. Willms*, No. 2:11-cv-00828 (W.D. Wash. 2011); *FTC v. Moneymaker*, No. 2:11-cv-00461 (D. Nev. 2011); *FTC v. Johnson*, No. 2:10-cv-02203 (D. Nev. 2010); *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975 (N.D. Cal. 2010); *FTC v. JAB Ventures, LLC*, No. 2:08-cv-04648 (C.D. Cal. 2008); *FTC v. Ultralife Fitness, Inc.*, No. 2:08-cv-07655 (C.D. Cal. 2008); *FTC v. FTN Promotions, Inc.*, No. 8:07-cv-1279 (M.D. Fla. 2007); *FTC v. Think All Publ'g, LLC*, No. 4:07-cv-00011 (E.D. Tex. 2007); *FTC v HispaNexo, Inc.*, No. 1:06-cv-424 (E.D. Va. 2006); *FTC v. Universal Premium Servs.*, No. 2:06-cv-00849 (C.D. Cal. 2006); *FTC v. Remote Response Corp.*, No. 1:06-cv-20168 (S.D. Fla. 2006).
[257] Policy Statement on Deception (Oct. 14, 1983) (appended to *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984)) (emphasis added).

The record shows the practice of misrepresenting material facts to induce consent to negative option features has created distinct issues consumers have not been able to address themselves, enabling sellers to collect numerous recurring payments before consumers detect the misrepresentation and act to stop the charges. This problem is not confined to a particular subset of industries or misrepresentations but instead is a too-frequent practice throughout negative option marketing. [258] Specifically, when a consumer makes a series of purchases from the same seller in ordinary circumstances (rather than through a negative option), each purchase requires the consumer to actively, even if only briefly, re-evaluate the transaction and affirmatively consent. Dishonest negative option sellers too easily bypass these typical guardrails of "repeat purchases." Thus, up-front misrepresentations can induce consumers into recurring transactions lacking ordinary sales' built-in interruptions for re-evaluation and renewed consent. As with other areas where consumers have limited opportunities for critical up-front evaluation (for example, consumers cannot easily evaluate medical claims about dietary supplements), so too, here, the Commission finds additional protection warranted.

The Commission has considered commenters' Section 18 specificity concerns pertaining to material misrepresentations and finds them unsupported by the record. These commenters suggest a hypothetical world where negative option features provide distinguishable commercial benefits without presenting distinguishable material misrepresentation challenges. The reality is otherwise. Thus, the final Rule prohibits the specific practice of sellers misrepresenting material terms or facts in connection with negative option sales.

---

[258] *See* n.256.

**(4)        For clarity, the final Rule adds a definition of "material" consistent with precedent.**

As noted above, and as suggested by commenters, the Commission defines "material" in the final Rule. This definition adds clarity and addresses the rhetorical questions raised by commenters regarding scope. Specifically, consistent with Section 5, the TSR, and longstanding Commission policy and case law, the final Rule defines the term to mean likely to affect a person's choice of, or conduct regarding, goods or services. [259] Thus, mere puffery is not material. [260]

The hypotheticals posed by MIA—"movies that you will love" or "great cleaning every time"—are classic examples of puffery, and thus, are not within the scope of materiality. [261] The response to the question posed by the Chamber—whether misrepresentation of a privacy policy would be covered—depends, as it always has, on whether the seller misrepresents its privacy policy in a way likely to affect consumer choice or conduct.

### 4.        Proposed § 425.4 Important Information

Section 425.4 of the proposed Rule prohibited sellers from failing to disclose "any material conditions related to the underlying product or service that is necessary to prevent deception, regardless of whether that term directly relates to the terms of the negative option offer." [262] As explained in the NPRM, the Commission drafted this provision because "many

---

[259] 16 CFR 310.2(t); *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984).

[260] *See FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 11 (1st Cir. 2010) ("Where a claim is merely 'exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely,' it may be un-actionable puffery.").

[261] The Commission declines to add language defining a "reasonable person standard" as suggested by RILA, and refers instead to the discussion of reasonableness set forth in the Commission's Policy Statement on Deception (Oct. 14, 1983) (appended to *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984)).

[262] NPRM, 88 FR 24727.

sellers fail to provide adequate disclosures, thereby luring consumers into purchasing goods or services they do not want."[263] To address this issue, the proposed Rule required sellers to provide the following important information prior to obtaining a consumer's billing information: "(1) that consumers' payments will be recurring, if applicable; (2) the deadline by which consumers must act to stop charges; (3) the amount or ranges of costs consumers may incur; (4) the date the charge will be submitted for payment; and (5) information about the mechanism consumers may use to cancel the recurring payments."[264]

The Commission also proposed requirements regarding the form and location of this important information, as its "law enforcement experience and consumer complaints are replete with examples of hidden disclosures, including those in fine print, buried in paragraphs of legalese and sales pitches, and accessible only through hyperlinks."[265] Thus, under the proposed Rule, information "directly related to the negative option feature … must appear immediately adjacent to the means of recording the consumer's consent for the negative option feature." Information "not directly related to the negative option feature … must appear before consumers make a decision to buy (*e.g.*, before they 'add to shopping cart')."

Further, the proposal stated all disclosures must be clear and conspicuous as defined in § 425.2(c). Among other elements of the clear and conspicuous definition, the proposed Rule specified that in any communication using an interactive electronic medium, such as the Internet, mobile application, or software, the disclosure must be unavoidable. The proposed Rule also specified that a disclosure is not clear and conspicuous if a consumer "must take any action, such as clicking on a hyperlink or hovering over an icon, to see it."

---

[263] NPRM, 88 FR 24726-27.
[264] NPRM, 88 FR 24726.
[265] NPRM, 88 FR 24727.

Finally, the proposed Rule prohibited sellers from including any information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the required disclosures. The final clause of this prohibition "includ[ed] any information not directly related to the material terms and conditions of any negative option feature."

Through these provisions, the Commission sought to prevent deception by businesses taking advantage of the gray areas in current law, to deter fraudulent actors through the possibility of monetary relief, and to "level the playing field for legitimate businesses, freeing them from having to compete against those employing deception."[266]

### a)       Summary of Comments

Thousands of commenters supported the important information requirement, stating it is "critically important that companies make it explicitly clear what consumers are signing up for."[267] Consumers identified problematic practices the provision would address, including insufficient and unclear disclosures in small print or those appearing too late in the transaction. For example, an individual commenter said, "[t]oo many [sellers] hide these details in extra fine print, and increasingly text is in a very light gray color, making it even harder to read."[268]

---

[266] NPRM, 88 FR 24727.

[267] Thousands of consumers submitted the following identical comment in their own names: "It's critically important that companies make it explicitly clear what consumers are signing up for and to make canceling fast and easy. If you signed up online, you should be able to cancel online. If it took one click to join, it should take one click to cancel. Implementing this consumer protection rule has the potential to save American consumers millions of dollars and I hope it is implemented as soon as possible." While apparently a response to a mass solicitation, many consumers further personalized their submission by adding their unique experiences and desire for the Rule. *See, e.g.*, Individual commenter, FTC-2023-0033-0161; -0163; -0164; 0198; -0204; -0545; 0658.

[268] Individual commenter, FTC-2023-0033-0268. Similarly, another individual commenter said, "Businesses should not present agreements in tiny print on an agent's tablet for the customer to sign. I can't read the print." Individual commenter, FTC-2023-0033-0349.

Another individual commenter noted, "I ordered skin care from a tv infomercial only to find out it was a subscription thing though none of this was disclosed by famous actresses on the promotion…. I went back to my receipt of what I originally ordered and in fine print saw that I had been duped!"[269]

Several individual commenters indicated clear upfront disclosures would help them make informed choices and improve their willingness to try negative option offerings, particularly if the disclosure provided an easy cancellation mechanism. As one put it, "I am much more like[ly] to try—and buy—a new service if I know there is an easy way to cancel online."[270] Another said, "I actually subscribe to far fewer services than I would if I knew that I could easily cancel once I had tried a sample."[271]

Public advocacy commenters also supported the provision. The Berkeley Consumer Law Center said, "the requirement of 'clear and conspicuous' disclosures of 'any material term related to the underlying goods or services that is necessary to prevent deception' will help prevent cancellation terms from being shrouded in mystery through complicated terms and conditions, while also blocking the practice of hiding subscription services that are needed to fully use a

---

[269] Individual commenter, FTC-2023-0033-0345.

[270] Individual commenter, FTC-2023-0033-0781.

[271] Individual commenter, FTC-2023-0033-0031. *Accord* Individual commenter, 0196 ("I have had to get to the point of not subscribing to any online offers, as far too many times I have found it nearly impossible to unsubscribe"); Individual commenter, FTC-2023-0033-0306 ("you could win over more subscribers to your services if you took away the fear and doubts of the public that they will probably be hooked into something that would be more troublesome to get out of … I can tell you that I have passed over many opportunities that I was interested in for this very reason."); Individual commenter, FTC-2023-0033-0333 ("I've had some difficulty in the past cancelling enrollments or subscriptions, so that now I've become very wary of products or services I would otherwise appreciate having. Implementing this consumer protection rule would help me feel more confident again.").

product."[272] Similarly, a coalition of consumer and public interest advocacy organizations asserted the proposed disclosure requirement "will clearly inform consumers of the terms of the contract and how they may terminate the agreement."[273]

Law enforcement commenters likewise supported the important information requirements. The State AGs said they would "repel the abusive practices of hidden disclosures, 'including those in fine print, buried in paragraphs of legalese and sales pitches, and accessible only through hyperlinks.'"[274] They particularly emphasized their support for "the required disclosure of 'the information necessary for the consumer to cancel the negative option feature.'"[275] The California Auto-Renew Task Force ("CART"), a group of Southern California prosecutors, supported disclosures appearing "immediately adjacent to the means of recording the consumer's consent for the negative option feature."[276] CART asserted this provision, together with others, "will greatly minimize consumer deception and ensure that consumers fully understand—and agree to—the nature of the transaction under consideration."[277]

Other commenters, mostly industry groups,[278] expressed several concerns with the proposed requirements, specifically with the definition of "clear and conspicuous," the scope and

---

[272] Berkeley Consumer Law Center, FTC-2023-0033-0855. Similarly, for the same reasons they provided in connection with the misrepresentations provision, the Law Professors encouraged the Commission to maintain the proposed disclosure provision's coverage of material terms necessary to prevent deception, regardless of whether such terms are exclusively about the negative option feature. Law Professors, FTC-2023-0033-0861.
[273] Public Interest Groups, FTC-2023-0033-0880.
[274] State AGs, FTC-2023-0033-0886.
[275] *Id.*
[276] CART, FTC-2023-0033-0698.
[277] *Id.*
[278] Not all industry groups criticized the provision. Specifically, MIA wrote, "The Association agrees with the important information requirement under the proposed Rule." MIA, FTC-2023-0033-1008.

timing of the material terms to be disclosed, specific disclosure requirements, placement, and treatment of other information.[279]

Multiple commenters claimed the requirement that disclosures using an interactive electronic medium must be "unavoidable" would be unworkable given the additional provision that a "disclosure is not clear and conspicuous if a consumer must take any action, such as clicking on a hyperlink or hovering over an icon, to see it."[280] Commenters noted it would be difficult or impossible to implement this requirement on small screens (such as mobile phones), and it may reduce rather than improve clarity.

Several commenters also objected to the requirement sellers disclose material terms other than those pertaining exclusively to the negative option feature, asserting this would be overbroad.[281] Additionally, commenters questioned how the Commission would enforce a requirement to disclose material terms before obtaining a consumer's billing information, especially where a consumer previously elected to save billing information with the seller.[282]

---

[279] In addition, some commenters cited industry-specific laws and regulations pertaining to disclosures as rendering the proposed provision unnecessary or counterproductive. ACA Connects-America's Communications Association ("ACA"), FTC-2023-0033-0881; NCTA, FTC-2023-0033-0858; SFE, FTC-2023-0033-1151; USTelecom, FTC-2023-0033-0876.

[280] ANA, FTC-2023-0033-1001; CCIA, FTC-2023-0033-0984; Coalition, FTC-2023-0033-0884; ESA, FTC-2023-0033-0867; IAB, FTC-2023-0033-1000; NCTA, FTC-2023-0033-0858; Chamber, FTC-2023-0033-0885. NFIB suggested the Commission strike the provision "The disclosure must use diction and syntax understandable to ordinary consumers" and replace it with "'The disclosure must use words and grammar that ordinary consumers would likely understand.'" FTC-2023-0033-0789.

[281] ACT App Association, FTC-2023-0033-0874; ANA, FTC-2023-0033-1001; BSA, FTC-2023-0033-1015; CCIA, FTC-2023-0033-0984; NCTA, FTC-2023-0033-0858; NFIB, FTC-2023-0033-0789; NRF, FTC-2023-0033-1005; PDMI, FTC-2023-003-0864; Sirius XM, FTC-2023-0033-0857; Chamber, FTC-2023-0033-0885.

[282] CTA, FTC-2023-0033-0997; ESA, FTC-2023-0033-0867; IAB, FTC-2023-0033-1000; NRF, FTC-2023-0033-1005; RILA, FTC-2023-0033-0883. Sirius XM asserted this requirement could be interpreted to mean every advertisement must contain disclosure of all material terms. FTC-2023-0033-0857.

Commenters also found the requirement that material terms "not directly related to the negative option feature … must appear before consumers make a decision to buy" to be vague.[283]

Several commenters took issue with the five specific disclosures in the proposed Rule. For example, the requirement to disclose "the date (or dates) each charge will be submitted for payment" drew substantial criticism, with several commenters asserting appropriate disclosures regarding frequency should suffice.[284] Commenters also criticized the requirements to disclose deadlines to act and the amount or range of costs.[285] A group of direct marketers asserted, for example, "the Proposed Rule goes too far in appearing to require a specific date by which consumers must act to stop charges when certain negative option plans are inherently more flexible and allow consumers to cancel anytime."[286] Commenters also found the requirement to disclose "the information necessary for the consumer to cancel the negative option feature" was vague and impractical. They contended the requirement would result in unnecessary details crowding out other disclosures.[287] IAB contended "[a] more effective strategy [regarding cancellation disclosures] would be to make clear but concise disclosures of where that information can be found."[288]

---

[283] Rebecca Kuehn ("Kuehn"), FTC-2023-0033-0871; NRF, FTC-2023-0033-1005.
[284] CCIA, FTC-2023-0033-0984; CTA, FTC-2023-0033-0997; ESA, FTC-2023-0033-0867; IAB, FTC-2023-0033-1000; NRF, FTC-2023-0033-1005; RILA, FTC-2023-0033-0883; Sirius XM, FTC-2023-0033-0857.
[285] IAB, FTC-2023-0033-1000 (deadlines); Comment from Kelley Drye & Warren LLP on behalf of certain direct marketing companies ("Direct Marketing Companies"), FTC-2023-0033-1016 (deadlines); NRF, FTC-2023-0033-1005 (amount or range of costs); Sirius XM, FTC-2023-0033-0857 (amount or range of costs).
[286] Direct Marketing Companies, FTC-2023-0033-1016.
[287] CCIA, FTC-2023-0033-0984; ESA, FTC-2023-0033-0867; IAB, FTC-2023-0033-1000; NRF, FTC-2023-0033-1005.
[288] IAB, FTC-2023-0033-1000.

Additionally, multiple commenters criticized the provision requiring the placement of material terms "directly related to the negative option feature" . . . "immediately adjacent" to recording the consumer's consent.[289] Commenters asserted having numerous disclosures in a constrained space would impair consumers' ability to make informed choices. As an individual commenter explained, "this important information may still become overwhelming to a user, or challenge the integrity of other disclosures if it must compete for space (especially because this disclosure must be placed immediately adjacent to where a user will consent to the negative option feature)."[290] NRF found unclear the distinction between which terms are or are not "directly related to the negative option feature."[291] Other commenters noted the "immediately adjacent" requirement may not be appropriate for voice transactions.[292]

Finally, one commenter expressed uncertainty about the meaning of the "other information" provision. NRF said it "asks companies to walk a tight rope between ensuring they contain all material terms, while risking liability if they include 'any information not directly related to the material terms.'"[293]

The State AGs also recommended three amendments to this proposal. First, they recommended requiring sellers to "disclose all material policies concerning cancellation." Second, they recommended "sellers be required to disclose 'all the information necessary for the

---

[289] ANA, FTC-2023-0033-1001; CCIA, FTC-2023-0033-0984; Coalition, FTC-2023-0033-0884; CTA, FTC-2023-0033-0997; ESA, FTC-2023-0033-0867; IAB, FTC-2023-0033-1000; Direct Marketing Companies, FTC-2023-0033-1016; NRF, FTC-2023-0033-1005; SFE, FTC-2023-0033-1151; Sirius XM, FTC-2023-0033-0857; Chamber, FTC-2023-0033-0885.
[290] Individual commenter, FTC-2023-0033-0552.
[291] NRF, FTC-2023-0033-1005.
[292] Coalition, FTC-2023-0033-0884; Chamber, FTC-2023-0033-0885.
[293] NRF, FTC-2023-0033-1005 (emphasis in comment); *see also* Chamber, FTC-2023-0033-0885 ("[T]he [disclosure] requirement is also ambiguous considering it does not clearly outline the specific material terms that need to be disclosed, which is particularly important considering the requirement applies not just to the negative option feature, but all terms in the transaction.").

consumer to effectively cancel the negative option feature.'" (Emphasis in comment.) They explained, "[d]isclosures in the form of 'click-here-to-cancel' icons, which lead to terms and conditions pages, confusing cancellation flows, or do not otherwise explain how to cancel online, should not be permitted." Third, they recommended "the FTC amend this provision to require that the important information identified by this proposed Rule be provided to the consumer in a manner that is capable of being retained by the consumer."[294]

### b) Analysis

Based on the record, the Commission retains proposed § 425.4 with several clarifications. First, as explained in Section VII.B.3 of this SBP, the Commission adds a definition of "material" at § 425.2(e). Second, in § 425.4(a), the Commission clarifies three of the listed types of important information sellers must provide and omits one to address commenters' concerns. Third, as explained in Section VII.B.4.b.2 of this SBP, the Commission revises the definition of "clear and conspicuous" in § 425.2(c). Fourth, in § 425.4(b)(2) the Commission clarifies language regarding "placement" of disclosures. Finally, the Commission clarifies the language prohibiting sellers from including "any other information" that "interferes with, detracts from, contradicts, or otherwise undermines" consumers' abilities to read, hear, see, or understand the required disclosures.

### (1) The Commission declines to limit the required important information under § 425.4(a).

The Commission declines to limit the scope of the required information under this provision to only information related to the negative option feature. Section 425.4(a)'s requirement that sellers disclose "all material terms" prior to obtaining the consumer's billing

---

[294] State AGs, FTC-2023-0033-0886.

information is consistent with ROSCA and Section 5 of the FTC Act. Moreover, in the Commission's law enforcement experience such a provision is necessary to prevent deception.[295] Therefore, extending this requirement is well within the Commission's rulemaking authority.[296]

To address commenters' concerns about clarity, however, § 425.2(e) adds a definition of "material;" specifically, material means "likely to affect a person's choice of, or conduct regarding, goods or services."[297] This definition is consistent with longstanding Section 5 case law and other Commission rules defining "material."[298]

Additionally, the Commission modifies the proposed list of important information.[299] The Commission retains the first proposed requirement that sellers must disclose "[t]hat consumers will be Charged for the good or service, or that those Charges will increase after any applicable trial period ends, and, if applicable, that the Charges will be on a recurring basis, unless the consumer timely takes steps to prevent or stop such Charges."[300] The Commission continues to find this requirement appropriate to combat deception.

---

[295] *See., e.g.*, *In re MoviePass, Inc.*, FTC Docket No. C-4751 (2021).

[296] 15 U.S.C. 57a(a)(1)(B).

[297] Additionally, the Commission changes "any" to "all" material terms, and deletes the phrase "related to the underlying good or service that is necessary to prevent deception" for clarity. Specifically, the Commission makes clear that sellers are required to disclose all material terms, consistent with the requirements of ROSCA.

[298] *See In re Cliffdale Associates, Inc*., 103 F.T.C. 110, 165 (1984) (misleading impression created by a solicitation is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product."); *see also FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006); 16 CFR 310.2(t) (TSR); 16 CFR 461.1 (Impersonation Rule); Policy Statement on Deception (Oct. 14, 1983) (appended to *In re Cliffdale Assocs., Inc*., 103 F.T.C. 110, 174 (1984)).

[299] In the misrepresentations provision (§ 425.3), the final Rule uses the term "including" to provide examples of categories of potentially material facts. In the disclosures provision, the final Rule retains the proposed Rule's use of "and including" (rather than just "including") to establish all of the specifically listed disclosures as being always material.

[300] NPRM, 88 FR 24735 (proposed 425.4).

The Commission revises the second proposed disclosure, that sellers provide "*the deadline* (by date or frequency) by which the consumer must act in order to stop *all* charges." As revised, this provision requires sellers to disclose "*each deadline* (by date or frequency) by which the consumer must act to prevent or stop *the* Charges." This change clarifies there may not be a single "deadline" by which a consumer must act to "stop all charges." A single seller, for example, may offer a single consumer multiple goods or services, and the consumer may wish to stop some charges without terminating the entire relationship. The Commission also clarifies that "frequency" as used in the final Rule includes a description of an irregular frequency (*e.g.*, within a certain period after the seller notifies the consumer a new item in a series has become available) as well as a regular one (*e.g.*, the 15th of each month).

The Commission also clarifies the third proposed disclosure. The proposed Rule required sellers to disclose "[t]he amount (or range of costs) the consumer will be charged, and, if applicable, the frequency of *such* charges a consumer will incur unless the consumer takes timely steps to prevent or stop those charges") (emphasis added).[301] The record suggests, however, that in some circumstances, the amounts to be charged may be inexact before the seller obtains the consumer's billing information. For example, taxes or delivery fees may depend in part on the billing information the consumer provides. Thus, the Commission clarifies under the final Rule as adopted, the "amount (or range of costs)" need not be exact if an exact figure is impossible, but the seller must give a reasonable approximation. For example, it is within the meaning of "amount (or range of costs)" for a seller to disclose an amount "plus tax" where the seller requires billing information to determine the actual amount of tax. However, a "plus shipping"

---

[301] The final Rule requires sellers to disclose "The amount (or range of costs) the consumer will be Charged and, if applicable, the frequency of the Charges a consumer will incur unless the consumer takes timely steps to prevent or stop those Charges."

disclosure may not be sufficient if the amount of shipping is beyond what a consumer would reasonably expect or is greater than the amount a seller would reasonably incur for shipping. In such a circumstance, the seller would need to provide an estimate of shipping costs. These clarifications should address commenters' concerns about having to disclose an exact cost when doing so is not possible.

The final Rule omits the proposed fourth disclosure: the date (or dates) each charge will be submitted for payment. The Commission is persuaded by commenters' concern that a specific date or dates may be cumbersome or impossible to calculate. For example, if the seller will submit a charge when it ships a new item in a series, the seller may not be able to predict the specific dates it will submit the charge in the future. In addition, in light of the change to the placement requirements of § 425.4(b)(2)(i), discussed below, including these dates could reduce the clarity and conspicuousness of higher priority adjacent disclosures (especially cancellation deadlines, which will often occur before dates of charges). If, however, disclosure of the date (or dates) each charge will be submitted for payment is necessary to prevent deception in individual cases, such disclosure is required under § 425.4(a). However, its placement is governed by revised § 425.4(b)(2)(ii) rather than § 425.4(b)(2)(i).

Finally, the Commission clarifies the fifth proposed mandatory disclosure (the fourth in the final Rule). The proposed Rule required sellers to disclose "[t]he information necessary for the consumer to *cancel the negative option feature*" (emphasis added). In contrast, the final Rule requires sellers to disclose "The information necessary for the consumer *to find the simple cancellation mechanism* required pursuant to § 425.6" (emphasis added). This change addresses commenters' concern the language of the proposed Rule, combined with the placement requirements of § 425.4(b)(2)(i), would result in detailed cancellation disclosures crowding out

other important required disclosures.[302] This new language should provide consumers with concise critical upfront information about how to cancel, while offering sellers flexibility to avoid obscuring other important information.[303]

Some sellers expressed concern regarding the timing of disclosures where a consumer previously elected to save billing information with the seller. To address this concern the Commission now clarifies that, where a consumer has previously provided account information to the seller and expressly allowed the seller to store that information,[304] the seller must make the required disclosures prior to obtaining the consumer's consent to use saved account information.[305]

---

[302] For example, IAB suggested the Commission should require sellers "to make clear but concise disclosures of where [cancellation] information can be found, so consumers can find that information if and when it is relevant to them." IAB, FTC-2023-0033-1000.

[303] The Commission declines to adopt the State AGs three suggestions to supplement this section. The Commission expects the final Rule will address two of those suggestions (disclosure of "all material policies concerning cancellation" and of "all the information necessary for the consumer to effectively cancel the negative option feature") through the requirement that sellers disclose all material terms (§ 425.4), the prohibition of misrepresentations of material facts or terms including those pertaining to cancellation (§ 425.3), and the requirement of a simple cancellation mechanism (§ 425.6). The Commission expects to address the concerns underlying their third suggestion ("to require that the important information identified by this proposed Rule be provided to the consumer in a manner that is capable of being retained by the consumer"), through its further development of the reminders requirement. In the interim, the Commission expects the Rule provisions as adopted will encourage sellers to make important information easy to find and easy to retain.

[304] It is a violation of Section 5 for a seller to retain and use a consumer's payment information without the consumer's consent. *E.g.*, *FTC v. Classic Closeouts LLC*, No. 2:09-cv-2692 (E.D.N.Y. 2009).

[305] *See FTC v. Amazon.com, Inc*., No. 2:23-cv-00932, 2024 WL 2723812, at *11 (W.D. Wash. May 28, 2024)* ("Nothing in ROSCA says that companies … may not give consumers the option to autofill the billing information already on file or simply to provide billing information after the disclosures, but ROSCA requires that consumers be given that choice *after* the disclosures.") (emphasis in original).

### (2)     The Commission modifies the requirements of § 425.4(b) to promote clarity.

Section 425.4(b)(1) provides, "[e]ach disclosure required by paragraph (a) of this section must be clear and conspicuous." The Commission retains this requirement but revises the definition of clear and conspicuous at § 425.2(c) to address commenters' concerns regarding space-constrained disclosures.[306] Specifically, the Commission deletes the sentence, "A disclosure is not Clear and Conspicuous if a consumer must take any action, such as clicking on a hyperlink or hovering over an icon, to see it." This prohibition would have made effective space-constrained disclosures of the terms required by the final Rule difficult if not impossible. However, a clear and conspicuous disclosure still must be "unavoidable." By this requirement, consumers are protected from buried or inconspicuous disclosures. Sellers, on the other hand, can make disclosures "unavoidable" even if the consumer must take some action to see it. Specifically, the seller could make it impossible for the consumer to consent to a transaction or feature unless and until the consumer has seen the disclosure. For example, a seller dealing with space constraints on a mobile device might not display a consent button until after the consumer has scrolled down to a clear disclosure and then clicked a button indicating they have seen the disclosure.

Section 425.4(b)(2) ("Placement") retains the proposed Rule's structure requiring a subset of disclosures to "appear immediately adjacent to the means of recording the consumer's consent for the negative option feature," while setting a more general timing requirement

---

[306] The Commission declines to adopt NFIB's suggested change to strike the provision "The disclosure must use diction and syntax understandable to ordinary consumers" and replace it with "'The disclosure must use words and grammar that ordinary consumers would likely understand.'" Particularly in the context of audio disclosures, the terms "diction and syntax" provide clearer requirements than the terms "words and grammar." NFIB, FTC-2023-0033-0789.

regarding other disclosures. However, the Commission has revised some terms to promote clarity.

Specifically, final § 425.4(b)(2)(i) requires only the four specific mandatory disclosures listed in § 425.4(a) to appear "immediately adjacent to the means of recording the consumer's consent." The Commission is persuaded by commenters' concerns that requiring market participants to determine which required disclosures are "directly related to the negative option feature," and which are not, is too great a burden and could lead to consumer confusion.[307] Thus, rather than define "directly related to the negative option feature," the Commission removes this phrasing and confines the "immediately adjacent" requirement to a specific, narrow list of disclosures. This change provides clarity and improves predictability for consumers, and should prevent disclosure overload.

Several commenters requested clarification of the "immediately adjacent" requirement in the context of voice transactions.[308] In response, the Commission clarifies to comply with this requirement, a voice transaction seller must make the required disclosures immediately before requesting and recording the consumer's consent to the negative option feature.

Two commenters expressed concern that requiring sellers to make disclosures "before consumers make a decision to buy" creates uncertainty because it is unclear when that triggering event occurs.[309] The Commission agrees. Therefore, it revises § 425.4(b)(2)(ii) to provide generally for all required disclosures to appear before the seller obtains consumer consent to the transaction pursuant to § 425.5. This amended language provides a triggering event based on a clear point in the process. Additionally, the Commission revises § 425.4(b)(2)(ii) to remove the

---

[307] NRF, FTC-2023-0033-1005; Law Professors, FTC-2023-0033-0861.
[308] Coalition, FTC-2023-0033-0884; Chamber, FTC-2023-0033-0885.
[309] Kuehn, FTC-2023-0033-0871; NRF, FTC-2023-0033-1005.

phrase "not directly related to the negative option feature," doing so for the same clarity reasons described above for removing the phrase "directly related to the negative option feature" from § 425.4(b)(2)(i).

Finally, the Commission adopts a clarified version of § 425.4(b)(3) ("Other information"). The Commission retains the proposed Rule's requirement that sellers not employ "other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the disclosures." However, the Commission finds the final clause in the proposed Rule ("including any information not directly related to the material terms and conditions of any negative option feature") could be read to contradict other requirements of the Rule. Specifically, there may be necessary material disclosures not directly related to the terms and conditions of a negative option feature, and it is illogical to simultaneously require these disclosures (through §§ 425.4(a) and (b)(2)) and prohibit them (through § 425.4(b)(3)). The Commission therefore omits the clause from the final Rule. This revision does not alter the requirement of § 425.4(b)(2)(i) that certain specific disclosures be made clearly and conspicuously immediately adjacent to the means of recording the consumer's consent. A seller who makes additional disclosures immediately adjacent to the means of recording the consumer's consent in a manner undermining the clarity and conspicuousness of the required § 425.4(b)(2)(i) disclosures violates § 425.4(b)(2)(i) and § 425.4(b)(3).

### 5.    Proposed § 425.5 Consent

Section 425.5(a) of the proposed Rule prohibited sellers from charging consumers before obtaining their express informed consent to the negative option feature. This provision mirrors 15 U.S.C. 8403(2) (ROSCA), but provided specificity for sellers covered by the Rule and to

prevent unfair and deceptive practices. Specifically, the provision addressed one of the most pervasive problems of negative option marketing: sellers employing inadequate consent procedures to increase enrollment. Even for marketers trying to comply with the law, negative option programs present unique challenges. Specifically, consumers often focus on the aspects of an offer that mirror the offers they regularly encounter (*e.g.*, the quality, functionality, and one-time price of the item) and think they are consenting to these core attributes while missing the negative option feature.

To address this problem, § 425.5(a)(1) of the proposed Rule required sellers to obtain a consumer's unambiguously affirmative consent to the feature separately from any other portion of the transaction. Section 425.5(a)(2) of the proposed Rule further required the seller to exclude any information that "interferes with, detracts from, contradicts, or otherwise undermines" the consumer's ability to provide express informed consent to the negative option feature. This prohibition is consistent with longstanding Commission precedent that consent can be subverted, including by so-called "dark patterns," sophisticated design practices used to manipulate users into making choices they would not otherwise have made.[310]

Additionally, under § 425.5(a)(3) of the proposed Rule, sellers had to obtain consumers' unambiguously affirmative consent to the rest of the transaction to ensure consumers agreed to all elements of the agreement, even those not specifically related to the negative option feature. Further, § 425.5(a)(4) of the proposed Rule required sellers to obtain and maintain (for three

---

[310] *See, e.g.*, *FTC v. RevMountain, LLC*, No. 2:17-cv-02000 (D. Nev. 2017); *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006); *United States v. Mantra Films, Inc.*, No. 2:03-cv-9184 (C.D. Cal. 2003); *FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001).

years or a year after cancellation, whichever is longer) verification of the consumer's consent. The Commission specifically sought comment on the appropriate recordkeeping period. [311]

To maintain consistency with the TSR, § 425.5(b) contained a cross-reference to 16 CFR part 310 so sellers subject to the TSR know they must comply with all applicable provisions of that Rule, including those related to pre-acquired account information and free-to-pay conversions.

Proposed § 425.5(c) provided an exemplar consent mechanism for those making written offers (including those on the Internet) to illustrate how sellers could obtain consumers' unambiguously affirmative consent to the negative option feature. Specifically, this provision stated for all written offers, sellers may obtain such consent through a check box, signature, or other substantially similar method, which the consumer must affirmatively select or sign to accept the negative option feature. This consent had to be independent from any other portion of the offer. [312]

Finally, the Commission invited comments on whether sellers offering free trials should be required to obtain an additional round of consent before charging a consumer at the end of a free trial. [313]

---

[311] NPRM, FR 88 24727 n.70; *see also id.* at 24734.

[312] To avoid potential conflict with EFTA, this proposed provision does not apply to transactions covered by the preauthorized transfer provision of that Act, 15 U.S.C. 1693e, and Regulation E, 12 CFR 1005.10. Those EFTA provisions, which apply to a range of preauthorized transfers include some used for negative options, contain various prescriptive requirements (*e.g.*, written consumer signatures that comply with E-Sign, 15 U.S.C. 7001-7006, evidence of consumer identity and assent, the inclusion of terms in the consumer authorization, and the provision of a copy of the authorization to the consumer) beyond the measures identified in the proposed Rule. Consequently, compliance with the proposed Rule would not necessarily ensure compliance with Regulation E. For example, use of a check box for consent without additional measures may not comply with Regulation E's more specific authorization requirements.

[313] NPRM, 88 FR 24728.

### a)  Summary of Comments

Consistent with the Commission's and states' enforcement experience,[314] individual

consumers' comments confirm the need for clear, unambiguous, affirmative consent to a

negative option feature. These comments identify numerous examples of consumers' unwitting

enrollment in negative option programs.[315]

Sellers and trade groups also supported the requirement,[316] as did consumer groups.[317]

However, sellers and trade groups expressed concern about the requirement that sellers obtain

separate, unambiguously affirmative consent to the "rest of the transaction," as opposed to the

"negative option feature" itself. Specifically, these commenters asserted consumers may be

confused where the product or service itself is only offered as a negative option, such as with

---

[314] *See, e.g.*, State Attorneys General (ANPR), FTC-2019-0082-0012; State AGs, FTC-2023-0033-0886 (citing cases); *FTC v. Amazon.com, Inc.*, No. 2:23-cv-0932 (W.D. Wash. 2023); *see also* n.109.

[315] *See, e.g.*, Anonymous commenter, FTC-2023-0033-0799 (automatically enrolled in program without consent); Individual commenter, FTC-2023-0033-0039 (free-trial conversion to one year plan without consent); Individual commenter-FTC-2023-0033-0052 (discount to full-price conversion without consent); Individual commenter, FTC-2023-0033-1119 (cancelled, then automatically re-enrolled without consent); Individual commenter, FTC-2023-0033-0079 (automatically re-enrolled without consent); Individual commenter, FTC-2023-0033-0083 (no disclosure account would be automatically renewed); FTC-2023-0033-0138 (charged after cancellation); Individual commenter, FTC-2023-0033-0275 (no affirmative consent to monthly charge).

[316] Sirius XM, FTC-2023-0033-0857 (businesses should be required to obtain express informed consent to the negative option feature at the point of sale); PDMI, FTC-2023-0033-0864 (no objection to the general requirement that sellers obtain a consumer's consent to a transaction containing a negative option feature); MIA, FTC-2023-0033-1008 (agreeing with the consent requirement under the proposed Rule).

[317] Berkely Consumer Law Center, FTC-2023-0033-0855; State AGs, FTC-2023-0033-0886 (noting State Attorneys General support the FTC's proposed consent requirements and agree this provision is necessary given how easily marketers can enroll consumers in negative option programs without actual consent.). One individual consumer generally supported the separate consent requirements of the proposed Rule, but asked that the regulation prevent businesses from only offering goods and services through auto-renewal and subscription programs, *i.e.*, consumers should have the option to purchase a good or service a la carte and not only on a recurring basis. Individual commenter, FTC-2023-0033-0026.

streaming services or periodicals.[318] As explained by one commenter, in these situations a

second consent is likely unanticipated, and thus, could be confusing.[319]

Other groups asserted if consumers are confused, they may not affirmatively consent to

the rest of the transaction, which could cause uncertainty about the existence of the contract.[320]

Commenters also noted too many required actions during the purchasing process may lead to

[318] Sirius XM, FTC-2023-0033-0857 (requiring an additional consent will only result in consumer confusion); NCTA, FTC-2023-0033-0858 ("requiring two consents could lead to consumer confusion (to say nothing of their exasperation at being forced to read and provide consent to a plethora of successive and largely duplicative documents). They may wonder why they are being asked to consent twice to a single transaction. And might worry that they have somehow misunderstood one or both of the consent notices"); PDMI, FTC-2023-003-0864 (anecdotal evidence received from several PDMI members demonstrates that any time an additional choice or check box is offered to a consumer during a single transaction, such extra steps are likely to cause consumer confusion); N/MA, FTC-2023-0033-0873 ("Requiring sellers to separate a single unified offer into separate components is not only unnecessary, it risks creating consumer confusion and fatigue" and consumers may "simply abandon the transaction"); RILA, FTC-2023-0033-0883 ("requirement for two distinct consents . . . may be confusing and not helpful to consumers."); DCN, FTC-2023-0033-0983 ("We are concerned that requiring a separate consent would be confusing for the consumer who may not have the details of the entire contract readily available in the mandated separate context. For example, most consumers would likely want to review all of the benefits they would receive as part of a subscription including any discounts when deciding on whether to choose the option of automatic renewal."); APCIA, FTC-2023-0033-0996 ("Requiring a separate consent for a feature that is inherent in service contracts – continuous coverage – seems unnecessary and detrimental to consumers.").
[319] IAB, FTC-2023-0033-1000 ("Furthermore, consumers are familiar with subscription sign-up experiences and do not expect to have to consent a second time once they choose to purchase an autorenewal plan."). One individual consumer confirmed the comment. Individual commenter, FTC-2023-0033-0552 ("The rule specifically prescribes that users must affirmatively assent specifically to the negative option feature, but in cases where a user is only purchasing a negative option product, how should other disclosures be presented?")
[320] NCTA, FTC-2023-0033-0858; Sonsini Alarm Clients, FTC-2023-0033-0860 ("could lead to consumers inadvertently failing to consent to auto-renewal (because they did not notice the second check box) and having an unintended lapse in home security system coverage."); Asurion, FTC-2023-0033-0878 ("many consumers who want and could benefit from auto-renewal protection provisions will neglect to make the requisite two separate affirmative consents and suffer real consequences when they find themselves with a broken device during a gap in coverage"); APCIA, FTC-2023-0033-0996 ("A consumer who wants a service contract but then inadvertently fails to check a box indicating separate consent for the negative option feature could find that they no longer have coverage at the time they most need it.").

"fatigue" and "cognitive overload," causing consumers to abandon transactions they may have otherwise wanted. [321] Finally, several commenters complained the separate consent requirements would be difficult (and costly) to implement, but without any benefit to consumers. [322] Thus, these commenters asked the Commission to exclude transactions where the negative option feature is not independent of the good or service being sold, *i.e.*, where the good or service is itself only offered as a negative option, [323] or to delete the requirement that sellers obtain separate, unambiguous, affirmative consent "to the rest of the transaction." [324]

Two commenters asked the Commission to modify the proposed provision by merging consent to the transaction and the negative option feature. These commenters suggested a separate consent should only be necessary where there are two independent portions of the

---

[321] *See, e.g.*, DCN, FTC-2023-0033-0983 (could lead to over-notification); CCIA, FTC-2023-0033-0984 ("Adding too much additional information or too many required actions in a purchase cart has diminishing returns for consumer comprehension and attention, and can increase the cognitive load for consumers to the point that they simply stop reading or give up on the purchase."); ANA, FTC-2023-0033-1001.

[322] NCTA, FTC-2023-0033-0858 ("would require companies to change their current customer sign-up flows, at significant cost, without providing consumers with any additional benefits"); PDMI, FTC-2023-003-0864 ("requiring merchants to implement a double opt-in would impose an extraordinary financial and resource burden on sellers."); *id.* (double opt-in requirements "makes absolutely no sense, where, as is often the case, there is no transaction separate from the negative option transaction"); SCIC, FTC-2023-0033-0879; Chamber, FTC-2023-0033-0885 (little to no evidence that double opt-in will create any consumer benefit, instead will increase consumer fatigue); *see also* IAB, FTC-2023-0033-1000 (double opt-in could be especially burdensome for bundled services, requiring consumers to check an additional box for each service, without added benefit to clarity or disclosure); ICA, 2023-0033-1142 ("requiring recording keeping of "express informed consent" potentially expressed through verbal, digital, or written records for multiple years will be an onerous and expensive requirement for small business owners to fulfill.").

[323] Chamber, FTC-2023-0033-0885 ("unless there is a negative promotional option, service providers should not be required to have a separate consent for monthly billing and the underlying transaction when the underlying transaction is for a monthly service."); *see also* MIA, FTC-2023-0033-1008 ("an additional consent to initiate a Subscription is unnecessary and superfluous").

[324] *See, e.g.*, Direct Marketing Companies, FTC-2023-0033-1016.

transaction: one related to the negative option feature and a second for the sale of a separate good or service (including a free trial).[325] Without this change, commenter Kuehn suggested "the proposed Rule could have the unintended result of diminishing the efficacy of other important terms of the contract." Accordingly, Kuehn suggested the Commission revise the definition of negative option feature to encompass the entire contract (rather than a provision of the contract).[326] This alteration, along with changing "rest of the transaction" to "the sale of another good or service," would make it clear separate consent is only required where the seller has both an auto renewal agreement and the sale of another good or service.

IAB, DCN, CTA, and several direct marketing companies asserted the Commission could achieve the same outcome—informed consent—through less restrictive means, *e.g.*, by requiring a clearer disclosure of the negative option feature.[327] For example, CTA posited: "[a]lternatively, to advance the same goal, and because the Proposed Rule already requires clear and conspicuous disclosure of material terms, the FTC could instead require subscription service providers to prominently disclose subscription terms in a manner that differentiates them from other disclosures, such as in bolded or underlined font, in the course of obtaining consumer consent to the transaction."[328] Additionally, several commenters questioned "why a seller should be precluded from including other material terms of the transaction in obtaining a single consent."[329]

---

[325] Kuehn, FTC-2023-0033-0871; RILA, FTC-2023-0033-0883.

[326] Kuehn, FTC-2023-0033-0871.

[327] Direct Marketing Companies, FTC-2023-0033-1016 ("the Commission provides no evidence or rationale that a robust, clear and conspicuous disclosure proximate to the consumer's consent would be insufficient to prevent deception and remedy allegedly prevalent unfair or deceptive acts and practices").

[328] CTA, FTC-2023-0033-0997.

[329] PDMI, FTC-2023-003-0864; Sirius XM, FTC-2023-0033-0857 ("Businesses should be able

Some commenters raised additional concerns. For instance, several commenters challenged the Commission's statement that a separate check box or similar method could be used to record a consumer's unambiguously affirmative consent. Specifically, PDMI contended the check box, signature, or "substantially similar" method of consent could quickly become obsolete and "replaced by far more effective and consumer friendly mechanisms."[330] Another, NRF, argued courts routinely hold a separate check box is not required for consumers to manifest asset to terms and conditions of the agreement, so long as the terms are reasonably conspicuous.[331] Finally, a group of direct marketing companies, argued standalone consent is not necessary or reasonable, and other methods could suffice. They suggested the Commission include language that it "shall be a question of fact" whether the seller obtained consent through another means.[332]

Additionally, several trade groups and sellers expressed concern about the NPRM's proposed recordkeeping requirements. For instance, one trade group explained the proposed requirements "would require sellers to maintain records of consumer consent for at least three years, even for consumers who signed up for a free trial and cancelled it before being charged. As drafted, the proposed amendments would also require sellers to maintain records of consumer

_____

to obtain such consent in conjunction with the other terms of an offer,[] as long as they clearly and conspicuously disclose the negative option features and the other material terms of the offer and refrain from "includ[ing] any information that 'interferes with, detracts from, contradicts, or otherwise undermines" the negative option terms.").

[330] PDMI, FTC-2023-003-0864.

[331] NRF, FTC-2023-0033-1005 (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017)). It is unclear from NRF's comment whether it questioned separate consent generally, or the guidance on a check box.

[332] Direct Marketing Companies, FTC-2023-0033-1016.

consent for eleven years for individuals who continuously subscribe to negative option features for at least ten years."[333]

Numerous commenters asserted these recordkeeping requirements would increase costs, which could ultimately be passed onto consumers,[334] or small businesses, especially with respect to in-person and telephone transactions.[335] Others raised concern the proposed recordkeeping requirement could conflict with best privacy practices. For example, commenters noted the retention period is at odds with the need to minimize the amount of consumer data that businesses hold and to enable customers to request deletion of their data.[336] Commenters also suggested the Commission reduce the length of the recordkeeping requirement, *e.g.*, to six

---

[333] ANA, FTC-2023-0033-1001; *see also* BSA, FTC-2023-0033-1015 ("the current language could be read to require a company to retain for three years the records of a customer who signed up for a free trial but cancelled before the trial ended—and was therefore never a paying customer.").

[334] APCIA, FTC-2023-0033-0996; IAB, FTC-2023-0033-1000 ("this requirement will be significantly costly, as subscription businesses will need to overhaul their sign-up processes to comply with this requirement. Businesses seeking to offset this increased cost will be forced to pass this cost to consumers or avoid offering subscriptions at all").

[335] NCTA, FTC-2023-0033-0858 ("The proposal fails to account for the immense burden the proposal would impose on companies using alternative means to sell their products and services by requiring them to create and implement ways to capture and store duplicative layers of consumer consent.").

[336] CCIA, FTC-2023-0033-0984 ("This record retention rule also seems to be at odds with key principles of consumer privacy, namely the need to minimize the amount of consumer data that businesses hold and to enable customers to request deletion of any data in possession of a third party. A shorter mandatory retention period is more appropriate for both businesses and consumers."); NCTA, FTC-2023-0033-0858 ("Not only is it expensive to maintain these records, it does not comport with privacy best practices.").

months,[337] or revise the proposal to eliminate the requirement for those who do not allow customers to purchase without accepting the terms of the negative option feature.[338]

Two consumer groups supported the consent provision but asked the Commission to add clarifying language. Specifically, Berkeley Consumer Law Center asked the Commission to state the Rule strictly prohibits the use of dark patterns to obtain consent and that consent cannot be given through silence. A group of professors asked the Commission to clarify that disclosures "appear in each language in which the representation that requires the disclosure appears."[339]

Finally, commenters split on whether the Rule should require separate affirmative consent for free-trial offers. Several consumers supported requiring separate consent at the conclusion of a free-trial period,[340] with one consumer suggesting the Commission ban free-trial offers that require the prepurchase of the good or service.[341] Other consumer interest and public

---

[337] ICA, 2023-0033-1142 ("Decrease the duration of the record-keeping requirement to six months after the business and the consumer enters into the agreement."); *see also* Direct Marketing Companies, FTC-2023-0033-1016 (change recordkeeping requirement to keep or maintain records "for at least one year if the consumer is charged at least twice within six months after the initial charge; or for at least three years if the consumer is not charged at least twice within six months after the initial charge.").

[338] PDMI, FTC-2023-003-0864; Chamber, FTC-2023-0033-0885.

[339] Law Professors, FTC-2023-0033-0861.

[340] Individual commenter, FTC-2023-0033-0843 ("In addition to making it easy to cancel an online subscription, it should be illegal for companies offering a 'free trial' to bill for any term of subscription without an opt-in step. If they really believe trying their product will prompt me to keep using it, then it needs to be a 2-step process in which at the end of the trial period they must ask for and receive an opt in before they place a charge on my card."); Individual commenter, FTC-2023-0033-0615 ("Rather than automatic renewals, I think subscriptions should only be renewed following consumer approval. For example, after a 14-day trial of an app, consumers should be asked if they approve a purchase to continue. If approval isn't given, the default should be that the subscription expired and the consumer isn't charged."); Individual commenter, FTC-2023-0033-0993 ("If it's a trial subscription the company should notify you that your trial is over and affirm your desire to continue.").

[341] Individual commenter, FTC-2023-0033-0026; *see also* Individual commenter, FTC-2023-0033-0583 ("Require that any entity not require a credit card on file for a trial, or any free period."); Individual commenter, FTC-2023-0033-0641 ("Consumers shouldn't have to be

advocacy groups reiterated consumers often forget, or are unaware they have signed up for, a negative option feature in connection with a free trial offer.[342] Sellers and trade groups disagreed, specifically noting the Commission's own analysis indicating a separate consent may not be necessary given the other requirements of the Rule[343] and existing state laws.[344]

### b) Analysis

Based on the record, the Commission removes the proposed requirement that sellers obtain separate consent to "the rest of the transaction" under § 425.5(a)(3). Further, the Commission modifies the recordkeeping requirement to require sellers to maintain records only for three years from the date of consent. Alternatively, if sellers can show by a preponderance of the evidence they use processes that make it technologically impossible for a consumer to purchase the good or service without consent, sellers need not retain such records.[345] Finally, the

---

[342] State AGs, FTC-2023-0033-0886 ("the State Attorneys General again respectfully encourage the FTC to require sellers offering free trials to obtain an additional round of consent before charging a consumer at the completion of the free trial."); Law Professors, FTC-2023-0033-0861 ("we ask that the Commission require additional consent from the consumer before a business may convert a free (or nominal-fee) trial into an expensive subscription. Indeed, it seems that Congress, in adopting ROSCA, validated consumer expectations that they would "have an opportunity to accept or reject [a] membership club offer at the end of [a] trial period."); TINA, FTC-2023-0033-1139 ("Such consumer complaints are consistent with survey data showing that 42 percent of consumers forget they are still paying for a subscription they no longer use.[] 'Many of those happen after you get enticed by a free trial for an online streaming service or a monthly subscription service for clothes or personal items, and then you forget to cancel it after that trial is over.'").

[343] Sirius XM, FTC-2023-0033-0857 ("As long as consumers are clearly informed about the terms of a free trial offer and evince affirmative consent, no further consumer consent should be required when the free trial period expires.").

[344] CCIA, FTC-2023-0033-0984; Chamber, FTC-2023-0033-0885.

[345] This change will not affect a seller's obligation to maintain appropriate records under other regulations, *e.g.*, the TSR.

Commission declines to modify the consent provisions to require separate consent for free-trial offers. However, should the Commission seek additional comments about a provision to require annual reminders,[346] it will consider addressing such offers at that time.

Prior to addressing each of the issues listed above, it is important to clarify one point. A negative option feature is not itself a product or service—it is simply a mechanism for repeatedly consenting to the extension of a contract through silence. Thus, there are not situations in which the negative option feature is the product, as some commenters suggested. In the example provided above, a subscription to a streaming entertainment service can be offered with (*e.g.*, the offer renews each month until cancellation) or without (*e.g.*, the subscription lasts one year and then must be affirmatively renewed, or it cancels) a negative option feature. There are situations in which sellers only offer products or services on a negative option basis; however, doing so does not lessen the need to ensure consumers consent to the negative option mechanism within the agreement. Therefore, the analysis below does not separately address this issue.

**(1)      The Commission does not adopt a requirement for separate consent to "the rest of the transaction" because it is unnecessary, confusing, and hard to implement.**

Based on the comments, the Commission finds requiring consumer consent to "the rest of the transaction" apart from the negative option feature is unnecessary, potentially confusing, and may be hard to implement. First, even without the separate consent requirement, the proposed Rule contained several elements that work together to ensure consumers know they are agreeing to a negative option feature. Specifically, the proposed Rule required sellers to obtain the consumer's unambiguously affirmative consent to the negative option feature separately from

---

[346] *See* Section VII.B.7.

any other portion of the transaction.[347] through, for example, a separately presented check box.[348] It also required sellers to clearly and conspicuously provide important information immediately adjacent to the request for consumer consent, including that the charge will be recurring, the deadline to act to stop charges, the amount of the charges, and information necessary to cancel.[349] Further, the proposed Rule stated the seller cannot include any information or employ any techniques that interfere with the consumer's ability to understand these important disclosures and provide unambiguously affirmative consent to the negative option feature.

Given these protections, a separate consent requirement is not necessary.[350] Second, the Commission agrees the separate consent requirement could cause consumer confusion. Moreover, compliance with the Rule's required disclosure and consent provisions should address the concerns commenters raised regarding deception. Finally, several sellers suggested, and there is no evidence to the contrary, that seeking consent to both the negative option feature and the rest of the transaction could be hard to implement for many sellers. Thus, the final Rule does not contain the separate consent requirement.[351]

---

[347] Section 425.5(a)(1).
[348] Section 425.5(c) allows sellers to comply with the requirement to obtain unambiguously affirmative consent to the negative option feature through a check box, signature, or other substantially similar method.
[349] *See* Rule § 425.4(a)(1)-(4).
[350] The Commission further notes because the seller is obtaining express informed consent to the negative option feature separately from the rest of the transaction, consumers are, in effect, agreeing to both the negative option feature and the sale of the good or service separately.
[351] *See* § 425.5(a)(3).

**(2)      The Commission modifies the recordkeeping requirements to address legitimate privacy concerns and reduce undue burden on small businesses.**

Section 425.5(a)(4) of the proposed Rule required sellers to obtain and maintain (for three years or a year after cancellation, whichever was longer) verification of the consumer's consent to the negative option feature. Implementation of this requirement would undoubtably enhance the FTC's ability to enforce the Rule. However, the Commission agrees the proposal creates privacy concerns. The Commission has long recommended companies employ data retention policies that "dispose of data once it has outlived the legitimate purpose for which it was collected."[352] Therefore, the Rule's data retention requirement, could, in some instances, be at odds with this guidance. Further, several commenters asserted a longer recordkeeping requirement will be burdensome, particularly for small businesses.

Balancing the Commission's interest in robust Rule enforcement against privacy and burden concerns, the Commission modifies the proposed Rule. Specifically, § 425.5(a)(3) of the final Rule requires sellers to keep or maintain verification of the consumer's consent for a period of three years from the date of consent (rather than three years or a year after cancellation, whichever is longer). Removing the requirement that sellers keep records until one year after cancellation prevents the retention of records for very long periods of time while the contract is still in force. Moreover, as some commenters stated,[353] sellers can employ technological processes for online consent that could alter the balance of concerns. Specifically, it is

---

[352] NCTA, FTC-2023-0033-0858 (citing FTC, "Protecting Consumer Privacy in an Era of Rapid Change" (2012) at 28, www.ftc.gov/reports/protecting-consumer-privacy-era-rapid-change-recommnedations-businessespolicymakers).
[353] ANA, FTC-2023-0033-1001; ESA, FTC-2023-0033-0867 (for purchases that cannot be completed without a consumer's consent, a business will be deemed compliant with any recordkeeping requirement and is not required to maintain an individual record of consent).

technologically feasible to make it impossible for customers to enroll without providing unambiguously affirmative consent. The Commission therefore further modifies the recordkeeping requirement to eliminate the requirement entirely if a seller can demonstrate it meets this threshold. The final provision will allow sellers to destroy consumer records more quickly, while accomplishing the same goal.[354] Finally, the Commission clarifies maintaining copies of advertisements or telephone scripts documenting the disclosures provided in general does not meet this requirement. Such information is easily manipulated by deceptive sellers and cannot show any particular consumer received the disclosures prior to giving consent. Therefore, sellers must either maintain records of each consumer's unambiguously affirmative consent or demonstrate they satisfy the technological exemption provision.

(3)     **Other concerns raised by commenters do not warrant modifications to the rule.**

As noted above, a few commenters questioned the Commission's proposed exemplar consent mechanism under § 425.5(c). This proposed provision states for written offers, a check box, signature, or "substantially similar" method can be used to obtain a consumer's unambiguously affirmative consent. The Commission notes the mechanism applies to the negative option feature only, and thus corrects the cross-reference contained in this provision from (a)(3) to (a)(1).

The Commission further notes this provision does not require a check box or signature. The Commission offered these methods only as examples a seller can use to obtain unambiguously affirmative consent, not the only ways to do so. Thus, the exemplar does not

---

[354] Importantly, if the seller does not maintain records and cannot satisfy the technological exemption, the seller has violated the Rule.

conflict with caselaw holding that a check box is not required to manifest consent. The Commission also declines to include language in the final Rule, as one commenter suggested, [355] stating whether a seller has complied with this provision is a question of fact. This is unnecessary because the Commission always evaluates sellers' practices on a case-by-case basis to determine whether they comply with the law.

The Commission further declines to remove this provision's reference to "substantially similar" methods as some commenters requested. The language is intended to cover any method that affords consumers all the same protections as a check box or signature. The phrase "substantially similar" performs this function while allowing for technological advancement, innovation, and adaption without tying sellers to specific mechanism that may become obsolete.

Further, the Commission declines to modify the final Rule to allow sellers to obtain express informed consent by merely "disclosing" the negative option more clearly through, *e.g.*, bolded or underlined font, rather than obtaining expressed informed consent separately for the negative option feature. Although this change would be "less restrictive," it would not adequately protect consumers from unknowingly enrolling in negative option programs. In the NPRM, the Commission balanced the need for clear, unavoidable disclosure of, *inter alia*, the negative option feature with the need for flexibility to allow sellers to best communicate their entire message to consumers. The proposed Rule strikes the right balance. As discussed above, proposed § 425.4 (Important Information), required sellers to clearly and conspicuously disclose important information about the negative option feature, immediately adjacent to the means of recording consent to the feature, and, under § 425.5 (Consent), separately from any other portion

---

[355] Direct Marketing Companies, FTC-2023-0033-1016.

of the transaction. The Commission did not specify exact placement, language, or font size because doing so would have diminished flexibility without a sufficient corresponding benefit.

While this balance is appropriate, the required disclosure of important information under § 425.4 does not replace the requirement that sellers obtain consumers' express informed consent. To avoid harm from unfair and deceptive practices, it is imperative consumers unequivocally understand they are agreeing to enrollment in a negative option program and demonstrate their agreement.

The Commission also declines to add language stating (1) the Rule strictly prohibits the use of dark patterns to obtain consent and (2) consent cannot be given through silence. The Rule already addresses both concerns. First, the Rule bars any information that "interferes with, detracts from, contradicts, or otherwise undermines" the consumer's ability to provide express informed consent. To the extent dark patterns run afoul of any of these requirements, they are prohibited. To the extent they do not, consumers' express informed consent as required by the Rule is not implicated. Second, under § 425.5, consumers already must give affirmative consent.

Finally, the Commission does not need to clarify, as some commenters suggested, that required consents "appear in each language in which the representation . . . appears."[356] To obtain a consumer's express informed consent, each disclosure must be clear and conspicuous and immediately adject to the means of recording the consumer's consent. To meet the clear and conspicuous standard as defined in the Rule, the disclosure must, among other things, "appear in each language in which the representation that requires the disclosure appears."[357]

---

[356] Law Professors, FTC-2023-0033-0861.
[357] Rule § 425.2(c)(6).

**(4)       The Commission does not modify the Rule to require separate consent for free trial offers.**

In the NPRM, the Commission invited comments on whether the Rule should require an additional (or alternative) round of consent after the end of a free trial offer. As explained in the NPRM, if the seller follows the proposed Rule's disclosure and consent requirements, consumers should understand they are enrolled in, and will be charged for, the negative option feature once the free trial ends. As discussed above, however, several commenters explained with enough time between initial enrollment and charge after conversion, consumers are primed to forget the negative option feature.[358] The Commission agrees this an important issue; however, clear upfront disclosures lessen the chance a negative option feature may be unfair or deceptive. Specifically, clear, accurate upfront disclosures reduce the risk of deception, and the potential harms caused are more likely to be reasonably avoidable (*i.e.*, the consumer can simply refuse to enter into the contract). That said, taking advantage of consumers' "forgetfulness" is extremely troubling and thus ripe to be addressed by other means.

**6.       Proposed § 425.6 Simple Cancellation ("Click to Cancel")**

Section 425.6 of the proposed Rule contains several requirements to ensure consumers can easily cancel negative option features. As explained in the NPRM, "easy cancellation is an essential feature of a fair and non-deceptive negative option program," but one that has become "far too often illusory."[359] "If consumers cannot easily leave a negative option program, the

---

[358] Deceptive sellers also commonly delay shipment of goods or services until close to the end of the trial period, giving consumers little time to stop the charge or cancel the negative option. *See, e.g.*, Individual commenter, FTC-2023-0033-0085.
[359] NPRM, 88 FR 24729; *see* ANPR, 84 FR 52395 (discussing general requirements for nondeceptive negative options); *id.* at 52396 (discussing the ongoing problems in the marketplace including inadequate or overly burdensome cancellation procedures).

negative option feature is little more than a means of charging consumers for goods and services they no longer want."[360]

To prevent unfairly trapping consumers in a transaction they do not want, the proposed Rule directed sellers to provide a cancellation mechanism that (1) immediately halts recurring charges; (2) is as simple to use as the mechanism the consumer used to consent to the negative option feature; and (3) is readily accessible through the same medium the consumer used to provide that consent. The Commission intended these requirements to erect clear guardrails, while providing sellers with the flexibility to innovate. Therefore, rather than propose specific prohibitions, which may lose utility over time, or inadvertently provide a roadmap for deception, the proposed Rule outlined a performance-based standard mapping the contours of what constitutes a simple mechanism, without overly prescriptive requirements.

a) **Section 425.6(a)-(b) Simple Mechanism Required For Cancellation; And Simple Mechanism At Least As Simple As Initiation.**

(1) **Summary of Comments**

Proposed §§ 425.5(a) and (b) required a fast and easy cancellation mechanism that, at minimum, allows the consumer to cancel as easily as they enrolled in the program. The Commission received thousands of comments in support of this provision, with individual consumers uniformly expressing their desire for a simple easy to use cancellation mechanism.[361]

---

[360] NPRM, 88 FR 24729.

[361] Individual commenter FTC-2023-0033-0029 ("Please implement this necessary rule to protect consumers and save us hours on the phone cancelling services we signed up for with one click online."); Individual commenter, FTC-2023-0033-0072 ("I have had issues with some online subscriptions which were entered into purely online, but to cancel I had to call a phone number open only during certain business hours. I would like a rule that requires all subscriptions to be

Such comments included: "If you signed up online, you should be able to cancel online. If it took one click to join, it should take one click to cancel;"[362] "I would like the option to cancel my subscriptions, [and] offers online just as easily as it was to sign up;"[363] "As more and more services enter online use, it is ridiculous that consumers have to jump through so many hoops to cancel services when it is so easy to sign up for them;"[364] and "Consumers need the one-click option."[365]

available to cancel through the same means as they were initiated, whether that is online, in person, phone, mail, or chat. I believe that would be fair to people of all technological levels while allowing businesses to conduct business how they feel comfortable without allowing them to create unnecessary hurdles for customers looking to end their service.").

[362] Individual commenter, FTC-2023-0033-0111. Thousands of individual consumers repeated this phrase through a mass media campaign. *See, e.g.*, Anonymous commenter, FTC-2023-0033-0013; Individual commenter, FTC-2023-0033-0016 ("If I can subscribe in one click, I should be able to unsubscribe in one click."); Individual commenter, FTC-2023-0033-0017 ("It should be as easy as one click to cancel an online account."); Individual commenter, FTC-2023-0033-0068 ("Being able to go online and with a simple click be able to cancel a subscription would be a dream."); *see also* Individual commenter, FTC-2023-0033-0015 ("Ending a subscription should be as easy as it was to sign up. it makes no sense how hard it is to close out an account with some places."); Individual commenter, FTC-2023-0033-0020 ("The time has come to make it as easy for consumers to cancel subscriptions as it has been to start them."); Individual commenter, FTC-2023-0033-0087 ("I think any offer you can buy with a click should also be an offer to unsubscribe with a click.").

[363] Individual commenter, FTC-2023-0033-0003; *see also* Individual commenter, FTC-2023-0033-0010 ("I for one would be for the Easing of subscription cancellation. Having it be much harder to cancel a subscription than start it simply shouldn't be."); Anonymous commenter, FTC-2023-0033-0024 ("It should be no harder for consumers to stop giving a company their money than it is for them to start giving it to them."); Individual commenter, FTC-2023-0033-0025 ("In fact, it should be as easy to cancel as it is to sign up.").

[364] Individual commenter, FTC-2023-0033-0231; Individual commenter, FTC-2023-0033-0109.

[365] Individual commenter, FTC-2023-0033-0403.

Some commenters suggested unsubscribing should be easier than enrolling,[366] and others, "very easy."[367] Indeed, several advocated for an "Unsubscribe link,"[368] similar to those available under the CAN-SPAM Act.[369] Numerous commenters complained they often have to resort to disputing the charge with credit card companies (or cancelling the card altogether) because cancellation is so difficult or impossible.[370] Additionally, commenters described the simple cancellation mechanism requirements as a "no brainer," "common sense," and "only fair"

---

[366] "Unsubscribing should be easier than subscribing." Individual commenter, FTC-2023-0033-0005. *Accord* Individual commenter, FTC-2023-0033-0021 (same); Anonymous commenter, FTC-2023-0033-0040 ("I am in favor of making it easier to discontinue services."); Individual commenter, FTC-2023-0033-0107 ("Canceling a subscription should be easier that setting up the subscription.").

[367] Individual commenter, FTC-2023-0011 ("It should be very easy to cancel a subscription, artificially creating difficulty or hurdles only serves to hurt the consumer of a service as well as a company's image and deplete trust in a brand or service."); Individual commenter, FTC-2023-0033-0036 ("It should be very easy to cancel a subscription!!!!!").

[368] Individual commenter, FTC-2023-0033-0030; Individual commenter, FTC-2023-0033-0035; *see also* Individual commenter, FTC-2023-0033-0188 ("If you sign up online, you should be able to cancel online. If it took one click to join, it should take one click to cancel. Kind of like 'unsubscribing' from an email newsletter you don't want to get anymore."); Individual commenter, FTC-2023-0033-0236 ("When I get an email from a politician I'm not interested in there is always an unsubscribe button. Why can't paid subscriptions be the same?").

[369] Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM Act"), 15 U.S.C. 7701-7713; 16 CFR part 316.

[370] *See, e.g.*, Individual commenter, FTC-2023-0033-0068; Individual commenter, FTC-2023-0033-0086; Individual commenter, FTC-2023-0033-0203 ("Recently, I had to start a dispute case with my credit card company because I had subscribed to a service and there was no way to cancel that service."); Individual commenter, FTC 2023-0033-0211; Individual commenter, FTC-2023-0033-0225 (had new card issued); Individual commenter, FTC-2023-0033-0275 (disputed the charge and cancelled card); Individual commenter, FTC-2023-0033-0311 (cancelled credit card); Individual commenter, FTC-2023-0033-0320 (disputed charge); Individual commenter, FTC-2023-0033-0501 (terminated credit card); Individual commenter, FTC-2023-0033-1134 (cancelled credit card).

to consumers.[371] These and others commenters complained of the hundreds of dollars[372] and

hours[373] wasted on unused and unwanted products and services they were not effectively able to

cancel due to byzantine cancellation procedures.[374]

[371] *See, e.g.*, Individual commenter, FTC-2023-0033-0256; Individual commenter, FTC-2023-0033-0408 ("common sense"); Individual commenter, FTC-2023-0033-0431 ("no brainer"); Individual commenter, FTC-2023-0033-0586 ("no brainer").

[372] Individual commenter, FTC-2023-0033-0232; Individual commenter, FTC-2023-0033-0459 ("I once lost hundreds of dollars because I could not find how to cancel."); Individual commenter, FTC-2023-0033-0509; Individual commenter, FTC-2023-0033-0232 ("I'm currently trapped in at least three subscriptions that are nearly impossible to cancel, costing me hundreds of dollars per year."); Individual commenter, FTC-2023-0033-0509; Individual commenter, FTC-2023-0033-0825 ("I have wasted hundreds of dollars for things that automatically renewed as a result of not being able to figure out easily how to cancel."); Individual commenter, FTC-2023-0033-0572; Individual commenter, FTC-2023-0033-0697 ("I have been caught up in just this very unfair practice where I've been lured in and can't get out— to the tune of hundreds of dollars that I don't have."); *see also* Public Interest Groups, FTC-2023-0033-0880.

[373] *See, e.g.*, Individual commenter, FTC-2023-0033-029 ("Please implement this necessary rule to protect consumers and save us hours on the phone cancelling services we signed up for with one click online."); Anonymous commenter, FTC-2023-0033-0040 ("My negative experience was that it was a simple 'click' on-line to sign up for a service but to cancel same service it took three phone calls and hours of my time.); Individual commenter, FTC-2023-0033-0084 ("I spent over two hours of my time trying to cancel the subscription."); Individual commenter, FTC-2023-0033-0106 ("I've definitely lost at least 30 hours of my life dealing with insufferable 'retention specialists,' all of whom should be ashamed of what they do."); Individual commenter, FTC-2023-0033-0431; Individual commenter, FTC-2023-0033-0385 ("This is not a bot generating a letter; it's an actual person, and I want to register strong support for the one Click rule you are considering. I have wasted hours trying to deal with customer service, whose only goal is to keep me on board."); Individual commenter, FTC-2023-0033-0672 ("It's about time! Trying to unsubscribe can waste many hours, induce stress, result in unwanted subscription or cancellation fees, and leave personal data subject to abuse."); Individual commenter, FTC-2023-0033-0642 ("There needs to be a substantial penalty when a service is requested to be cancelled, but the charges continue. I dropped my TV service from Comcast 3 months ago and they continue to charge me. Every time I need to re-contact them I waste an hour.").

[374] Individual commenter, FTC-2023-0033-0422 ("Implementing this consumer-protection rule has the potential to save American consumers millions of dollars, and prevent unscrupulous companies from using byzantine cancellation procedures to squeeze unwarranted funds out of their customers."); Individual commenter, FTC-2023-0033-0233 ("I had to navigate an endless labyrinth of dark-patterned links in order to cancel an Amazon Prime subscription that took me one click to sign up for."); Individual commenter, FTC-2023-0033-0482 ("They make it a labyrinth of obscure phrases and if you don't know to click on just the right one, you'll never be able to cancel.").

As summarized by the Berkeley Consumer Law Center, "requiring the mechanism of cancellation be as simple as enrollment" will minimize "overly complex cancellation processes with multiple steps," and prevent sellers "from trapping consumers in automatically renewing subscriptions through obstacles created by tedious processes or confusion."[375]

Sellers and trade organizations argued the proposed requirements were "too vague."[376] For instance, PDMI asserted the requirement that the simple cancellation mechanism be as easy to use as the one used to initiate the transaction provides no clear guidance on when a transaction is "initiated." Several industry and trade groups echoed this comment, contending "as easy as" is a difficult, and often subjective, standard.[377] Other businesses complained the proposed Rule fails to define "simple mechanism"[378] and making cancellation as easy as enrollment was not possible because they serve different purposes.[379] IAB asserted the proposed requirements were overbroad in relation to the prevalent acts or practices the Commission identified.[380]

---

[375] Law Professors, FTC-2023-0033-0861; *see also* State AGs, FTC-2023-0033-0886 ("state attorneys general strongly endorse the FTC's efforts to ensure that consumers enrolled in subscription services or other negative option plans are continuing to pay for those plans because they want to maintain their subscriptions, and not because it is too much trouble to cancel.").

[376] PDMI, FTC-2023-003-0864; ACT App Association, FTC-2023-0033-0874 (elusive language); IAB, FTC-2023-0033-1000 (unclear how to measure simplicity).

[377] Chamber, FTC-2023-0033-0885 ("ambiguous and hard to implement requirement); NRF, FTC-2023-0033-1005 (as simple as not defined and no examples).

[378] ACT App Association, FTC-2023-0033-0874. The Commission does indeed define "simple mechanism" through the requirements of § 425.6, as well as through existing caselaw and the 2021 Enforcement Policy Statement. *See* n.384.

[379] ESA, FTC-2023-0033-0867; IHRSA, FTC-2023-0033-0863; Chamber, FTC-2023-0033-0885; BSA, FTC-2023-0033-1015.

[380] IAB, FTC-2023-0033-1000. The Commission addresses IAB's prevalence assertions elsewhere. *See* Section VII.A.

**(2)     Analysis**

Considering the overwhelming support for a simple cancellation[381] mechanism that immediately halts charges,[382] and given substantial evidence supporting the need for such mechanism to prevent unfair and deceptive acts and practices, the Commission retains proposed §§ 425.6(a) and (b).[383] The Commission disagrees with commenters' argument that the "as easy as" standard is vague. The Commission has provided considerable guidance on what constitutes a simple or "easy" cancellation mechanism through numerous cases and its 2021 Enforcement Policy Statement.[384]

---

[381] Beyond the near universal support by consumers and consumer advocacy groups, some trade groups also supported the goal of ensuring consumers have a quick and easy mechanism to cancel. RILA, FTC-2023-0033-0883; *see also* Sirius XM, FTC-2023-0033-0857 ("All parties want an easy-to-use and an accessible method of cancellation"); ZoomInfo, FTC-2023-0033-0865 ("We concur with the FTC's recognition that negative option terms, often concealed in 'fine print', can be difficult for consumers to negotiate or even to comprehend fully, and that canceling these contracts can be unfairly burdensome.").

[382] Some commenters asked for clarification regarding whether the requirement under § 425.6(a) would also immediately cancel the entire contract. *See, e.g.*, N/MA ("The FTC should also clarify that the "Click to Cancel" proposal applies only to the negative option portion of a subscription and not to the entire subscription."). The language of the Rule is clear—cancellation under the Rule applies only to the negative option portion of the contract, and not the entire contract. Section 425.6 ("it is violation of this Rule . . . for the negative option seller to fail to provide a simple mechanism for a consumer to cancel *the negative option feature*") (emphasis added). Thus, when a consumer cancels, all terms and conditions continue until the expiration of the contract or agreement.

[383] BSA specifically requested the Commission revise subsection (a) to the following: "We suggest revising this language to clarify the intended result by stating the obligation is 'to cancel the negative option feature and immediately stop any recurring charges for the good or service.'" BSA, FTC-2023-0033-1015. However, this change could create ambiguity regarding application of the subsection to the initiation of charges under free- and fee-to-paid conversions. Accordingly, the Commission will not incorporate the suggested change.

[384] *See, e.g.*, EPS, 86 FR 60822; *FTC v. FloatMe Corp.*, No. 5:24-cv-00001 (W.D. Tex. 2024); *United States v. Cerebral, Inc.*, No. 1:24-cv-21376 (S.D. Fla. 2024); *FTC v. Bridge It, Inc.*, No. 1:23-cv-09651 (S.D.N.Y. 2023); *FTC v. Vonage Holdings Corp.*, No. 3:22-cv-06435 (D.N.J. 2022); *FTC v. Benefytt Techs., Inc.*, No. 8:22-cv-01794 (M.D. Fla. 2022); *FTC v. First Am. Payment Sys.*, No. 4:22-cv-00654 (E.D. Tex. 2022); *United States v. MyLife.com, Inc.*, No. 2:20-cv-6692 (C.D. Cal. 2020); *FTC v. RagingBull.com, LLC*, No. 1:20-cv-03538 (D. Md. 2020);

Moreover, the "as easy as" standard is even clearer in context, *i.e.*, a flexible measure that ensures consumers have similar cancellation and consent experiences in terms of time, burden, expense, and ease of use, among other things.[385] The Commission is aware these experiences may not always be perfectly symmetrical. Consumers may have to verify or authenticate their identity, for instance,[386] or they may be asked to confirm their intent to cancel.[387] However, reasonable verification, authentication, or confirmation procedures should not create distinctly asymmetrical experiences, particularly if the cancellation mechanism is located within account or user settings secured by authentication requirements for access. Any authentication, verification, or confirmation procedure that creates unreasonable asymmetry runs afoul of Section 5 of the FTC Act and the Rule. Moreover, given the extensive record and the Commission's experience with sellers using verification and authentication tools to thwart or delay cancellation,[388] the

---

*FTC v. Age of Learning, Inc.*, No. 2:20-cv-07996 (C.D. Cal 2020); *FTC v. Match Grp., Inc.*, No. 3:19-cv-02281 (N.D. Tex. 2019); *FTC v. Cardiff*, No. 5:18-cv-02104 (C.D. Cal. 2018); *FTC v. AdoreMe, Inc.*, No. 1:17-cv-09083 (S.D.N.Y. 2017); *FTC v. AAFE Prods. Corp.*, No. 3:17-cv-00575 (S.D. Cal. 2017); *FTC v. JDI Dating, Ltd.*, No. 1:14-cv-08400 (N.D. Ill. 2014).

[385] Some commenters raised the concern that sellers might create complicated signup procedures to justify complex cancellation mechanisms. ESA, FTC-2023-0033-0867; State AGs, FTC-2023-0033-0886; IAB, FTC-2023-0033-1000. As pointed out by the State AGs sellers must comply with all requirements of a simple cancellation mechanism, including that consumers can promptly effectuate cancellation through an accessible means.

[386] Commenters insisted that reasonable authentication and verification procedures be allowed prior to cancellation to ensure that only authorized persons are making changes to an account. NFIB, FTC-2023-0033-0789; IHRSA, FTC-2023-0033-0863; ESA, FTC-2023-0033-0867; N/MA, FTC-20230033-0873; RILA, FTC-2023-0033-0883; ANA, FTC-2023-0033-1001.

[387] *See, e.g.*, MIA, FTC-2023-0033-1008.

[388] Berkeley Consumer Law Center, FTC-2023-0033-0855; RocketMoney, FTC-2023-0033-0998; Anonymous commenter, FTC-2023-0033-0024; Individual commenter, FTC-2023-0033-0411; Individual commenter, FTC-2023-0033-0850; Individual commenter, FTC-2023-0033-0861; Individual commenter, FTC-2023-0033-0888; Anonymous commenter; FTC-2023-0033-0134; Individual commenter, FTC-2023-0033-0326; Individual commenter, FTC-2023-0033-0778.

Commission declines to create a safe harbor for these activities as some states have.[389] and as some commenters requested.[390]

Nevertheless, as some commenters point out, the proposed initiation or purchase date trigger may provide insufficient clarity.[391] Not all negative option features begin with a purchase (*e.g.*, free trials), and when a transaction is initiated is subject to interpretation or possible manipulation. Given this ambiguity, businesses attempting to comply with the proposed Rule may have difficulty, and those attempting to evade the proposed Rule may find loopholes with the proposed initiation or purchase date trigger. Thus, the Commission revises § 425.6(b).[392] to require the simple cancellation mechanism be "as easy as" the mechanism the consumer used "to consent" to the negative option feature, rather than "initiate" or "purchase" the feature. The moment of consent avoids the lack of clarity the terms "purchase" and "initiate" introduce and clarifies the action to which the cancellation must be compared.

**b)** **Proposed Section 425.6(c) Minimum Requirements For Simple Mechanisms.**

**(1)** **Summary of Comments**

The proposed Rule required sellers to provide a simple cancellation mechanism through the same medium (Internet, phone, in-person) the consumer used to consent to the negative

---

[389] *See, e.g.*, Cal. Bus. & Prof. Code § 17602(d)(3); Colo. Rev. Stat. § 6-1-732(2)(d)(I)(B).
[390] USTelecom, FTC-2023-0033-0876 ("expressly allow" business to engage in privacy and data security measures prior to cancellation); ANA, FTC-2023-0033-1001.
[391] For online cancellation, § 425.6(c)(1) of the proposed Rule required sellers to provide a simple cancellation mechanism through the same medium consumers used "to purchase the negative option feature."
[392] The Commission also will make a conforming change to add "consent" in Section 425.6(c)(1).

option feature. Almost uniformly, consumers supported this requirement.[393] However, a number of a trade groups disagreed, arguing, as explained below, the requirement is too prescriptive, or could lead to accidental or inadvertent cancellation.[394] Instead, these commenters suggested the Commission allow consumers to choose their cancellation medium (*e.g.*, based on "consumer expectations," convenience, or common use by the seller).[395]

Consumer groups and law enforcement asked the Commission to add minimum requirements to the simple cancellation mechanism. For instance, the State AGs asked the Commission to include the various requirements stated in the 2021 Enforcement Policy Statement, *e.g.*, require negative option sellers "not [to] erect unreasonable barriers to cancellation or impede the effective operation of promised cancellation procedures, and must honor cancellation requests that comply with such procedures."[396] They also urged the Commission to adopt language from New York's statute, which provides simple cancellation mechanisms must be "cost effective, timely, and easy to use."[397] Additionally, the Center for

---

[393] *See, e.g.*, Individual commenter, FTC-2023-0033-0072 ("I would like a rule that requires all subscriptions to be available to cancel through the same means as they were initiated, whether that is online, in person, phone, mail, or chat."); Individual commenter, FTC-2023-0033-0252 ("the method provided for signing up for a service must also be provided for cancelling the same service, be just as easy to find, and require no more steps than it took to sign up.").

[394] *See, e.g.*, NCTA, FTC-2023-0033-0858; PDMI, FTC-2023-0033-0864; CTA, FTC-2023-0033-0997; ANA, FTC-2023-0033-1001. *See also* Wilson Sonsini Goodrich & Rosati on behalf of certain of its alarm company clients ("Sonsini Alarm Clients"), FTC-2023-0033-0860 (alarm companies should be able to speak to the customers to verify identity and confirm cancellation intent); N/MA-FTC-2023-0033-0873 (A "one click" cancellation requirement for an entire subscription, especially absent some form of authentication, could also lead to accidental and/or malicious cancellations.); NRF, FTC-2023-0033-1005 (data suggests that one-click-cancellation functions frequently cause accidental cancellations).

[395] *See, e.g.*, Sirius XM, FTC-2023-0033-0857; N/MA, FTC-2023-0033-0873; State AGs, FTC-2023-0033-0886.

[396] State AGs, FTC-2023-0033-0886.

[397] *Id.*

Data Innovation asked the Commission to create a working group to define simple mechanism further, including best practices for businesses.[398]

Finally, some commenters suggested the record lacks evidence that it would be unfair or harmful to consumers to have a cancellation process different from the sign-up process.[399] Accordingly, they argued promulgating a trade regulation rule requiring such symmetry is beyond the Commission's authority. Further, IAB argued the Commission cannot create new requirements defining simple cancellation methods beyond ROSCA's simplicity standard, *i.e.*, that sellers provide simple mechanisms to stop recurring charges, because Congress already decided the appropriate standard.[400]

### (a) Proposed § 425.6(c)(1): Online Cancellation

Section 425.6(c)(1) of the proposed Rule specifically addressed online cancellation, requiring sellers to provide a cancellation mechanism over the same website or web-based application the consumer used to consent. Thousands of commenters repeated the mantra: "If you signed up online, you should be able to cancel online," noting they often face hurdles finding a cancellation mechanism, and then must call and spend significant time on the telephone to cancel their subscriptions.[401]

In contrast, RILA suggested consumers would not always expect to find a cancellation function through the same online medium the consumer used to enroll. "For example, contracts

---

[398] CDI, FTC-2023-0033-0887.

[399] CTA, FTC-2023-0033-0997; IAB, FTC-2023-0033-1000.

[400] IAB, FTC-2023-0033-1000.

[401] Individual commenter, FTC-2023-0033-0215 ("If you signed up online, you should be able to cancel online. If it took one click to join, it should take one click to cancel."); Individual commenter, FTC-2023-0033-0847; Anonymous commenter, FTC-2023-0033-0040 ("My negative experience was that it was a simple 'click' on-line to sign up for a service but to cancel same service it took three phone calls and hours of my time. If I can sign up with a 'click' then I SHOULD be able to cancel with a 'click.'").

are . . . increasingly concluded online through third parties or via social media apps. Regardless of how a customer initially signs up, once she/he establishes a purchasing arrangement with a seller, the customer will logically look to the seller to cancel."[402] Several commenters agreed, stating where a consumer enrolls through a third party, or through an IoT device, the consumer may naturally look to the seller with whom the consumer has the agreement.[403]

Similarly, trade groups, such as NCTA and PDMI, argued mandating consumer cancellation through the same website or web-based application the consumer used to initiate the transaction is too prescriptive.[404] Several of these commenters asserted the proposed requirement is unnecessary and contrary to consumer expectations.[405] They further contended when consumers enroll online, any online cancellation mechanism should be adequate.[406] Further, these commenters suggested it may not be possible to offer the same website or web-based application due to contractual obligations and limitations imposed by third parties.[407]

Additionally, broadband, wireless, and streaming groups, such as NCTA and USTelecom, suggested the same-medium requirement is particularly troublesome for their industries because consumers often subscribe to multiple, or bundled, services, rendering cancellation online through a single click difficult or impossible. These industries posited consumers often do not, in fact, want to cancel, but rather seek to downgrade or modify services.

---

[402] RILA, FTC-2023-0033-0883.
[403] ESA, FTC-2023-0033-0867; ANA, FTC-2023-0033-1001.
[404] NCTA, FTC-2023-0033-0858; PDMI, FTC-2023-0033-0864; CTA, FTC-2023-0033-0997; ANA, FTC-2023-0033-1001.
[405] *See, e.g.*, ESA, FTC-2023-0033-0867; IAB, FTC-2023-0033-1000.
[406] *See, e.g.*, IAB, FTC-2023-0033-1000; MIA, FTC-2023-0033-1008; *see also* RILA, FTC-2023-0033-0883 (enrollment online, *e.g.*, Internet-based mobile applications, should be allowed through seller's website).
[407] *See, e.g.*, ESA, FTC-2023-0033-0867.

Therefore, requiring a consumer to speak to a live agent best accomplishes this goal, regardless of how the consumer enrolled. [408]

Alarm companies raised a similar concern, *i.e.*, there are no safeguards to ensure the consumer intended to cancel (rather than, *e.g.*, unsubscribe from marketing emails) when cancelling online. They also emphasized the importance of verifying a consumer's identity prior to cancellation. As explained by a commenter representing various alarm company clients, alarm companies' "cancellation procedures are designed to prevent inadvertent or malicious disabling of alarm monitoring services, often by directing consumers to call trained customer support representatives who can verify the consumer's identity via their secure passcode and ensure any changes made to the account are intentional and fully informed." [409]

### (b)     Proposed § 425.6(c)(2): Telephone Cancellation

Proposed § 425.6(c)(2) addressed situations in which sellers obtain consumer consent by telephone. In these situations, the proposed Rule required sellers to provide a telephone number to consumers and "assure" all calls are answered promptly during "normal business hours" and are no more costly than the call to enroll.

---

[408] USTelecom, FTC-2023-0033-0876; CTIA, FTC-2023-0033-0866 ("imperative that businesses are able to have a live representative speak with a customer seeking to cancel, regardless of the medium used to sign up"); NCTA, FTC-2023-0033-0858; ("Whatever these consumers' reasons for seeking to cancel or modify services, in most instances they are best served by speaking with a live agent, even if they enrolled online."); *see also* Chamber, FTC-2023-0033-0885 (subscriptions to multiple products or services "require[] more time and personal assistance to address when a customer seeks to cancel only one of such related products or services").

[409] Sonsini Alarm Clients, FTC-2023-0033-0860; *see also* Joint Alarm Industry Comments - ESA, TMA, SIA and AICC, FTC-2023-0033-1014 (asking for clarification that alarm companies can require written or verbal confirmation of online cancellation requests). The concerns raised by these industries are likely an artifact of the Saves provision, which, as proposed, could be interpreted to prevent verification procedures and cancellation intent. The Commission addresses these concerns in Section VII.B.6.c.

Several commenters asked the Commission to modify this Section. Specifically, N/MA asked that sellers be allowed to confirm telephone cancellations through email verification.[410] A group of law professors asked the Commission to require sellers to answer cancellation calls in "comparable timeframe to sign-up calls."[411] They also suggested telephone answering systems should not be limited to normal business hours if they are entirely automated. The State AGs further asked the Commission to incorporate the guidance for telephone cancellation from the 2021 Enforcement Policy statement, for example, ensuring "the calls are not lengthier or otherwise more burdensome than the telephone call the consumer used to consent to the negative option feature," and prohibiting sellers from "hang[ing] up on consumers who call to cancel; plac[ing] them on hold for an unreasonably long time; provid[ing] false information about how to cancel; or misrepresent[ing] the reasons for delays in processing consumers' cancellation requests."[412]

**(c)      Proposed § 425.6(c)(3): In-person Cancellation**

For in-person sales, proposed § 425.6(c)(3) required sellers to offer online or telephone call cancellation mechanisms in addition to the same in-person mechanism, where practical. The proposed Rule further required sellers not make telephone cancellation more costly than the method used to consent to the negative option feature.

Individual consumers identified the many ways in which demanding in-person cancellation is unfair. For instance, they observed it may not always be possible to cancel in

---

[410] N/MA, FTC-2023-0033-0873.
[411] Law Professors, FTC-2023-0033-0861.
[412] State AGs, FTC-2023-0033-0886.

person, as was true during the COVID pandemic, [413] after a consumer moves from the area, [414] or for people with young children or who have difficulty leaving their home. [415] Others complained they showed up numerous times in person, only to be told they could not cancel because the manager was not available. [416] One commenter complained sellers demanded consumers cancel by certified mail if they originally consented in person. [417]

In contrast, two trade associations requested the Commission allow sellers to require consumers to cancel in person if they signed up in person. These commenters argued such a limitation is appropriate due to the unique challenges of their industries. For example, IHRSA, which represents the health and fitness industry, stated, "it is appropriate for a brick-and-mortar business" to require customers to cancel in person "to verify their identity." The International Carwash Association ("ICA") stated some of its members sell products and services exclusively in person; therefore, it asked the Commission to not "force" these small business owners "to set

---

[413] Individual commenter, FTC-2023-0033-0399 ("Even if I didn't sign up online, terminating, a membership in person isn't always possible. Lock down during Covid being a prime example.").
[414] Individual commenter, FTC-2023-0033-0677 ("Companies are absolutely being deceptive about their practices when it comes to canceling a service, including their initial pitch to 'Cancel anytime!' only for you to find out that canceling requires you to go in person to a business in a place you might not even live anymore").
[415] Individual commenter, FTC-2023-0033-0741 ("[m]any places . . . require you to go in person to cancel - they won't even let you do it over the phone! This harms anyone that may have trouble leaving the house regularly, including disabled folks and parents of small children and those caring for older or ailing family members."). *See also* TechFreedom, FTC-2023-0033-0872 ("Returning to the in-person venue where the initial sale occurred may be inconvenient, or even impossible, for the consumer."); Individual commenter, FTC-202-0033-1141 ("Sometimes an unexpected move or unforeseen circumstances make it impossible to cancel in person. I would like to see an option to be able to cancel remotely, even if the subscription was purchased on site.").
[416] *See, e.g.*, Individual commenter, FTC-2023-0033-0510 ("I had to go in person 3 different times because the manager wasn't there so to cancel it").
[417] Individual commenter, FTC-2023-0033-0007 ("I work dispute resolutions for a bank. I see so many cases where someone is trying to cancel something like a gym membership and, while they can sign up in person, they for some reason have to mail a certified letter to the [company's] home office. That has always seemed unreasonable and deliberately contrived.").

up an online marketplace" to process cancellations if the seller does not already have an online presence.[418]

**(2)    Analysis**

**(a)    The Commission retains the general "same medium" requirements of § 425.6(c).**

Based on the record, the final Rule retains the general requirements proposed in § 425.6(c); specifically, the negative option seller must provide a simple cancellation mechanism through the same medium (such as Internet, telephone, mail, or in-person) the consumer used to consent to the negative option feature. Further, the final Rule retains § 425.6(a) that requires sellers to provide consumers with a simple mechanism to immediately stop charges that is cost-effective, timely, and easy to use. Such a mechanism cannot include "unreasonable barriers to cancellation or impede the effective operation of promised cancellation procedures."[419] This provision makes adding language from the 2021 Enforcement Policy Statement or the New York statute unnecessary because the simple mechanism provision already includes it. Further, several commenters asked the Commission to allow consumers to choose additional, alternate means of cancellation.[420] This modification, however, is also unnecessary. The "same medium"

---

[418] ICA, FTC-2023-0033-1142. ICA's comment seems to suggest a misunderstanding that the Rule would require both telephone and online cancellation for in-person consent. It does not. A business may elect either online or telephone (or both), but there must be at least one mechanism in addition to in-person cancellation.

[419] EPS, 86 FR 60823; *see also* NPRM, 88 FR 24728 (explaining the simple cancellation mechanism proposed in the Rule should remove barriers, such as unreasonable hold times or verification requirements).

[420] *See, e.g.*, N/MA, FTC-2023-0033-0873 (subscribers should be allowed to choose method most convenient; subscribers who sign up by mail may prefer to cancel online or by telephone, and consumers who subscribed by telephone may prefer to cancel online); Sirius XM, FTC-2023-0033-0857 ("For example, requiring a customer to use direct mail to cancel if the customer used direct mail to accept a subscription offer would be inconvenient for the customer and not

requirement presents a floor, not a ceiling. That is, it only requires businesses to offer consumers the ability to cancel in the manner they were able to sign up. Sellers are free to provide additional cancellation mechanisms, giving consumers choices.

Moreover, despite some commenters' assertions to the contrary, the Commission has clear authority to issue a rule requiring sellers to offer cancellation through the same medium as enrollment. As detailed in Section VII.A, there is a substantial record demonstrating the negative option practices covered by this Rule are unfair or deceptive, prevalent, and have caused significant consumer harm.[421] Moreover, Magnuson-Moss empowers the Commission to promulgate requirements designed to prevent any unfair or deceptive practice it identifies with specificity.[422] By promulgating a rule that prevents sellers from making cancellation unreasonably difficult, the Commission has done so here. Further, while ROSCA does not provide for APA rulemaking, it does not limit the Commission's authority to issue a trade regulation rule.[423] In fact, the Commission's Negative Option Rule predates ROSCA, and the statute does not rescind that Rule.

---

the customer's expected or desired means for cancellation. Instead, the cancellation method should be an easy-to-use mechanism for a consumer to stop recurring charge which would closely track consumer expectations and allow for changes in technology."); State AGs, FTC-2023-0033-0886 ("We respectfully suggest requiring sellers to allow *all* consumers to cancel through *any* medium that the seller uses to sell subscriptions or memberships, regardless of the medium through which that particular consumer signed up.").

[421] *See generally* Section VII.A.

[422] 15 U.S.C. 57a(a)(1)(B).

[423] NPRM, 88 FR 24716 n.9. Although, as stated in the NPRM, Congress did not direct the FTC to promulgate implementing regulations, it certainly did not preclude them, and the language contained in ROSCA confirms the FTC's authority to do so. 15 U.S.C. 8404(a) ("Violation of this chapter *or any regulation prescribed under this chapter* shall be treated as a violation of a rule. . . .") (emphasis added); *see also id.* 8404(b) ("Any person who violates this chapter *or any regulation prescribed under this chapter*" shall be subject to penalties) (emphasis added); *id.* 8404(c) ("Nothing in this section shall be construed to limit the authority of the Commission under any other provision of law.").

**(b)  The Commission modifies the requirements of § 425.6(c)(1): Online Cancellation.**

In response to comments, the Commission makes several changes to clarify the online cancellation mechanism requirements. First, it removes the requirement that, for website or web-based applications, cancellation must be afforded through the same precise means as consent. Instead, the final Rule provides the simple cancellation must be easy to find. Second, the revised provision incorporates a definition of "interactive electronic medium" in place of "Internet." Third, the Commission excludes cancellation mechanisms requiring interaction with a live or virtual agent, unless the consumer consented to the negative option feature through such mechanism. Each modification is discussed below.

**(i)  The simple cancellation mechanism must be easy to find.**

Consumers uniformly opposed having to engage with a representative to cancel when they could simply click a button to enroll. [424] They also expressed deep frustration over having to

---

[424] Individual commenter, FTC-2023-0033-0003 ("When signing up, I didnt talk to a single individual. So its fair that when cancelling, I should not have to talk to a single individual."); Individual commenter, FTC-2023-0033-0006 (was forced to call "and speak with several agents" because unable to cancel online); Anonymous commenter, FTC-2023-0033-0044 (shouldn't be forced to make a phone call and sit on hold for hours if signed up online); Individual commenter, FTC-2023-0033-0072 (fair to consumers to allow consumers to cancel through same means as they were initiated); Individual commenter, FTC-2023-0033-0087 ("I think any offer you can buy with a click should also be an offer to unsubscribe with a click"; having to call instead is a scam); Anonymous commenter, FTC-2023-0033-0095 ("I would like to specify that [company] did not allow to terminate the account online. They specifically requested a phone call, which they then ignored for as long as possible. This practice is unfair and deceptive and needs to be outlawed."); Anonymous commenter; FTC-2023-0033-0097 (FTC should ban practice of companies only offering cancellation via phone call, despite not requiring a phone call for signup); Individual commenter, FTC-2023-0033-0274 ("having to call the company to cancel when the party clicked on the website is forced verbal speech"); Individual commenter, FTC-2023-0033-0356 ("If you signed up online, you should be able to cancel online. If it took one click to join, it should take one click to cancel. I am tried [sic] of calling some call center,

hunt to find cancellation mechanisms, usually buried deep within a website or in fine print on a

bill or other correspondence. [425] The Commission has brought numerous cases alleging these

---

waiting on hold, and then having someone go through a long script about why I should not cancel. Generally make it as easy to cancel as to sign up."); Individual commenter, FTC-2023-0033-0379 ("I have now been charged for a full month because I have to call and speak to a representative instead of clicking to cancel."); Individual commenter, FTC-2023-0033-0443 ("If the public is allowed to set up an account online we should be allowed to cancel online without ever making a phone call. The consumer should have more rights than corporations."); Individual commenter, FTC-2023-0033-0617 ("It is truly obnoxious to be able to click to join but have to research to find the way to cancel, often involving making a phone call and being left on hold."); Individual commenter, FTC-2023-0033-0716 ("We shouldn't have to call the company to cancel!"); Individual commenter, FTC-2023-0033-0788 (requiring a call when enrolled online is "coercive and unfair"); Individual commenter, FTC-2023-0033-0822 ("I am sick of having to call a phone number to cancel something I signed up for on line, and often speaking to someone who is snide, sarcastic, or downright rude!").

[425] Individual commenter, FTC-2023-0033-0065 ("Often a company makes it significantly more difficult to even find out where or how to cancel a subscription."); Individual commenter, FTC-2023-0033-0024 ("It took a Google search to find the right Customer Service number because it was hidden or unavailable on the website."); Individual commenter, FTC-2023-0033-0084 (finally found corporate number to cancel trampoline park after scouring website for a membership enrolled online); *see also* Individual commenter, FTC-2023-0033-0067 ("why are they allowed to sign you up for automatic renewal with no way to cancel nothing on their web page in order to cancel a subscription"); Individual commenter, FTC-2023-0033-0071 (biggest annoyance is that subscriptions can be signed up for so easily with a few buttons on the remote but nearly impossible to cancel); Anonymous commenter, FTC-2023-0033-0108 ("I certainly hope this goes through. These companies make it incredibly difficult to even find the cancel or opt out option."); Anonymous commenter, FTC-2023-0033-0123 ("Straight forward plain language cancelation instructions that are easy to locate should be required."); Individual commenter, FTC-2023-0033-0124 ("Clearly there should be an easy way to unsubscribe that is easy to find."); Individual commenter, FTC-2023-0033-0560 (cancellation page should be easy to find); Individual commenter, FTC-2023-0033-0642 ("If you signed up online, you should be able to cancel online. If it took one click to join, it should take one click to cancel. I have had trouble finding where to cancel on multiple subscription services. Often, they are confusing on purpose to keep customers like me trapped in the payment cycle. Some require an email or phone call to a separate customer service representative. Cancelling should not be harder than signing up for their service."); Individual commenter, FTC-2023-0033-0685 ("I am tired of having to screen grab the fine print to figure out my options for cancelling subscriptions-it just shouldn't be this hard!?!"); Ashley Sheil on behalf of Maynooth University and in collaboration with Radboud University, FTC-2023-0033-1006 (observing that companies may take advantage of the "as easy as" requirement, and recommending any termination button should be highlighted and in an obvious location).

practices are unfair or deceptive.[426] The proposed Rule sought to prevent these unfair and deceptive practices by requiring sellers to provide an easily accessible online cancellation mechanism to consumers who enrolled online.[427] As several commenters rightly noted, however, consumers may not always expect (and it may not always be possible) to use the same precise means for both enrollment and cancellation.[428]

Accordingly, to clarify the intent of the original language and to better match consumer expectation with actual cancellation procedures, the Commission now clarifies that where a consumer enrolls online, whether through a website, a mobile application, chat, email, or messaging, consumers must be afforded an equally simple online cancellation experience, *i.e.*, one that allows them easily to find and use the cancellation mechanism.[429]

---

[426] *See* n.384 (citing simple cancellation cases).

[427] NPRM, 88 FR 24728 ("On the internet, this 'Click to Cancel' provision requires sellers, at a minimum, to provide an accessible cancellation mechanism on the same website or web-based application used for sign-up.").

[428] *See, e.g.*, ESA, FTC-2023-0033-0867 ("Such a requirement would not be helpful for players seeking to cancel a subscription, as in-game is not the place that most players would expect to find a cancellation ingress."); RILA, FTC-2023-0033-0883 ("The method that a consumer uses for initial sign-up may not be the place where that consumer would expect to find a simple cancellation function. For example, contracts are also increasingly concluded online through third parties or via social media apps. Regardless of how a customer initially signs up, once she/he establishes a purchasing arrangement with a seller, the customer will logically look to the seller to cancel the arrangement.").

[429] The Chamber asked the Commission to clarify that web-based chat is an appropriate cancellation where a consumer signs up online. As is clear from the record, unless the seller required the consumer to engage with an agent through a web-based chat to enroll, the Rule will preclude requiring the consumer to do so to cancel. There is substantial evidence this asymmetrical practice of requiring consumers to engage with agents (live or virtual) for cancellation but not enrollment is one of the principal methods sellers use to create unfair and deceptive cancellation procedures. Accordingly, it is appropriate to include limitations within the Rule to prevent unscrupulous sellers from using such practices.

Many commenters agreed consumers would consider a link or button located on a website or within a user's account or device settings to be "easy to find."[430] Providing a clearly-labeled cancellation button in a consumer's account or user settings is, thus, one example of a simple online cancellation mechanism.[431] The Commission cautions, however, while such a mechanism need not be exactly the same as the consent mechanism, the seller cannot make it more difficult to use or find than the consent mechanism. For example, the seller cannot prominently label the mechanism within the account settings but make it difficult for consumers to find the account settings in the first instance.

Further, the Commission emphasizes that the cancellation mechanism must be easy to find at the time the consumer decides to cancel. Providing an easy-to-find mechanism at consent does not mean the mechanism will be easy to find later when the consumer wants to cancel, and therefore will not prevent unreasonable barriers to cancellation. Thus, providing the information necessary to find the cancellation mechanism at enrollment (as required under § 425.4) does not

---

[430] Individual commenter, FTC-2023-0033-0124 ("Clearly there should be an easy way to unsubscribe that is easy to find."); Individual commenter, FTC-2023-0033-0252 ("I had been thinking of contacting my Governor to suggest just such a rule that the method provided for signing up for a service must also be provided for cancelling the same service, be just as easy to find, and require no more steps than it took to sign up."); Individual commenter, FTC-2023-0033-0560 ("And ensure the bill is explicit with requirement to make it EASY TO FIND HOW TO REACH the company or cancellation page."); Individual commenter, FTC-2023-0033-0640 ("The Federal Trade Commission needs to make it mandatory for companies to have an easy to find button to cancel a subscriptions -online-."); Individual commenter, FTC-2023-0033-0784 ("And the cancel button should be easy to find and as attractively marketed as an opportunity to extend a subscription (font size, colors, etc.)."); Individual commenter, FTC-2023-0033-1006 (cancellation should be highlighted and in an obvious location).

[431] *See*, *e.g.*, Cal. Bus. & Prof. Code § 1702(d)(1)(A); Conn. Gen. Stat. Ann. § 42-158ff (d)(1)(A); N.J. Stat. Ann. § 56:8-42.1.a.

discharge the seller's obligation to ensure cancellation is easy to find when most relevant to the consumer.[432]

**(ii)    "Interactive electronic medium" is broadly defined to include all methods of electronic communication.**

The State AGs asked the Commission specifically to address the requirements for cancellation by chat, text messaging, and email. The State AGs explained that although chat and text are increasingly common cancellation mechanisms, they share some of the same qualities and potential problems as telephone cancellation because they require interaction with a live or virtual customer representative.[433] Further, the State AGs suggested email should not be an acceptable cancellation medium for online consent.[434]

To address these concerns, the Commission revises the proposed provision to refer to "interactive electronic medium" rather than "Internet." This change clearly includes text, chat, and email within the scope of online cancellation mechanisms. Specifically, the phrase "interactive electronic medium" used in the "clear and conspicuous" definition includes all media that involve electronic communications (except telephone calls), whether or not they strictly use the Internet (and thus would otherwise be "online"). Consumers may not know whether a text or chat is MMS (online) or SMS (offline), for example. This broader definition should provide flexibility to sellers while continuing to require parallel cancellation and sign-up procedures to meet consumers expectations.

---

[432] *See, e.g.*, Individual commenter, FTC-2023-0033-0022 ("Note that subscriptions are by their very nature long lasting in time, therefor requirements should not just emphasize some fine print disclosure at the time of sign up but also it should be easy to check back with the company or their many layers of subcontractors to cancel at anytime in the future.").
[433] State AGs, FTC-2023-0033-0886.
[434] *Id.*

Although the State AGs suggested prohibiting the use of email as a cancellation mechanism, the record provides no basis for doing so. Further, consistent with the Commission's definition of interactive electronic medium, several states specifically allow sellers to use email as an online cancellation method.[435] Thus, the final Rule does not bar the use of email to effectuate online cancellation.

### (iii)   No interaction with representatives for online cancellation.

The State AGs noted, and consumer comments further support, the fact that sellers have often used chat, text, and messaging to perpetrate the same abuses documented for telephone cancellation. The Commission, therefore, reiterates all cancellation mechanisms, including chat, text, messaging, and email, are subject to the same "simple" requirements, *i.e.*, sellers may not erect unreasonable barriers or prevent consumers from immediately halting charges. Cancellation mechanisms must be as easy to use as the mechanism the consumer used to sign up, in terms of time, expense, burden, and ease of use; and the mechanism must be as readily accessible as the means the consumer used to consent in the first place.

Consumer comments, as well as the Commission's and State AGs' enforcement experience demonstrate asymmetrical enrollment and cancellation experiences, such as requiring telephone cancellation when consumers can easily sign up online without speaking with an agent, are unfair. Specifically, this asymmetry creates unreasonable barriers to cancellation, such

---

[435] *See, e.g.*, Cal. Bus. & Prof. Code § 17602 ("The business shall provide a method of termination that is online in the form of either of the following:  By an immediately accessible termination email formatted and provided by the business that a consumer can send to the business without additional information."); Conn. Gen. Stat. Ann. § 42-158ff (an electronic mail message from the business to the consumer, which is immediately accessible by the consumer and to which the consumer may reply without obtaining any additional information); N.J. Stat. Ann. § 56:8-42.1 (a termination email formatted and provided by the subscription service provider that a consumer can email to the subscription service provider without being required to provide any additional information).

as unreasonable hold times, unreasonable verification requirements, and aggressive save tactics. Moreover, comments and the Commission's enforcement experience indicate consumers likely understand a simple online enrollment experience as an implied claim that the cancellation experience also will be simple.[436] As consumers themselves explain, they do not anticipate engaging with a customer service representative (whether by phone, or through a web-based chat or messaging) if they did not do so to sign up for the negative option feature.[437] Thus, the Commission further clarifies, for online consent, the seller cannot require the consumer to engage with an agent or customer service representative to cancel unless the consumer did so at enrollment.[438]

Finally, the Commission declines to exclude industries providing bundled services from the same medium requirement. NCTA and other industries with such services insisted their customers are better served by speaking with a live representative, even when they enroll online.[439] They expressed concern these sellers cannot confirm a consumer's cancellation intent

---

[436] *See* nn.361-368; *see also* vlogbrothers, Why isn't this Illegal?, https://www.youtube.com/watch?v=FjAw1LMShIA&pp=ygUMdmxvZ2Jyb3RoZXJz (last visited Aug. 25, 2024).

[437] *See, e.g.*, Anonymous commenter, FTC-2023-0033-0024 (could not cancel online even though consumer could upgrade online and via TV); Individual commenter, FTC-2023-0033-0137 ("3 months to cancel, 3 minutes to sign-up. Seriously?"); Individual commenter, FTC-2023-0033-0252 (detailing three instances where consumer signed up online with a few clicks but was required to call to cancel, concluding "the method provided for signing up for a service must also be provided for cancelling the same service, be just as easy to find, and require no more steps than it took to sign up."); Individual commenter, FTC-2023-0033-0457 ("If I enrolled in a subscription online, there are no good reasons why I can't disenroll that way as well. Forcing me to call a number to unsubscribe, which is only staffed during 'normal business hours,' unnecessarily complicates the process"); Anonymous commenter, FTC-2023-0033-0802 (this practice of making someone call or chat to someone to cancel a membership is predatory).

[438] The Chamber asked the Commission to "make clear that a web-based chat qualifies as an appropriate cancellation mechanism where a customer signed up for a service online." FTC-2023-0033-0885. The Commission reiterates that a web-based chat cancellation mechanism may be appropriate, but only if the consumer enrolled through a virtual or live agent.

[439] NCTA, FTC-2023-0033-0858; CTIA, FTC-2023-0033-0866.

(consumers may want to modify or renegotiate services) or apprise consumers of any negative consequences of cancellation (loss of access to emergency services, for example) without a live discussion.[440] They further assert providing this information online could be complicated and expensive for the seller and not what the consumer would prefer.[441] NCTA noted only 30% of its members' customers sign up online, with the remaining 70% enrolling in person or over the phone.[442]

NCTA's comment seems to suggest the simple cancellation mechanism requirement demands a certain asymmetry—specifically, no matter how complex online enrollment is, the proposed Rule would require a simple "one click" cancellation mechanism, which could preclude the seller from confirming cancellation intent or apprising consumers of negative consequences of cancellation. The Commission reiterates the simple cancellation requirement requires symmetry in terms of, *inter alia*, time, burden, expense, and ease of use. It does not require use of the exact same mechanism.

Further, existing verification procedures, such as two-factor authentication, are routinely used to ensure a consumer's identity in highly sensitive situations. Thus, they are more than sufficient to ensure the correct person is cancelling and do not require the use of a cancellation mechanism different than enrollment. Moreover, at this juncture, the Commission has removed the proposed "saves" provision from the final Rule, making communication regarding material consequences of cancelling easier to convey (so long as communicating through the same medium).

---

[440] *Id.*

[441] *Id.*

[442] NCTA, FTC-2023-0073-0008.

**(c)       The Commission adopts § 425.6(c)(2): Telephone Cancellation as proposed, with one exception.**

The Commission adopts the telephone cancellation provision as proposed, except the final Rule removes the requirement sellers must **assure** all calls are answered during normal business hours. Instead, the final Rule requires sellers to promptly effectuate cancellation requests by consumers via a telephone number that is answered **or** records messages during normal business hours.

Several commenters suggested specific changes were necessary to enhance the proposed telephone medium requirements. For instance, the State AGs asked the Commission to include the various requirements detailed in the 2021 Enforcement Policy Statement, *e.g.*, require negative option sellers "not [to] erect unreasonable barriers to cancellation or impede the effective operation of promised cancellation procedures, and . . . honor cancellation requests that comply with such procedures." However, the proposed provisions already include these requirements. [443]

Nonetheless, several commenters correctly pointed out requiring sellers to answer cancellation calls during normal business hours could create considerable costs for small businesses while not directly addressing the core problem identified by the Commission—the unreasonable delay of cancellation requests. To address these concerns, the Commission first clarifies normal business hours are those hours in which the business would normally engage with its customers. A seller, however, cannot make telephone cancellation available only at times that are so inconvenient they erect a barrier to cancellation. For instance, it would be improper to

---

[443] *E.g.*, the requirements that all cancellation mechanisms be simple and easy to use (§ 425.6), and the seller disclose where to find the cancellation mechanism prior to the sale (§ 425.4).

limit cancellation calls to only between midnight and 3 a.m., regardless of whether these are the seller's normal business hours. Importantly, however, the final Rule does not require a seller to physically answer the telephone call (a task that could be difficult for, *e.g.*, a sole proprietorship). An answering machine that clearly provides for cancellation (*e.g.*, a message stating: if you want to cancel your subscription please identify that subscription, and leave identifying information) would comply with this provision of the Rule. To effectuate the provision's intent, the final Rule states sellers, whether answering the cancellation call in person or not, must effectuate that cancellation promptly. Thus, a seller could not, for example, have an answering machine it does not regularly monitor or for which it does not promptly effectuate cancellation requests.

Notably, the final Rule retains the requirement that, for the mechanism to be at least as simple as the one used to initiate the recurring charge, any cancellation call cannot be more expensive than the call used to enroll (*e.g.*, if the sign-up call is toll free, the cancellation call must also be toll free). Consumers would not expect such fees, rendering them unfair or deceptive.[444]

---

[444] *Cf. United States v Adobe, Inc.*, No. 5:24-cv-03630 (N.D. Cal. 2024) (cancellation fees plead as a failure to disclose and failure to obtain consent to charge in violation of ROSCA); *FTC v. FloatMe Corp.*, No. 5:24-cv-00001 (W.D. Tex. 2024) (extra cost in relation to timing of receipt of product deceptive in violation of Section 5); *United States v. Cerebral, Inc.*, No. 1:24-cv-21376 (S.D. Fla. 2024) (delays in cancellation deceptive and injured consumers in violation of Section 5); *FTC v. Bridge It, Inc.*, No. 1:23-cv-09651 (S.D.N.Y. 2023) (claims to cancel at any time without paying any fees, interest, or other charges deceptive); *FTC v. Vonage Holdings Corp.*, No. 3:22-cv-06435 (D.N.J. 2022) (requiring phone cancellation with roadblocks including long hold times, frequent disconnects, endless loops, and early termination fee unfair under Section 5); *FTC v. Benefytt Techs., Inc.*, No. 8:22-cv-01794 (M.D. Fla. 2022) (unexpected cost for additional product is deceptive and unfair); *In re Dun & Bradstreet, Inc.*, FTC Docket No. C-4761 (2022) (renewal practices, including at end of designated time periods, deceptive); *FTC v. First Am. Payment Sys.*, No. 4:22-cv-00654 (E.D. Tex. 2022) (misrepresentations in cancellation and unfair debiting); *United States v. MyLife.com, Inc.*, No. 2:20-cv-6692 (C.D. Cal. 2020) (cancellation by phone discouraged or prevented by unavailable or uncooperative agents specified as a violation of ROSCA); *FTC v. Match Grp., Inc.*, No. 3:19-cv-02281 (N.D. Tex.

**(d)     The Commission adopts § 425.6(c)(3): In-Person Cancellation as proposed.**

Based on the Commission's experience and that of other states, as well as many comments in the record, requiring in-person cancellation presents significant opportunities for unfair and deceptive practices. To prevent such practices, the final Rule adopts provision 425.6(c)(3) essentially as proposed. Thus, the provision continues to require in-person sellers to provide alternatives to in-person cancellation, either online or by phone, at the seller's choice. The Commission, however, corrects the requirement that if the alternative is a telephone call, the call cannot be more costly than the in-person consent. That proposal connected two unrelated costs and thus did not make logical sense. To effectuate the purpose of this provision, however, the Commission adds language stating the call cannot impose any cost that creates an unreasonable barrier to cancellation, including by making the call unreasonably expensive. [445]

To address ICA's concerns, the Commission clarifies the Rule does not require sellers who sell in-person to maintain an alternative online presence to process cancellations. Sellers

---

2019) (pleading cancellation difficulties in violation of ROSCA); *In re Urthbox, Inc.*, FTC Docket No. C-4676 (2019) (unexpected charges, including for a full 6 months following the first month of free trial, are a failures to disclose in violation of Section 5); *FTC v. Cardiff*, No. 5:18-cv-02104 (C.D. Cal. 2018) (unexpected charges a Section 5 misrepresentation and unfair charging); *FTC v. BunZai Media Grp., Inc.*, No. 2:15-cv-04527 (C.D. Cal. 2015) (failure to disclose charge as deceptive and unfair); *FTC v. Tarr*, No. 3:17-cv-02024 (S.D. Cal. 2017) (failure to disclose material terms deceptive and unfair); *FTC v. AdoreMe, Inc.*, No. 1:17-cv-09083 (S.D.N.Y. 2017) (cancelling made difficult by phone, contributing to misrepresentations regarding store credit); *FTC v. RevMountain, LLC*, No. 2:17-cv-02000 (D. Nev. 2017) (unexpected product deceptive); *FTC v. AAFE Prods. Corp.*, No. 3:17-cv-00575 (S.D. Cal. 2017); *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649 (D. Nev. 2014) (deceptive costs).

[445] N/MA suggested there may be instances where the original method of consent is no longer available. FTC-2023-0033-0873. For example, if the person signed up a trade show in person, returning to the in-person venue may be impossible. The Commission notes the in-person method only must be made available, "where practical."

who have no such presence can allow cancellations by phone if they comply with the simple telephone cancellation requirements detailed above.

c) **Section 425.6(d) Saves**

**(1)** **Summary of Comments**

Proposed § 425.6(d) would have required sellers to immediately effectuate cancellation unless they obtained the consumer's unambiguously affirmative consent to receive a save prior to cancellation. The Commission explained the record shows many businesses have created unnecessary and burdensome obstacles to cancellation, including forcing uninterested consumers to sit through multiple upsells before allowing them to cancel. [446] Individual consumer commenters corroborated the pervasive use of such unfair tactics to thwart cancellation. [447]

---

[446] NPRM, 88 FR 24729.

[447] *See, e.g.*, Individual commenter, FTC-2023-0033-0006 ("Last year I had the pleasure of trying to cancel a radio subscription which took 2 attempts and far too much time to accomplish. Unable to cancel online, I was forced to call and speak with several agents trying to convince me to keep their service. After nearly a half hour of insisting I wanted to cancel, they simply hung up on me which forced me to start the cancellation process all over again from the beginning."); Anonymous commenter, FTC-2023-0033-0024 (able to cancel only after listening to a "long sale pitch about why he shouldn't"); Anonymous commenter, FTC-2023-0033-0066 (when you request a cancellation, will pass your call on to a more "experienced representative" in an attempt to convince you to keep your service. They do not listen to your concerns, instead make you jump through hoops for a cancellation which makes me not want to be one of their customers even more); Individual commenter, FTC-2023-0033-0071 (call to cancel and they repeatedly said "well let's just see how we can save you money" instead of canceling); Individual commenter, FTC-2023-0033-0082 ("You have to call them and endure a high pressure pitch to renew . . . . It wastes time and minutes on your phone bill"); Anonymous commenter, FTC-2023-0033-0097 (the only way to cancel a service is to call them on the phone, intended to allow for sales reps to make a pitch); Individual commenter, FTC-2023-0033-0120 ("However, when you attempt to cancel a continuous subscription you are told you cannot do that and you must call the provided phone number. You are connected to a sales person who then will negotiate with you to continue at a lower rate."); Individual commenter, FTC-2023-0033-0125 ("The only way for me to cancel this service was to CALL THEM DIRECTLY, whereupon they spent nearly half an hour trying to upsell me into a two year subscription."); Individual commenter, FTC-2023-0033-0130 ("It should not be required to call (and sit on hold forever), only to have to sit through a diatribe of hard-sell techniques to try to convince one not to

cancel."); Individual commenter, FTC-2023-0033-0233 ("I had to wait on hold and then get sales pitch after sales pitch after sales pitch to cancel a digital-only [newspaper] subscription that I signed up for online."); Individual commenter, FTC-2023-0033-0228 (had difficulty canceling a newspaper subscription of all things as it required consumer to call an 800 number during the day and then had to listen to multiple sales pitches and saying "No! What part of 'no' don't you understand" to cancel); Individual commenter, FTC-2023-0033-0312 ("I and members of my family have had to use valuable time to call corporations to cancel subscriptions, each time getting a long pitch to keep the subscription. If I wanted to keep it, I would not be calling to cancel it."); Individual commenter, FTC-2023-0033-0356 ("If it took one click to join, it should take one click to cancel. I am tired of calling some call center, waiting on hold, and then having someone go through a long script about why I should not cancel."); Individual commenter, FTC-2023-0033-0457 (Forcing me to call a number to unsubscribe, which is only staffed during "normal business hours," unnecessarily complicates the process for the provider's benefit: I don't need to give opportunity to upsell or persuade me to continue at a reduced price.); Individual commenter, FTC-2023-0033-0491 ("Some have even required me to make a phone call and listen to a hard sell before they will cancel the service."); Individual commenter, FTC-2023-0033-0597 (have to sit and turn down multiple offers to cancel); FTC-2023-0033-0677 (sit and "suffer through a long sales pitch" to cancel); Individual commenter, FTC-2023-0033-0784 ("I suggest limiting the seller's efforts to pitch additional offers & modifications when trying to cancel . . . . no one wants to wade through too many of screens until the cancel 'finally' appears."); Anonymous commenter, FTC-2023-0033-0785 (person being "penalized by losing time waiting to speak to a customer service rep, having to decline further sales, or being stuck with recurring charges they don't want"); Individual commenter, FTC-2023-0033-0798 (difficult to cancel subscriptions, including by repeatedly forcing the customer to turn down "special offers" to entice the customer not to cancel); Individual commenter, FTC-2023-0033-0815 (No reason to have to call customer service reps who will keep trying to prevent me from canceling); Individual commenter, FTC-2023-0033-0835; Individual commenter, FTC-2023-0033-0850 (Have to make a long awkward phone call and wait on hold or long repetitive live chat); Individual commenter, FTC-2023-0033-0913 ("I've experienced having to call to cancel a subscription only to be forced to listen to a sales spiel in order to do so."); Individual commenter, FTC-2023-0033-0967 ("Some have even required me to make a phone call and listen to a hard sell before they will cancel the service."); Individual commenter, FTC-2023-0033-0999 (Consumers should have an on-line option to cancel. A national media company ONLY provides a cancel option with a call to customer service. When doing so, you are met with a CS rep that will not accept your request to cancel, talks over you, continued harassment, making offer after offer. We must stop this deceptive practice.); Individual commenter, FTC-2023-0033-1063 ("Now I'm about to cancel my [company name] account. If it's anything like the last time when I moved, I expect to spend several hours dealing with multiple levels of salespeople, trying to convince me to stay."); Individual commenter, FTC-2023-0033-1099 (Once customer service is contacted, it should not take more than about 90 seconds to cancel a subscription instead of the endless questions of why you want to cancel. Then try to keep you by offering a discounted rate on yet another year of useless service. Please make this end.); Individual commenter, FTC-2023-0033-1138 (The agent, made multiple attempts to sell me the service, disregarding my many direct statements that I just wanted to cancel.); Individual commenter, FTC-2023-0033-1150

135

However, other commenters explained some of the "barriers" consumers complained about are necessary to prevent harm, at least in certain situations. Specifically, commenters noted consumers might not understand the negative consequences of cancellation,[448] and the provision might prevent consumers from taking advantage of money-saving offers prior to cancellation.[449] Some commenters also expressed confusion regarding whether verification or authentication procedures, or discussion of consumers' attempts to pause or modify their existing offers, would violate the Rule.[450] Finally, commenters noted the proposed provision requiring consumers to opt-in to saves could interfere with the simplicity of a cancellation mechanism.[451]

**(2)** **Analysis**

Based on the record, the Commission determines revisions to this proposed provision are necessary, for which the Commission would need to seek additional comment. Therefore, the Commission does not adopt this provision in the final Rule at this time. On one hand, the record demonstrates saves are often used simply as a barrier to prevent cancellations.[452] On the other, the proposed opt-in save provision could have unintended consequences.[453] Specifically, the provision may thwart attempts to confirm consumers' intent or apprise consumers of any

---

(They make you call their company so that sales retention can try to talk you into staying with freebies etc.); Individual commenter, FTC-2023-0033-1153 (There is no reason a person should be subjected to 20 minutes or repeated drilling if they say upfront that they want to cancel service.).

[448] NCTA, FTC-2023-0033-0858; PDMI, FTC-2023-0033-0864; Chamber, FTC-2023-0033-0885.

[449] *Id*.

[450] *See, e.g.*, PDMI, FTC-2023-0033-0864; ANA, FTC-2023-0033-1001; CTIA, FTC-2023-0033-0866.

[451] *See, e.g.*, CCIA, FTC-2023-0033-0984. Some commenters also argued the saves provision violates the First Amendment. *E.g.*, PDMI, FTC-2023-0033-0864; Chamber, FTC-2023-0033-0885; ACT App Association, FTC-2023-0033-0874. The Commission rejects this proposition. *See Mainstream Mktg. Servs., Inc. v. FTC*, 358 F.3d 1228 (10th Cir. 2004).

[452] *See* nn.446-447.

[453] *See* nn.448-451.

negative consequences of cancellation (*e.g.*, losing data). Moreover, the opt-in save provision may prevent consumers from obtaining valuable concessions (*e.g.*, lower prices), which they would otherwise want.

Consequently, the proposed saves provision did not achieve the right balance between protecting consumers from unfair tactics and allowing sellers to provide necessary and valuable information about cancellation. Therefore, the Commission will consider issuing an SNPRM in the future seeking a better solution to this difficult problem.

However, the Commission notes the removal of the saves proposal is not a license to erect unreasonable and unnecessary barriers to cancellation. The final Rule requires sellers to provide a simple, easy to use cancellation mechanism. Save attempts that interfere with this mandate by requiring consumers to navigate through upsells, jump through unreasonable hoops, or wait unreasonable amounts of time to cancel are neither simple nor easy. [454]

### 7.   Proposed § 425.7 Annual Reminders

In the NPRM, the Commission proposed requiring sellers to provide an annual reminder to consumers for non-physical goods sold with a negative option feature. Under this proposal, reminders would have needed to identify the product or service, the frequency and amount of charges, and the means to cancel. Additionally, the proposal required Negative Option Sellers to provide the reminders through the same medium the consumer used to consent to the negative option feature. The Commission opined the delivery of physical goods may remind consumers they enrolled in a negative option feature. Therefore, these consumers effectively already receive reminders and can reasonably avoid further payments by canceling their subscription. For

---

[454] *See, e.g.*, *United States v. Adobe, Inc.*, No. 5:24-cv-03630 (N.D. Cal. 2024); *FTC v. Amazon.com, Inc.*, No. 2:23-cv-0932 (W.D. Wash. 2023).

services lacking a regular, tangible presence (*e.g.*, data security monitoring or subscriptions for online services), however, many consumers may reasonably forget they enrolled and, consequently, incur charges for services they do not want or use. Thus, the Commission concluded, the failure to provide reminders for such contracts would meet all elements of unfairness.[455] The Commission sought comment on this proposal, including whether it should narrow the coverage of the proposed language, for example, by types of covered services or the duration between reminders.[456]

### a) Summary of Comments

The Commission received 32 comments in response.[457] Consumers, public interest and consumer advocacy groups, and academics, among others, generally supported the reminder requirement, observing, for example, that "subscription-based products and services have become so widespread that consumers are having difficulty keeping track of them all."[458] The commenters asserted the proposed "annual notice will clearly inform consumers of the terms of the contract and how they may terminate the agreement."[459] Despite this support, virtually every

---

[455] NPRM, 88 FR 24729, citing FTC Policy Statement on Unfairness, appended to *In re International Harvester Co.*, 104 F.T.C. 949 (1984). "To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided." *Id.*; *see also* 15 U.S.C. 45(n) (Commission has no authority to declare a practice unfair "unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition").

[456] NPRM, 88 FR 24729; *see also id.* at Section XIII, Request for Comments ("The Commission seeks any suggestions or alternative methods for improving current requirements.").

[457] The Commission received comments from, *inter alia*, individual consumers; cable/broadband/communications industry groups; public interest and consumer advocacy groups; various trade associations representing traditional and digital marketing, technology, news and magazine media, gaming and entertainment, and retail industries; academic and public policy groups; and service contract and alarm company industries.

[458] State AGs, FTC-2023-00330-0886.

[459] Public Interest Groups, FTC-2023-0033-0880.

group of commenters—individuals, consumer advocates, trade organizations, and industry groups—suggested the Commission modify or clarify its proposal.

Only three commenters specifically requested the Commission jettison a reminder provision altogether. Specifically, ESA argued the requirement (1) would impose a significant burden on businesses because several state laws already require reminders or notices; (2) would be improper because the Commission did not raise reminders in the ANPR; and (3) would increase the overall number of notices consumers receive, which could result in consumers ignoring reminders, thus benefiting bad actors. NCTA suggested the Commission should instead "allow businesses flexibility to determine whether to provide reminders."[460] IAB also "recommend[ed] that the Commission remove this requirement for several reasons."[461] Both ESA and NCTA conceded, however, the Commission could adopt the provision with additional modifications, such as making the reminders optional (NCTA) or offering consumers the ability to opt-out of subscription reminders (ESA).[462] Other commenters agreed, asking for "less prescriptive" requirements that would allow businesses more flexibility.[463]

Several commenters, while not urging the Commission to reject the reminder requirement, suggested the NPRM proposal did not satisfy the unfairness test. For instance, CTA, a technology trade association, questioned whether there was sufficient basis to find a lack

---

[460] NCTA, FTC-2023-0033-0858.

[461] IAB, FTC-2023-0033-1000.

[462] ESA, FTC-2023-0033-0867; NCTA, FTC-2023-0033-0858.

[463] *See, e.g.*, Sirius XM, FTC-2023-0033-0857 (asking Commission not to mandate exactly how renewal notices must be sent); N/MA, FTC-2023-0033-0873 (allow sellers to obtain consent to provide notice through alternate means); Chamber, FTC-2023-0033-0885 (proposed revisions); DCN, FTC-2023-0033-0983 (make annual notice an option company could comply with to provide adequate notice of obligations); ACT App Association, FTC-2023-0033-0874 (adopt a less prescriptive approach so same medium can be used to comply with state and federal requirements).

of annual reminder is an unfair practice or causes consumer harm.[464] Similarly, two other commenters from the communications industry questioned whether a lack of annual reminder would be unfair in the specific context of services that are "always on," such as cable or wireless services.[465]

A few commenters asked to be exempted from the reminder requirement based on the nature of their industries or the frequency of existing notices.[466] For instance, cable/broadband/wireless/streaming industry groups suggested they should be exempt for the same reasons they argued the unfairness test did not render the lack of reminders illegal in their industries. Similarly, these and other sellers, such as service contract providers, suggested consumers who receive monthly bills are already effectively receiving reminders, and therefore, these transactions should be exempt.[467]

Several commenters questioned the proposed requirement that sellers provide the annual reminder through the same medium the consumer used to consent to the negative option feature.[468] For example, several commenters observed that requiring reminders through a telephone call could violate the TCPA, the TSR, or at minimum, be a nuisance, and thus ignored by consumers.[469] Many of these commenters advocated for letting consumers choose how they

---

[464] CTA, FTC-2023-0033-0997 (no basis to conclude different medium is unfair, or that lack of reminders is unfair).

[465] NCTA, FTC-2023-0033-0858 (lack of notice for "always on" services not unfair, injury reasonably avoidable); USTelecom, FTC-2023-0033-0876 (same).

[466] *See, e.g.*, CTIA, FTC-2023-0033-0866 (exempt mobile services offered on a month-to-month basis); USTelecom, FTC-2023-0033-0876 (exempt broadband and communication services). The Commission addresses exemptions elsewhere in the SBP at Sections VII.B.1 and VIII.

[467] *See, e.g.*, Chamber, FTC-2023-0033-0885.

[468] Sirius XM, FTC-2023-0033-0857; Kuehn, FTC-2023-0033-0871; N/MA, FTC-2023-0033-0873; Act App Association, FTC-2023-0033-0874; CTA, FTC-2023-0033-0997; Chamber, FTC-2023-0033-0885; ANA, FTC-2023-0033-1001.

[469] Sirius XM, FTC-2023-0033-0857; Kuehn, FTC-2023-0033-0871; N/MA, FTC-2023-0033-0873; Chamber, FTC-2023-0033-0885; SCIC, FTC-2023-0033-0879.

want to receive annual reminders,[470] or allowing sellers to provide reminders through any medium they typically use to communicate with consumers.[471]

Additionally, several commenters disagreed with the Commission's observation that agreements involving delivery of physical goods inherently create a "regular, tangible presence" that serves as a reminder of the contract.[472] For example, they noted some companies charge a monthly fee, but only deliver physical goods at the consumer's request.

Some commenters stated that, without federal preemption, the annual reminder requirement would create another layer of regulatory complexity because several state laws already require reminders or notices.[473] In contrast, Professor Hoofnagle stated many "credit card processing service" providers likely afford a simple and inexpensive means for sellers to comply with state and federal mandates "because policy changes can be made programmatically in dashboards."[474]

Several commenters suggested the Commission amend the proposal. For instance, TINA and several individual consumers recommended the Commission require reminders at the end of a free trial period.[475] Others suggested the Commission require more frequent reminders, such as

---

[470] Sirius XM, FTC-2023-0033-0857; Kuehn, FTC-2023-0033-0871; Chamber, FTC-2023-0033-0885; Public Interest Groups, FTC-2023-0033-0880.

[471] State AGs, FTC-2023-0033-0886.

[472] Individual commenter, FTC-2023-0033-0026; TINA, FTC-2023-0033-1139.

[473] NCTA, FTC-2023-0033-0858; ESA, FTC-2023-0033-0867; IAB, FTC-2023-0033-1000; ACT App Association, FTC-2023-0033-0874.

[474] Hoofnagle, FTC-2023-0033-1137.

[475] Individual commenter, FTC-2023-0033-0039 (not reminded "that the free trial was up"); Individual commenter, FTC-2023-0033-0045 ("consumer should get an email reminder their free period is about to end"); Individual commenter, FTC-2023-0033-0050 (businesses should "be required to provide advance notice that the free trial is about to expire."); TINA, FTC-2023-0033-1139; ACT App Association, FTC-2023-0033-0874 (provide less prescriptive process).

every six months, or before each charge.[476] They noted that under an annual notice requirement, a consumer could be charged up to 12 times before discovering a negative option feature.[477] One commenter asked the Commission to require a reminder for so-called "zombie" agreements, ones that have long periods, *e.g.*, 24 months, of inactivity.[478]

In contrast, other commenters noted consumers may suffer from "notice fatigue" given the increasing popularity of subscription services.[479] Some argued there is no evidence of tangible consumer benefit from additional notices, and consumers should be given a choice whether to opt-in to receive annual reminders (or more frequent reminders), or to opt-out.[480] Three commenters suggested sending annual reminder notices could increase opportunities for phishing and other deceptive practices.[481]

Finally, several commenters asked the Commission to clarify certain aspects of the reminder requirement. For instance, ANA asked the Commission to explain what constitutes the "same medium," and a group of law professors asked for more detail about what constitutes an

---

[476] Public Interest Groups, FTC-2023-0033-0880 ("consumers deserve to know when they are about to be charged automatically, with a chance to opt out"); State AGs, FTC-2023-0033-0886; MIA, FTC-2023-0033-1008; Individual commenter, FTC-2023-0033-0026 (notification within one month of renewal, stating specific renewal date); Individual commenter, FTC-2023-0033-0708 (commenting that companies do not provide reminders before being charged, possibly overdrawing an account).

[477] *See, e.g.*, Public Interest Groups, FTC-2023-0033-0880.

[478] Law Professors, FTC-2023-0033-0861.

[479] NCTA, FTC-2023-0033-0858; USTelecom, FTC-2023-0033-0876; CCIA, FTC-2023-0033-0985 (recommending a biannual reminder for longer subscriptions); and Coalition, FTC-2023-0033-0884; *see also* DCN, FTC-2023-0033-0983 (incorrectly states the current proposed rule would require monthly notice for month-to-month renewals).

[480] NCTA, FTC-2023-0033-0858 (opt in); ESA, FTC-2023-0033-0867 (opt out); Chamber, FTC-2023-0033-0885 (opt in); DCN, FTC-2023-0033-0983 (opt out); Public Interest Groups, FTC-2023-0033-0880 (opt out).

[481] NCTA, FTC-2023-0033-0858; ESA, FTC-2023-0033-0867; DCN, FTC-2023-0033-0983.

adequate telephone reminder.[482] Additionally, some commenters asked the Commission to
clarify that sellers can rely on contact information provided by the consumer at the time of
consent,[483] or to provide that abiding by state reminder requirements satisfies a seller's
obligations under this provision.[484]

### b)  Analysis

After reviewing these comments, the Commission determines it needs additional
information on the scope and particularities of the proposed annual reminder requirement. The
record suggests, given the proliferation of subscription and auto-renewal services, consumers
have difficulty tracking all the negative option services and products in which they may be
enrolled—so much so that there are now companies claiming to help consumers keep track of
these services for a fee. As one commenter noted, consumers should not have to sign up for yet
another service to manage all their subscriptions.[485] Thus, limiting the reminder provision to just
non-physical goods, and only annually, may not adequately mitigate the harm caused by negative
option practices in the marketplace.

Additionally, the Commission shares some commenters' concerns that consumers may
ignore these reminder calls. Further, as some commenters noted, the proposed provision does not
specify the timing for these reminders (*e.g.*, should sellers issue reminders annually from the date

---

[482] ANA, FTC-2023-0033-1001 (same medium); Law Professors, FTC-2023-0033-0861
(adequate phone reminder).
[483] Sirius XM, FTC-2023-0033-0857; NFIB, FTC-2023-0033-0789.
[484] ACT App Association, FTC-2023-0033-0874.
[485] State AGs, FTC-2023-0033-0886 ("Subscription management has become an entire industry;
consumers can choose from a variety of companies that offer to monitor their recurring
subscriptions. We believe that consumers should not have to sign up for yet another service—
one that comes with privacy and security risks, as subscription monitoring services require
sharing financial account and other sensitive information—in order to effectively manage their
subscriptions.").

of initial purchase and a specific number of days before the charge?). Accordingly, the Commission will consider issuing a SNPRM seeking additional comment on these issues at a later date.

### 8.    Proposed § 425.8 Relation to State Laws

In its NPRM, the Commission proposed that amendments to the Rule would not affect state laws, regulations, orders, or interpretations relating to negative options, except to the extent they are inconsistent with the final Rule, and then only to the extent of the inconsistency. A state provision would not be "inconsistent" with the proposed Rule if it affords any consumer greater protection than the Rule.[486]

The Commission received a range of comments in response. On one end, a commenter opined the "FTC cannot preempt existing [state] laws," so it should instead strive for "harmonization and consistency with existing laws."[487] At the other end, multiple industry groups said the Commission should completely preempt state laws in this area.[488] These commenters argued having both state and federal standards may confuse consumers and create financial and operational burdens for sellers, thus raising consumer prices. For example, NCTA asserted that, without preemption, the proposed Rule "would encourage the enactment of new state laws with differing standards."[489] Another industry commenter suggested the Commission should work with lawmakers on one national standard.[490]

---

[486] *See* proposed § 425.8.
[487] ANA, FTC-2023-0033-1001.
[488] NCTA, FTC-2023-0033-0858; PDMI, FTC-2023-0033-0864; CCIA, FTC-2023-0033-0984; ESA, FTC-2023-0033-0867; IAB, FTC-2023-0033-1000.
[489] NCTA, FTC-2023-0033-0858; *see also* Chamber, FTC-2023-0033-0885 ("A floor just creates an increased federal burden without actually ensuring consistency of overall regulation on entities in the different states.").
[490] IHRSA, FTC-2023-0033-0863 (national standard).

Other industry groups and individual businesses supported preemption in various ways. For example, CTA argued the Rule should "preempt state laws with differing requirements."[491] Two additional commenters, including a mixed group of industry associations, asserted the Rule should set the ceiling and preempt any state provision that is more stringent.[492]

NRF said the Rule should "preempt any state law requirements that contradict or are inconsistent with the Rule … to the extent of the inconsistency."[493] To effectuate this change, NRF suggested the Commission adopt language from California's Automatic Renewal Law, which it said other states have copied. NRF proposed state laws be deemed inconsistent if they require disclosures or actions "that contradict . . . the [final rule]," and requirements be deemed contradictory if they use the same terms differently from the final rule or require "using a term different from the one required in the [final rule] to describe the same item."[494]

Several industry groups expressed concern regarding potential confusion about preemption. For example, ACA Connects asserted it "may be unclear whether and to what extent [a particular state law offers] 'greater' or 'lesser' protection than [the proposed Rule]" and asked for more guidance generally or for a process that lets interested parties ask the Commission if a particular state law is inconsistent.[495] NRF noted such a system has worked well with gift card laws, explaining the CARD Act (Pub. L. No. 111-24, 124 Stat. 2385) preempts less restrictive state laws.[496]

---

[491] CTA, FTC-2023-0033-0997; *see also* Sirius XM, FTC-2023-0033-0857; DCN, FTC-2023-0033-0983.
[492] Coalition, FTC-2023-0033-0884; CCIA, FTC-2023-0033-0984.
[493] NRF, FTC-2023-0033-1005.
[494] *Id.*
[495] ACA, FTC-2023-0033-0881 (greater or lesser); NRF, FTC-2023-0033-1005 (more guidance); DCN, FTC-2023-0033-0983 (more guidance).
[496] NRF, FTC-2023-0033-1005.

Finally, a group of law professors supported the Commission's proposed Rule. They noted "more than half of states … regulate some negative option marketing practices," and said the Commission "does not occupy the field or displace non-conflicting state [laws]."[497] The professors added states "can often move more nimbly to address problematic elements and evolving business models" and should retain the ability to do so.[498]

Having considered the foregoing comments, the Commission will streamline the text of the final Rule for clarity and efficiency, while maintaining the substance of the proposed Rule's proposed preemption language (renumbered in the final Rule as § 425.7). The FTC Act does not expressly preempt state law, and the legislative history of the FTC Act indicates Congress did not intend the FTC to occupy the consumer protection regulation field.[499] Therefore, any preemptive effect of the Rule must be limited to instances where it is not possible to comply with both state law and the Rule, or where application of state law would frustrate the purposes of the Rule.[500] This approach preserves states' ability to continue to act as laboratories to handle new and changing business models. This approach is consistent with other Commission Rules.[501]

Therefore, § 425.7 of the final Rule specifies the Rule does not supersede, alter, or affect state statutes, regulations, orders, or interpretations relating to negative option marketing, except to the extent a state statute, regulation, order, or interpretation is inconsistent with the Rule. The

---

[497] Law Professors, FTC-2023-0033-0861.
[498] *Id.*
[499] *See, e.g.*, *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 989 (D.C. Cir. 1985).
[500] Preemption would occur where there is an actual conflict between the two schemes of regulation such that both cannot stand in the same area. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141 (1963); *see also Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957 (D.C. Cir. 1985) (Credit Practices Rule); *Harry & Bryant Co. v. FTC*, 726 F.2d 993 (4th Cir. 1984) (Funeral Rule); *Am. Optometric Ass'n v. FTC*, 626 F.2d 896 (D.C. Cir. 1980) (Ophthalmic Practices Rule).
[501] *See, e.g.*, 16 CFR 437.9(b) (Business Opportunity Rule); *id.* 435.3(b) (Merchandise Rule); *id.* 436.10 (Franchise Rule); *id.* 429.2 (Cooling-Off Rule).

final language also continues to make clear state requirements are not inconsistent with the Rule to the extent they afford greater protection to any consumer. The manners in which a state law may provide greater protection are many. For example, a state law that requires sellers to remind consumers at the end of a free trial that they are about to be billed would provide greater protection to consumers and not be inconsistent with the Rule.

## VIII. MODIFICATIONS, ALTERNATIVES CONSIDERED

### A. New Provisions in Final Rule for Clarification

#### 1. New § 425.8 Exemptions

The NPRM sought comment on whether the Rule should exempt any entities or activities that are otherwise subject to the Commission's authority under the FTC Act.[502] Several commenters requested Rule exemption for their business or industry.[503] These commenters made various arguments based on the law and facts in their particular circumstances. For example, some argued existing state licensing and other requirements that already apply to their activities adequately address the problems identified in the NPRM and additional rules would only interfere with the existing regulatory structure. Because such decisions are highly fact dependent, the Commission must consider exemptions, even of larger groups, on an individualized basis pursuant to the FTC's Rules of Practice.[504] Pursuant to these rules, interested persons may file

---

[502] *See, e.g.*, NPRM, 88 FR 24730.

[503] Categories of products and services for which commenters sought exemptions include: alarm companies (FTC-2023-0033-0860; FTC-2023-0033-1001); wireless carriers (FTC-2023-0033-0866); telecommunication providers (FTC-2023-0033-0876; FTC-2023-0033-0881); service contracts (FTC-2023-0033-0877; FTC-2023-0033-0879; FTC-2023-0033-0882; FTC-2023-0033-0996; FTC-2023-0033-1136; FTC-2023-0033-1143); insurance agreements, service contracts on consumer goods, and cancellable month-to-month agreements (FTC-2023-0033-0878); and retail energy service (FTC-2023-0033-1151). Some of these and others sought to exclude B2B agreements. *See* Section VII.B.1.c.

[504] *See* 16 CFR 1.25, 1.31; *see also* 86 FR 59851 (Oct. 29, 2021) (amending Commission procedures and rules on the petition exemption process).

petitions for exemption with relevant evidence and data. If the Commission deems the petition sufficient to warrant further consideration, it will follow the procedures outlined in § 1.31 of its rules.

The Commission adopts a new section, § 425.8. Pursuant to this provision, and consistent with the Commission's Rules of Practice, sellers and other covered persons may seek full or partial exemptions if they can demonstrate application of the Rule's requirements to a particular product or service, or class of product or service, is not necessary to prevent the acts or practices to which the Rule relates.

### 2.    New § 425.9 Severability

One commenter, NFIB, asked the Commission to address severability in the Rule.[505] Specifically, NFIB proposed a provision stating if a court finds any part of the Rule to be invalid, then the remainder of the Rule remains in force. The Commission agrees with this proposal. It is the Commission's intent that the provisions of the final Rule are separate and severable from one another; therefore, if any provision is stayed or determined to be invalid, the remaining provisions shall continue in effect. Thus, the final Rule includes this language in a new section, § 425.9.[506]

### B.    Notice of Material Changes

In the NPRM, the Commission sought comment on whether and how sellers should notify consumers when they make material changes to contracts with a negative option.[507] As discussed in the NPRM, several commenters responding to the ANPR recommended the

---

[505] NFIB, FTC-2023-0033-0789.

[506] This provision is comparable to the severability provision in other Commission Rules. *See* 16 CFR 437.10 (Business Opportunity Rule); 16 CFR 455.7 (Used Motor Vehicle Rule); 16 CFR 436.11 (Franchising Rule); 16 CFR 453.8 (Funeral Industry Rule); 16 CFR 310.9 (TSR).

[507] NPRM, 88 FR 24730.

Commission require sellers to send consumers notices of such changes. TINA, for example, asserted the Commission should require such notice and provide consumers an opportunity to cancel before the terms become effective.[508] Several states require similar notices.[509] The Commission, however, did not require notice of material changes in the proposed Rule. As it explained at the time, whether a seller's failure to provide such notice is unfair or deceptive is a highly fact-specific inquiry that must be determined on a case-by-case basis. Given the importance of the issue, however, the Commission requested further comment.

## 1.     Summary of Comments

Five commenters responded.[510] TINA reiterated sellers should provide consumers with notice of material changes to subscription terms.[511] Further, it asserted the Commission's reasoning is at odds with state laws and the Commission's longstanding position on material terms, *i.e.*, that they be "clearly and conspicuously disclosed when relevant to the marketing being presented."[512] TINA further argued allowing businesses to "hide" material changes to these contracts is likely to cause injury because consumers "do not read these contracts (let alone monitor them for changes) and a significant minority of consumers are not even aware they are bound by these subscription contracts."[513]

In contrast, ESA, USTelecom, ACA, and IAB supported the Commission's proposal. IAB and ESA said it is "industry practice for subscription-based services and products to have

---

[508] NPRM, 88 FR 24724.

[509] Those states include Virginia, California, and Oregon. NPRM, 88 FR 24724.

[510] ESA, FTC-2023-0033-0867; USTelecom, FTC-2023-0033-0876; ACA, FTC-2023-0033-0881; IAB, FTC-2023-0033-1000; and TINA, FTC-2023-0033-1139.

[511] TINA, FTC-2023-0033-1139.

[512] *Id.*

[513] *Id.*

regular price increases over time," and consumers expect it. [514] USTelecom agreed with the Commission's rationale that "whether such a practice is unfair or deceptive depends heavily on the facts presented in each case." [515] ACA, a telecommunications trade association, noted the FCC and states already have notice requirements for contract term changes. [516]

## 2. Analysis

Based on the record, the Commission does not require notice of material changes to contract conditions in the final Rule. The final Rule requires the seller disclose important information prior to charging the consumer. Such information includes all material terms, including, *e.g.*, the range of costs the consumer will be charged and the frequency of charges that will incur unless the consumer takes timely steps to prevent or stop them. The seller's failure to disclose such information upfront, clearly and conspicuously, violates the Rule.

Moreover, state laws have different predicate requirements (*e.g.*, less robust initial disclosures) and, importantly, are often based on different legal authority. Additionally, the Commission's final Rule does not conflict with its longstanding advice on clear upfront disclosure. The final Rule requires just such disclosure, § 425.4; and the Commission has never required after sale disclosure based on its Section 5 authority.

Finally, as the Commission explained in the NPRM, whether a seller's failure to notify a consumer of material changes is unfair or deceptive could be heavily dependent on the particular facts and circumstances, such as the seller's upfront marketing claims. For example, based on a clear upfront agreement to allow periodic price increases, consumers may understand that firms can make small price increases over long periods of time. On the other hand, significant

---

[514] IAB, FTC-2023-0033-1000; ESA, FTC-2023-0033-0867.
[515] USTelecom, FTC-2023-0033-0876.
[516] ACA, FTC-2023-0033-0881.

unilateral changes to the terms of the agreement, such as huge prices increases over short periods of time would probably be inconsistent with reasonable consumer expectation, and therefore, deceptive or unfair. Because the determination of whether a practice runs afoul of Section 5 in this context is highly fact dependent, the Commission declines to address it at this time. Nevertheless, the Commission will continue to monitor the need for such a requirement and will continue to bring enforcement actions when appropriate.

## C.   Consumer Education

The Commission solicited comments on alternative approaches such as additional consumer and business education, and received two comments in response.[517] The Commission plans to continue its efforts to provide information to help consumers with their purchasing decisions and avoid ensnarement in unwanted recurring payment programs. However, consumer education is not a substitute for improving existing regulatory provisions. Consumer education is likely to have a limited benefit where sellers lure consumers into an agreement without consumers' knowledge, particularly with the use of dark patterns.

## D.   Implementation Date

Several industry groups and one individual commenter asked the Commission to delay the final Rule's effective date. Three commenters sought a delay of at least 12 months or up to 18 months, citing generalized concerns that changes can take time "given the complexities" of the proposed Rule.[518] The Chamber asked for a two-year period "depending on the scope and

---

[517] *See* NPRM. 88 FR 24730; NFIB, FTC-2023-0033-0789 (requesting a business education enforcement provision); Hoofnagle, FTC-2023-0033-1137 (consumer and business education probably uneconomical intervention).
[518] IAB, FTC-2023-0033-1000 (at least 12 months); ESA, FTC-2023-0033-0867 (12-18 months); Kuehn, FTC-2023-0033-0871 (12-18 months).

specific requirements of the final rule."[519] By contrast, consumers generally encouraged the Commission to enact the Rule without delay.[520]

None of the commenters identified a precise period it would take to comply with a specific provision or otherwise detailed what would necessitate a particular length of time.[521] They did, however, detail the general actions they would need to take. For example, NCTA explained, "this proposal would require companies to change and update their customer processes and user interfaces to provide the mandated notices, obtain additional consent, and implement cancellation mechanisms," as well as troubleshoot those changes in a careful way to avoid "glitches and issues that would affect service and frustrate and harm consumers."[522]

The Commission recognizes changes to processes and disclosures typically require some time to address and has regularly provided a grace period for implementation of its rules.[523] Small businesses in particular may require time to ensure their modified processes conform to the Rule. To address these concerns, the final Rule provides 180 days from the date the final Rule is published to come into full compliance. However, sellers must comply with § 425.3 60 days after publication of the Rule, consistent with 5 U.S.C. 801(a)(3). This section prohibits misrepresentations in connection with a negative option feature. Existing law already requires

---

[519] Chamber, FTC-2023-0033-0885.

[520] Individual commenter, FTC-2023-0033-0257; Individual commenter, FTC-2023-0033-0685.

[521] ACA, FTC-2023-0033-0881; SCIC, FTC-2023-0033-0879 (noting many states require service contract forms be filed with state regulators for approval); ANA, FTC-2023-0033-1001; NCTA, FTC-2023-0033-0858.

[522] NCTA, FTC-2023-0033-0858.

[523] *E.g.*, 38 FR 33766 (Dec. 7, 1973) (original Negative Option Rule, 6-month grace period); 60 FR 43842 (Aug. 23, 1995) (TSR. 4-month grace period); 89 FR 26767 (Apr. 16, 2024) (TSR amendment, 180-day grace period); 79 FR 55615 (Sept. 17, 2014) (Merchandise Rule amendments, 3-month grace period).

sellers not to make misrepresentations. Therefore, this provision should not impose an added time or cost burden on businesses operating lawfully. [524]

The Commission recognizes the remainder of the final Rule may require some businesses to implement or modify systems, software, or procedures. As detailed in the NPRM, however, the existing legal landscape already includes a patchwork of relevant federal laws and regulations in addition to state laws to address sellers' negative option practices. [525] The Commission has also issued guidance to businesses on the basic requirements that negative option marketers must follow to avoid deception. [526] Compliance with these statutes and regulations should mean sellers have a significant head start on their compliance efforts.

Moreover, the Commission has streamlined the final Rule, significantly reducing the compliance burdens. Specifically, for reasons detailed in Section VII, above, the final Rule omits or modifies proposed requirements that gave some commenters particular concern. Most notably, the Commission omitted the entire annual reminder and saves requirements. As commenters pointed out, these two sections imposed the greatest compliance burdens on sellers. [527] Their removal, therefore, should substantially reduce the time and expense needed to ensure processes comply.

---

[524] Similarly, the various procedural sections of the Rule, *e.g.*, § 425.1 (Scope), § 425.2 (Definitions); § 425.7 (Relation to State Laws), § 425.8 (Exemptions), and § 425.9 (Severability) are also operative 60 days after publication.
[525] NPRM, 88 FR 24716-18.
[526] *See* EPS, 86 FR 60822; Staff Report, https://www.ftc.gov/sites/default/files/documents/reports/negative-options-federal-tradecommission-workshop-analyzing-negative-optionmarketing-report-staff/p064202negativeoptionreport.pdf {last visited on Aug. 26, 2024}.
[527] *See* Sections VII.B.6 (saves) and VII.B.7 (reminders).

Similarly, other modifications should clarify and streamline requirements, making compliance easier. For example, the final Rule eliminates certain recordkeeping requirements. [528] Additionally, the final Rule narrows the required disclosures. [529] These changes combined with existing law obviate the need for a lengthy grace period.

### E.    Anti-Abuse Provision

The Law Professors suggested the Commission include an "anti-abuse" provision to provide a mechanism for enforcement against sellers' attempts to evade the Rule. [530] Such a provision would make it an "unfair or deceptive act or practice" for a seller to, for example, set up a facially complicated sign-up process to allow for a similarly complicated cancellation process, but in practice to simplify the sign-up process to maximize enrollment. [531] As the Law Professors acknowledge, such attempts to evade the Rule already violate the Rule, and the record does not suggest a need for such an additional anti-abuse provision.

### IX.    CONGRESSIONAL REVIEW ACT

Pursuant to the Congressional Review Act, 5 U.S.C. 801 *et seq*., we anticipate the Office of Information and Regulatory Affairs will designate the final Rule as a "major rule," as defined by 5 U.S.C. 804(2).

### X.    FINAL REGULATORY ANALYSIS

Under Section 22(a) of the FTC Act, 15 U.S.C. 57b-3(a), the Commission must issue a preliminary regulatory analysis for a proceeding to amend a rule if the Commission:

(1) estimates that the amendment will have an annual effect on the national economy of $100

---

[528] *See* § 425.5(a)(4).
[529] *See* § 425.4.
[530] Law Professors, FTC-2023-0033-0861.
[531] *Id.*

million or more; (2) estimates that the amendment will cause a substantial change in the cost or price of certain categories of goods or services; or (3) otherwise determines that the amendment will have a significant effect upon covered entities or upon consumers. Although the Commission preliminarily determined the proposed amendments to the Rule would not have such effects on the national economy; on the cost of goods and services offered for sale by mail, telephone, or over the Internet; or on covered parties or consumers, several commenters raised concerns with the Commission's preliminary determination. Ultimately, the presiding officer determined, after receiving additional comments from interested stakeholders, the proposed amendments would have such effect. [532] In accordance with Section 22, the Commission therefore issues its final regulatory analysis below.

### A.    Introduction

Under Section 22 of the FTC Act, 15 U.S.C. 57b-3, the final regulatory analysis must contain (1) a concise statement of the need for, and objectives of, the final rule; (2) a description of any alternatives to the final rule which were considered by the Commission; (3) an analysis of the projected benefits, any adverse economic effects, and any other effects of the final rule; (4) an explanation of the reasons for the determination of the Commission that the final rule will attain its objectives in a manner consistent with applicable law and the reasons the particular alternative was chosen; and (5) a summary of any significant issues raised by the comments submitted during the public comment period in response to the preliminary regulatory analysis, and a summary of the assessment by the Commission of such issues.

---

[532] Recommended Decision by Presiding Officer, https://www.regulations.gov/comment/FTC-2024-0001-0042.

The Commission received comments from trade associations regarding the preliminary regulatory analysis in the NPRM, and three presented testimony and expert reports at the informal hearing. Comments and testimony, including reports submitted by experts, were largely conclusory in nature.[533] The general theme of the comments and testimony, however, was that the compliance costs would be higher than those estimated in the NPRM's preliminary analysis, and the Commission herewith presents revised estimates of those compliance costs.

### B.    Regulatory Analysis

#### 1.    Concise statement of the need for, and the objectives of, the final Rule.

As discussed previously, the objective of the proposed amendments is to curb deceptive or unfair negative option practices . The legal basis for the proposed amendments is Section 18(a)(1)(B) of the FTC Act, which provides the Commission with authority to issue "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce."[534]

As described in this SBP, the amendments address unfair or deceptive negative option practices. The FTC, other federal agencies, and state attorneys general have brought multiple administrative and judicial actions to stop and remedy harmful negative option practices. The record demonstrates, however, that existing legal authorities fall short because they leave consumers unprotected from certain practices and constrain the relief the Commission may obtain for law violations to redress consumers and deter future unlawful activity. In the ANPR

---

[533] Where specific components of the Rule, as anticipated when the NPRM was published, were discussed, commenters combined them, such that the concerns expressed cannot readily be separated to reflect what remains in the final Rule. For example, NCTA claims that "(t)he rigid 'Click-to-Cancel' requirements and limits on 'saves' will harm consumers," but addresses these harms only in combined and qualitative ways. FTC-2023-0073-0008.

[534] 15 U.S.C. 57a(a)(1)(B).

and NPRM, the Commission explained it receives thousands of consumer complaints a year related to negative option marketing.

As discussed above in Sections III-VII, the final Rule clarifies existing requirements regarding negative option marketing currently dispersed in other rules and statutes administered by the FTC and provides a consistent legal framework across media and offers. It also consolidates all requirements, such as those in the TSR and ROSCA, specifically applicable to negative option marketing. The final Rule also provides clarity about how to avoid deceptive negative option disclosures and procedures. For example, ROSCA lacks specificity about cancellation procedures and the placement, content, and timing of cancellation-related disclosures. The final Rule now provides clear standards for sellers about, *inter alia*, the content and timing of important information disclosures and what constitute "simple mechanisms" for the consumer to stop recurring charges. Further, the Rule allows the Commission to seek civil penalties and consumer redress under Section 19(a)(1) of the FTC Act in contexts where such remedies are currently unavailable, such as deceptive or unfair practices involving negative options in print materials and face-to-face transactions (*i.e.*, in media not covered by ROSCA or the TSR).

**2.      A description of any alternatives to the final Rule which the Commission considered.**

In formulating the final Rule, the Commission makes every effort to avoid imposing unduly burdensome requirements on sellers. To that end, the Commission avoids, where possible, proposing specific, prescriptive requirements that could stifle marketing innovation or otherwise limit seller options in using new technologies. In the NPRM, the Commission sought comments on several alternatives, including provisions related to consent requirements (additional consent for free trials) and reminder requirements (narrowing the scope of product

types requiring reminders). The Commission also sought comments on how it could modify the proposed amendments to reduce costs or burdens for small entities. In response to the comments, and as discussed in the Section-by-Section analysis, the Commission determines not to finalize the proposed Rule in its entirety. Instead, the Commission finalizes a Rule that limits the material terms to be disclosed immediately adjacent to consent for the negative option feature; removes the limitation on saves and the accompanying recordkeeping requirement; removes the annual reminder provision; and modifies the length of the recordkeeping requirement for verification of consent to three years and provides an alternative method of compliance.

One alternative to the final Rule would be to terminate the rulemaking and rely instead on the existing legal framework to combat unfair or deceptive negative option practices. Another alternative would be to limit the scope of the final Rule to just those negative option plans that are marketed in person or through the mail and therefore, currently, are covered only by Section 5 of the FTC Act and not by ROSCA or the TSR. However, failing to proceed in accordance with the final Rule would substantially reduce or eliminate the benefits of the Rule, including clarifying the requirements currently spread throughout statutes and regulations and covering negative options in media not subject to the TSR or ROSCA.

Given that the Commission expects the unquantified benefits and unquantified costs of the final Rule to be small, and that there is considerable scope for the net benefits to remain positive and large even if compliance costs have been substantially underestimated, this regulatory analysis indicates that adoption of the Rule will result in benefits to the public that outweigh the costs.

   **3.  An analysis of the projected benefits and any adverse economic effects**

**and any other effects of the final Rule.**

a)      **Summary of Benefits and Costs**

The primary consumer benefits of the final Rule, relative to the existing regulatory

baseline,[535] come in the form of faster cancellations when consumers wish to cancel

subscriptions.[536]

---

[535] As explained in Section III of the SBP, several other statutes and regulations address harmful negative option practices. Section 5 of the FTC Act, which prohibits unfair or deceptive acts or practices, has traditionally served as the Commission's primary mechanism for addressing deceptive negative option claims. ROSCA, the TSR, 1the Unordered Merchandise Statute, and EFTA all address various aspects of negative option marketing.

[536] The final Rule also requires that specific disclosures relating to negative option features be provided separately to consumers before consent is obtained, whereas the existing regulatory framework requires that all material terms of a negative option contract be disclosed in a clear and conspicuous manner. The new disclosure requirements will aid consumers in understanding both that they are entering a negative option contract and the terms and conditions of that contract, especially how they can cancel the contract and when such cancellation must occur to avoid future charges. No consumer testing of the final Rule's disclosure requirements, relative to a "control" of "clear and conspicuous" disclosure requirements under the existing regulatory baseline, has been done. Accordingly, it is not possible to quantify any incremental consumer comprehension of a negative option plan at the time a consumer provides consent to that plan that may result from the final Rule's disclosure requirements. Moreover, some academic studies claim that "[n]ot only do consumers have a tendency to forget, but also a tendency to forget that they forget," suggesting that any gain in comprehension of the negative option features of an agreement that might be measured under consumer testing might not be durable. *See* Sophia Wang, "One Size Does Not Fit All: The Shortcomings of Current Negative Option Legislation," 26 Cornell J. of L. & Pub. Policy, 197, 212 n.135 (2016) citing Keith M. Marzilli Ericson, "Forgetting We Forget: Overconfidence and Memory," 9 J. Eur. Econ. Assoc. 43 (2011). Additionally, if the disclosures required by the final Rule come to be viewed as "boilerplate" language that consumers rush through, or consumers consider those disclosures to be less salient than other aspects of the transaction, such as acquiring a free trial of a product or service, the final Rule's disclosures may not offer any incremental benefit over existing "clear and conspicuous" because "people have limited attentional resources and will overlook non-salient features of any transaction." *See* Tess Wilkinson-Ryan, "A Psychological Account of Consent to Fine Print," 99 Iowa L. Rev. 1745 (2014). Concerns such as these are consistent with some consumer advocacy groups seeking amendments that would require a second round of consent to be obtained at the end of a free trial and before any recurring charges could be initiated in addition to routine reminders of recurring charges. *See, e.g.*, TINA, FTC-2019-0082-0014 (seeking amendments to require notice and re-affirmance of consumer consent, prior to being charged because consumers may forget about the trial and incur unwanted charges or enrollments at the end of the offer, particularly with long trial periods).

159

The final Rule requires negative option sellers to provide cancellation mechanisms that are at least as easy to use as the mechanisms by which consumers consent to negative option plans. For negative option sales made online or over the telephone, "at least as easy to use" requires that the cancellation mechanism operate in the same medium and take no more time or effort than the consumer used when enrolling in the negative option plan. For negative option sales that are made in-person or through the mail, the final Rule requires that, in addition to offering cancellation through the specific method used for enrollment, the seller must also offer at least one alternate cancellation mechanism that can be used remotely, *e.g.*, cancellation via a website, email, or a toll-free telephone number and, again, that the consumer can cancel the negative option contract at least as quickly as he or she completed enrollment in the negative option plan.

In the following analysis, the Commission describes the anticipated effects of the final Rule. Where possible, it quantifies the benefits and costs. If a benefit or cost is quantified, it indicates the sources of the data relied upon. If an assumption is needed, the text makes clear which quantities are being assumed. The Commission measures the benefits and costs of the Rule against the existing regulatory baseline that consists primarily of ROSCA, the TSR, and Section 5 enforcement. [537]

First, the likely per-cancellation benefits of the final Rule in relation to four scenarios under the existing regulatory baseline are considered. Next, the number of transactions relevant to each scenario are estimated. The product of average benefits-per-cancellation in each scenario

---

[537] The Unordered Merchandise Statute and EFTA also address various aspects of negative option marketing, but violations of those laws in relation to negative option marketing are typically pleaded in conjunction with violations of other laws; without loss of generality, the regulatory analysis expressly considers only ROSCA, the TSR, and Section 5 as the regulatory baseline against which incremental benefits and costs from the final Rule are measured.

multiplied by the likely number of consumer cancellation transactions for each scenario, summed across all scenarios, provides an estimate of the aggregate, quantifiable, consumer benefits produced by marketers' compliance with the final Rule's cancellation requirements. Quantifiable costs primarily reflect the resources spent by businesses to review the Rule and to take any preemptive or remedial steps to comply with its provisions, including, when and as needed, making changes to the manner they receive and process cancellation requests from consumers.

The Commission estimates the present discounted value of quantified benefits over ten years, using a 2 percent discount rate, will range between $6.1 and $49.3 billion. Annualized over 10 years, the Commission estimates the quantified benefits will range between $682.8 million and $5.5 billion per year. The Commission estimates the present discounted value of quantified costs over ten years, using a 2 percent discount rate, will range between $100.9 and $826.2 million. Annualized over ten years, the Commission estimates the quantified costs will range between $11.2 and $92.0 million per year. These estimates are presented in Table 1 below.

Table 1. Summary of Total Quantified Benefits and Costs (in millions, 2023 dollars)

| | Low | High |
|---|---|---|
| Present Discounted Value over 10 years, 2% discount rate | | |
| Benefits | $6,133.57 | $49,315.39 |
| Costs | $100.89 | $826.15 |
| *Net Benefits* | *$5,307.43* | *$49,214.50* |
| Annualized over 10 years, 2% discount rate | | |
| Benefits | $682.83 | $5,490.11 |
| Costs | $11.23 | $91.97 |
| *Net Benefits* | *$590.86* | *$5,478.88* |

**b)      Benefits of the Final Rule**

This section describes the beneficial impacts of the Rule, provides quantitative estimates where possible, and describes benefits that are only assessed qualitatively.

The quantifiable estimates reflect benefits stemming from the decreased amount of time and effort consumers will need to expend cancelling subscriptions, and in contexts where data are available, welfare gains from avoided expenditure for unwanted subscriptions, under the final Rule relative to marketers' compliance with the existing regulatory baseline. This section first estimates per-consumer savings from cancellation mechanisms that would become at least as easy to use as the mechanisms through which consent to the negative option transactions was given and then estimates the number of cancellation transactions to which those benefits apply.

In addition to these quantified benefits, there are several benefits we do not quantify. First, marketers' compliance with the final Rule is likely to improve consumer confidence in using subscriptions[538] and increase the number of consumers who are willing to subscribe and obtain the convenience, and often cost savings, that subscriptions can provide. Second, research in economics and psychology finds the perceived monetary and psychological costs from switching products or services can lead consumers to make sub-optimal decisions. The final Rule, by reducing these costs through simpler cancellation methods, may improve consumer decision-making by reducing enrollments in subscriptions that consumers do not value and increasing enrollments in subscriptions that they do value.[539] Marketers' compliance with the

---

[538] One survey found that consumers without subscriptions were much more pessimistic about the ability to cancel subscriptions than were consumers who had subscriptions. *See* Jabil, "Connected Packaging Perceptions and Attitudes: A Consumer Insights Survey" (July 2021), https://www.jabil.com/dam/jcr:ecdb74e6-c34f-4c30-aa34-c10269617db6/2021-connected-packaging-survey.pdf#page=3. Another recent study finds that consumers are aware that they may be inattentive in future and not cancel subscriptions that they no longer desire, and so are less likely to sign up for negative-option subscriptions. *See* Klaus Miller, *et al.*, "Sophisticated Consumers with Inertia: Long-Term Implications from a Large-Scale Field Experiment" (2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4065098.

[539] A large literature in economics has documented that consumers face switching costs and/or psychological biases towards inertia. *See, e.g.*, Brigitte Madrian & Dennis Shea, "The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior," 116 Quarterly J. of Econ.

final Rule, and the consumer confidence that compliance inspires, may also "exert additional competitive pressures on businesses who offer subscription contracts (and) could increase productivity in the sector."[540]

Compliance with the final Rule may also result in some allocative effects when consumers can cancel online instead of by telephone. In such cases, consumers will be able to cancel subscriptions at times of the day that may be more convenient to them than the hours that subscription sellers staff their telephone lines and from devices that they find more convenient to use than telephones.[541]

Finally, the Commission's estimates of quantified benefits are based on reductions in time and effort from cancelling subscriptions to non-business consumers. The Commission expects small businesses may also benefit in similar ways from less costly cancellations, but it does not quantify such benefits due to lack of data on business cancellation transactions.

The following subsections then estimate the quantified benefits from reductions in time and effort from cancelling subscriptions. First, in subsection (1), the Commission estimates the per-cancellation benefit relative to the regulatory baseline for i) online cancellation when only ROSCA-compliant telephonic cancellation was available, ii) simpler online cancellation when

1149 (2001); William Samuelson and Richard Zeckhauser, "Status Quo Bias in Decision Making," 1 J. of Risk & Uncertainty 7 (1988). Research has found that many consumers do not cancel subscriptions due to such inertia effects. *See, e.g.*, Miller, *et al.* (2023); Liran Einav, *et al.*, "Selling Subscriptions" (2023), https://harris.uchicago.edu/sites/default/files/mahoney_ppe_seminar_paper_9-26-23_0.pdf.

[540] *See* U.K. Department for Business and Trade, "Impact Assessment—Digital Markets, Competition and Consumers Bill: Subscription Measures," at 3 (Apr. 20, 2023), https://publications.parliament.uk/pa/bills/cbill/58-03/0294/ImpactAssessmentAnnex2.pdf.

[541] In some instances, an online cancellation completed at, say, 11:59 p.m., compared to a counterfactual in which a call center closed at, say, 8 p.m., could result in sparing a consumer from a recurring charge that would take effect the next day, and such instances would result in actual monetary savings to consumers, but we are unable to estimate the frequency of such occurrences or the monetary savings they would engender.

only ROSCA-compliant online cancellation was available, iii) simpler telephone cancellation when only TSR-compliant cancellation was available, and iv) online or telephone cancellation when only in-person or mail cancellation was available. The Commission then estimates the number of cancellation transactions in subsection (2), and finally calculates benefits as the per-cancellation benefit in each scenario multiplied by the number of affected transactions in subsection (3).

### (1) Estimating per-Cancellation Benefits

For each of the four scenarios below, the Commission estimates a range of benefits that a consumer will gain each time they cancel a negative option subscription. In these scenarios, the Commission assumes a final Rule-compliant online cancellation should take no more than 30 seconds to one minute, based on the Commission's experience that the average time for consumers to read required disclosures and provide consent to a negative option plan online is 30 seconds to one minute. For telephone cancellations under the final Rule, the Commission assumes that a rule-compliant cancellation should take no more than one to two minutes, based on the assumption it takes a telemarketer twice as long to read required disclosures to a consumer as it would take a consumer to read such disclosures to his or herself online.

### (a) Estimated per-Cancellation Benefit Relative to ROSCA-compliant Telephonic Cancellation

For consumers enrolling in negative option plans online, the existing regulatory baseline, ROSCA, requires marketers to provide "simple" cancellation mechanisms. A facially ROSCA-compliant, "simple" telephonic cancellation may, nonetheless, require more time and effort from consumers than was expended when enrolling in the negative option plan. Online subscription sellers' compliance with the final Rule will save consumers that extra measure of time and effort.

164

To estimate the average time savings to consumers of a final Rule-compliant "click-to-cancel" mechanism compared to a ROSCA-compliant simple telephonic cancellation, this analysis first assumes that ROSCA-compliant simple telephonic cancellations take no more time than the "average handle time" for all customer service requests made to call centers, which an industry source indicates is six minutes and three seconds.[542] As discussed at the beginning of this subsection, the Commission assumes a final Rule-compliant cancellation should take no more than 30 seconds to one minute, saving consumers between five minutes and three seconds and five minutes and 33 seconds per cancellation relative to a simple telephonic cancellation.

The Commission then assumes consumers, on average, value their non-work time at 82% of the mean hourly wage of $31.48, or $25.81 (*i.e.,* .82 x $31.48) per hour.[543] Accordingly, the Commission estimates the faster online cancellations the final Rule will provide, relative to ROSCA-compliant telephonic cancellations, will be valued at between $2.17 (*i.e.,* 5:03 minutes x $25.81/hour) and $2.39 (*i.e.,* 5:33 minutes x $25.81/hour).

    **(b)**     **Estimated per-Cancellation Benefit Relative to ROSCA-Compliant Online**

---

[542] *See* Michelle Hawley and Shane O'Neill, "21 Important Call Center Statistics to Know About," (Apr. 3, 2024), https://www.cmswire.com/contact-center/16-important-call-center-statistics-to-know-about. We use this proxy for the time a ROSCA-compliant telephonic cancellation takes only for the express purpose of estimating the incremental benefits to consumers of a final Rule-compliant cancellation replacing a ROSCA-compliant telephonic cancellation. "Average handle time" has not been used as a standard for ROSCA enforcement and is not intended to set a standard here.

[543] The Commission uses a mean hourly wage rate of $31.48; *see* Bureau of Labor Statistics, "May 2023 National Occupational and Wage Estimates, Unites States," https://www.bls.gov/oes/current/oes_nat.htm. A meta-analysis of studies on how consumers value time used in traveling (an area in which "a huge literature has arisen") has determined that consumers value time used in that matter at 82% of their wage rate. *See* Daniel S. Hamermesh, "What's to Know About Time Use?," 30 J. Econ. Surv. 1, 198-203 (2015). The Commission assumes for the purpose of the final Rule consumers value transaction costs savings in the same way that they value travel time.

**Cancellation**

For online cancellations of online-entered subscriptions, the Commission lacks a source of average cancellation times presumed to be ROSCA-compliant that is as comprehensive as that used for the average handle times of call centers. The Commission relies, instead, on an experiment that involved signing up for 16 online subscriptions between August 2 to October 4, 2022, then canceling each one, and recording the time it took to cancel, as well as the variety of other obstacles faced in canceling. [544] To estimate the average time for online cancellations, the Commission subtracts the time incurred in canceling the three subscriptions that required telephonic cancellation from the aggregate time reported to cancel all 16 subscriptions. This yields an average of two minutes and 4 seconds per online cancellation. [545]

Based on the Commission staff's experience, the average time needed to read the required disclosures and provide consent to a negative option feature is 30 seconds to one

---

[544] *See* Caroline Sinders, "How Companies Make It Difficult to Unsubscribe," https://pudding.cool/2023/05/dark-patterns. Among the obstacles noted for otherwise seemingly simple online cancellations were that some websites did not use straight forward terms, such as "unsubscribe" or "cancel," and instead put the cancellation path under titles such as "auto-renew" or "edit plan."

[545] The researcher reported the aggregate time expended to cancel all 16 subscriptions was 57 minutes and 31 seconds. Of the three subscriptions that required telephonic cancellations, one call took 17 minutes and 36 seconds, one took seven minutes, and the time to cancel the third one was not reported (apart from explaining that it was necessary to call three times due to the seller's "technical difficulties"). The Commission replaces this missing value with the average handle time found by Hawley/O'Neill (2024) of six minutes and three seconds. The Commission therefore subtracted 30 minutes and 39 seconds from the aggregate cancellation time of 57 minutes and 31 seconds; measured in seconds, this becomes 3,451 - 1,839 = 1,612. Dividing this result by 13 equals 124 seconds, or two minutes and 4 seconds. The Commission notes this average cancellation time, though relevant for this regulatory analysis, has not been used as a standard for ROSCA enforcement and is not intended to set a standard here. Moreover, while we have calculated this average, the study notes cancellation took under one minute for three large sellers of digital entertainment subscriptions. Last, the Commission notes one commenter opined, "(f)or the most part," companies offer convenient, no-hassle, cancellation options that probably take about five clicks on average, though the commenter did not indicate a time duration. *See* Individual commenter, FTC-2023-0033-0780.

minute. An online cancellation that took no longer than the provision of online consent would therefore save the consumer between one minute and four seconds and one minute and 34 seconds. Valuing consumers' time at $25.81 per hour, as assumed above, the final Rule would therefore save consumers who enroll online and cancel online time that they value at between $0.46 (*i.e.*, 1:04 seconds x $25.81/hour) and $0.67 (*i.e.*, 1:34 minutes x $25.81/hour).

**(c)      Average per-Cancellation Benefit Relative to TSR-Compliant Cancellation**

For consumers enrolling in negative option plans via telemarketing, the existing regulatory baseline is the TSR. The TSR does not specify a performance standard specific to negative option cancellations. Although egregious cancellation delays can be pleaded against telemarketers under § 310.3(a)(1)(vii) (requiring disclosure of all material terms and conditions of the negative option feature) or § 310.3(a)(2)(ix) (prohibiting misrepresentation directly or by implication of any material aspect of a negative option feature), the final Rule's requirement that the cancellation mechanism be at least as easy to use as the consent mechanism provides cancellation-specificity to negative options sold through telemarketing that is lacking under the existing regulatory baseline. Because telemarketers have substantial discretion in designing and implementing consent processes specific to their programs, telemarketers will have a clear benchmark for the speed with which they must complete a final Rule-compliant cancellation.

As described at the beginning of this subsection, the Commission assumes it takes telemarketers between one and two minutes to read the required disclosures to consumers and receive their consent for enrollment in a negative option plan. Using the same average handle time measure of six minutes and three seconds used a previous scenario to proxy for baseline time spent for a telephonic cancellation, the Commission assumes the final Rule will save consumers who consent to a negative option sale via telemarketing, and cancel in the same

manner, between four minutes and three seconds and five minutes and three seconds. Evaluating that time saving in the same manner as above, compliance with the final Rule results in a per-cancellation time saving that is worth between $1.74 (*i.e.,* 4:03 minutes x $25.81/hour) and $2.17 (*i.e.,* 5:03 minutes x $25.81/hour).

### (d)    Estimated per-Cancellation Benefit Related to In-Person Enrollments

Some sellers market negative option plans in ways that are not covered by ROSCA or the TSR. Those that involve in-person enrollment and only offer in-person or mail cancellation, in particular, may be highly burdensome to consumers. The final Rule requires sellers who offer in-person enrollment to offer at least one alternate cancellation method that consumers may use remotely, *e.g.*, online [546] or via telephone.

Providing consumers with an alternative to in-person cancellations will give consumers a faster route to cancel a subscription and may also spare some consumers from incurring additional recurring charges which might accrue during the pendency of a slow cancellation mechanism, enabling consumers to reallocate their spending power in directions of greater utility, resulting in allocative efficiencies.

Unlike negative option transactions entered into online (ROSCA) or by telephone (TSR), the Commission lacks comprehensive experience with negative option plans that require cancellation in person or through the mail. However, because many gym/fitness center/health studio memberships (hereafter, "gym memberships") are sold via negative options[547] and may

---

[546] At the seller's choice, an online cancellation method may be through a website or via email.
[547] IHRSA, The Global Health & Fitness Association, commenting on behalf of itself and the industry (*see* FTC-2023-0033-0863) claimed there were clear distinctions between in-person, brick and-mortar health and fitness businesses and online subscription services, explaining a month-to-month contract is a very different risk to consumers than a long-term contract that begins after a free trial or auto-renews without notice. IHRSA further claims short-term (e.g.,

require cancellation via certified mail or in person (sometimes even when consumers can enroll online[548]), the Commission proxies the per-cancellation benefits of an additional, remote, method of cancellation by looking at those benefits in the context of gym memberships.[549]

As noted in the comment submitted by comment filed by IHRSA,[550] The Global Health & Fitness Association, "many (fitness club) operations allow several options for agreement termination through simple online solutions including online account management, email cancellation requests, and specific online cancellation buttons or forms" and "[m]any of these

---

month-to-month) continuous service agreements should be distinguished from purely online subscription services targeted by the rule. IHRSA further (mis-) characterizes the Rule as appearing to be concerned with paid contracts that initiate automatically after a free trial period or auto-renew without notice after a long, pre-paid initial term. IHRSA notes consumers with membership agreements with firms in its industry are on notice of the recurring cost because of the monthly charge and have the option to cancel each month under the terms of their contract. The Commission disagrees with IHRSA's characterization of the Rule; the Rule is not intended to exclusively, or even primarily, address online subscription services or long-term contracts that begin after a free trial or auto-renew without notice, but to address all recurring charge plans where the consumer's silence or failure to cancel is interpreted as consent to recurring charges. Accordingly, consumer memberships with firms in IHRSA's industry where consumers have the option to cancel each month squarely fit within the Rule's coverage of negative option plans.
[548] Individual commenter, FTC-2023-0033-0233.
[549] The International Carwash Association ("ICA"), however, commented many of its 60,000 U.S. members offer carwash subscriptions that offer a reduced price for carwashes to subscribers and strengthen the relationship with customers and reduce dependence on cash transactions for these businesses. *See* FTC-2023-0033-1142. These subscriptions may be purchased in person, on the world wide web, via a mobile app, or at an automated teller, which indicates at least some of those subscriptions are covered by ROSCA. ICA asserts cancellation through a means other than in person may be burdensome to the generally small businesses that operate carwashes. *Id.* Although commenter Rocket Money, FTC-2023-0033-0998, mentioned "car wash chains that require consumers to visit a specific location to cancel their membership as an example of draconian cancellation requirements they experienced working with consumers, no individual consumer commenter mentioned difficulties with carwash subscriptions. Because no consumer commenter provided any other indication of the number of carwash subscriptions purchased or the costs of cancelling such subscriptions, even anecdotally, they are excluded from the analysis. The estimate of the consumer benefits that would flow from the final Rule's provision that an extra, remote, cancellation mechanism be required of marketers who currently offer only in person or mail cancellation mechanisms may therefore be an under-estimate of such benefits.
[550] FTC-2023-0033-0863.

options are currently available for members who have purchased their membership either online or in person." IHRSA did not quantify the share of their member organizations that provide such cancellation opportunities or the number or share of consumer cancellation transactions in which online cancellation is available. Accordingly, the Commission assumes the low-end of the range of quantifiable benefits to consumers who purchased negative option plans in person, but could currently cancel online is the same as the same the low-end of the range for consumers who purchased negative option plans online and had access to online cancellations: $0.46 per cancellation.

Notwithstanding IHRSA's assertion that many fitness clubs offer online cancellation, at least 25 individual consumers submitted comments attesting to the difficulties of canceling gym memberships. Some wrote in general terms of the difficulties consumers experience in canceling such memberships as something that contributed to their support for the Rule.

- "What seems more troublesome tend to be stuff like gym memberships."[551]
- "I work dispute resolutions for a bank. I see so many cases where someone is trying to cancel something like a gym membership and, while they can sign up in person, they for some reason have to mail a certified letter to the companies (sic) home office."[552]
- "I have experienced so much frustration ending memberships with gyms, online subscriptions, etc. over many years and welcome help in this matter. So many friends I speak to share similar stories of how they were roped into paying for longer memberships and subscriptions that they no longer wanted."[553]
- "Many places, like [specific fitness center chain], require you to go in person to cancel - they won't even let you do it over the phone! This harms anyone that may have trouble leaving the house regularly, including disabled folks and parents of small children and those caring for older or ailing family members, not to mention being horribly inconvenient for everyone else."[554]

---

[551] Individual commenter, FTC-2023-0033-0780.
[552] Individual commenter, FTC-2023-0033-0007.
[553] Individual commenter, FTC-2023-0033-1046.
[554] Individual commenter, FTC-2023-0033-0741.

Many others conveyed personal experiences with burdensome gym membership cancellation. The Commission relies upon these comments to estimate the high-end of the range of quantifiable benefits that the final Rule will provide to consumers who purchase negative option plans in-person. Examples of these include:

- "I had to write a letter and physically mail it to cancel a gym membership I singed [sic] up for on an iPad."[555]
- "Recently it took me three days and several hours to cancel a gym membership (that) had taken less than 20 minutes to join, on line [sic]."[556]
- "I had to go in person 3 different times because the manager wasn't there so [sic] to cancel it." This consumer attached a screen shot of the gym's cancellation policy, which read, in part, "There is no contract and you are free to cancel your Direct Debit at any time. If you do decide to cancel your membership, you must allow at least 7 days before the fifth of the month to ensure your payment is cancelled and advise Reception of the cancellation." Both "(a)t *least* 7 days before the fifth of the month," and the failure to specify whether "7 days" is seven business days or seven calendar days introduce considerable uncertainty as to when, precisely, the consumer must tender a cancellation to avoid the next recurring payment.[557]
- "Years ago, I had signed up for a gym membership, and after a change in job situation, was no longer able to make use of it. Repeated attempts to reach the gym membership department and cancel my membership went unheeded - a [sic] got a classic runaround, and as often forwarded to unattended phone numbers - and I kept racking up monthly bills for a membership I didn't want …. It was only through a personal relationship with someone who worked in the corporate office that I was finally able to get past their automatic renewals and effect a cancellation."[558]
- "We wanted to cancel the [gym] membership, but when we called and emailed, we were told we couldn't cancel that way. We had to send a certified letter or go in person. We have gone in person twice to try to cancel or [sic] membership and it has been a nightmare."[559]
- "Personally, I have been impacted by my local gym's undisclosed policies and shady cancelation policies that have costed me hundreds of dollars."[560]
- "They bill you monthly for your gym membership but when you want to cancel your membership that's when the problems arise. You cannot do it over phone or on their website. You have to go into the gym personally to cancel said membership. Not only that I was told that I'd have to go to the gym [home gym] where I signed up in order to

---

[555] Individual commenter, FTC-2023-0033-0233.
[556] Individual commenter, FTC-2023-0033-1076.
[557] Individual commenter, FTC-2023-0033-0510.
[558] Individual commenter, FTC-2023-0033-0968.
[559] Individual commenter, FTC-2023-0033-0387.
[560] Individual commenter, FTC-2023-0033-0572.

cancel membership. I could only imagine what this would be like had I moved out of the state. Please help us stop these practices."[561]

- "I am currently trying to cancel a gym membership and have been overwhelmed by how difficult it has been …. I just called my gym … and the pre-recorded automated answering message literally says there is no direct line to the gym! That's outrageous!!!"[562]
- "My personal experience is with my gym membership …. Getting out of it was terrible, and I'd hate to see it happen to anyone else."[563]

Based on these comments, the Commission makes the simplifying assumption that the worst gym membership cancellation experiences involve three failed attempts at cancellation, each costing one hour of time, and that, because of those cancellation failures, three unwanted monthly charges were processed. The Commission assumes a fourth cancellation attempt, also costing one hour of time, succeeds in halting the recurring payments.

As above, the Commission values consumers' time at $25.81/hour. The typical gym membership costs between $40 and $70 a month.[564] The Commission therefore assumes, at the high-end, consumers incur gym membership cancellation costs of $313.25 (*i.e.,* (4 x $25.81) + (3 x $70)) in the absence of this Rule.[565] As stated previously, the Commission assumes a final Rule-compliant cancellation should take no more one minute at the high end, which has a value of consumers' non-market time of $0.43. Then, to estimate the high-end avoided burden that

---

[561] Individual commenter, FTC-2023-0033-0299.

[562] Individual commenter, FTC-2023-0033-1163.

[563] Individual commenter, FTC-2023-0033-0545.

[564] *See* Dana George, "This Is How Much the Average American Really Spends on Gym Memberships," Jan. 7, 2024, https://www.fool.com/the-ascent/personal-finance/articles/this-is-how-much-the-average-american-really-spends-on-gym-memberships. Because this report is from January 2024, the Commission assumes it measured gym membership costs in 2023 dollars.

[565] Note the avoided recurring payments associated with delayed cancellations may overstate the amount of consumer surplus gained attributable to the final Rule if consumers continue to use their gym membership during that period of delayed cancellation. However, it is difficult to estimate the extent to which that occurs due to lack of data. A part of those gains may also be transfers of producer surplus from firms to consumers.

such consumers would experience under the final Rule, the Commission takes the difference between the high-end cancellation costs in the absence of this Rule ($313.25) and the high-end final Rule-compliant cancellation costs ($0.43), which equates to $312.82. Accordingly, the low-to-high range of benefits provided by the final Rule to consumers who purchase negative option plans in person or through the mail ranges from $0.46 to $312.78.[566]

### (e) Summary of per-Cancellation Benefits

Table 1 presents a summary of the per-cancellation benefit the Commission estimates would result from this final Rule. For subscriptions that are currently cancelled over the phone but would be cancelled online under this final Rule, the Commission estimates consumers would experience a benefit of between $2.17 and $2.39 per cancellation. For subscriptions that are currently cancelled online and would move to a simpler online cancellation under this Rule, the Commission estimates consumers would experience a benefit of between $0.46 and $0.67 per cancellation. For subscriptions that are currently cancelled over the phone and would move to a simpler telephone cancellation under this Rule, the Commission estimates consumers would experience a benefit of between $1.74 and $2.17 per cancellation. For subscriptions enrolled in person that would be required to provide online or telephone cancellation under this Rule, the Commission estimates consumers would experience a benefit of between $0.46 and $312.82 per cancellation.

Table 1. Estimates of Benefit per Cancellation (in 2023 dollars)

|  | Low | High |
| --- | --- | --- |
| Phone to Online Cancellation | $2.17 | $2.39 |
| Online to Simpler Online Cancellation | $0.46 | $0.67 |
| Phone to Simpler Phone Cancellation | $1.74 | $2.17 |

---

[566] Other cancellation methods gyms may currently offer, such as in-person visits that succeed in cancellation and cancellation via certified mail, would fall in between these low/high endpoints, as would the benefits to consumers if those methods were augmented under the final Rule not with online cancellations but with telephonic cancellations.

| In-Person to Online or Phone Cancellation | $0.46 | $312.82 |
|---|---|---|

### (2)  Estimating the Number of Consumer Cancellation Transactions

### (a)  Baseline Number of Subscriptions

The Commission regards "consumers" for the purposes of this analysis as the U.S. population over the age of 18;[567] this is estimated to be 269 million in 2025,[568] the first year in the ten-year period over which the Commission estimates the benefits and costs of the final Rule ("Year 1").

Because negative option sales are a form of marketing of goods and services, and not an industry or type of output, and because no occupational category is uniquely associated with negative option marketing, no publicly produced data source, such as the Economic Census, tracks the use of negative option marketing in the United States. Accordingly, the Commission must look to other data sources, to estimate the number of subscription cancellations and the channels through which consumer consent was obtained and cancellation mechanisms provided.

To estimate the aggregate number of consumer cancellation transactions, the Commission relies upon a credible source that found that, as of mid-2023, 83% of American consumers had at least one subscription.[569] The Commission assumes, for the purposes of this analysis, that the

---

[567] Although this final Rule also benefits small businesses that purchase negative option plans, the Commission does not have sufficient data to quantify those effects in this analysis.

[568] *See* U.S. Census, "Demographic Turning Points for the United States: Population Projections for 2020 to 2060: Population Estimates and Projections," Feb. 2020, https://www.census.gov/library/publications/2020/demo/p25-1144.html. The Commission linearly extrapolated between the report's figures for the population over the age of 18 in 2020 and its estimates of the same population in 2030 to estimate the number of consumers in years 2025 through 2029. Similarly, the Commission linearly extrapolated between the report's estimates of the over age 18 population in 2030 and 2040 to estimate the over age 18 population in the years 2031 through 2034.

[569] *See* Julia Stoll, "SVOD service user shares in the U.S. 2015-2023" (Sept. 7, 2023) (noting 83

174

percentage of American consumers with at least one subscription remains constant over ten years. Accordingly, in Year 1 the Commission assumes 223.27 million consumers (*i.e.*, .83 x 269 million) have at least one subscription.

To estimate the total number of subscriptions held by U.S. consumers the Commission looks to data on the average number of subscriptions per subscriber. One source, relying upon a large sample of U.S. consumers conducted in late 2023 and early 2024, reported, "[t]he average subscriber now has 4.5 subscriptions."[570] The Commission therefore applies a multiplier of 4.5 to the number of consumers estimated to have at least one subscription to estimate the aggregate number of subscriptions held by consumers in each year. Continuing with the Year 1 example from above, the Commission assumes the 223.27 million U.S. consumers who have subscriptions collectively hold 1,004,715 subscriptions (*i.e.*, 223.27 million x 4.5). The Commission acknowledges some uncertainty in these estimates which could lead to overestimation since subscriptions may be held by households of multiple individual consumers or underestimation due to potential growth in subscription-based goods and services.

**(b)    Baseline Number of Cancellations**

The Commission next considers how many subscriptions consumers may want to cancel. To do so, we look to subscription "churn," or cancellation, rate data. Churn rates can reflect intentional cancellations as when a consumer completes a merchant's cancellation process, but can also reflect involuntary or passive cancellations, which occur when the payment mechanism

---

percent of U.S. consumers used a subscription video-on-demand service in 2023), https://www.statista.com/statistics/318778/subscription-based-video-streaming-services-usage-usa.

[570] Bango, "Subscription Wars: Super Bundling Awakens," at 4 (2024) (based on data from 5,000 U.S. subscribers), https://bango.com/resources/subscription-wars-super-bundling-awakens.

the consumer has on file with the merchant is unable to be processed by the merchant.[571] Churn

rates may be calculated on a monthly, quarterly, or annual basis,[572] and some rates do not

disclose a time dimension; mischaracterizing a monthly churn rate as an annual churn rate could

vastly underestimate the volume of annual cancellations.

One source reports an aggregate measure of voluntary[573] churn of 3% per month.[574] The

Commission assumes this rate is constant from month to month and from year to year and

therefore assume that the average annual churn rate across all subscriptions is 36%.[575] This

---

[571] *See* Stripe, "Subscription churn 101: A complete guide for businesses" (Jan. 23, 2024), https://stripe.com/resources/more/subscription-churn-101.

[572] *Id.* (noting the choice often depends on your business cycle and how often you want to assess your performance).

[573] Some consumers may welcome an "involuntary" cancellation of a subscription, and other cancellations that payment processors perceive as "involuntary" may reflect consumers' deliberate cancellation of a credit card as a means of escaping a subscription that was difficult to cancel. The Commission's analysis nonetheless uses only the reported "voluntary" churn rate to avoid the possibility of over-estimating the consumer benefits of the final Rule.

[574] Recurly, a subscription management platform used across multiple industries, reports an overall churn rate of 4.1% per month and parses this rate into that arising from voluntary cancellations, 3%, and involuntary cancellations, 1%, with, presumably, 0.1% lost to rounding. Recurly explains its methodology in producing these estimates is based on a sample of over 1,200 subscription sites on the Recurly platform over 12 months (January to December 2023); its churn rates are monthly, calculated by dividing the number of subscribers who churn during the month by the total number of subscribers and uses median, 25th, and 75th percentile values to eliminate outliers and provide a more accurate representation of the data in its view. *See* Recurly, "What is a good churn rate?," https://recurly.com/research/churn-rate-benchmarks. Other payment processors report similar churn rates but provide fewer details on the data underlying their churn rate estimates or do not distinguish voluntary from involuntary churn rates.

[575] Because consumers may cancel a subscription and then enroll in a different subscription (or even re-enroll in a recently canceled subscription), the Commission assumes average, aggregate, monthly voluntary churn rates are additive across months and that the number of consumers with subscriptions do not "decay" at a rate of 3% per month. Indeed, another report found one-quarter of U.S. consumers cancelled a streaming video service in the past 12 months and resubscribed to the same service, with younger generations significantly more likely to return. *See* Deloitte, Digital Media Trends Survey: 16th Edition (2022), https://www2.deloitte.com/us/en/insights/industry/technology/digital-media-trends-consumption-habits-survey/summary.html. The Deloitte report also notes the average churn cancellation rate has remained consistent since 2020 at about 37% across all paid streaming video on demand

---

churn rate, multiplied by the number of subscriptions held by consumers each year, provides the yearly estimate of how many subscriptions are cancelled by consumers.[576] Continuing with the Year 1 example from above, the Commission therefore estimates 361.70 million cancellations (*i.e.,*.36 x 1,004.72 million) will occur in Year 1 of the analysis and that this number will increase to 384.82 million by Year 10. Table 2 presents the number of subscriptions and total number of cancellations expected in each year.

Table 2. Number of Subscriptions and Total Cancellations per Year (in millions)

| Year | Subscriptions | Cancellations |
|------|---------------|---------------|
| 1 | 1,004.72 | 361.70 |
| 2 | 1,012.48 | 364.49 |
| 3 | 1,020.25 | 367.29 |
| 4 | 1,028.02 | 370.09 |
| 5 | 1,035.79 | 372.88 |
| 6 | 1,043.56 | 375.68 |
| 7 | 1,049.91 | 377.97 |
| 8 | 1,056.26 | 380.25 |
| 9 | 1,062.61 | 382.54 |
| 10 | 1,068.96 | 384.82 |

### (c)    Number of Cancellations by Enrollment and Baseline Cancellation Method

As discussed in the estimates of per-cancellation benefits, the estimated per-cancellation benefits stemming from the final Rule depend on the regulatory baseline cancellation methods relative to those that would be made available under the final Rule. To determine the number of cancellations for which the four categories of per-cancellation benefits estimates would apply,

---

services. Similarly, a comment from NCTA, FTC-2023-0073-0008, quotes Congressional testimony from Consumer Reports that 36% of consumers who subscribed to streaming services, switched and resubscribed multiple times over a period of 12 months.

[576] The Commission is aware a recent survey of U.S. subscribers found 75% identified one subscription as one they will never cancel or even pause. *See* Bango (2024) at 8. The Commission assumes no adjustment is needed to the reported "churn" rate in light of this finding as subscriptions with such loyalty are already reflected in the denominator of the reported churn rate.

the Commission uses data on its enforcement experience to determine the share of cancellations likely to occur through online and telephone methods. For cancellations of subscriptions that are enrolled in person, the Commission uses data on gym membership cancellations as a proxy.

### (i)    In-Person Subscriptions

As a proxy for the number of subscriptions entered into in person, the Commission uses a report from Renew Bariatrics that claims 19 percent of the U.S. population are members of gyms or health clubs.[577] The Commission assumes gym members are uniformly distributed by age and multiplies the U.S. adult population by 19 percent to estimate that 51.11 million adults will have active gym membership subscriptions when this final Rule goes into effect. An IHRSA article from 2019 stated the average health club has an annual attrition rate of 28.6 percent.[578] Interpreting this to mean 28.6 percent of all adult gym members cancel their memberships each year, the Commission estimates 14.62 million gym membership subscriptions will be cancelled in the first year of this Rule. In Year 10, the Commission estimates 15.55 million gym membership subscriptions will be cancelled. The Commission uses these estimates as a proxy for the total number of subscriptions that are entered into in person and cancelled each year.

The Commission acknowledges several limitations with this proxy. To begin, there are likely many other types of businesses, such as car washes, lawn care, pest control, and personal care and grooming establishments, that may offer in-person subscription enrollment. To the extent these subscriptions are not included in the count, the estimates may be understated.

---

[577] *See* "28 Gym Membership Statistics: Average Cost of Memberships," Renew Bariatrics (Jan. 4, 2024), https://renewbariatrics.com/gym-membership-statistics/.

[578] *See* "Why Health Club Retention Requires a Technology Solution," IHRSA (May 20, 2019), https://www.healthandfitness.org/improve-your-club/why-health-club-retention-requires-a-technology-solution/#:~:text=Acquiring%20a%20new%20customer%20is%20five%20times,rates%20by%205%%20increases%20profits%20from%2025%%2D95%.

Further, the source that states 19 percent of the population are members of gyms does not specify the age distribution of the gym members. The Commission has assumed children and adults are distributed uniformly across that 19 percent; however, if adults are more likely to have gym memberships than children, the estimates of gym memberships and cancellations among adults will be understated. On the other hand, gym memberships are not always individual memberships; multiple family members may share a single-family membership. In estimating the number of gym memberships and cancellations, the Commission has assumed each adult gym member has their own subscription, which may overestimate the number of subscriptions and cancellations.

### (ii) Online and Telephone Subscriptions

The Commission assumes all subscriptions that are not entered into in person are instead entered into either online or over the phone. Subtracting the in-person subscription, as proxied by gym membership cancellations, from the total number of cancellations, the Commission estimates 347.08 million subscriptions entered into either online or over the phone will be canceled in the first year of this Rule. This number would increase to 369.27 million cancellations in Year 10.

To estimate the distribution of cancellation methods for these subscriptions that are entered into online and over the phone, the Commission reviewed matters it has brought and resolved[579] in which complaints specifically alleged negative option cancellation mechanisms

---

[579] This tally does not include ongoing matters or matters that obtained "fencing-in" relief encompassing the sale of negative options without expressly pleading complaint counts related to cancellation mechanisms.

that violated ROSCA, the TSR, or Section 5.[580] The Commission found 54 matters met these criteria.

Online[581] enrollment was possible in 42 of 54 matters that met the review criteria. In the remaining 12 matters, enrollment occurred over the phone. Among the 42 matters in which online enrollment was possible, only six firms offered online[582] cancellation,[583] and the remaining 36 firms offered only telephonic cancellation.[584] Among the 12 matters in which

---

[580] In many instances, ROSCA and TSR counts were cross-pled as Section 5 counts; in parsing cancellation transactions by their enrollment methods, we use "Section 5" to refer to instances in which neither ROSCA nor TSR violations were pled.

[581] For ease, the Commission includes in this tally two negative option plans that enrolled consumers via phone apps. Similarly, the Commission regards matters involving online marketing of negative options that were resolved before the passage of ROSCA (and some others that were resolved after the passage of ROSCA, but addressed online marketers' conduct that occurred prior to the passage of ROSCA), as ROSCA matters for the purposes of assessing the incremental benefits of the final Rule relative a regulatory baseline of ROSCA's simple cancellation mechanism.

[582] In a few of these matters, online cancellation was offered in addition to telephonic cancellation, and to simplify the analysis, the Commission attributed half to the measure of telephonic cancellations and half to the measure of online cancellations. In a few other instances the Commission's designation of "online" cancellation includes cancellation by email or within the marketer's app.

[583] In contrast, other evidence indicated that 81.25% of U.S. online marketers offered online cancellation. *See, e.g.*, Sinders (2023). Different research looked at nine U.S. news media publishers that sold subscriptions online. When two "personas" created by the researchers subscribed to each of the nine publications, and then attempted to cancel, 17 of the 18 subscriptions could be canceled online; one publication permitted only the California resident persona to cancel online and offered only telephonic cancellation to the persona posing as a Texas resident. *See* Ashley Sheil, *et al.*, "Staying at the Roach Motel: Cross-Country Analysis of Manipulative Subscription and Cancellation Flows," in Mueller, F.F. (ed.), CHI '24: Proceedings of the CHI Conference on Human Factors in Computing Systems (May 11-16, 2024), https://repository.ubn.ru.nl/handle/2066/30690.

[584] In some of the 36 matters, no cancellation method was disclosed by the seller, and in a few other matters consumers were required to return merchandise through the mail to prevent a free trial from rolling over into a subscription or to obtain a refund for merchandise that was shipped to a consumer, and for which the consumer was charged. Such instances generally occurred before the passage of ROSCA, and it is highly unlikely that an online marketer who offered only a mailed-in cancellation could be in compliance with ROSCA's requirement that cancellation mechanisms be "simple." Without loss of generality, the Commission therefore treats instances

enrollment occurred over the telephone; none of the firms offered online cancellation, therefore, the Commission treats these 12 matters as if only telephone cancellation was available. [585] To summarize, the Commission finds that, among subscriptions that are entered into online and over the phone, 66.7 percent (*i.e.*, 36/54) offered online enrollment and only telephone cancellation, 11.1 percent (*i.e.*, 6/54) offered online enrollment and online cancellation, and 22.2 percent (*i.e.*, 12/54) offered telephone enrollment and telephone cancellation. Extrapolating the baseline cancellation methods from enforcement matters may weight the online enrollment/telephone cancellation subscriptions and the telephone enrollment/telephone cancellation subscriptions more heavily than is currently experienced in the market. It also assumes that there are no subscriptions offered in the baseline with cancellation methods that are already compliant with the provisions of this Rule. The Commission explores the impacts of these limitations in a sensitivity analysis in section (d).

Multiplying the distribution of cancellation methods for subscriptions entered into online and over the phone by the total number of cancellations of online and telephone subscriptions, the Commission estimates the annual number of cancellations that fall into each of these categories. In Year 1, the Commission estimates that, in the absence of this final Rule, there would be 231.39 million cancellations by telephone of subscriptions entered into online, 38.56 million online cancellations of subscriptions entered into online, and 77.13 million telephone cancellations of subscriptions entered into over the phone.

### (iii)   Summary of Subscription Cancellations by Enrollment and Baseline

---

in which online cancellation was not offered as instances in which only telephonic cancellation was offered to consumers.

[585] Some required the return of merchandise through the mail if consumers wanted refunds. In two matters, no cancellation mechanism was revealed. Without loss of generality, we assume that cancellation could take place telephonically.

**Cancellation Method**

Table 3 provides the number of subscription cancellations each year distributed across the four enrollment and regulatory baseline cancellation method categories: online enrollment and telephone cancellation; online enrollment and online cancellation; telephone enrollment and telephone cancellation; and in-person enrollment.

Table 3. Cancellations by Enrollment and Baseline Cancellation Method (in millions)

| Year | Online enrollment, Telephone Cancellation | Online enrollment, Online cancellation | Telephone enrollment, Telephone cancellation | In-Person enrollment |
|------|-----|-----|-----|-----|
| 1 | 231.39 | 38.56 | 77.13 | 14.62 |
| 2 | 233.18 | 38.86 | 77.73 | 14.73 |
| 3 | 234.96 | 39.16 | 78.32 | 14.84 |
| 4 | 236.75 | 39.46 | 78.92 | 14.96 |
| 5 | 238.54 | 39.76 | 79.51 | 15.07 |
| 6 | 240.33 | 40.06 | 80.11 | 15.18 |
| 7 | 241.79 | 40.30 | 80.60 | 15.27 |
| 8 | 243.26 | 40.54 | 81.09 | 15.37 |
| 9 | 244.72 | 40.79 | 81.57 | 15.46 |
| 10 | 246.18 | 41.03 | 82.06 | 15.55 |

**(3)      Total Quantified Benefits**

To estimate total benefits from this final Rule, the Commission first matches the enrollment and baseline cancellation method categories from the previous section to the four scenarios used to estimate the per-cancellation benefit. The Commission assumes that, under this final Rule, subscriptions enrolled online and cancelled over the phone in the baseline would move to online cancellations; subscriptions enrolled online and cancelled online would move to simpler online cancellation; subscriptions enrolled over the phone and cancelled over the phone would move to simpler telephone cancellation; and subscriptions enrolled in person would allow online or phone cancellation.

Next, the Commission multiplies the number of cancellations in each baseline category by the matched per-cancellation benefit on the low- and the high-end and then sums across all four categories to obtain total benefits each year. Those totals are presented in the **Error! Reference source not found.**. In the first year following implementation of the final Rule, the Commission estimates the benefits will range between $661.52 million and $5.32 billion. In Year 10, the Commission estimates the benefits will range between $703.82 million and $5.66 billion. Using a 2 percent discount rate, the Commission estimates the present discounted value of benefits over 10 years to range between $6.13 and $49.32 billion. Annualized over 10 years using a 2 percent discount rate, the Commission estimates the benefits to range between $682.83 million and $5.49 billion per year.

Table 5 Total Quantified Benefits (in millions, 2023 dollars)

| Year | Low | High |
|---|---|---|
| 1 | $661.52 | $5,318.76 |
| 2 | $666.63 | $5,359.88 |
| 3 | $671.75 | $5,401.01 |
| 4 | $676.86 | $5,442.14 |
| 5 | $681.98 | $5,483.26 |
| 6 | $687.09 | $5,524.39 |
| 7 | $691.27 | $5,558.00 |
| 8 | $695.45 | $5,591.62 |
| 9 | $699.63 | $5,625.23 |
| 10 | $703.82 | $5,658.84 |
| Present Discounted Value of Benefits over 10 years, 2% discount rate | $6,133.57 | $49,315.39 |
| Annualized Benefits over 10 years, 2% discount rate | $682.83 | $5,490.11 |

c)      **Estimated Costs of the Final Rule**

This section describes the costs associated with firms coming into compliance with the final Rule, provides quantitative estimates where possible, and describes costs that are only assessed qualitatively. Whereas benefits were estimated based on cancellation transactions,

compliance costs are estimated on the basis of firms covered by the final Rule. The Commission first examines the comment record on compliance costs and then estimates the compliance costs for the initial year and subsequent nine years following implementation of the final Rule.

### (1)    The Comment Record

The comment record has not provided specific data useful to the estimation of the costs of compliance with the disclosure, cancellation, and recordkeeping requirements of the final Rule.

Some industry commenters addressed compliance costs by providing broad, aggregate, conclusory cost estimates; because those costs were not itemized by specific features of the Rule as proposed in the NPRM, the Commission is unable to use those comments to estimate compliance costs relevant to the substantially narrowed scope of the final Rule in comparison to the Rule proposed in the NPRM. [586] The same is generally true of testimony and expert reports

---

[586] For example, NCTA, FTC-2023-0073-0008, indicated some major cable operators estimate it could cost $12-$25 million per company and take 2-3 years to rebuild their systems and *one* of its members thought annual costs could be 15-20% of the implementation costs (an industry rule of thumb). This comment does not itemize costs across different elements of the specific rules adopted. Additionally, estimates of the annual costs of maintaining systems may be blanket costs that include a host of programming maintenance features that are unrelated to the specific disclosures and "click to cancel" features of the final Rule. Moreover, NCTA's comment indicated customers of top cable operators enrolled over the phone (43%), online (30%), and in person (24%) and calls to customer service are answered within 30 seconds and lines are available 24 hours a day, 7 days a week. Accordingly, no extra compliance steps may be necessary with respect to offering final Rule-compliant cancellations for enrollments made by telephone, and compliance with the final Rule's requirement that firms offer an extra cancellation mechanism for in-person enrollments likely could be met through reliance on these firms' existing telephonic cancellation capabilities. Accordingly, the provision of an online cancellation mechanism will be required only for the 43% of their consumers who presently enroll online, and NCTA has not provided estimates of compliance costs that are specifically tailored to that segment of their consumer base. Because NCTA members who enroll consumers online already, clearly, have websites, the Commission rejects the notion that adding "click to cancel" functionality to websites that already include an order path for enrolling, and likely also include functionality for registering a payment mechanism for automated billing, would cost

submitted in conjunction with the informal hearing. Those materials did not focus on providing specific, relevant, data that would permit estimating compliance costs of the final Rule. [587]

Another commenter addressed the Paperwork Reduction Act cost estimate in the NPRM in a way that conflated it with the totality of compliance costs. IFA, which represents firms,

---

$12-$25 million, particularly in light of NCTA's discussion of compliance with the 2019 Television Viewer Protection Act ("TVPA") which, NCTA claims, already regulates *the very same practices* the FTC is attempting to regulate here. NCTA further claims major cable operators estimate that it cost approximately $2.5 to 4 million per company and took about one year for TVPA compliance. However, having *already* incurred the costs to comply with "the very same practices" the final Rule addresses in the course of complying with the TVPA, there would appear to be no incremental costs to comply with the final Rule. Therefore, because the final Rule is narrower in scope than as proposed in the NPRM and because it offers firms the opportunity to apply to be excluded, the Commission rejects NCTA's claim compliance with the Rule would be multiples of TVPA compliance costs and require building online cancellation systems virtually from the ground up and expensive ongoing recordkeeping requirements across all services. Accordingly, the Commission does not include in the estimates of compliance costs the aggregate, non-specific, and possibly idiosyncratic compliance costs NCTA cites. Similarly, an expert's survey submitted by IAB (attachment B to FTC-2024-0001-0010) found only six respondents (out of more than 100,000 companies subject to the proposed Rule) indicated the annual cost of compliance would be a total of $50 million, but provided no itemization of these costs, such that they cannot be disaggregated to comport with the narrower scope of the final Rule.

[587] For example, an expert report (Christopher Carrigan and Scott Walster, FTC-2024-0001-0026) filed by IAB concluded the effects of the proposed Rule, if finalized, on the U.S. economy would surpass $100 million annually. The Commission agrees with this conclusion. The Commission disagrees, however, with both the initial and on-going compliance costs used by Carrigan-Walster; both were liberally based on replicating assumptions made in the preliminary regulatory analysis in the NPRM. Further, their assumptions are inappropriate to this cost analysis because they fail to account for the fact firms subject to the final Rule, unlike firms subject to the proposed Unfair or Deceptive Fees Rule, are already required to provide clear and conspicuous disclosures of all material facts relating to the sale of negative option contracts under the totality of ROSCA, the TSR, and Section 5 of the FTC Act, and to provide simple cancellation mechanisms under ROSCA for those firms covered by ROSCA. In addition, firms subject to the final Rule are also required to comply with a variety of other laws relating to negative option sales, including the current Prenotification Rule, EFTA, the Unordered Merchandise Statute, numerous state laws, various laws and regulations that effect specific industries, such as the Television Viewer Protection Act of 2019 (TVPA), other FCC regulations, and, for multi-national entities, various foreign laws. Accordingly, the units of specialized labor, *e.g.*, lawyer, web developer, and business analyst time, that Carrigan-Walster adopt from the Unfair or Deceptive Fees NPRM are not valid representations of the usage of such inputs that are *incremental* to compliance with the final Rule relative to its existing regulatory baseline.

including small firms, in the fitness, preventative healthcare, personal wellness or children's extracurricular activities industries, commented, "the FTC's estimate (in the NPRM) that it will cost companies merely three hours annually at $22.15/hr to comply is grossly understated for IFA's members."[588] The Commission agrees the final Rule's compliance costs will exceed the Paperwork Reduction Act costs discussed in the NPRM because the Paperwork Reduction Act costs only include burden associated with information collection requirements, such as recordkeeping and disclosure costs, while the total compliance costs include those costs as well as costs of familiarization with the Rule and costs to bring cancellation mechanisms into compliance. IFA did not, however, provide a sufficiently detailed alternative estimate of annual or ongoing general compliance or recordkeeping costs for its members.[589] Similarly, IFA provided no information on the enrollment mechanisms used by its members nor an estimate of what share of its members offer negative option plans.[590]

---

[588] *See* IFA, FTC-2024-0001-0001.

[589] IFA provided an extreme example relevant to what it identified as a preventative healthcare franchise system without disclosing how many individual firms belonged to that system. In the context of that system, IFA stated it would take thousands of hours to access if modifications are necessary to existing contracts, marketing, and operational processes and implement any requirements, costing hundreds of thousands of dollars. IFA did not, however, provide detailed, itemized, estimates of compliance costs that relate to the specific features of the final Rule, which has been substantially streamlined relative to what was proposed in the NPRM, making IFA's highly aggregated notion of compliance costs for one particular group system' inapplicable to the current cost analysis. The same lack of specificity is present in IFA's discussion of "Fitness franchise systems." With somewhat greater specificity, IFA estimates costs to comply with disclosure and recordkeeping requirements are 24 hours annually, but IFA did not disclose what type of labor inputs are involved in those tasks nor the number of fitness facilities that will incur these costs. Moreover, IFA reveals its members estimate the impact to member lifetime value will exceed $100,000 per fitness center and lost revenue is expected to be nearly $40,000 annually per fitness center, but these figures cannot properly be considered compliance costs as they may, in fact, represent benefits consumers receive from speedier exits from fitness club memberships that are no longer wanted by consumers.

[590] Some of its members may offer yearly contracts that do not auto-renew, but that apportion payments over 12 months for the convenience of consumers. Such contracts are installment plans, and not negative option plans. Others may conduct business on a pay-as-you-go basis.

IFA did, however, comment that many of its members already offer consumers the ability to pause or "freeze" memberships, noting, "consumers take advantage of alternatives to membership cancellation at rates of 10% to 40%, with many consumers electing to reactivate their memberships, saving thousands of dollars annually in increased membership rates and additional initiation fees." While pause/freeze capabilities are indeed beneficial to consumers, they do not relieve a firm from an obligation to offer a cancellation mechanism. IFA did not provide similar data on what percentage of its member firms' consumers are dissatisfied with pause/freeze opportunities and seek authentic cancellations or what cancellation mechanisms its member firms make available to consumers.

The technological capability to pause or freeze subscriptions suggests the presence of software architecture "scaffolding" upon which a cancellation mechanism could be built at a modest incremental cost. Alternatively, the offering of subscription pauses or freezes by some IFA members may suggest those members use the services of third-party e-commerce hosting platforms or payment processors who routinely provide consumer subscription account management tools relied on by businesses, including small businesses. As discussed, below, existing software scaffolding and the utilization of third-party consumer subscription management tools can facilitate low- (and even no-) cost compliance with some of the final Rule's requirements.

(2)    **Initial Compliance Costs**

The Commission has previously estimated that 106,000 firms offer negative option plans.[591] The Commission assumes that to come into compliance with the final Rule, all 106,000

---

[591] As explained in the NPRM, this estimate is based primarily on data from the U.S. Census North American Industry Classification System (NAICS) for firms and establishments in

firms selling negative option plans will need to expend some resources to familiarize themselves with the final Rule and some firms will incur costs related to improvements in their pre-consent disclosures and cancellation mechanisms.

Familiarization costs: No commenters presented estimates expressly related to the costs of legal and managerial review of the final Rule and front-line staff training needed to come into compliance. The U.K. "Impact Assessment," using surveys and interviews with managers of firms that sold goods and services via negative options, found that firms would need between four and 16 hours of "senior staff" time, depending upon the size of the firm, to gain familiarization with their proposed rule, and between zero and 80 hours of "service staff" time, again depending upon the size of the firm. [592] The Commission assumes that similarities between American and British firms are such that the same units of time are relevant for American firms to gain familiarity with the final Rule. In the American context, the Commission assumes "senior staff time" is proxied by "attorney time," and uses the mean hourly wage for attorneys, $84.84

_____

industry categories wherein some sellers offer free trials, automatic renewal, prenotification plans, and continuity plans. Based on NAICS information as well as Commission staff's own research and industry knowledge, the Commission identified an estimated total of 530,000 firms involved in such industries. However, the Commission estimates only a fraction of the total firms in these industry categories offer negative option features to consumers. For example, few grocery stores and clothing retailers, which account for approximately a third of the of the total estimate from all industry categories, are likely to regularly offer negative option features. In addition, some entities included in the total may be exempt from the Commission's authority. Accordingly, the Commission estimates approximately 106,000 business entities (20%) offer negative option features to consumers. *See* 88 FR 24733. Although no commenter proposed a different number, ETA, FTC-2023-0033-1004, challenged the Commission's estimated number of firms selling negative option plans on the basis that it did not account for "the many providers of goods and services to business where automatic renewal clauses are used."

[592] *See* U.K. "Impact Assessment" (2023) at 26. While the U.K.'s rule may not be directly analogous to the final Rule, it addresses similar problems associated with consent and cancellation associated with negative option practices. Therefore, the burden the U.K.'s rule places upon subscription sellers, in terms of executive and staff resources to read and understand the rule and assess whether existing procedures are in compliance or need to be revised, may be highly similar to the familiarization steps that U.S. businesses will need to undertake.

per hour, to estimate those costs.[593] Similarly, the Commission assumes "service staff time" is proxied by the average of mean wages for salespersons and clerical workers, which is $23.27.[594] Accordingly, the Commission estimates the aggregate initial year familiarization costs as ranging between $35.97 million and $341.22 million.

Disclosures: Clear and conspicuous disclosures are already required by the existing regulatory baseline; § 425.4(a)(1)–(4) of the final Rule adds specificity to those disclosures, albeit in a flexible way.[595] As estimated below, the Commission assumes some marketers are already in compliance with the disclosure requirements of the final Rule; for these marketers, there are no incremental costs of compliance with the disclosure requirements of the final Rule.

For online marketers, the current regulatory baseline is ROSCA, which requires marketers to clearly and conspicuously disclose all material terms of the transaction before obtaining the consumer's billing information. To the extent ROSCA-covered marketers' current disclosures lack the specificity required by the final Rule, the Commission estimates changes will be needed only to textual elements of such marketers' websites and that no changes to the underlying website architecture will be needed. The Commission further assumes any such

---

[593] The mean hourly wage for lawyers in 2023 was $84.84; *see* Bureau of Labor Statistics, "Occupational Employment and Wages, May 2023, 23-1011 Lawyers," https://www.bls.gov/oes/current/oes231011.htm.

[594] The Commission uses a mean hourly wage for sales personnel of $25.62; *see* Bureau of Labor Statistics, "Occupational Employment and Wages, May 2023, 41-0000 Sales and Related Occupations (Major Group)," https://www.bls.gov/oes/currenT/oes410000.htm. The Commission uses a mean hourly wage for clerical workers of $20.94, *see* Bureau of Labor Statistics, "Occupational Employment and Wages, May 2023, 43-9061 Office Clerks, General," https://www.bls.gov/oes/currenT/oes439061.htm. The average of these two mean wage rates is $23.27.

[595] The final Rule requires disclosure of: the fact consumers will be charged; the amount(s) they will be charged; when the consumer must act (by deadline or frequency) to prevent or stop charges; and the information needed for the consumer to find the simple cancellation mechanism.

changes, if needed, will be made by website developers, whose mean hourly wage is $45.95.[596]

Similarly, some telemarketers and in-person negative option marketers may need to modify their

sales agents' scripts to incorporate the disclosures required by the final Rule. Without loss of

generality, the Commission assumes the mean wage rates of marketers' staff who will make such

script changes is proxied by the mean wage rates of web developers.[597] Although in the

Commission's experience these changes should take very little time, perhaps as little as one hour,

the Commission adopts a range of one to 10 hours to complete this task.[598]

Accordingly, the Commission estimates that for those marketers whose disclosures are

not already in compliance with the requirements of the final Rule, disclosure compliance costs

will range between $45.95 and $459.50.

Cancellation mechanisms: Section 425.6 of the final Rule requires negative option

marketers to provide a simple cancellation mechanism that is in the same medium, and at least as

simple for the consumer to use, as the mechanism by which the consumer provided consent to

the negative option plan. Additional requirements are medium-specific. For example, when

consent is provided through an interactive electronic medium, the cancellation mechanism (also

provided through an interactive electronic medium) must be easy for the consumer to find when

the consumer seeks cancellation information (for example, on a website, the cancellation

mechanism cannot be hidden in "terms and conditions" or otherwise difficult to find) and cannot

---

[596] *See* Bureau of Labor Statistics, "Occupational Employment and Wages, May 2023, 15-1254 Web Developers," https://www.bls.gov/oes/2023/may/oes151254.htm.

[597] This is consistent with the approach taken in the expert report submitted by IAB. *See* Carrigan-Walster, FTC-2024-0001-0026 (noting many firms using negative option marketing present offers through the Internet and, for firms presenting offers through other means, web developer time is used as a proxy for worker time to create the presentation of the offers).

[598] The assumed range of one to 10 hours is consistent with the time estimate used for compliance checks and minor modifications of websites in the Unfair or Deceptive Fees NPRM. *See* 88 FR 77420 (Nov. 9, 2023).

require interactions with live or virtual representatives (such as chatbots) if no such interactions were required when the consumer consented.

When consent is provided over the telephone, the final Rule requires that telephonic cancellation must be available during normal business hours and not be more costly for the consumer to use than the telephone call the consumer used to consent to the negative option feature.

When consumer consent to a negative option plan is provided via an in-person method, the marketer must offer cancellation opportunities, where practical, in a like manner. In addition, the marketer must offer an alternative simple cancellation mechanism through an interactive electronic medium or by providing a telephone number that satisfies all final Rule requirements related to use of those cancellation media.

The costs negative option sellers will incur in the initial year following implementation of the final Rule to bring their cancellation mechanisms into compliance with the final Rule will depend upon their pre-existing cancellation mechanisms. No commenter provided research or data on the frequency of use of different cancellation mechanisms across negative option marketers or on the incremental costs to make the existing cancellation mechanism compliant with the requirements of the final Rule.[599]

---

[599] Trade association commenters who addressed cancellation mechanisms used by their members, and whether those mechanisms were or were not symmetric with enrollment mechanism or as easy to use as enrollment mechanisms did so only in a very general manner. For example, NCTA (FTC-2024-0001-0011) commented that, in 2021 and 2022, customers of top cable operators enrolled over the phone (43%), online (30%), and in person (24%)" but provided no information on available cancellation mechanisms. Additionally, NCTA stated its analysis shows complaints received about cancellation are very limited (approximately 0.017% of cancellations) out of the approximately 14 million customers who cancelled some or all of their services from NCTA's largest cable operator members in 2022. Anecdotes such as these, about "top" or "largest" companies do not provide sufficiently reliable data for the instant analysis.

Because the comment record has not provided sufficient data to estimate the costs of compliance with the final Rule's cancellation requirements, the Commission turns to data from the U.K.'s "Impact Assessment" on regulating subscriptions there. Based on these sources, the Commission finds some sellers of negative option plans are already in compliance with the cancellation requirements of the final Rule, and many others will incur only minimal costs to make their cancellation flows compliant with the final Rule.

The relevant experimental research looked at the cancellation practices of 16 online subscription sellers, many of them large and well-known firms, and noted the cancellation mechanisms made available to consumers and how easy those mechanisms were for consumers to locate and use. [600] Although the number of firms sampled in this research was small, publicly available data on total enrollments, located for just seven of the 16 firms, collectively numbered over 350 million, [601] which may lend significance to this research beyond what might otherwise

---

Similarly, IHRSA's comment about "many" fitness club operations allowing options to cancel by simple online solutions is not specific enough to be helpful (*see* FTC-2023-0033-0863).

[600] *See* Sinders (2023).

[601] The Commission located subscriber estimates for seven (Amazon, Ancestry, Hulu, Netflix, Paramount+, The Boston Globe, and The New York Times) of the 16 firms included in the research. The number of U.S. subscribers to Amazon Prime is estimated to reach 171.8 million in 2024. *See* https://www.yaguara.co/amazon-prime-statistics. At year-end 2023, Ancestry.com had over 3 million subscribers. *See* https://www.ancestry.com/corporate/newsroom/press-releases/ancestry-2023-annual-impact-report--underscoring-corpor. As of the second quarter of 2024, Hulu had 50.2 million paid U.S. subscribers. *See* https://www.statista.com/statistics/258014/number-of-hulus-paying-subscribers). Also as of the second quarter of 2024, Netflix had 84.11 million subscribers in the U.S. and Canada. *See* https://www.statista.com/statistics/483112/netflix-subscribers. Even if the Commission makes the extreme assumption that every Canadian held a Netflix subscription, that would still leave approximately 50 million U.S. subscribers. Paramount+ had over 71 million subscribers as of the first quarter of 2024. *See* https://www.theverge.com/2024/4/29/24144766/paramount-plus-now-has-over-71-million-subscribers). The Boston Globe had 260,000 (mostly digital) subscribers in 2023. *See* https://pressgazette.co.uk/north-america/us-local-news-subscribers-ranking. As of mid-year 2024, the New York Times had 10.8 million subscribers. *See* https://www.nytimes.com/2024/08/07/business/media/new-york-times-earnings.html. The

be associated with a sample size of 16 firms. Moreover, the methodology of the study suggests that the researcher's experiences with enrollment and cancellation likely would be typical of any consumer undertaking the same enrollment and cancellation tasks with those firms.

The experimental research found that 18.75% (*i.e.*, 100 x 3/16) of the online marketers studied offered online cancellations in a straightforward, easy to use manner such that it took the researcher less than one minute to complete a subscription cancellation. The Commission therefore assumes that 18.75% of online sellers of negative option plans will not need to change their websites to come into compliance with the cancellation requirements of the final Rule. Although this research did not specifically measure the adequacy of pre-consent disclosures, the Commission assumes that companies who make cancellation so easy for consumers perform equally well in making disclosures. Accordingly, the Commission assumes that the 18.75% of online firms selling negative options that will not incur incremental costs to comply with the final Rule's cancellation requirements also will not incur any incremental costs to comply with the final Rule's disclosure requirements. The Commission assumes that the remaining 81.25% of online negative option sellers that lacked such easy-to-use cancellation mechanisms also performed less well in making the disclosures required by the final Rule, such that they would incur initial year compliance costs of improving their disclosures as indicated by the range estimated above.

The same research found that 62.5% (*i.e.*, 100 x 10/16) of sampled online negative option sellers had cancellation paths that took longer for consumers to complete as a result of nomenclature, not website architecture. These sites, rather than using straightforward terms such

___

Commission was unable to locate subscriber data for some of the other firms sampled (*e.g.*, Savage Fenty, Daily Harvest, Deliveroo) and in some other instances found subscriber data reported only on a global basis (*e.g.*, Google One, Adobe).

as "unsubscribe" or "cancel," put the cancellation path under titles such as "auto-renew" or "edit plan,"[602] and locating the cancellation mechanism delayed the researcher in completing the cancellation task because of the non-intuitive labeling of the entry point into the cancellation mechanism. In such instances, more intuitive, consumer-friendly labeling of the existing cancellation architecture is assumed to be what is needed for these sites to come into compliance with the cancellation requirements of the final Rule. The Commission assumes such relabeling will not require any additional programming or changes to the underlying website architecture. In the Commission's experience, such "cosmetic" changes can be made quickly and inexpensively, possibly in as little as one hour of a website developer's time. The Commission notes, however, that the U.K. "Impact Assessment," in considering "general updates to websites such as reflecting the clearer communication on contract conditions and updating cancellation options," estimated that such changes would "require eight hours' work from an IT professional and that these costs are uncorrelated with the size of the business."[603] The website changes contemplated in that assessment likely exceed those required to merely relabel consumer-facing elements of an existing cancellation architecture. Out of an abundance of caution, however, the Commission uses the U.K.'s estimate of eight hours as an upper bound on the time required to make the needed changes and further assumes that the relevant "IT professionals" are website developers, which, as noted previously, have a mean wage rate of $45.95. Accordingly, the Commission assumes each firm that needs to relabel existing cancellation mechanisms to make those mechanisms easy for consumers to locate and use will spend between $45.95 (*i.e.*, 1 x

---

[602] In the researcher's view, this kind of naming is confusing and adds unnecessary friction to the cancellation process. *See* Sinders (2023).
[603] U.K. "Impact Assessment" (2023) at 26.

$45.95) and $367.60 (*i.e.*, 8 x $45.95) to come into compliance with the final Rule's cancellation requirements.

Lastly, the aforementioned research found that 18.75% (*i.e.*, 100 x 3/16) of online negative option sellers offered only telephonic cancellation. Such firms, because they were online sellers, clearly had online ordering and payment website architecture in place, and so had "scaffolding" upon which online cancellation architecture could be built. No commenter provided relevant data on the costs of building-out a "click-to-cancel" mechanism in such instances, and the U.K "Impact Assessment" indicated it "lacked high quality evidence on the costs businesses would incur" to integrate "easy exiting mechanisms into websites." As a result, the "Impact Assessment" turned to "external estimates" from "[t]he U.S. eCommerce agency OuterBox [which] indicates a possible range of costs. It suggests that integrating simple tools into an existing eCommerce platform would cost most businesses approximately $500" in 2022.[604] In 2023 dollars, that amount is $532.05.[605] The Commission notes, however, that many payment processors and website hosting platforms used by many businesses, particularly small and medium-sized businesses, provide marketers with consumer subscription account

---

[604] U.K. "Impact Assessment" (2023) at 27 (citing a report from 2022).

[605] *See* Bureau of Labor Statistics, "CPI Inflation Calculator," https://www.bls.gov/data/inflation_calculator.htm. We note that this amount is equal to 10.25 hours of computer programmer time valued at a mean hourly wage rate of $51.90; *see* Bureau of Labor Statistics, "Occupational Employment and Wages, May 2023, 15-1251 Computer Programmers," https://www.bls.gov/oes/current/oes151251.htm. As such, this is consistent with the outcome of the approach used by Carrigan-Walster, FTC-2024-0001-0026, in proxying the first-year costs of compliance costs with each of the six provisions of the Rule proposed in the NPRM (which differed, substantially, from the narrowed final Rule, although not with respect to "click to cancel" provisions). That approach made the ad hoc assumption that technological changes required by the Rule would require the same labor inputs as similar requirements in the NPRM for the FTC's Rule on Unfair or Deceptive Fees, notwithstanding the two rules differ substantially in their regulatory baselines. *See* 88 FR 77420.

management tools that provide consumers with "click-to-cancel" functionality at no direct [606] incremental cost to marketers. [607] As no commenter provided information on (1) how many negative option sellers comply with ROSCA by offering only telephonic cancellation, (2) what specific costs they would face to provide an online cancellation mechanism, or (3) whether they would build such functionality themselves or use a third-party payment processor or hosting platform to provide it for them, we estimate such costs to range between $0 and $532.05 per firm.

---

[606] To the extent that a marketer uses the easy subscription account management and cancellation tools offered by hosting platforms or payment processors and the presence of such tools reduces consumers' perception of the risks of entering into a subscription agreement with the marketer, the marketer's sales may increase along with any payments to the platform or processor that are based on the number of transactions or aggregate sales.

[607] See, for example, Shopify's help page at https://help.shopify.com/en/manual/products/purchase-options/shopify-subscriptions/customer-experience#subscription-management-for-customers, "Shopify Subscriptions displays subscription information to customers in the checkout. For example, when buying a subscription product, the order frequency and discount amount for the subscription is displayed in the order summary …. During checkout, your customer needs to agree to the cancellation policy terms to confirm that they understand they're purchasing a subscription. They can't complete their purchase without agreeing to this policy …. Customers can log in to their customer account to view and manage their subscription orders. Customers can resume, skip, and cancel their subscriptions, and manage their payment methods and shipping address." Moreover, Shopify offers a variety of consumer subscription management tools to merchants that use Shopify for payment processing ("checkout") or website hosting at no incremental cost to merchants *See* https://apps.shopify.com/categories/selling-products-purchase-options-subscriptions. The fees Shopify charges merchants varies with a number of merchant-specific features, including website design elements, whether merchants want "Shopify checkout" to work on social media platforms in addition to the merchant's own website, how many of the merchant's employees will have the ability to log-in to the merchant's Shopify account, etc. (*see* https://aureatelabs.com/blog/shopify-website-development-cost). So, although what merchants pay to use Shopify may vary across firms, the incremental cost of using Shopify for consumer subscription account management is assumed to be zero. *See also* Hoofnagle, FTC-2023-0033-1137 ("There are scores of companies like Chargebee that help companies manage subscriptions …. Compliance with new rules is inexpensive because policy changes can be made programmatically in dashboards" provided by entities such as Chargebee.").

Accordingly, the Commission assumes that most online marketers of negative option plans will face minimal IT costs of coming into compliance with the cancellation requirements of the final Rule.[608]

As noted previously, telemarketers have substantial control over both how long the consent process takes and how long it takes a consumer to complete a cancellation over the telephone. If compliance with the final Rule expedites the cancellation process over the phone, telemarketers may experience cost-savings associated with such resources. Furthermore, no telemarketers or call centers that provide services to telemarketers submitted comments relating to what costs telemarketers would incur to bring cancellation mechanisms into compliance with the final Rule. Because of this, and because the Commission has previously found that only 2,000[609] of 106,000 firms selling negative options were telemarketers (and no commenter has disputed this finding), the Commission proceeds as if telemarketers face no incremental costs in complying with the final Rule's cancellation requirements. However, to reduce any potential downward bias[610] this might introduce into the compliance cost estimate, the Commission does not subtract the estimated number of telemarketers (2,000) from the total estimated number of online negative option marketers in its calculations of costs. Similarly, the Commission lacks data on how many of the 106,000 firms selling negative option plans currently offer only in-person or by-mail cancellations.[611] The final Rule requires such firms to add a cancellation

---

[608] No commenter to the ANPR or NPRM, and no comment, expert report, or testimony in relation to the informal hearing provided estimates of compliance costs firms would incur that were specific to the features of the Rule as then-proposed that remain in the final Rule.

[609] *See* NPRM, 88 FR 24733.

[610] Because telemarketing firms are such a small share of all firms that will be covered by the final Rule, the Commission does not expect this treatment of telemarketers (or, indeed, even a total exclusion of telemarketers from the analysis) to impart a significant bias.

[611] Three trade associations, who have some members who either sell or offer cancellation

mechanism that consumers can easily use in a remote manner, *e.g.*, through interactive electronic media or by telephone.

Lastly, the Commission considers the initial year recordkeeping costs required by the Rule, which are estimated in Section XIII to be $6.54 million when aggregated across all 106,000 firms.

Because of the aforementioned data limitations emerging from the comment record, the Commission applies the findings of the experimental research above, which looked only at online sellers, to the full number of firms, 106,000, that it has previously estimated to be

---

mechanisms in-person, submitted comments that were not sufficiently detailed to permit Commission staff to estimate the number of firms that both sell and cancel in-person or through the mail. For example, IHRSA (FTC-2023-0033-0863) commented many of its members allow several options for agreement termination through simple online solutions including online account management, email cancellation requests, and specific online cancellation buttons or forms, adding many of these options are currently available for members who have purchased their membership either online or in person. The International Carwash Association ("ICA"), FTC-2023-0033-1142, commented on subscription-related revenues of member firms (noting more than half, and sometimes more than 80%, of store revenues can be attributable to subscription sales), but not on the number of firms that sell subscriptions or how many subscriptions they sell. Similarly, although it commented subscriptions could be purchased in person, on the world wide web, via a mobile app, or at an automated teller, it provided no data on the relative shares of subscription purchases through these channels or the cancellation mechanisms made available to consumers. The objections ICA raised to a Rule requiring its members to offer cancellation by any method other than in-person strongly suggests that most member firms currently only offer cancellation that way, suggesting that those who sell on the Internet, via a mobile app and (possibly) at an automated teller may already be in violation of ROSCA if in-person cancellations are a violation of ROSCA's "simple cancellation mechanism" requirement. IFA (FTC-2023-0033-0856) provided data from its database on the number of franchisees operating fitness establishments, spa/massage studios, entertainment facilities, and preventative healthcare facilities in the U.S., but provided no information on what share of firms sold subscriptions or the media through which consent was obtained or cancellation mechanisms were offered. In a later comment (FTC-2024-0001-0009), IFA noted consumers of member firms used the alternative of "freezing" their memberships at rates of 10%-40% but did not provide information on what the "freezing" mechanism was or what cancellation mechanisms were available to consumers.

marketers of negative option plans. This approach comports with a general proposition made by the report submitted by IAB. [612]

Accordingly, the Commission makes the following estimates of initial year compliance costs.

Familiarization costs: All 106,000 firms selling negative options will collectively incur final Rule familiarization costs of between $35.97 million and $341.22 million.

Disclosure costs: 19,875 firms (*i.e.*, .1875 x 106,000) will incur no costs in bringing their disclosures into compliance with the requirements of the final Rule because their disclosures are already compliant. The remaining 86,125 firms will collectively incur costs of between $3.96 million (*i.e.*, $45.95 x 86,125) and $39.58 million (*i.e.*, $459.50 x 86,125) to make their disclosures compliant with the final Rule.

Cancellation costs: 19,875 firms (*i.e.*, .1875 x 106,000) will incur no costs in bringing their cancellation mechanisms into compliance with the final Rule. 66,250 firms (*i.e.*, .625 x 106,000) collectively will incur costs of between $3.04 million (*i.e.*, 1 x $45.95 x 66,250) and $24.35 million (*i.e.*, 8 x $45.95 x 66,250) to bring their online cancellation mechanisms into compliance with the final Rule by relabeling consumer-facing elements of their existing cancellation architecture. 19,875 firms (*i.e.*, .1875 x 106,000) collectively will incur costs of between $0 and $10.57 million (*i.e.*, 19,875 x $532.05) to bring their telephonic cancellation mechanisms into compliance with the final Rule.

---

[612] *See* Carrigan-Walster, FTC-2024-0001-0026 (employing a similar assumption: "Many firms using negative option marketing present their offers through the web. For those firms that present offers through other means, web developer time is used as a proxy for worker time to create the presentation of the offers.").

The Commission notes that this analysis does not quantify costs for the firms selling negative option plans that offer only in-person or by-mail cancellation. The Commission assumes that, in complying with this final Rule, these firms will choose to provide the alternative cancellation method (by phone, online, or both) that makes the most economic sense. The Commission also assumes that the cost of processing a cancellation over the phone should be similar to or less than the cost of processing a cancellation in person or by-mail for these firms. Therefore, the Commission assumes that these firms will not incur significant compliance costs to provide an alternative cancellation method.

Recordkeeping costs: Collectively, firms will incur recordkeeping costs of $6.54 million annually.

Total Initial Year Costs: Summing costs enumerated above, the Commission estimates the costs of the Rule in the first year will range between $49.52 and $422.26 million. These costs are presented in Table 6. The Commission assumes that these costs will be incurred by the end of the initial year following the Rule's implementation.

Table 6: Total Initial Year Compliance Costs (in millions, 2023 dollars)

|  | Low | High |
|---|---|---|
| Familiarization Costs | $35.97 | $341.22 |
| Disclosure Costs | $3.96 | $39.57 |
| Cancellation Mechanisms Costs | $3.04 | $34.93 |
| Recordkeeping Costs | $6.54 | $6.54 |
| Total Initial Year Costs | $49.52 | $422.26 |

### (3)     Ongoing Compliance Costs, Years 2 through 10

Compliant disclosures, cancellation paths, and consumer-facing information about cancellation mechanisms will form a "template" that can be used without any incremental compliance costs as new subscription products are added to a marketer's retinue of products offered for sale via a negative option plan. The information relevant to the sale of a new product

may be "dropped" into the template in a fill-in-the-blank way. The Commission assumes marketers, in the ordinary course of business, know what is required for the disclosures (*e.g.*, the amounts consumers will be charged, when, by date or frequency, such charges will occur, when consumers must act to stop recurring charges, etc.) and consider the costs of entering this information into established disclosure templates to be a routine cost of doing business, not an incremental cost required by compliance with the final Rule. The same will also be true for negative option plans that are telemarketed or sold in person; once a telemarketing script or an in-person sales disclosure form is developed in the initial year of compliance, it becomes a template that readily can be used as new subscription products are offered over time. Accordingly, once a marketer comes into compliance with the final Rule there should be no incremental costs of ongoing compliance with respect to disclosures and cancellation mechanisms, and the costs of adding, changing, or deleting products the marketer offers for sale via negative option will be no different from what they would have been absent the final Rule.

The Commission can seek redress or civil penalties for violations of the final Rule. Absent the final Rule, enforcement actions against unfair or deceptive negative option practices would be brought under Section 5 where civil penalties are not available and where, post-*AMG*, it is difficult to obtain redress. Accordingly, some negative option marketers may pay closer attention to underlying claims made for products marketed using negative option sales because of the monetary relief available for violations of the final Rule relative to a Section 5 enforcement action. This, however, is no different than what any firm should do to assure that it is not in violation of Section 5, and the Commission considers the costs of attentiveness to Section 5 compliance as part of the existing regulatory baseline, not as costs that are incremental to complying with the final Rule.

The U.K.'s "Impact Assessment" of its regulatory treatment of subscription plans did not estimate ongoing compliance costs because "the size of these costs … are likely small in comparison to the one-off cost and benefits." [613] In further support of this, the "Impact Assessment" cited a report that found that on-going costs were meaningful only in relation to sending reminders to consumers about their subscriptions, and only for firms that used postal mail delivery and not electronically delivered reminders. [614] The final Rule does not contain a "reminder" requirement, and so the ongoing costs of sending reminders to consumers, small though they may be, are not ongoing costs of compliance with the final Rule.

The experts' report submitted by IAB estimated 10 hours of attorney time for annual compliance checks for the Rule proposed in the NPRM. Because the final Rule has removed the most complex (and, therefore, costly) features of the proposed Rule (*e.g.*, double consent, the treatment of "saves" in cancellation flows, and the issuance of annual "reminders" for some subscriptions), the Commission assumes half of the annual compliance check hours assumed in IAB's experts' report, five hours, is an upper bound on attorney hours needed for annual compliance checks. Moreover, the Commission assumes that some firms will incur no incremental annual compliance check costs, either because their pre-existing business practices followed what the final Rule requires or because the platforms or payment processors they use provide compliant disclosures and cancellation flows. [615]

---

[613] U.K. "Impact Assessment" (2023) at 30.

[614] "We note for example, that Ofcom assessed … the business costs of providing customers with notifications at the end of their contracts. These involved possible ongoing costs related to identifying customers that needed notifications on an ongoing basis and providing them with the notification. After consultation with stakeholders, Ofcom only estimated the costs of providing consumers with letters, on the basis that only this medium had significant ongoing costs." *Id*.

[615] See discussion in Section VII.B.1.a.2 of this SBP and n.146.

Accordingly, the Commission estimates the aggregate annual costs of compliance checks to range between $0 and $44.97 million (*i.e.*, 106,000 x 5 hours x $84.84/hour). Inclusive of recordkeeping costs, total ongoing costs range between $6.54 million (*i.e.*, $0 + $6.54 million) and $51.51 million (*i.e.*, $44.97 million + $6.54 million).

### (4)    Summary of Total Costs

Table 7 presents the initial and recurring costs of this Rule in each year, as well as the present discounted value and annualized costs over 10 years using a 2 percent discount rate. The Commission estimates that in Year 1, the initial costs will range between $49.52 and $422.26 million. In each of the following years, the Commission estimates that the recurring costs will range between $6.54 and $51.51 million. The Commission estimates that the present discounted value of costs over ten years, using a 2 percent discount rate, will range between $100.89 and $826.15 million. The Commission estimates that these costs, annualized over ten years using a 2 percent discount rate, would range between $11.23 and $91.97 million per year.

Table 7. Total Quantified Costs (in millions, 2023 dollars)

| Year | Low | High |
|---|---|---|
| 1 | $49.52 | $422.26 |
| 2 | $6.54 | $51.51 |
| 3 | $6.54 | $51.51 |
| 4 | $6.54 | $51.51 |
| 5 | $6.54 | $51.51 |
| 6 | $6.54 | $51.51 |
| 7 | $6.54 | $51.51 |
| 8 | $6.54 | $51.51 |
| 9 | $6.54 | $51.51 |
| 10 | $6.54 | $51.51 |
| Present Discounted Value of Costs over 10 years, 2% discount rate | $100.89 | $826.15 |
| Annualized Costs over 10 years, 2% discount rate | $11.23 | $91.97 |

### d)   Sensitivity Analysis

As a sensitivity analysis, the Commission considers an alternative method that does not rely on data from historical enforcement matters for distributing subscription cancellations across the baseline cancellation methods used to estimate quantified benefits. This alternative method assumes the majority of subscriptions are enrolled online and can be cancelled online in the baseline; whereas, in the main analysis, the majority of subscriptions are enrolled online and can only be cancelled by phone in the baseline. Compared with the main analysis, this alternative method produces lower total quantified benefits by $419.77 to $449.53 million annualized per year, yet the estimated range of quantified benefits still exceeds the estimated range of quantified costs.

### (1)   Number of Cancellations by Enrollment and Baseline Cancellation Method

Under this sensitivity analysis, the Commission assumes that the baseline number of subscriptions and cancellations is the same as in the main analysis. The Commission also assumes the number of in-person subscriptions, as proxied for by gym memberships, is the same as in the main analysis. What differs here is the approach for determining the share of cancellations likely to occur through online and telephone methods.

The main analysis uses enforcement data to determine the share of cancellations likely to occur through online and telephone methods. This data may suffer from selection bias if, among other factors, only the more egregious violations are pursued through enforcement methods. This approach also assumes no marketers of negative option plans comply with this Rule in the baseline. Further, because the data only include resolved cases and resolved cases tend to be older, they are less likely to reflect the current state of the market.

In this alternative analysis, the Commission uses statistics discussed in the NPRM—that 106,000 firms offer negative option plans and 2,000 of those firms are telemarketers. [616] Based on that, the Commission assumes 1.9 percent (*i.e.*, 2,000/106,000) of subscriptions and cancellations are enrolled and cancelled over the phone in the baseline. The Commission then assumes the remaining cancellations of subscriptions that were not enrolled over the phone or in person were instead enrolled online. [617]

To estimate the distribution of baseline cancellation methods of subscriptions enrolled online, the Commission uses the results from an experiment in which a researcher consented to 16 online subscriptions between August 2 to October 4, 2022 and then canceled each one, recording the time it took to cancel along with a variety of other obstacles faced in cancelling. [618] Of the 16 online subscriptions, three were found to be easy to cancel online, indicating they are likely in compliance with this Rule; three required phone calls to cancel; and the remaining 10 had a non-straightforward online cancellation method. Based on these results, the Commission assumes 18.75 percent (*i.e.*, 3/16) of online subscriptions have Rule-compliant cancellation methods in the baseline; 18.75 percent (*i.e.*, 3/16) of online subscriptions require telephone cancellation in the baseline; and 62.5 percent (*i.e.*, 10/16) of online subscription offer non-Rule-compliant online cancellations in the baseline.

Table 8 provides the number of subscription cancellations each year distributed across the enrollment and regulatory baseline cancellation methods: online enrollment and telephone

---

[616] *See* NPRM, 88 FR 24733.
[617] The Commission acknowledges this excludes subscriptions that are enrolled by mail, likely resulting in an overestimate of the number of subscriptions enrolled online.
[618] *See* Sinders (2023). Among the obstacles noted for otherwise seemingly simple online cancellations were that some websites did not use straight forward terms, such as "unsubscribe" or "cancel," and instead put the cancellation path under titles such as "auto-renew" or "edit plan."

cancellation; online enrollment and non-Rule-compliant online cancellation; online enrollment and Rule-compliant online cancellation; telephone enrollment and telephone cancellation; and in-person enrollment.

Table 8. Sensitivity Analysis: Cancellations by Enrollment and Baseline Cancellation Method (in millions)

| Year | Online Enrollment, Telephone Cancellation | Online Enrollment, Non-Compliant Online Cancellation | Online Enrollment, Compliant Online Cancellation | Telephone Enrollment, Telephone Cancellation | In-Person Enrollment |
|------|------|------|------|------|------|
| 1 | 63.79 | 212.63 | 63.79 | 6.87 | 14.62 |
| 2 | 64.28 | 214.27 | 64.28 | 6.93 | 14.73 |
| 3 | 64.78 | 215.92 | 64.78 | 6.98 | 14.84 |
| 4 | 65.27 | 217.56 | 65.27 | 7.03 | 14.96 |
| 5 | 65.76 | 219.21 | 65.76 | 7.08 | 15.07 |
| 6 | 66.26 | 220.85 | 66.26 | 7.14 | 15.18 |
| 7 | 66.66 | 222.19 | 66.66 | 7.18 | 15.27 |
| 8 | 67.06 | 223.54 | 67.06 | 7.22 | 15.37 |
| 9 | 67.46 | 224.88 | 67.46 | 7.27 | 15.46 |
| 10 | 67.87 | 226.23 | 67.87 | 7.31 | 15.55 |

**(2)  Estimating Total Benefits**

To estimate total quantified benefits under this sensitivity analysis, the Commission uses the same matching of enrollment and baseline cancellation methods to per-cancellation benefit estimates as in the main analysis. The only difference here is that the Commission assumes consumers who experience Rule-compliant online cancellations in the baseline will not see any additional benefit as a result of this final Rule.

As in the main analysis, the Commission multiplies the number of cancellations in each category by the matched per-cancellation benefit on the low- and the high-end and then sums across all five categories to obtain total quantified benefits each year. Those totals are presented in Table 9 below. In the first year following implementation of the final Rule, the Commission estimates the benefits under this sensitivity analysis will range between $254.85 million and

206

$4.88 billion. In Year 10, the Commission estimates the benefits will range between $271.15 million and $5.20 billion. Using a 2 percent discount rate, the Commission estimates the present discounted value of benefits over 10 years to range between $2.36 and $45.28 billion. Annualized over 10 years using a 2 percent discount rate, the Commission estimates the benefits to range between $263.06 million and $5.04 billion per year. These annualized benefits estimates are between $419.77 and $449.53 million less per year than the estimates from the main analysis.

Table 9. Sensitivity Analysis: Estimates of Benefits (in millions, 2023 dollars)

| Year | Low | High |
|------|-----|------|
| 1 | $254.85 | $4,883.26 |
| 2 | $256.82 | $4,921.01 |
| 3 | $258.79 | $4,958.77 |
| 4 | $260.76 | $4,996.53 |
| 5 | $262.73 | $5,034.29 |
| 6 | $264.70 | $5,072.05 |
| 7 | $266.31 | $5,102.91 |
| 8 | $267.92 | $5,133.77 |
| 9 | $269.54 | $5,164.63 |
| 10 | $271.15 | $5,195.49 |
| Present Discounted Value of Benefits over 10 years, 2% discount rate | $2,362.97 | $45,277.43 |
| Annualized Benefits over 10 years, 2% discount rate | $263.06 | $5,040.58 |
| Difference in Annualized Benefits from Main Analysis | -$419.77 | -$449.53 |

**4. An explanation of the reasons for the determination of the Commission that the final Rule will attain its objectives in a manner consistent with applicable law and the reasons the particular alternative was chosen.**

As discussed above in Sections I, II, and VII.A, the Commission determines the following deceptive or unfair practices are widespread in the negative option marketplace and cause consumer harm: (1) material misrepresentations made while marketing goods or services with negative option features; (2) failure to provide important information about material terms prior to obtaining consumers' billing information and charging consumers; (3) lack of informed

consumer consent; and (4) failure to provide consumers with a simple cancellation method, including failure to honor cancellation requests, refusal to provide refunds to consumers who unknowingly enrolled in programs, denying consumers refunds and forcing them to pay to return the unordered goods, and requiring consumers to cancel using a different method than the one used to sign up for the program.

The final Rule amendments prohibit sellers from misrepresenting material facts in connection with promoting or offering for sale a good or service with a negative option feature, require negative option sellers to disclose certain important information about negative option features, obtain a consumer's express informed consent and maintain records of consumer consent for three years after the initial transaction (unless the seller satisfies the technological exemption), and provide consumers a simple mechanism for cancellation. In promulgating the final Rule, the Commission sought to enhance consumer protections while avoiding detailed, prescriptive requirements that would impede innovation.

> **5. A summary of any significant issues raised by the comments submitted during the public comment period in response to the preliminary regulatory analysis and a summary of the assessment by the Commission of such issues.**

Several commenters (*e.g.,* NCTA, IAB) raised concerns over the Commission's conclusions regarding the economic effect of the proposed Rule. NCTA asserted the NPRM lacked any meaningful cost-benefit analysis, suggesting compliance with the proposed Rule would result in significant costs to its members. [619] Among other things, NCTA said its members would be required to implement changes to their existing customer processes, review and revise

---

[619] NCTA, FTC-2023-0033-0858; IAB, FTC-2023-0033-1000. *See also* IFA, FTC-2023-0033-0856; USTelecom, FTC-2023-0033-0876; RILA, FTC-2023-0033-0883; Coalition, FTC-2023-0033-0884; Chamber, FTC-2023-0033-0885 (urging the Commission to refine its cost benefit analysis).

existing disclosures, and revamp recordkeeping systems. During the informal hearing process, NCTA further argued it could cost major cable operator members between $12-25 million to comply with the proposed Rule.[620] Additional commenters also suggested compliance with the proposed Rule would cost more than what the Commission estimated. None of them, however, offered any empirical analysis of the issue. In response to these comments, and following the presiding officer's recommended decision, the Commission provides the detailed cost-benefit analysis above in Section X.B.3.

## XI.  FINAL REGULATORY FLEXIBILITY ACT ANALYSIS

The Regulatory Flexibility Act ("RFA"), 5 U.S.C. 601-612, requires the Commission to conduct an Initial Regulatory Flexibility Analysis ("IRFA") with a proposed rule and a Final Regulatory Flexibility Analysis ("FRFA"), if any, with a final rule, unless the Commission certifies the rule will not have a significant economic impact on a substantial number of small entities.[621]  The Regulatory Flexibility Act further states the required elements of the FRFA may be performed in conjunction with or as part of any other agenda or analysis required by any other law if such other analysis satisfies the provisions of the FRFA.[622]

In the NPRM, the Commission provided an IRFA, stating its belief that the proposal will not have a significant economic impact on small entities, and solicited comments on the burden on any small entities that would be covered. Specifically, the Commission acknowledged it did not have sufficient empirical data to determine whether the proposed amendments may affect a

---

[620] FTC-2024-0001-0011; *see also* Asurion, FTC-2023-0033-0878 (stating the Commission's estimated annual labor costs are understated, and projecting the costs to Asurion and its clients would be millions of dollars); SCIC, FTC-2023-0033-0879 (cost of compliance for the service contract industry would be substantially higher than cost of compliance for unregulated entities, and disproportionately borne by small businesses; APCIA, FTC-2023-0033-0996 (same).
[621] *See* 5 U.S.C. 603-605.
[622] 5 U.S.C. 605.

substantial number of small entities; therefore, the Commission sought comment on the percentage of affected companies that qualify as small businesses.

The Commission reviewed and considered the comments in response to the NPRM and determined, as an alternative to finalizing the proposed Rule in its entirety, to modify the Rule. In particular, the Commission decided to limit the material terms to be disclosed immediately adjacent to consent for the negative option feature; remove the limitation on saves and the accompanying recordkeeping requirement; remove the annual reminder provision; and modify the length of the recordkeeping requirement for verification of consent by fixing it to three years and provide an alternative method of compliance. After careful consideration of the comments and following the Commission's determination not to finalize the proposed Rule in its entirety, the Commission certifies that the final Rule will not have a significant economic impact on a substantial number of small entities. Nevertheless, because the Commission included an IFRA in the NPRM, the Commission has also performed an FRFA below, and comments to the IFRA are discussed below.

### A. A statement of the need for, and objectives of, the Rule.

The Commission describes the need for and the objectives of the final Rule in Section X.B.1 to the Final Regulatory Analysis.

### B. A statement of the significant issues raised by the public comments in response to the Initial Regulatory Flexibility Analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed Rule as a result of such comments.

Several commenters raised issues about the proposed Rule's economic impact on small businesses. For instance, NFIB asked the Commission to adopt a special provision that would limit enforcement of the Rule against small businesses (fewer than 50 employees) to instances of

willful or repeated violations, and set up a program for education on compliance.[623] IFA and IHRSA encouraged the Commission to conduct a "Small Business Regulatory Impact Analysis" to determine how the proposal will impact small businesses.[624] IHRSA stated that small businesses in the health and fitness industry operate at "much different capacity" than larger industries, noting 44% of U.S. small businesses have less than three months of cash reserves, making them more vulnerable to disruptions.[625] Similarly, ACT App Association noted that roughly 20% of small business startups fail in the first year due to scarcity in financial resources.[626]

Other commenters, including PDMI, ESA, Joint Small Business Digital Economy Innovators, and ICA, generally stated the proposed Rule would impose unnecessary and undue burdens on small businesses, but did not offer any detailed empirical data for the Commission to consider.[627]

In response, the Commission first notes its sensitivity to small businesses' concerns. It provides numerous free resources through the Bureau of Consumer Protection Business Center webpage[628] to assist businesses of all sizes in complying with the law and will engage in consumer and business education campaigns about this Rule. Second, in consideration of comments regarding regulatory burden, the Commission clarifies or modifies the Rule in several significant ways: (1) it defines "material" and provides several concrete categories of material facts to ensure businesses have a clear understanding of how it will interpret materiality under

---

[623] NFIB, FTC-2023-0033-0789.
[624] IFA, FTC-2023-0033-0856; IHRSA, FTC-2023-0033-0863.
[625] IHRSA, FTC-2023-0033-0863.
[626] ACT App Association, FTC-2023-0033-0874.
[627] PDMI, FTC-2023-0033-0864; ESA, FTC-2023-0033-0867; Joint Small Business Digital Economy Innovators, FTC-2023-0033-0875; ICA, FTC-2023-0033-1142.
[628] Https://www.ftc.gov/business-guidance.

the Rule; (2) it limits the number of terms that must mandatorily appear "immediately adjacent" to the request for consent to the negative option feature; (3) it removes the requirement to obtain separate affirmative consent to "the rest of the transaction" and modifies the recordkeeping requirement; (4) it removes the saves and annual reminder requirements, which also should reduce recordkeeping and compliance burdens. Additionally, the Commission delays the effective date of the final Rule for 180 days to allow time for implementation (except for the provisions related to misrepresentations and other procedural requirements, which should not be an added burden for businesses already complying with the law and which take effect 60 days after publication of the final Rule).

### C. The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed Rule, and a detailed statement of any change made to the proposed rule in the final Rule as a result of the comments.

The Small Business Administration did not file comments in response to the proposed Rule.

### D. A description of and an estimate of the number of small entities to which the Rule will apply or an explanation of why no such estimate is available.

The final Rule affects sellers, regardless of industry, engaged in making negative option offers, defined by the final Rule to mean any person "selling, offering, charging for, or otherwise marketing goods or services with a Negative Option Feature." [629] Small entities in potentially any industry could incorporate a negative option feature into a sales transaction. [630] The Commission is unaware, however, of any source of data identifying across every industry the number of small entities that routinely utilize negative option features. Although the NPRM requested comments

---

[629] Rule § 425.2(g).

on the percentage of affected companies that qualify as small businesses, and some trade association commenters indicated that some of their members were small businesses, these comments did not identify either the number or share of their small business members that sold negative option contracts.

**E.    A description of the projected reporting, recordkeeping, and other compliance requirements of the Rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.**

The estimates of the recordkeeping requirements under the final Rule are set out within the Paperwork Reduction Act analysis in Section XII below. As mentioned above, the Commission preliminarily determined the impact of the proposed requirements on small entities is most likely not significant. The small entities potentially covered by these amendments will include all such entities subject to the Rule (*e.g.*, all entities selling goods or services through negative option programs). The professional skills necessary for compliance with the proposed amendments would include sales and clerical personnel. The Commission requested comment on these issues.

In the NPRM, The FTC estimated the majority of firms subject to the recordkeeping requirements already retained these types of records in the normal course of business. The FTC anticipated many transactions subject to the final Rule would be conducted via the Internet, minimizing burdens associated with compliance. Additionally, most entities subject to the final Rule were likely to store data though automated means, which reduces compliance burdens associated with record retention. Furthermore, regarding the disclosure requirements, the Commission stated it was likely the substantial majority of sellers routinely provide these disclosures in the ordinary course as a matter of good business practice. Moreover, many state laws already require the same or similar disclosures as the Rule would mandate. Finally, some

negative option sellers are already covered by ROSCA and the TSR and thus subject to similar disclosure requirements.

Commenters provided additional comments, suggesting small businesses will be significantly impacted, and the Commission underestimated the burdens. Recordkeeping and disclosure costs associated with the Rule became one of the issues designated for the informal hearing, after which the presiding officer determined "the issue is not genuinely disputed," noting the failure of interested parties to "provide any evidence to establish what the costs *would be*," as opposed to generalized complaints "costs will be *higher* than the NPRM's estimates."[631] As explained in the Paperwork Reduction Act estimates below and elsewhere in this SBP, the Commission made changes to the Rule based on the record. Specifically, the Commission determined to specify and thereby limit the types of disclosures required, narrow the scope of entities covered (by excluding those solely involved in "promoting" negative option plans), curtail the length of time for retaining records (to only three years), and establish an option for sellers to eliminate having to keep records of consent if they have the requisite processes in place. Because neither the Commission nor the presiding officer at the informal hearing received evidence to dispute the recordkeeping and disclosure costs figures in the NPRM, the Commission adopts the NPRM's analysis. Given the narrower scope of the final Rule, that analysis should be more conservative and tend to overstate the burden.

> **F.     A description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final Rule and why each one of the other significant alternatives to the Rule considered by the agency which affect the impact on small**

---

[631] Recommended Decision by Presiding Officer, https://www.regulations.gov/comment/FTC-2024-0001-0042 (emphasis in original).

**entities was rejected.**

In formulating the proposed amendments, the Commission made every effort to avoid imposing unduly burdensome requirements on sellers. To that end, the Commission avoided, where possible, proposing specific, prescriptive requirements that could stifle marketing innovation or otherwise limit seller options in using new technologies.

As explained above, in response to comments regarding regulatory burden, the Commission clarifies or modifies the Rule in several significant ways: (1) it defines "material" and provides several concrete categories of material facts to ensure businesses have a clear understanding of how it will interpret materiality under the Rule; (2) it limits the number of terms that must mandatorily appear "immediately adjacent" to the request for consent to the negative option feature; (3) it removes the requirement to obtain separate affirmative consent to "the rest of the transaction" and modifies the recordkeeping requirement; (4) it removes the saves and annual reminder requirements, which also should reduce recordkeeping and compliance burdens. Additionally, the Commission delays the effective date of the final Rule for 180 days to allow time for implementation (except for the provisions related to misrepresentations and other procedural requirements, which should not be an added burden for businesses already complying with the law and which take effect 60 days after publication of the final Rule).

## XII.    PAPERWORK REDUCTION ACT

The Paperwork Reduction Act ("PRA"), 44 U.S.C. 3501 *et seq*., requires federal agencies to obtain Office of Management and Budget ("OMB") approval before collecting information directed to ten or more persons. The current Rule contains various provisions that constitute information collection as defined by 5 CFR 1320.3(c), the OMB regulations implementing the PRA. In January 2024, OMB approved continuation of the Rule's existing information collection

(OMB Control No. 3084-0104). The final Rule makes changes in the Rule's recordkeeping and disclosure requirements that will increase the PRA burden as detailed below. Accordingly, the Commission is submitting the final Rule and a Supplemental Supporting Statement to OMB for review under the PRA.[632] The associated burden analysis follows.

## A.    The Proposed Rule

In the NPRM, the Commission provided time and cost estimates for the proposed Rule's recordkeeping and disclosure requirements, and solicited comments about their associated costs, including on: (1) whether the disclosure, recordkeeping, and reporting requirements are necessary, including whether the resulting information will be practically useful; (2) the accuracy of our burden estimates, including whether the methodology and assumptions used are valid; (3) how to improve the quality, utility, and clarity of the disclosure requirements; and (4) how to minimize the burden of providing the required information to consumers.[633]

The NPRM also included staff's estimate that the burden for recordkeeping compliance would be 53,000 hours and the estimated burden for disclosures would be 212,000 hours, for a total of 265,000 hours. These estimates are explained below.

**Number of Respondents.** FTC staff estimated there are 106,000 entities offering negative option features to consumers. This estimate is based primarily on data from the U.S. Census North American Industry Classification System (NAICS) for firms and establishments in industry categories wherein some sellers offer free trials, automatic renewal, prenotification plans, and continuity plans. Based on NAICS information as well as its own research and industry knowledge, FTC staff identified an estimated total of 530,000 firms involved in such

---

[632] The PRA analysis for this rulemaking focuses strictly on the information collection requirements created by and/or otherwise affected by the amendments.
[633] 88 FR 24734.

industries.[634] However, FTC staff estimated that only a fraction of the total firms in these industry categories offer negative option features to consumers. For example, few grocery stores and clothing retailers, which account for approximately a third of the of the total estimate from all industry categories, are likely to regularly offer negative option features. In addition, some entities included in the total may qualify as common carriers, exempt from the Commission's authority under the FTC Act. Accordingly, the Commission estimated approximately 106,000 business entities (20%) offer negative option features to consumers.

**Recordkeeping Hours.** FTC staff estimated the majority of firms subject to the Rule already retain the types of records in the normal course of business that would be required by the proposed Rule. Under such conditions, the time and financial resources needed to comply with disclosure requirements do not constitute "burden" under the PRA.[635] Moreover, staff anticipated that many transactions subject to the Rule are conducted via the Internet and most entities subject to the Rule are likely to store data though automated means, which reduces compliance burdens associated with record retention. Accordingly, staff estimated that 53,000 entities subject to the Rule will require approximately one hour per year to comply with the Rule's recordkeeping requirements, for an annual total of 53,000 burden hours.

---

[634] Examples of these industries include sellers of software, streaming media, social media services, financial monitoring, computer security, fitness services, groceries and meal kits, dietary supplements, sporting goods, home service contracts, home security systems, office supplies, pet food, computer supplies, cleaning supplies, home/lawn maintenance services, personal care products, clothing sales, energy providers, newspapers, magazines, and books. The NAICS does not provide estimates for all of these categories. Where such data is unavailable, the staff has used its own estimates based on its knowledge of these industry categories.

[635] Under the PRA, the time, effort, and financial resources necessary to comply with the collection of information that would be incurred by persons in the normal course of their activities (*e.g.*, in compiling and maintaining business records) does not constitute a burden under the Rule where the associated recordkeeping is a usual and customary part of business activities. 5 CFR 1320.3(b)(2).

**Disclosure Hours.** Staff anticipated that the substantial majority of sellers already routinely provide the disclosures that would be required by the proposed Rule. For these sellers, the time and financial resources associated with making these disclosures do not constitute a "burden" under the PRA because they are a usual and customary part of regular business practice. 5 CFR 1320.3(b)(2). Moreover, many state laws require the same or similar disclosures as the Rule mandates. In addition, approximately 2,000 negative option sellers are already covered by the TSR and subject to its disclosure requirements. Accordingly, FTC estimated the disclosure burden required by the Rule will be, on average, two hours each year for each seller subject estimated to be subject the Rule, for a total estimated annual burden of 212,000 hours.

**Estimated Annual Labor Cost.** To estimate labor costs for recordkeeping requirements, staff multiplied the 53,000 hours to comply with the proposed Rule's recordkeeping provisions by a clerical wage rate of $18.75/hour. [636] The result is an annual cost of approximately $993,750.

To estimate annual labor costs for disclosures for all entities, staff multiplied the 212,000 hours to comply with the proposed Rule's disclosure provisions by a sales personnel wage rate of $22.15/hour. [637] The result is an annual cost of approximately $4,695,800.

Thus, the estimated annual labor costs were $5,689,550 [($993,750 recordkeeping) + ($4,695,800 disclosure)].

**Estimated Annual Non-Labor Cost.** The NPRM stated capital and start-up costs

---

[636] This figure is derived from the mean hourly wage shown for Information and Record Clerks. *See* Bureau of Labor Statistics, "Occupational Employment and Wages–May 2021," at Table 1 (Mar. 31, 2022) (National employment and wage data from the Occupational Employment Statistics survey by occupation, May 2021), https://www.bls.gov/news.release/pdf/ocwage.pdf.
[637] This figure is derived from the mean hourly wage shown for Sales and related occupations. *See id.*

associated with the Rule's recordkeeping provisions are *de minimis*. Any disclosure or recordkeeping capital costs involved with the Rule, such as equipment and office supplies, would be costs borne by sellers in the normal course of business.

### B.      Comments Received and Informal Hearing

The NPRM sought comments on the PRA analysis and stated, "comments should provide any available evidence and data that supports their position, such as empirical data."[638] The Commission did not receive such evidence. A few commenters from businesses and industry groups, however, raised generalized concerns that the NPRM underestimated PRA-related costs.[639]

As noted earlier, the Commission set an informal hearing, at the request of interested parties, and appointed Administrative Law Judge Carol Fox Foelak as the presiding officer.[640] Based on submissions by interested parties, and other information in the record, the presiding officer designated two disputed issues of material fact, including, "What will the recordkeeping and disclosure costs associated with the proposed rule be?"[641]

Based on the record, the presiding officer concluded, "There is insufficient evidence to make a finding concerning the … recordkeeping and disclosure costs associated with the

---

[638] 88 FR 24730.

[639] Sirius XM, FTC-2023-0033-0857; SCIC, FTC-2023-0033-0879; Coalition, FTC-2023-0033-0884; ETA, FTC-2023-0033-1004; Direct Marketing Companies, FTC-2023-0033-1016. In addition, one commenter seemingly confused PRA-related costs with full implementation of the Rule, but still offered only generalized points. *See* Asurion, FTC-2023-0033-0878. Another commenter queried whether the Commission's estimate of the number of firms offering negative option features include B2B sales with automatic renewal clauses. ETA, FTC-2023-0033-1004. The staff estimate did not seek to exclude such sellers.

[640] Hr'g Notice, 88 FR 85525.

[641] Recommended Decision by Presiding Officer, https://www.regulations.gov/comment/FTC-2024-0001-0042.

proposed rule," and "in the absence of evidence, the issue is not genuinely disputed."[642] The presiding officer further explained: "IAB made a well-reasoned argument that the costs will be *higher* than the NPRM's estimates, generalizing from limited estimates that it, IFA, and NCTA provided. However, it did not provide any evidence to establish what the costs *would be*."[643]

## C. Final PRA Analysis

As previously discussed, the Commission made changes to the Rule based on the record. Some of these changes, in turn, affect the PRA analysis. Specifically, the Commission determined to specify and thereby limit the types of disclosures required, narrow the scope of entities covered (by excluding those solely involved in "promoting" negative option plans), curtail the length of time for retaining records (to only three years), and establish an option for sellers to eliminate having to keep records of consent if they have the requisite processes in place. Neither the Commission nor the presiding officer at the informal hearing received evidence to dispute the specific PRA-related figures in the NPRM. For the final Rule, the Commission adopts the following PRA analysis.

**Number of Respondents.** The Commission received no evidence to dispute the NPRM's statements on the number of entities offering negative option features to consumers, so the Commission adopts the NPRM estimate that there are 106,000 such entities. Although the final Rule is narrower in that it excludes the term "promote" from its scope, the Commission retains the estimate of 106,000 entities for the purposes of this analysis, which would be more conservative and tend to overstate the burden.

---

[642] Recommended Decision by Presiding Officer, https://www.regulations.gov/comment/FTC-2024-0001-0042.
[643] Recommended Decision by Presiding Officer, https://www.regulations.gov/comment/FTC-2024-0001-0042.

**Recordkeeping Hours.** The Commission received no evidence to dispute the NPRM's statements on recordkeeping under the PRA. As the final Rule is narrower, the time and financial resources needed to comply with disclosure requirements still do not constitute "burden" under the PRA.[644] Accordingly, the Commission adopts the NPRM estimate that 53,000 entities subject to the Rule will require approximately one hour per year to comply with the Rule's recordkeeping requirements, for an annual total of 53,000 burden hours.

**Disclosure Hours.** Similarly, the Commission received no evidence to dispute the NPRM's statements on disclosure hours under the PRA. As the final Rule narrowed and delineated the types of disclosures required, the time and financial resources associated with making these disclosures is even less than under the proposed Rule, which also did not constitute a "burden" under the PRA because they are a usual and customary part of regular business practice. 5 CFR 1320.3(b)(2). Accordingly, the Commission adopts the NPRM estimate that the disclosure burden required by the Rule will be, on average, two hours each year for each seller subject estimated to be subject the Rule, for a total estimated annual burden of 212,000 hours.

**Estimated Annual Labor Cost.** The Commission received no evidence to dispute the NPRM's statements on labor costs under the PRA. For the final Rule, the Commission updates its labor cost estimates by using more recent wage data. For recordkeeping, staff multiplied the 53,000 estimated hours to comply with the Rule's recordkeeping provisions by a clerical wage rate of $20.94/hour,[645] to yield an annual cost of approximately $1,109,820. For disclosure

---

[644] Under the PRA, the time, effort, and financial resources necessary to comply with the collection of information that would be incurred by persons in the normal course of their activities (*e.g.*, in compiling and maintaining business records) does not constitute a burden under the Rule where the associated recordkeeping is a usual and customary part of business activities. 5 CFR 1320.3(b)(2).

[645] This figure is derived from the mean hourly wage shown for Information and Record Clerks.

compliance, staff multiplied the 212,000 estimated hours by an hourly wage rate for sales personnel of $25.62,[646] to yield an annual cost of $5,431,440. Thus, the estimated total annual labor costs are $6,541,260 [($1,109,820 recordkeeping) + ($5,431,440 disclosure)].

**Estimated Annual Non-Labor Cost.** The Commission received no evidence to dispute the NPRM's statements that capital and start-up costs associated with the Rule's recordkeeping provisions are *de minimis* under the PRA. The Commission adopts those findings.

## XIII. FINAL RULE LANGUAGE

**PART 425—RULE CONCERNING RECURRING SUBSCRIPTIONS AND OTHER NEGATIVE OPTION PROGRAMS**

Sec.

425.1  Scope.

425.2  Definitions.

425.3  Misrepresentations.

425.4  Important Information.

425.5  Consent.

425.6  Simple Cancellation ("Click to Cancel").

425.7  Relation to State Laws.

425.8  Exemptions.

425.9  Severability.

**Authority:** 15 U.S.C. 41-58.

---

*See* Bureau of Labor Statistics, "Occupational Employment and Wages, May 2023, 43-9061 Office Clerks, General," https://www.bls.gov/oes/currenT/oes439061.htm.
[646] This figure is derived from the mean hourly wage shown for Sales and related occupations. *See id.*

## § 425.1 Scope.

This Rule contains requirements related to any form of negative option program in any media, including, but not limited to, Interactive Electronic Media, telephone, print, and in-person transactions.

## § 425.2 Definitions.

(a) *Billing Information* means any data that enables any person to access a consumer's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card.

(b) *Charge, Charged, or Charging* means any attempt to collect money or other consideration from a consumer, including but not limited to causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account, telephone bill, or other account.

(c) *Clear and Conspicuous* means that a required disclosure is easily noticeable (*i.e.*, difficult to miss) and easily understandable by ordinary consumers, including in all of the following ways:

(1) In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

(2) A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

(3) An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

(4) In any communication using an Interactive Electronic Medium, such as the Internet, mobile application, or software, the disclosure must be unavoidable.

(5) The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

(6) The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

(7) The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

(8) When the representation or sales practice targets a specific audience, such as children, older adults, or the terminally ill, "ordinary consumers" includes members of that group.

(d) *Interactive Electronic Medium* is any electronic means of communicating (except via telephone calls), including Internet, mobile application, text, chat, instant message, email, software, or any online service.

(e) *Material* means likely to affect a person's choice of, or conduct regarding, goods or services.

(f) *Negative Option Feature* is a provision of a contract under which the consumer's silence or failure to take affirmative action to reject a good or service or to cancel the agreement is interpreted by the negative option seller as acceptance or continuing acceptance of the offer, including, but not limited to:

(1) an automatic renewal;

(2) a continuity plan;

(3) a free-to-pay conversion or fee-to-pay conversion; or

(4) a pre-notification negative option plan.

(g) *Negative Option Seller* means the person selling, offering, charging for, or otherwise marketing a good or service with a Negative Option Feature.

## § 425.3 Misrepresentations.

In connection with promoting or offering for sale any good or service with a Negative Option Feature, it is a violation of this Rule and an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act ("FTC Act") for any Negative Option Seller to misrepresent, expressly or by implication, any Material fact, including any of the following:

(a) the Negative Option Feature or any term of the Negative Option Feature, including consumer consent, any deadline to prevent or stop a Charge, or the cancellation of the Negative Option Feature;

(b) cost;

(c) purpose or efficacy of the underlying good or service;

(d) health or safety; or

(e) any other Material fact.

## § 425.4 Important Information.

(a) *Disclosures.* In connection with promoting or offering for sale any good or service with a Negative Option Feature, it is a violation of this Rule and an unfair or deceptive act or practice in violation of Section 5 of the FTC Act for a Negative Option Seller to fail to disclose to a consumer, prior to obtaining the consumer's Billing Information, all Material terms, regardless of whether those terms directly relate to the Negative Option Feature, and including but not limited to:

225

(1) That consumers will be Charged for the good or service, or that those Charges will increase after any applicable trial period ends, and, if applicable, that the Charges will be on a recurring basis, unless the consumer timely takes steps to prevent or stop such Charges;

(2) Each deadline (by date or frequency) by which the consumer must act to prevent or stop the Charges;

(3) The amount (or range of costs) the consumer will be Charged and, if applicable, the frequency of the Charges a consumer will incur unless the consumer takes timely steps to prevent or stop those Charges; and

(4) The information necessary for the consumer to find the simple cancellation mechanism required pursuant to section 425.6.

(b) *Form and Content of Required Information.*

(1) Clear and Conspicuous: Each disclosure required by paragraph (a) of this section must be Clear and Conspicuous.

(2) Placement:

(i) The disclosures required by paragraphs (a)(1-4) of this section must appear immediately adjacent to the means of recording the consumer's consent for the Negative Option Feature; and

(ii) The disclosures required by paragraph (a) of this section (including, but not limited to, the disclosures required by paragraphs (a)(1-4)) must appear before obtaining the consent required pursuant to section 425.5.

(3) Other Information: All communications, regardless of media, must not contain any other information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to read, hear, see, or otherwise understand the disclosures required by paragraph (a) of this section.

## § 425.5 Consent.

(a) *Express Informed Consent.* In connection with promoting or offering for sale any good or service with a Negative Option Feature, it is a violation of this Rule and an unfair or deceptive act or practice in violation of Section 5 of the FTC Act for a Negative Option Seller to fail to obtain the consumer's express informed consent before Charging the consumer. In obtaining such expressed informed consent, the Negative Option Seller must:

(1) Obtain the consumer's unambiguously affirmative consent to the Negative Option Feature offer separately from any other portion of the transaction;

(2) Not include any information that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their express informed consent to the Negative Option Feature; and

(3) Keep or maintain verification of the consumer's consent for at least three years. However, if the seller can demonstrate by a preponderance of the evidence that it uses processes ensuring no consumer can technologically complete the transaction without consent, such seller does not have to maintain these records for such transactions.

(b) *Requirements for Negative Option Features Covered in the Telemarketing Sales Rule.* Negative Option Sellers covered by the Telemarketing Sales Rule must comply with all applicable requirements provided in part 310 of this title, including, for transactions involving preacquired account information and a free-to-pay–conversion feature, obtaining from the customer, at a minimum, the last four (4) digits of the account number to be charged and making and maintaining an audio recording of the entire telemarketing transaction as required by part 310.

(c) *Documentation of Unambiguously Affirmative Consent for Written Offers.* Except for transactions covered by the preauthorized transfer provisions of the Electronic Fund Transfer Act (15 U.S.C. 1693e) and Regulation E (12 CFR 1005.10), a Negative Option Seller will be deemed in compliance with the requirements of paragraph (a)(1) of this section for all written offers (including over the Internet or phone applications), if that seller obtains the required consent through a check box, signature, or other substantially similar method, which the consumer must affirmatively select or sign to accept the Negative Option Feature and no other portion of the transaction. The consent request must be presented in a manner and format that is clear, unambiguous, non-deceptive, and free of any information not directly related to the consumer's acceptance of the Negative Option Feature.

**§ 425.6 Simple Cancellation ("Click to Cancel").**

(a) *Simple Mechanism Required for Cancellation.* In connection with promoting or offering for sale any good or service with a Negative Option Feature, it is a violation of this Rule and an unfair or deceptive act or practice in violation of Section 5 of the FTC Act for the Negative Option Seller to fail to provide a simple mechanism for a consumer to cancel the Negative Option Feature; avoid being Charged, or Charged an increased amount, for the good or service; and immediately stop any recurring Charges.

(b) *Simple Mechanism at Least as Simple as Consent.* The simple mechanism required by paragraph (a) of this section must be at least as easy to use as the mechanism the consumer used to consent to the Negative Option Feature.

(c) *Minimum Requirements for Simple Mechanism.* At a minimum, the Negative Option Seller must provide the simple mechanism required by paragraphs (a) and (b) of this section through the same medium the consumer used to consent to the Negative Option Feature, and:

(1) For cancellation by Interactive Electronic Medium, the simple cancellation mechanism must be easy to find when the consumer seeks to cancel. Compliance with the disclosure required under section 425.4(a)(4) does not discharge this obligation. In no event shall a consumer be required to interact with a live or virtual representative (such as a chatbot) to cancel if the consumer did not do so to consent to the Negative Option Feature.

(2) For cancellation by telephone call, the Negative Option Seller must promptly effectuate cancellations requested by the consumer via a telephone number that is answered or records messages, made available during normal business hours, and not more costly to use than the telephone call the consumer used to consent to the Negative Option Feature.

(3) For cancellation of consent obtained in person, in addition to offering cancellation, where practical, via an in-person method similar to that the consumer used to consent to the Negative Option Feature, the Negative Option Seller must offer the simple mechanism through an Interactive Electronic Medium or by providing a telephone number. The alternate simple mechanism required by this paragraph must satisfy all requirements of sections 425.6(c)(1) and (2), as applicable. If the Negative Option Seller offers the alternate mechanism by providing a telephone number, the seller shall not erect a cost-barrier to cancellation by imposing any unnecessary or unreasonable cost for the cancellation call.

### § 425.7 Relation to State Laws.

(a) *In General.* This part shall not be construed as superseding, altering, or affecting any State statute, regulation, order, or interpretation relating to negative option requirements, except to the extent it is inconsistent with the provisions of this part, and then only to the extent of the inconsistency.

(b) *Greater Protection under State Law.* For purposes of this section, a State statute, regulation, order, or interpretation is not inconsistent with the provisions of this part if it affords any consumer greater protection than provided under this part.

## § 425.8 Exemptions.

Any person to whom this Rule applies may petition the Commission for a partial or full exemption. The Commission may, in response to petitions or on its own authority, issue partial or full exemptions from this part if the Commission finds application of the Rule's requirements is not necessary to prevent the acts or practices to which the Rule relates. The Commission shall resolve petitions using the procedures provided in § 1.31 of this chapter. If appropriate, the Commission may condition such exemptions on compliance with alternative standards or requirements to be prescribed by the Commission.

## § 425.9 Severability.

The provisions of this Rule are separate and severable from one another. If any provision is stayed or determined to be invalid, the remaining provisions shall continue in effect.

By direction of the Commission, Commissioners Holyoak and Ferguson dissenting.

**April J. Tabor,**

*Secretary*.